1  XAVIER BECERRA
   Attorney General of California
2  JULIE WENG-GUTIERREZ
   Senior Assistant Attorney General
3  GREGORY D. BROWN, SBN 219209
   NIMROD P. ELIAS, SBN 251634
4  Deputy Attorneys General
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA 94102-7004
     Telephone: (415) 703-5461
6    Fax: (415) 703-5480
     E-mail: Gregory.Brown@doj.ca.gov
7  *Attorneys for Plaintiff the State of California*
   *[Additional counsel listed on next page]*
8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO/OAKLAND DIVISION

12

13  **THE STATE OF CALIFORNIA; THE STATE**          Case No. _____
    **OF CONNECTICUT; THE STATE OF**
14  **DELAWARE; THE DISTRICT OF**                   **COMPLAINT FOR DECLARATORY**
    **COLUMBIA; THE STATE OF ILLINOIS;**            **AND INJUNCTIVE RELIEF**
15  **THE STATE OF IOWA; THE**
    **COMMONWEALTH OF KENTUCKY; THE**               (Administrative Procedure Act Case)
16  **STATE OF MARYLAND; THE**
    **COMMONWEALTH OF MASSACHUSETTS;**
17  **THE STATE OF MINNESOTA; THE STATE**
    **OF NEW MEXICO; THE STATE OF NEW**
18  **YORK; THE STATE OF NORTH CAROLINA;**
    **THE STATE OF OREGON; THE**
19  **COMMONWEALTH OF PENNSYLVANIA;**
    **THE STATE OF RHODE ISLAND; THE**
20  **STATE OF VERMONT; THE**
    **COMMONWEALTH OF VIRGINIA; and THE**
21  **STATE OF WASHINGTON,**

22                                 Plaintiffs,

23       v.

24  **DONALD J. TRUMP, President of the United**
    **States; ERIC D. HARGAN, Acting Secretary of**
25  **the United States Department of Health and**
    **Human Services; UNITED STATES**
26  **DEPARTMENT OF HEALTH AND HUMAN**
    **SERVICES; STEVEN T. MNUCHIN, Secretary**
27  **of the United States Department of the**
    **Treasury; UNITED STATES DEPARTMENT**
28  **OF THE TREASURY; and DOES 1-20,**

                                   Defendants.

                                      1

1    ATTORNEYS FOR ADDITIONAL PLAINTIFFS

2    GEORGE JEPSEN
     *Attorney General of Connecticut*
3    JOSEPH R. RUBIN*
     *Associate Attorney General*
4    ROBERT W. CLARK*
     *Special Counsel to the Attorney General*
5    55 Elm Street
     Hartford, CT 06103
6
     MATTHEW P. DENN
7    *Attorney General of Delaware*
     AARON R. GOLDSTEIN*
8    *State Solicitor*
     SARAH FISHMAN GONCHER*
9    JOHN H. TAYLOR*
     *Deputy Attorneys General*
10   Delaware Department of Justice
     801 N. French Street
11   Wilmington, DE 19801

12   KARL A. RACINE
     *Attorney General for the District of Columbia*
13   ROBYN R. BENDER*
     *Deputy Attorney General*
14   Public Advocacy Division
     441 4th Street, NW
15   Suite 650 North
     Washington, DC 20001
16
     LISA MADIGAN
17   *Attorney General of Illinois*
     DAVID F. BUYSSE*
18   *Deputy Chief, Public Interest Division*
     100 West Randolph Street, 12th Floor
19   Chicago, IL 60601

20   THOMAS J. MILLER
     *Attorney General of Iowa*
21   JEFFREY THOMPSON*
     *Solicitor General of Iowa*
22   1305 East Walnut
     Hoover State Office Building, Second Floor
23   Des Moines, IA 50319

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANDY BESHEAR
*Attorney General*
*Commonwealth of Kentucky*
LA TASHA BUCKNER*
*Executive Director*
*Office of Civil and Environmental Law*
S. TRAVIS MAYO*
TAYLOR PAYNE*
*Assistant Attorneys General*
*Office of the Attorney General*
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, KY 40601-3449

BRIAN E. FROSH
*Attorney General of Maryland*
STEVEN M. SULLIVAN*
*Solicitor General*
200 St. Paul Place
Baltimore, MD 21202

MAURA HEALEY
*Attorney General of Massachusetts*
ERIC GOLD*
*Assistant Attorney General*
One Ashburton Place, 18th Floor
Boston, MA 02108

LORI SWANSON
*Attorney General of Minnesota*
ALAN GILBERT*
*Solicitor General*
JASON PLEGGENKUHLE*
KATHERINE KELLY*
*Assistant Attorneys General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101

HECTOR H. BALDERAS
*Attorney General of New Mexico*
TANIA MAESTAS*
*Chief Deputy Attorney General*
408 Galisteo Street
Santa Fe, NM 87501

3

ERIC T. SCHNEIDERMAN
*Attorney General of New York*
BARBARA D. UNDERWOOD*
*Solicitor General*
STEVEN C. WU*
*Deputy Solicitor General*
HOWARD MASTER*
*Senior Enforcement Counsel*
LISA LANDAU*
*Bureau Chief, Health Care Bureau*
ERIC HAREN*
*Special Counsel and Senior Advisor*
120 Broadway, 25th Floor
New York, NY 10271

JOSHUA H. STEIN
*Attorney General of North Carolina*
RYAN Y. PARK*
*Deputy Solicitor General*
SRIPRIYA NARASIMHAN*
*Deputy General Counsel*
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
HENRY KANTOR
*Special Counsel to the Attorney General*
J. NICOLE DeFEVER, SBN 191525
*Assistant Attorney General*
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
*Attorney General of Pennsylvania*
JONATHAN SCOTT GOLDMAN*
*Executive Deputy Attorney General*
MICHAEL J. FISCHER*
*Chief Deputy Attorney General*
PATRICK M. GREENE*
*Deputy Attorney General*
16th Floor, Strawberry Square
Harrisburg, PA 17120

PETER KILMARTIN
*Attorney General of the State of Rhode Island*
REBECCA TEDFORD PARTINGTON*
*Chief, Civil Division*
MICHAEL W. FIELD*
*Assistant Attorney General*
RI Office of the Attorney General
150 South Main Street
Providence, RI 02903

4

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
BENJAMIN D. BATTLES*
*Solicitor General*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
*Attorney General of Virginia*
MATTHEW R. MCGUIRE*
*Acting Deputy Solicitor General*
202 North Ninth Street
Richmond, VA 23219

ROBERT W. FERGUSON
*Attorney General of Washington*
JEFFREY T. SPRUNG*
RENE D. TOMISSER*
*Assistant Attorneys General*
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104

* Pro hac vice application forthcoming

**INTRODUCTION**

1. The States of California, Connecticut, Delaware, Illinois, Iowa, Maryland, Minnesota, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont and Washington; the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia; and the District of Columbia, bring this action to protect themselves and their residents from the unlawful actions of the President and the Secretaries of the Treasury and Health and Human Services, and other federal officials responsible for implementing the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010).

2. The ACA is a landmark law that made affordable health insurance coverage available to over 20 million Americans, many for the first time, and brought the number of uninsured Americans to a historic low. To achieve its goals, the ACA created local health markets (called Exchanges), both state run and federally run, that offer health insurance options to consumers. The ACA also created subsidies to make premiums and out-of-pocket expenses more affordable in these markets. 26 U.S.C. § 36B; 42 U.S.C. § 18071.

3. This case involves a central feature of those markets: federal cost-sharing reduction (CSR) subsidies. CSRs make health insurance more affordable for low- and middle-income Americans by reducing out-of-pocket costs such as deductibles, co-pays, and similar expenses. Under the CSR provisions, insurance companies pay upfront a portion of covered patients' out-of-pocket costs, with a promise that the insurance company will be reimbursed for those costs by the federal government.

4. CSR subsidies are backed by a mandatory payment provision. The ACA requires the Secretaries of Health and Human Services and the Treasury to make "periodic and timely payments" directly to insurance companies that are "equal to the value of the reductions." 42 U.S.C. § 18071(c)(3)(A). It also provides a permanent appropriation that authorizes the Secretaries to reimburse insurers for CSR costs without further appropriations from Congress.

5. The ACA's permanent appropriation is essential to the Act's proper functioning. Without it, insurers and state regulators alike lack the stability, predictability, and basic fairness

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (Case No. ___)

1   and rationality necessary to maintain functional health insurance markets.  Further, it ensures that

2   beneficiaries have access to healthcare.

3        6.    Since insurers began offering health insurance plans through the Exchanges in

4   January 2014, the Secretaries of Health and Human Services and Treasury have made CSR

5   reimbursement payments each month under the authority provided to them by the ACA's

6   permanent appropriation.

7        7.    On October 12, 2017, with only minimal explanation, the President announced that

8   his Administration was reversing course.  In a curt written statement issued by the White House

9   Press Secretary, the Administration stated that the Department of Health and Human Services had

10   concluded that the ACA's permanent appropriation does not apply to CSR payments.  On the

11   morning of October 13, 2017, the U.S. Department of Justice made a court filing including a copy

12   of a new opinion by the Attorney General addressing the purported legal basis for the

13   Administration's action.  Early that same morning, the President tweeted, "The Democrats

14   ObamaCare is imploding.  Massive subsidy payments to their pet insurance companies has

15   stopped.  Dems should call me to fix!"

16        8.    The Administration's new refusal to make the required federal payments directly

17   subverts the ACA, and will injure the Plaintiff States, their residents, and the entire healthcare

18   system.  The loss of funds and financial uncertainty caused by their actions will lead to higher

19   health insurance costs for consumers and to insurers abandoning the individual health insurance

20   market.  The number of uninsured Americans will increase once again, hurting vulnerable

21   individuals and directly burdening the States.  The unlawful refusal to make CSR reimbursement

22   payments will also substantially complicate the States' efforts to administer their healthcare

23   markets and in some instances leave consumers with no health plan to access despite their federal

24   entitlements under the ACA.  Indeed, across the nation, there are 1,472 counties with only one

25   insurer.  The Administration's refusal to make CSR reimbursement payments will cause some

26   insurers to pull out of the market, leaving many counties vulnerable and without health insurance

27   coverage.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  (Case No. ___)

9. Accordingly, the Plaintiff States seek declaratory and injunctive relief to compel the President and the Secretaries of Health and Human Services and the Treasury to make CSR reimbursement payments in accordance with the ACA and its permanent appropriation.

## JURISDICTION

10. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 because this case involves a civil action arising under the Constitution and laws of the United States. Further, the Court has jurisdiction under 28 U.S.C. § 1361 because this is an action to compel officers and agencies of the United States to perform duties owed to Plaintiffs. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

11. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a) and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706, and the Court's equitable powers.

## VENUE

12. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e)(1)(C) because the State of California and its Attorney General have offices in San Francisco, California, and this action seeks relief against the United States, agencies of the United States, and officials acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

13. Pursuant to Civil Local Rule 3-2(c) and (d), assignment to the San Francisco Division or Oakland Division is appropriate because Plaintiff State of California and its Attorney General maintain offices in San Francisco, California.

## PARTIES

14. Plaintiff the State of California is a sovereign state in the United States of America. The State of California brings this action by and through Attorney General Xavier Becerra. The Attorney General is the chief law officer of the State, Cal. Const., art. V, § 13, and is authorized to file civil suits directly involving the State's rights and interests or deemed necessary by the Attorney General to protect public rights and interests. Cal. Gov't Code § 12511; *Pierce v.*

1  *Superior Court*, 1 Cal. 2d 759, 761-62 (1934). This challenge is brought pursuant to the Attorney

2  General's independent constitutional, statutory, and common law authority to bring suit and

3  obtain relief on behalf of the State of California.

4       15.   Attorney General George Jepsen brings this action on behalf of Plaintiff the State of

5  Connecticut at the request of Governor Dannel P. Malloy to protect the interests of Connecticut and

6  its residents. Conn. Gen. Stat. § 3-5. The Attorney General is the State's chief legal officer with

7  general supervision over all civil legal matters in which the State is an interested party. The

8  Attorney General shall appear for the State in all suits and other civil proceedings in which the

9  State is a party or is interested. Conn. Gen. Stat. § 3-125.

10       16.   Plaintiff the State of Delaware is a sovereign state in the United States of America.

11  The State of Delaware brings this action by and through Attorney General Matthew P. Denn. The

12  Attorney General is the State's chief law enforcement and legal officer, Del. Const., art. III, and is

13  authorized to file civil suits. 29 Del. C. § 2504(3).

14       17.   Plaintiff the District of Columbia is a municipal corporation empowered to sue and be

15  sued, and is the local government for the territory constituting the permanent seat of the federal

16  government. The District is represented by and through its chief legal officer, the Attorney

17  General for the District of Columbia. The Attorney General has general charge and conduct of all

18  legal business of the District and all suits initiated by and against the District and is responsible

19  for upholding the public interest. D.C. Code Ann. § 1-301.81(a)(1).

20       18.   Plaintiff the State of Illinois, by and through its Attorney General, Lisa Madigan, is a

21  sovereign state of the United States of America. The Attorney General is the chief legal officer of

22  the State, Ill. Const. 1970, art. V, § 15, and is authorized to institute and prosecute all actions and

23  proceedings in favor of or for use of the State, which may be necessary in the execution of the

24  duties of any State officer. 15 Ill. Comp. Stat. 205/4. The Attorney General brings this challenge

25  pursuant to her constitutional, statutory, and common law authority to protect the sovereign,

26  quasi-sovereign, and proprietary interests of the State of Illinois.

27       19.   Plaintiff the State of Iowa is represented by and through the Attorney General of

28  Iowa, Thomas J. Miller, its chief legal officer with general charge, supervision, and direction of

the State's legal business. The Attorney General's powers and duties include prosecuting and defending all actions and proceedings in which the state may be a party or interested when, in the Attorney General's judgment, the interest of the state requires such action. Iowa Code section 13.2(1)(b).

20.  Plaintiff the Commonwealth of Kentucky is represented by and through the Attorney General, Andy Beshear, its chief law officer authorized to exercise all common law duties and authority pertaining to the office of the Attorney General. This duty permits the Kentucky Attorney General to represent the Commonwealth before all courts in any matter in which the Commonwealth has an interest. Ky. Rev. Stat. § 15.020.

21.  Plaintiff the State of Maryland is represented by and through the Attorney General of Maryland, Brian Frosh, its chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

22.  Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America. The Commonwealth brings this action by and through Attorney General Maura Healey, who is the Commonwealth's "chief law officer," and who has both statutory and common-law authority and responsibility to represent the public interest for the people of Massachusetts in litigation, as well as the Commonwealth itself and state agencies and officials in litigation. *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1266-67 (Mass. 1977); *see also* Mass. Gen. Laws ch. 12, s. 3.

23.  Plaintiff the State of Minnesota is represented by and through the Attorney General of Minnesota, Lori Swanson, its chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Minnesota in the federal courts on matters of public concern. Minn.

Stat. § 8.01.  The Minnesota Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

24.    Plaintiff the State of New Mexico is represented by and through the Attorney General, Hector H. Balderas, its chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of New Mexico in the federal courts on matters of public concern.  Under the New Mexico Constitution, and pursuant to New Mexico law, the Attorney General has the authority to file suit to challenge any action that in his judgment threatens the public interest and welfare of New Mexico residents.  NM Const. art. V, § 1; NMSA 1978, § 8-5-2 (1975).

25.    Plaintiff the State of New York is a sovereign state in the United States of America.  The State of New York brings this action by and through Attorney General Eric T. Schneiderman, who has charge and control of all the legal business of the State and authority to prosecute and defend all actions and proceedings in which the State is interested.  N.Y. Executive Law § 63(1).

26.    Plaintiff the State of North Carolina is a sovereign state of the United States of America.  The State of North Carolina brings this action by and through Attorney General Joshua H. Stein.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common-law authority to bring suit and obtain relief on behalf of the State of North Carolina.

27.    Plaintiff the State of Oregon is represented by and through the Attorney General of Oregon, Ellen F. Rosenblum.  The Attorney General is the State's chief legal adviser whose powers and duties include acting in federal court on matters of public concern.  Or. Rev. Stat. 180.060 § (1)(d), (7).

28.    Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1.  The Attorney General has the authority to represent the Commonwealth in civil matters brought by the Commonwealth or its agencies.  71 P. S. § 732-204(c).  In filing this action, the Attorney General

11

seeks to protect the citizens and agencies of the Commonwealth from the harm caused by Defendants' illegal conduct.

29.    Plaintiff the State of Rhode Island is represented by and through its Attorney General, Peter Kilmartin.  Pursuant to the constitution, statutes, and common law of the State of Rhode Island, the Attorney General is the legal representative of the State, especially in the area of public interest litigation.  *See State v. Lead Industries Ass'n*, 951 A.2d 428, 472 (R.I. 2008).  The Department contains the Office of Health Care Advocate, R.I. Gen. Laws 42-9.1-1, and an Insurance Regulatory Unit, *id.* 27-36-1, to advocate for the interest of Rhode Islanders in obtaining quality health care and fair insurance rates.  The State of Rhode Island operates its own Health Insurance Exchange.  www.healthsourceri.com.

30.    Plaintiff the State of Vermont is represented by and through the Attorney General of Vermont, Thomas J. Donovan, Jr., its chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Vermont in the federal courts on matters of public concern.  Under the laws of Vermont, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Vermont residents.  *See* 3 Vt. Stat. Ann. secs. 152, 157.

31.    Plaintiff the Commonwealth of Virginia is represented by, through, and at the relation of Mark R. Herring, Attorney General of Virginia.  Virginia law provides that the Attorney General, as chief executive officer of the Department of Law, performs all legal services in civil matters for the Commonwealth.  Va. Const. art. V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507 (2017).

32.    Plaintiff the State of Washington is represented by the Attorney General of Washington, Bob Ferguson, who is the chief legal adviser to the State.  The Attorney General's powers and duties include acting in federal court on matters of public concern.  Washington brings this action to redress harms to its proprietary interests, its sovereign and quasi-sovereign authority to protect the health, safety, and well-being of its residents, and its interests as *parens patriae*.

33.    The Plaintiff States rely on the guaranteed payment of CSR reimbursements to keep their health insurance Exchange markets stable in accordance with the ACA.  As developed below, the Plaintiff States have suffered legally cognizable harm because of the Secretaries' actions, and an order requiring the Secretaries to continue to make the CSR reimbursement payments would redress Plaintiffs' injuries.  Accordingly, Plaintiffs have standing to bring this action.

34.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

35.    Defendant Eric D. Hargan is the Acting Secretary of the United States Department of Health and Human Services.  As Acting Secretary, defendant Hargan is responsible for all actions taken by the Department.  Acting Secretary Hargan is sued in his official capacity.

36.    Defendant United States Department of Health and Human Services (HHS) is an agency in the Executive Branch of the federal government.

37.    Defendant Steven T. Mnuchin is the Secretary of the United States Department of the Treasury.  As Secretary, defendant Mnuchin is responsible for all actions taken by the Department.  Secretary Mnuchin is sued in his official capacity.

38.    Defendant United States Department of the Treasury is an agency in the Executive Branch of the federal government.

39.    Does 1 through 20 are sued under fictitious names.  Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the violations alleged, but pray that the same may be alleged in this complaint when ascertained.

## ALLEGATIONS

### I.    THE ACA REQUIRES AND AUTHORIZES THE FEDERAL GOVERNMENT TO REIMBURSE INSURERS FOR COST-SHARING REDUCTIONS PROVIDED TO QUALIFIED INDIVIDUALS

40.    Congress enacted the ACA to "increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012).  In order to achieve these goals, the ACA adopted a "series of interlocking reforms," including the creation of an "'Exchange' in each State—basically, a marketplace that

13

1   allows people to compare and purchase insurance plans." *King v. Burwell*, 135 S. Ct. 2480, 2485

2   (2015).

3       41.    To make health insurance more affordable for low- and moderate-income Americans,

4   the ACA also provides for billions of dollars in federal funding.  Those subsidies help offset the

5   two kinds of costs that consumers must pay in order to obtain health insurance: premiums and

6   out-of-pocket expenses such as co-pays and deductibles.  The latter are known as "cost-sharing"

7   expenses.

8       42.    Section 1401 of the Act provides tax credits that reduce monthly insurance premiums

9   for individuals who earn between 100% and 400% of the federal poverty level—in 2017, between

10   $24,600 and $98,400 for a family of four—and who satisfy additional criteria. 26 U.S.C. § 36B.

11   The vast majority of individuals who buy insurance through the Exchanges rely on premium tax

12   credits to lower the costs of insurance.

13       43.    Section 1402 of the Act requires insurers to cover at least some portion of cost-

14   sharing expenses for individuals who are eligible to receive tax credits under Section 1401 and

15   whose household income is less than 250% of the federal poverty level—in 2017, less than

16   $61,500 for a family of four.  42 U.S.C. § 18071.  An insurer that wants to offer a plan through an

17   Exchange must offer at least one "silver" plan that reduces cost-sharing expenses for eligible

18   individuals.  *Id.* § 18071(c)(2).

19       44.    The ACA requires the Secretaries of HHS and the Treasury to pay both of these

20   subsidies directly to insurers.  42 U.S.C. § 18082(a)(3).  For each individual who is eligible to

21   receive a premium tax credit, the Secretary of the Treasury must make "advance payments" to the

22   insurer in the amount of the premium tax credit allowed on a monthly basis.  *Id.*

23   § 18082(c)(2)(A).  For each individual eligible to receive cost-sharing reductions, the Act

24   similarly provides that the Secretary of HHS "shall make periodic and timely payments to the

25   [insurer] equal to the value" of those cost-sharing reductions.  *Id.* § 18071(c)(3)(A).

26       45.    These payments are made through a single, integrated program created by the ACA.

27   42 U.S.C. § 18082.  Under that program, the Secretary of the Treasury must make "advance

28   payments" of both premium tax credits and cost-sharing reductions.  *Id.* § 18082(a)(3).

46. To fund this integrated system of health insurance subsidies, the Act amended 31 U.S.C. § 1324. Section 1324 provides a permanent appropriation for amounts necessary to "refund[] internal revenue collections provided by law," including "refunds due … from" listed provisions of the tax code. *Id.* § 1324(a), (b)(2). The ACA amended this list to include "refunds due … from" 26 U.S.C. § 36B.

47. By amending 31 U.S.C. § 1324, the ACA created a permanent appropriation for both premium tax credits and CSR subsidies. As a result, the Executive Branch has both the authority and the obligation to make premium tax credit and CSR payments to insurers on a regular basis. No further appropriation from Congress is required.

**II. AFTER MAKING CSR PAYMENTS ON A MONTHLY BASIS SINCE 2014, THE SECRETARY OF HHS HAS NOW "DETERMINED" THAT HE LACKS THE AUTHORITY TO MAKE THEM ABSENT FURTHER APPROPRIATIONS FROM CONGRESS**

48. Since the Exchanges began operating in January 2014, both the Obama and Trump Administrations have reimbursed insurers for CSR payments each month.

49. Those payments have created substantial reliance interests. Residents who are eligible for CSRs have relied on them to reduce their out-of-pocket expenses. Insurers also assumed that those payments would be made when they set premiums for the 2017 plan year. And the Plaintiff States assumed that those payments would be made when they reviewed proposed premium rates and approved insurers to participate in the Exchanges during the 2017 plan year.

50. Like their predecessors in the Obama Administration, the Secretaries of the Treasury and HHS in the Trump Administration have reimbursed insurers for CSR payments on a monthly basis since taking office in January 2017. And they have done so on the authority granted to them by Section 1324.

51. On October 12, 2017, however, the Trump Administration announced that it would no longer make CSR payments. In a press statement, the White House stated that "[b]ased on guidance from the Department of Justice, the Department of Health and Human Services has concluded that there is no appropriation for cost-sharing reduction payments to insurance companies under [the ACA]. In light of this analysis, the Government cannot lawfully make the

15

cost-sharing reduction payments."  HHS also released a press statement, stating:  "After a thorough legal review by HHS, Treasury, OMB, and an opinion from the Attorney General, we believe that … Congress has not appropriated money for CSRs, and we will discontinue these payments immediately."

52.   On the morning of October 13, 2017, the U.S. Department of Justice made a court filing including a copy of a new opinion by the Attorney General addressing the purported legal basis for the Administration's action.  Early that same morning, the President tweeted, "The Democrats ObamaCare is imploding.  Massive subsidy payments to their pet insurance companies has stopped.  Dems should call me to fix!"

### III.   THE DECISION TO STOP MAKING CSR PAYMENTS IS PART OF THE TRUMP ADMINISTRATION'S EFFORT TO "EXPLODE" THE ACA

53.   The Administration's decision to stop funding CSR reimbursement payments is not based on a good-faith reading of the statute.  Instead, it is part of a deliberate strategy to undermine the ACA's provisions for making health care more affordable and accessible.

54.   Since taking office, the Trump Administration has engaged in a sustained effort to "explode" the ACA by making it more difficult and expensive for individuals to procure health insurance through the Act's Exchanges.  *See* Goldstein & Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017.[1]  His first act as President included signing the Executive Order, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal*.[2]

55.   Among other actions, the President has repeatedly threatened to stop making CSR payments at a moment's notice.  Those statements have created substantial market uncertainty. As a result, some insurers, unsure of whether the Administration will continue making the required payments, have decided not to offer plans through the Exchanges in 2018 at all.  Others

---

[1] https://www.washingtonpost.com/national/health-science/affordable-care-act-remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-10c3-11e7-ab07-07d9f521f6b5_story.html?utm_term=.9ad0a92dce44.

[2] https://www.whitehouse.gov/the-press-office/2017/01/2/executive-order-minimizing-economic-burden-patient-protection-and.

have indicated that they will raise premiums by as much as 23% during 2018, to guard against the risk that they will not be reimbursed for these required expenditures.  Both of these predictable responses will make health insurance costlier and more difficult to obtain.

56.   The President's recent Executive Order, *Promoting Healthcare Choice and Competition Across the United States*, is also aimed at weakening the Exchanges.[3]  That order, among many other policies that are in conflict with the ACA, directs the Administration to expand access to association health plans.  Those plans do not require the essential health benefits, which could leave people without access to mental health and substance-use disorder treatment, and fewer patient protections (e.g. allowing cherry picking of healthy enrollees over the sick) than those provided under the ACA.  By doing this, the President hopes to lure healthy individuals out of the Exchanges.  That would leave the sick as the only population receiving insurance through the Exchanges, which would make insurance plans offered there costlier (if insurance companies do not abandon the market altogether).  That, in turn, could destabilize the market and create the very "death spirals" that the ACA was intended to prevent.

57.   The Administration has also substantially reduced its efforts to educate and encourage individuals to sign up for health insurance through the Exchanges.  The Department of Health and Human Services slashed its advertising budget for this purpose to $10 million, a 90% decrease from the $100 million allocated for this program in 2016.  The Department also reduced the amount of money granted to nonprofit organizations that serve as "navigators" to help individuals enroll in health plans offered through the Exchanges to $36 million, as compared to $63 million in 2016.

58.   In addition, the Department of Health and Human Services produced nearly twenty testimonial videos featuring individuals discussing how the ACA harmed them.  These videos, which subvert the law, were produced at taxpayer expense.

---

[3] https://www.whitehouse.gov/the-press-office/2017/10/12/presidential-executive-order-promoting-healthcare-choice-and-competition.

59. HHS has also cut in half the enrollment period during which individuals can sign up for health insurance through the Exchanges established by the Act. Last year, individuals had approximately twelve weeks to sign up for health insurance; this year, they have only six.

60. Underscoring this Administration's efforts to sabotage the ACA, HHS announced that it will shut down *HealthCare.gov*, the website through which consumers may enroll in coverage through the Exchanges, for nearly 12 hours every Sunday during the open enrollment period, which will make signing up for health insurance even more difficult.

61. Furthermore, the Internal Revenue Service suspended enforcement of a rule designed to encourage individuals to sign up for health insurance. At the beginning of the year, the IRS was set to reject tax returns if filers failed to check a box indicating that they would have health insurance coverage for the "full-year." This would have prodded individuals without health insurance to sign up for it. After President Trump took office, however, the IRS reversed course, and allowed returns to be accepted for processing even if the relevant box is not checked.

## IV. THE REFUSAL TO MAKE COST-SHARING REDUCTION PAYMENTS DIRECTLY HARMS THE PLAINTIFF STATES AND THEIR RESIDENTS

### A. Failure to Fund CSRs Will Lead to Increased Health Insurance Premiums, Insurer Withdrawals from the Exchanges, More Uninsured Residents, Uncompensated Care, and Higher State Costs

62. The Secretaries' refusal to make cost-sharing reduction payments will harm millions of state residents and the States themselves by making health insurance more expensive and less accessible.

63. The ACA requires participating insurers to offer plans with cost-sharing reductions and to cover those costs, independent of the statutory requirement that the government reimburse them. 42 U.S.C. §§ 18021(a)(1), 18022(a)(2), 18071(a)-(c). The Secretaries' decision to stop making CSR reimbursement payments to insurers thus means that insurers will be required to cover CSR costs, but will not be reimbursed. In response, insurers will raise premiums for plans offered through the Exchanges in future years. The increases in premiums due to the lack of cost-sharing reduction funding will be significant.

64.   Rising premiums, in turn, will force more people to forgo health insurance, increasing the number of uninsured.  As many as 6.7 million residents will have to pay for these increased premiums out of their own pocket, and many of those individuals will be unable to afford that additional cost.

65.   Rising premiums will also increase the number of uninsured individuals through more indirect channels.  The increase in premiums will exempt more residents from the Act's "shared responsibility" provision, which imposes a tax on people who do not have health insurance.  No tax is levied if premiums exceed about 8% of household income.  26 U.S.C. § 5000A(e)(1)(A). The rise in premiums triggered by the Secretaries' failure to reimburse insurers for cost-sharing reductions will carry some people above this threshold—and once exempted from the "shared responsibility" tax, many individuals will wait to purchase health insurance until they need care.

66.   The loss of individual purchasers from the Exchanges will also have a larger destabilizing effect.  Healthy individuals are the most likely to stop buying insurance because of increased costs.  The loss of healthy participants destabilizes individual insurance markets.  It can also lead to "death spirals"—the loss of healthy participants drives up premiums, which in turn drives away additional healthy participants, which further increases premiums, creating a feedback loop that continuously pushes up premium rates and pushes out healthier participants.

67.   The Secretaries' decision to stop making CSR payments will also make obtaining insurance more difficult because it will cause some insurers to exit the Exchanges altogether. Indeed, many insurers have already exited the Exchanges simply because the Administration refused to guarantee the continued payment of CSRs.

68.   Fewer insurers will lead to fewer affordable coverage choices and ultimately more uninsured residents.

69.   This problem will be most acute in counties where no insurer will offer a plan through the Exchanges, as will be true in several counties across the country if CSR payments stop.  Qualified residents in those counties will be unable to take advantage of premium tax credits and cost-sharing reductions, because those subsidies are only available for plans offered

1  through the ACA's Exchanges.  And while some might have other options, such as purchasing a

2  non-Exchange individual plan, most would not.

3        70.   Even in counties where insurers continue to offer plans, the loss of some insurers will

4  lead to more uninsured.  Fewer insurers decreases competition and drives up premiums.  Higher

5  premiums force more people to forgo insurance.

6        71.   The possibility that Congress might appropriate funds to cover some CSR

7  reimbursements each year does not obviate these concerns.  As an initial matter, it is unlikely that

8  Congress would make that appropriation—as recent history demonstrates, any new appropriation

9  for CSRs would be controversial and subject to intense partisan opposition.

10       72.   Even if Congress eventually appropriated CSR reimbursement funds, it is unlikely

11 that it would do so before insurers had to make the critical choices of whether to participate in the

12 Exchanges, and if so, where to set premiums.  Insurers start to make those decisions in January

13 for the upcoming plan year.  Congress, however, often does not make its ordinary annual

14 appropriations decisions until October or later.  Thus, insurers wanting to participate in

15 Exchanges will have to commit themselves to known expenses (the CSRs), without knowing until

16 months later whether Congress will pass a specific appropriation to fund cost-sharing reduction

17 reimbursements.  Insurers will respond to such uncertainty by preemptively raising premiums in

18 order to cover any shortfall that will result if Congress later decides not to appropriate funds for

19 cost-sharing reduction reimbursements.

20       73.   The Secretaries' decision will thus impose a great human cost.  It will also directly

21 burden the States by forcing them to spend more on healthcare costs.  States ultimately cover the

22 costs of care when uninsured persons seek treatment at state-funded facilities.  Under federal law,

23 state-funded hospitals must provide emergency care, regardless of a patient's insurance status or

24 ability to pay.  42 U.S.C. § 1395dd.  State law typically imposes similar mandates.  *See*, *e.g.*, Cal.

25 Welf. & Inst. Code §§ 17000, 17600; N.Y. Public Health Law § 2807-k.  As the number of

26 uninsured goes up, then, so does state healthcare spending.

27

28

**B.     The Secretaries' Actions Will Create Annual Uncertainty Concerning Whether CSR Subsidy Payments Will Be Made, Increasing the Plaintiff States' Administrative Costs and Burdens**

74.    The Secretaries' refusal to fund cost-sharing reductions will also directly affect and substantially complicate the States' efforts to administer their Exchanges.

75.    The States play a critical role in delivering plans offered through the Exchanges. State regulators review proposed premium rates to evaluate whether they are "actuarially sound," Cal. Health & Safety Code § 1385.06(a), and whether proposed rate increases are "unjustified," *id.* § 1385.11(a), or not "excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers," N.Y. Insurance Law § 2303. *See also* 18 Del. Code § 2503; Md. Code, Ins. § 11-603(c)(2)(i); Mass. Gen. Laws ch. 176J, § 6(c).  Similarly, the ACA relies on regulators in most States to annually review "unreasonable increases in premiums" and compel insurers to justify such increases before they go into effect.  42 U.S.C. § 300gg-94(a)(1); 45 C.F.R. §§ 154.200-154.230, 154.301.

76.    The States also review plans offered on their Exchanges to determine, among other things, whether they meet requirements such as covering essential health benefits and paying cost-sharing reductions for eligible individuals.  42 U.S.C. § 18031(b)-(e); 45 C.F.R. §§ 155.1000-155.1010, 156.20, 156.200.

77.    The Secretaries' failure to fund CSR reimbursement payments will directly affect these state regulatory decisions.  While rate review and plan selection take place between May and October, Congress typically does not make appropriations decisions until October or later. Thus, state regulators will be required to evaluate proposed premiums, and select plans for inclusion in Exchanges, without knowing whether insurers will receive federal cost-sharing reduction payments.  That will make it more difficult and onerous for regulators to determine appropriate premiums and to ensure adequate insurer participation on Exchanges.

78.    The Secretaries' failure to fund cost-sharing reductions will also increase States' administrative burdens and costs.  Regulators typically review only one proposed premium rate per plan year.  The Secretaries' refusal to disburse cost-sharing reduction reimbursement payments unless Congress provides a further appropriation will require regulators either to review

1   two premium proposals or Exchange applications—one assuming cost-sharing reductions will be

2   reimbursed and one not—or to establish processes for modifying premiums or changing

3   participation after the review and selection process has begun.  In either scenario, the States will

4   be forced to spend more money to carry out these administrative burdens.

5                                    **CLAIMS FOR RELIEF**

6                                 **FIRST CLAIM FOR RELIEF**

7   **(Action Not in Accordance with Law in Violation of the Administrative Procedure Act, 5**

8                                    **U.S.C. §§ 701-706)**

9           79.   Plaintiffs reallege and incorporate herein by reference each and every allegation and

10  paragraph set forth previously.

11          80.   Under the APA, 5 U.S.C. §§ 701-706, courts must overturn agency action that is

12  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is

13  "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C.

14  § 706(2).

15          81.   The Departments of Health and Human Services and the Treasury are "agencies"

16  under the APA.  5 U.S.C. § 551(1).

17          82.   The Secretaries' refusals to make CSR reimbursement payments are actions of

18  administrative agencies and subject to review under the APA.  5 U.S.C. §§ 551(1), (13), 704.

19          83.   That refusal is not in accordance with law because the ACA requires and authorizes

20  the Secretaries to reimburse insurers for cost-sharing reductions on a "periodic and timely basis."

21  42 U.S.C. § 18071; 31 U.S.C. § 1324.  That refusal also conflicts with the core purpose of the

22  ACA, which is to provide affordable health insurance coverage.

23          84.   The Secretaries' refusal to make CSR payments therefore violates 5 U.S.C. § 706.

24                                **SECOND CLAIM FOR RELIEF**

25  **(Arbitrary and Capricious Action in Violation of the Administrative Procedure Act, 5**

26                                   **U.S.C. §§ 701-706)**

27          85.   Plaintiffs reallege and incorporate herein by reference each and every allegation and

28  paragraph set forth previously.

                                              22

86.    The Secretaries have failed to adequately explain why they have suddenly decided that they no longer have the authority to make CSR payments.

87.    That makes their decision "arbitrary and capricious," and therefore violates 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF

### (Violation of the Take Care Clause, U.S. Const., art. II, § 3, cl. 5)

88.    Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

89.    The U.S. Constitution provides that the President must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3, cl. 5.

90.    By refusing to make the CSR reimbursement payments mandated by the ACA and its permanent appropriation, and taking other similar actions of the sort outlined above, the President and the Secretaries are deliberately seeking to undermine, rather than faithfully execute, the ACA.

91.    Those actions violate the Take Care Clause.

### FOURTH CLAIM FOR RELIEF

### (Declaratory Relief)

92.    Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

93.    An actual controversy presently exists between Plaintiffs and the Secretaries about whether 31 U.S.C. § 1324, as amended by the ACA, provides a permanent appropriation that authorizes payment of the cost-sharing reduction reimbursement payments required by the ACA.

94.    Plaintiffs are entitled to a declaration that the ACA authorizes and compels the Secretaries to make CSR payments on a monthly basis without further specific appropriations from Congress.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Declare, pursuant to 28 U.S.C. § 2201(a), that the Secretaries have the authority and obligation to make cost-sharing reduction payments to insurers under 31 U.S.C. § 1324, 26 U.S.C. § 36B, and 42 U.S.C. § 18071;

2.  Declare that the Secretaries' failure to make the required CSR reimbursement payments is:

     a.  an action not in accordance with law, in violation of Administrative Procedure Act, 5 U.S.C. §§ 701-706;

     b.  an arbitrary and capricious action, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706; and

     c.  a violation of the Take Care Clause of the United States Constitution, U.S. Const., art. II, § 3, cl. 5;

3.  Grant a temporary restraining order, preliminary injunction, and permanent injunction compelling the Secretaries, their officers, agents, employees, and all persons who are in active concert or participation with them to make the required cost-sharing reduction payments under 31 U.S.C. § 1324, 26 U.S.C. § 36B, and 42 U.S.C. § 18071 immediately, and on a periodic and timely basis going forward;

4.  Award to Plaintiffs their costs of litigation including, but not limited to, reasonable attorneys' fees, pursuant to 28 U.S.C. § 2412, and any other applicable law; and

5.  Order such other and further relief as this Court deems just and appropriate.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  (Case No. ___)

1    Dated:  October 13, 2017                          Respectfully submitted,

2                                                      XAVIER BECERRA
                                                       Attorney General of California
3                                                      JULIE WENG-GUTIERREZ
                                                       Senior Assistant Attorney General
4

5                                                      */s/ Gregory D. Brown*

6                                                      GREGORY D. BROWN
                                                       NIMROD P. ELIAS
7                                                      Deputy Attorneys General
                                                       *Attorneys for Plaintiff the State of California*
8
                                                       GEORGE JEPSEN
9                                                      Attorney General of Connecticut
                                                       JOSEPH R. RUBIN
10                                                     Associate Attorney General
                                                       ROBERT W. CLARK
11                                                     Special Counsel to the Attorney General
                                                       *Attorneys for Plaintiff the State of*
12                                                     *Connecticut*

13                                                     MATTHEW P. DENN
                                                       Attorney General of Delaware
14                                                     AARON R. GOLDSTEIN
                                                       State Solicitor
15                                                     SARAH FISHMAN GONCHER
                                                       JOHN H. TAYLOR
16                                                     Deputy Attorneys General
                                                       *Attorneys for Plaintiff the State of Delaware*
17
                                                       KARL A. RACINE
18                                                     Attorney General for the District of
                                                       Columbia
19                                                     ROBYN R. BENDER
                                                       Deputy Attorney General
20                                                     *Attorneys for Plaintiff the District of*
                                                       *Columbia*
21
                                                       LISA MADIGAN
22                                                     Attorney General of Illinois
                                                       DAVID F. BUYSSE
23                                                     Deputy Chief, Public Interest Division
                                                       *Attorneys for Plaintiff the State of Illinois*
24
                                                       THOMAS J. MILLER
25                                                     Attorney General of Iowa
                                                       JEFFREY THOMPSON
26                                                     Solicitor General of Iowa
                                                       *Attorneys for Plaintiff the State of Iowa*
27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  (Case No. ___)

ANDY BESHEAR
Attorney General
Commonwealth of Kentucky
LA TASHA BUCKNER
Executive Director
Office of Civil and Environmental Law
S. TRAVIS MAYO
TAYLOR PAYNE
Assistant Attorneys
General
*Attorneys for Plaintiff the Commonwealth of Kentucky*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General
*Attorneys for Plaintiff the State of Maryland*

MAURA HEALEY
Attorney General of Massachusetts
ERIC GOLD
Assistant Attorney General
*Attorneys for Plaintiff the Commonwealth of Massachusetts*

LORI SWANSON
Attorney General of Minnesota
ALAN GILBERT
Solicitor General
JASON PLEGGENKUHLE
KATHERINE KELLY
Assistant Attorneys General
*Attorneys for Plaintiff the State of Minnesota*

HECTOR H. BALDERAS
Attorney General of New Mexico
TANIA MAESTAS
Chief Deputy Attorney General
*Attorneys for Plaintiff the State of New Mexico*

ERIC T. SCHNEIDERMAN
Attorney General of New York
BARBARA D. UNDERWOOD
Solicitor General
STEVEN C. WU
Deputy Solicitor General
HOWARD MASTER
Senior Enforcement Counsel
LISA LANDAU
Bureau Chief, Health Care Bureau
ERIC HAREN
Special Counsel and Senior Advisor
*Attorneys for Plaintiff the State of New York*

26

JOSHUA H. STEIN
Attorney General of North Carolina
RYAN Y. PARK
Deputy Solicitor General
SRIPRIYA NARASIMHAN
Deputy General Counsel
*Attorneys for Plaintiff the State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon
HENRY KANTOR
Special Counsel to the Attorney General
J. NICOLE DeFEVER
Assistant Attorney General
*Attorneys for Plaintiff the State of Oregon*

JOSH SHAPIRO
Attorney General of Pennsylvania
JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
PATRICK M. GREENE
Deputy Attorney General
*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

PETER KILMARTIN
Attorney General of the State of Rhode Island
REBECCA TEDFORD PARTINGTON
Chief, Civil Division
MICHAEL W. FIELD
Assistant Attorney General
*Attorneys for Plaintiff the State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
*Attorneys for Plaintiff the State of Vermont*

MARK R. HERRING
Attorney General of Virginia
MATTHEW R. MCGUIRE
Acting Deputy Solicitor General
*Attorneys for Plaintiff the Commonwealth of Virginia*

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBERT W. FERGUSON
Attorney General of Washington
JEFFREY T. SPRUNG
RENE D. TOMISSER
Assistant Attorneys General
*Attorneys for Plaintiff the State of Washington*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  (Case No. ___)