XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5841
  Fax: (415) 703-5480
  E-mail: Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*
*[Additional counsel listed in signature block]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON,**<br><br>                                  Plaintiffs,<br><br>          **v.**<br><br>**DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,**<br><br>                                  Defendants. | Case No. 4:17-cv-05895-KAW<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br><br>**RELIEF REQUESTED BY 4:00 P.M. THURSDAY, OCTOBER 19, 2017** |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Issue Presented ........................................................................................................... 3

Factual Background ..................................................................................................... 4

Legal Standard ............................................................................................................ 7

Argument .................................................................................................................... 8

I.      The States Are Likely to Succeed on the Merits of Their Claim that the
        Executive Branch is Required to Make the ACA's Mandatory Cost-Sharing
        Reduction Payments ................................................................................... 8

        A.      The ACA Requires the Secretaries of the Treasury and HHS to
                Make Cost-Sharing Reduction Reimbursement Payments ................ 9

                1.      The text of the ACA mandates cost-sharing reduction
                        reimbursement payments ................................................... 9

                2.      The text, structure and design of the ACA demonstrate that
                        Congress permanently appropriated funds for cost-sharing
                        reduction payments ......................................................... 10

                3.      Eliminating CSR reimbursement payments would have the
                        perverse effect of increasing the federal government's net
                        expenditures because it would increase premium tax credits ....... 12

        B.      The Executive Branch's Sudden Decision to Terminate CSR
                Payments is "Arbitrary and Capricious" Under the APA ................ 13

II.     The States Are Likely to Prevail on the Merits of Their Take Care Clause
        Claim .......................................................................................................... 13

III.    The States and Their Residents Will Suffer Irreparable Harm in the
        Absence of Preliminary Relief .................................................................. 16

        A.      Ending Cost-Sharing Reduction Payments Will Destabilize the
                Individual Markets by Increasing Premiums, Decreasing Plan
                Choices, and Suppressing Market Participation ......................... 17

        B.      Ending Cost-Sharing Reduction Payments Will Increase the
                Number of Uninsured Individuals and Increase Uncompensated
                Care Costs Paid for by the States and Counties ......................... 21

        C.      Ending Cost-Sharing Reduction Payments Now Will Cause
                Substantial Consumer Confusion and Force Insurers to Absorb
                Multi-Million Dollar Losses, Further Destabilizing the
                Individual Market ........................................................................ 22

IV.     The Balance of Equities Tips Sharply in Favor of the Plaintiff States and a
        Preliminary Injunction is in the Public Interest and Will Preserve the Status
        Quo .............................................................................................................. 23

V.      A Nationwide Injunction is Necessary and Appropriate.......................... 24

VI.     No Security Should Be Required as a Condition for Granting the TRO or
        Preliminary Injunction .............................................................................. 25

Conclusion ................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2010) ..................................................................................... 7

*Ariz. Dream Act Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014) ................................................................................... 23

*Bresgal v. Brock*
    843 F.2d 1163 (9th Cir. 1987) ................................................................................... 25

*Califano v. Yamaski*
    442 U.S. 682 (1979) ............................................................................................. 8, 24

*Chalk v. U.S. Dist. Court Cent. Dist. Cal.*
    840 F.2d 701 (9th Cir. 1988) ..................................................................................... 23

*County of Santa Clara v. Trump*
    2017 WL 1459081 (N.D. Cal. April 25, 2017) .......................................................... 16

*Diaz v. Brewer*
    656 F.3d 1008 (9th Cir. 2011) ................................................................................... 25

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ................................................................................... 23

*Goldie's Bookstore, Inc. v. Superior Court*
    739 F.2d 466 (9th Cir. 1984) ..................................................................................... 16

*In re Aiken County*
    725 F.3d 255 (D.C. Cir. 2013) .............................................................................. 13, 14

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
    4 F.3d 819 (9th Cir. 1993) ......................................................................................... 23

*King v. Burwell*
    135 S. Ct. 2480 (2015) ......................................................................................... *passim*

*Leigh v. Salazar*
    677 F.3d 892 (9th Cir. 2012) ..................................................................................... 23

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ..................................................................................... 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
    132 S. Ct. 2566 (2012) ................................................................................................. 4

ii

# TABLE OF AUTHORITIES
### (continued)

Page

*Nken v. Holder*
 556 U.S. 418 (2009) ...................................................................................................23

*Safe Air for Everyone v. U.S.E.P.A.*
 488 F.3d 1088 (9th Cir. 2007) .....................................................................................9

*Texas v. United States*
 809 F.3d 134 (5th Cir. 2015) ......................................................................................25

*Trump v. Int'l Refugee Assistance Project*
 137 S. Ct. 2080 (2017) ......................................................................................7, 8, 23

*United States v. North Carolina*
 192 F. Supp. 3d 620 (M.D.N.C. 2016) .....................................................................16

*Utility Air Regulatory Group v. E.P.A.*
 134 S. Ct. 2427 (2014) ...............................................................................................14

*Washington v. Trump*
 847 F.3d 1151 (9th Cir. 2017) ...............................................................................8, 25

*Winter v. Natural Res. Def. Council, Inc.*
 555 U.S. 7 (2008) .......................................................................................7, 16, 23

STATUTES

5 U.S.C.
 § 551(6) .......................................................................................................................8
 § 551(13) .....................................................................................................................8
 § 702 ...........................................................................................................................8
 § 704 ...........................................................................................................................8
 § 706 .................................................................................................................8, 9, 13

26 U.S.C.
 § 36B ...........................................................................................................2, 5, 6, 10
 § 36B(a) .....................................................................................................................10
 § 36B(b)(2)(B) ..........................................................................................................12
 § 36B(f)(3)(B) ...........................................................................................................11
 § 36B(f)(3)(C) ...........................................................................................................11
 § 4980H(a)(2) ...........................................................................................................11
 § 4980H(b)(1)(B) ......................................................................................................11
 § 4980H(c)(3) ............................................................................................................11
 § 4980H(d)(3) ...........................................................................................................11
 § 6055(b)(1)(B)(iii)(II) .............................................................................................11
 § 6103(l)(21)(A) ........................................................................................................11

iii

1

2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

3

29 U.S.C. § 218b(a)(2)......................................................................................................11

4

31 U.S.C.

5

§ 1324...............................................................................................6, 10, 11, 13
§ 1324(a)........................................................................................................6

6

§ 1324(b)(2) .........................................................................................2, 6, 9, 14

7

42 U.S.C.

8

§ 300gg-4(l)(3)(A)(ii)..........................................................................................11
§ 1395dd.........................................................................................................21

9

§ 1397ee(d)(3)(B) ............................................................................................11
§ 18021(a)(1)..................................................................................................23

10

§ 18021(a)(1)(C)(ii)...........................................................................................5
§ 18022(a)(2)..................................................................................................23

11

§ 18022(d)......................................................................................................5
§ 18023(b)(2)(A)(i)-(ii).......................................................................................11

12

§ 18023(b)(2)(B)(i)(I) ........................................................................................11
§ 18031(i)(3)(B) ...............................................................................................11

13

§ 18031(c)(5)(B) ..............................................................................................11

14

§ 18031(d)(4)(G) ..............................................................................................11
§ 18032(e)(2)...................................................................................................11

15

§ 18033(a)(6)(A)...............................................................................................11
§ 18051(a)(2)...................................................................................................11

16

§ 18051(d)(3)(A)(i) ...........................................................................................11
§ 18051(d)(3)(A)(ii) ..........................................................................................11

17

§ 18052(a)(3)...................................................................................................11
§ 18054(c)(3)(A)...............................................................................................11

18

§ 18071..........................................................................................................2, 10

19

§ 18071(a)-(c).................................................................................................5, 23
§ 18071(b).......................................................................................................5

20

§ 18071(c)(2)..................................................................................................5, 10
§ 18071(c)(3)..................................................................................................10

21

§ 18071(c)(3)(A).............................................................................................1, 5, 9, 14
§ 18071(f)(2)..................................................................................................5, 10, 11

22

§ 18081(a)(1)...................................................................................................11

23

§ 18081(a)(2)...................................................................................................11
§ 18081(a)(2)(B)...............................................................................................11

24

§ 18081(b)(3)...................................................................................................11
§ 18081(b)(4)...................................................................................................11

25

§ 18081(c)(3)...................................................................................................11

26

§ 18081(e)(2)(A)(i)............................................................................................11
§ 18081(e)(4)(B)(ii)...........................................................................................11

27

§ 18081(e)(4)(B)(iii)..........................................................................................11
§ 18081(g)(1)...................................................................................................11

28

iv

### TABLE OF AUTHORITIES
**(continued)**

Page

§ 18081(g)(2)(A) ..............................................................................................11
§ 18082(a) ....................................................................................................6, 10
§ 18082(a)(1) ............................................................................................10, 11
§ 18082(a)(2)(B) ..............................................................................................11
§ 18082(a)(3) ..................................................................................6, 9, 11, 14
§ 18082(b)(3) ....................................................................................................10
§ 18082(c) ........................................................................................................11
§ 18082(c)(2)-(3) ..............................................................................................11
§ 18082(c)(3) ........................................................................................9, 10, 14
§ 18082(d) ........................................................................................................11
§ 18082(e) ........................................................................................................11
§ 18082(e)(2) ....................................................................................................10
§ 18083(e)(1) ....................................................................................................11
§ 18084(2) ........................................................................................................11

ACA
§ 1401 ......................................................................................................4, 5, 6
§ 1401(d)(1) ......................................................................................................6
§ 1402 ................................................................................................................5

Cal. Welf. & Inst. Code § 17000 et seq ....................................................................21

**CONSTITUTIONAL PROVISIONS**

Take Care Clause ....................................................................................................14

U.S. Const., Article II, § 3 ......................................................................................14

**COURT RULES**

Federal Rule of Civil Procedure 65(b) ........................................................................1

Federal Rule of Civil Procedure 65(c) ......................................................................25

N.D. Cal. Local Civil Rule 65-1 ................................................................................1

**OTHER AUTHORITIES**

42 C.F.R. § 156.430 ............................................................................................9, 10

Bartolone, et al. *Anthem's Retreat Leaves Californians with Fewer Choices, More Worries*, Kaiser Health News, Aug. 2, 2017 ....................................................19

Congressional Budget Office, *The Effects of Terminating Payments for Cost-Sharing Reductions*, August 2017 ....................................................................12, 18

v

**TABLE OF AUTHORITIES**
(continued)

Page

Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026* (Mar. 2016)............................................5, 17

*Health Insurance Marketplaces 2017 Open Enrollment Period Final Enrollment Report: November 1, 2016 – January 31, 2017* (Mar. 15, 2017).............................................18

http://hbex.coveredca.com/data-research/library/PolicyOptions-CountiesWithNO-QHPCoverage--04-14-17%20Final.pdf ...............................................................................20

http://thehill.com/policy/healthcare/355258-trump-to-cut-off-key-obamacare-payments ...........................................................................................................................7

http://thehill.com/policy/healthcare/health-insurance/355708-pennsylvania-obamacare-plans-to-see-massive-premium-spike ...................................................18

http://www.commonwealthfund.org/publications/explainers/2017/apr/cost-sharing-reductions#/#11 .........................................................................................................17

http://www.commonwealthfund.org/publications/issue-briefs/2016/mar/cost-sharing-reductions ..............................................................................................................6

http://www.coveredca.com/news/pdfs/CoveredCA_CL_2018_Rates-HHSLetter.pdf .................................................................................................................18

http://www.kff.org/health-reform/state-indicator/total-marketplace-enrollment-and-financial-assistance/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Locatio n%22,%22sort%22:%22asc%22%7D......................................................................17

https://aspe.hhs.gov/system/files/pdf/156571/ASPE_IB_Cost-sharing reductions.pdf ....................................................................................................................12

https://obamacare.net/2017-federal-poverty-level/ ...........................................................5

https://twitter.com/realDonaldTrump/status/918772522983874561 .................................7

https://twitter.com/realDonaldTrump/status/919009334016856065 ....................2, 7, 14

https://twitter.com/realDonaldTrump/status/919160558712172544 .................................7

https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-18-keyissues.pdf .....................................................................................................................4

https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53009-costsharingreductions.pdf ...............................................................................................12

### TABLE OF AUTHORITIES
#### (continued)

Page

https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-
Marketplaces/Downloads/2017-09-13-Issuer-County-Map.pdf ................................................20

https://www.cms.gov/CCIIO/Resources/Regulations-and-
Guidance/Downloads/CMS-Guidance-on-CSR-Reconciliation.pdf.........................................10

https://www.urban.org/sites/default/files/publication/87816/2001126-uncertain-
future-for-affordable-care-act-leads-insurers-to-rethink-participation-
prices_1.pdf............................................................................................................................19

https://www.washingtonpost.com/national/health-science/affordable-care-act-
remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-
10c3-11e7-ab07-07d9f521f6b5_story.html?utm_term=.9ad0a92dce44 .....................................2

https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-
trump-cabinet-meeting ........................................................................................................3, 7, 15

https://www.wsj.com/articles/trump-threatens-to-withhold-payments-to-insurers-
to-press-democrats-on-health-bill-1492029844 ........................................................................15

Mangan & Coombs, *Anthem pulls out of Obamacare Markets in Wisconsin and
Indiana for 2018*, CNBC, June 21, 2017 ..................................................................................19

Office of the Assistant Sec'y for Planning & Evaluation, Department of Health &
Human Services, *ASPE Issue Brief: Potential Fiscal Consequences of Not
Providing CSR Reimbursements* (2015) ...................................................................................12

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 65(b) and Local Civil Rule 65-1, Plaintiffs the State of California; the State of Connecticut; the State of Delaware; the District of Columbia; the State of Illinois; the State of Iowa; the Commonwealth of Kentucky; the State of Maryland; the Commonwealth of Massachusetts; the State of Minnesota; the State of New Mexico; the State of New York; the State of North Carolina; the State of Oregon; the Commonwealth of Pennsylvania; the State of Rhode Island; the State of Vermont; the Commonwealth of Virginia; and the State of Washington (collectively, States) seek a temporary restraining order (TRO) and order to show cause why a preliminary injunction should not issue to enjoin Defendants Donald J. Trump, President of the United States; Eric D. Hargan, Acting Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services; Steven T. Mnuchin, Secretary of the United States Department of the Treasury; and the United States Department of the Treasury (collectively, Defendants) from terminating the cost sharing reduction (CSR) payments required by the Patient Protection and Affordable Care Act (ACA) pending judicial resolution of this action. Because Defendants have stated that they will not make the monthly CSR reimbursement payments to insurers that are due on Friday, October 20, 2017, Plaintiffs ask that **a TRO issue by 4:00 p.m. Thursday, October 19, 2017** requiring that timely and complete payments be made.

The requested injunctive relief, which would simply preserve the status quo pending a final resolution of this case, is necessary and appropriate here. First, after full consideration the Court is likely to conclude that the law requires Defendants to continue making CSR reimbursement payments. Multiple provisions of the ACA require Defendants to make these payments, which are an essential part of the Act's carefully integrated structure. *See* 42 U.S.C. §§ 18071(c)(3)(A); 18082(a)(3) & (c)(3). The cost-sharing reduction payments work hand-in-hand with the ACA's premium tax credits to provide low and middle income families access to more affordable health care. Understanding that these federal subsidies are integral to the ACA's success, and that they must work seamlessly and predictably every year in order for the ACA to achieve its goals, Congress both mandated that the payments be made and exempted them from the annual

1

appropriations process by creating a permanent appropriation for these funds.  *See* 31 U.S.C.

§ 1324(b)(2); 26 U.S.C. § 36B; 42 U.S.C. § 18071.  Since the ACA's operative provision took

effect in January 2014, the Secretaries of the Treasury and Health and Human Services (HHS)

(under both Presidents Obama and Trump) have made monthly CSR reimbursement payments

pursuant to this statutory authority.  They have done so without interruption, and without further

congressional appropriations.

Late last week, Defendants suddenly announced that they would no longer be making these

payments.  That announcement was made just eight days before the October 2017 monthly

payments are due, and less than three weeks before open enrollment for 2018 is set to begin.  The

Administration's abrupt reversal not only violates the ACA, but is also arbitrary and capricious in

violation of the Administrative Procedure Act (APA).  And, under the unusual circumstances of

this case, it violates the President's constitutional duty to take care that the laws be faithfully

executed.  The President's own statements make clear that the termination of CSR payments is

not based on any neutral, good faith interpretation of the statutes, but instead is deliberately

intended to *undermine* the proper functioning of the ACA.  Since taking office, the Trump

Administration has engaged in a continued and sustained effort to "explode" the ACA by making

it more difficult and expensive for individuals to procure health insurance coverage through the

Act's health insurance Exchanges.[1]  His first act as President included signing the Executive

Order, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act

Pending Repeal*.[2]  And after repeatedly trying, but failing, to convince Congress to repeal the

ACA, President Trump is now openly seeking to "dismantle[]" this landmark Act of Congress—

which provided affordable health insurance coverage to over 20 million Americans—through

sudden, unilateral, and irresponsible executive action.[3]  To take just one example, after abruptly

---

[1] https://www.washingtonpost.com/national/health-science/affordable-care-act-remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-10c3-11e7-ab07-07d9f521f6b5_story.html?utm_term=.9ad0a92dce44.

[2] https://www.whitehouse.gov/the-press-office/2017/01/2/executive-order-minimizing-economic-burden-patient-protection-and.

[3] https://twitter.com/realDonaldTrump/status/919009334016856065.

2

1   ending the CSR payments, which millions of American families rely on for access to high quality

2   and affordable health care, the President declared in a Cabinet meeting that:

3       The healthcare, as you know, is moving along.  I knocked out the CSRs; that was a subsidy
        to the insurance companies … Republicans are meeting with Democrats because of what I
4       did with the CSR, because I cut off the gravy train … Obamacare is finished.  It's dead.  It's
        gone.  It's no longer—you shouldn't even mention it.  It's gone.  There is no such thing as
5       Obamacare anymore.[4]

6       Under these circumstances, equitable relief is necessary to preserve the status quo while the

7   court resolves the important legal questions presented by this case.  Interim relief will bring some

8   modicum of stability and order to the situation and prevent irreparable harm to the plaintiff States

9   and to the millions of Americans who have access to affordable health insurance because of the

10  ACA.  In contrast, allowing Defendants to stop making the CSR payments required by the Act,

11  particularly in the precipitous fashion they have proposed, will bring about chaos and uncertainty,

12  cause premium increases and insurer withdrawals from ACA markets, increase the number of

13  uninsured Americans, and increase uncompensated care costs that are ultimately borne by state

14  and local governments.  And, ironically, allowing Defendants to depart from the intended

15  statutory structure by terminating the CSR payments will cost the federal government *more*

16  money in the end.  These unfortunate consequences are wholly unnecessary, and should not be

17  tolerated simply because Defendants now suddenly argue that they lack the authority to make

18  CSR payments in the absence of a further specific appropriation.  Notably, Defendants' current

19  stance is a complete reversal of the legal position the Executive Branch has maintained and acted

20  on for nearly four years, including for eight months under the new Administration.  This Court

21  should issue an immediate TRO to preserve the status quo and permit the Court to consider the

22  merits of the Executive Branch's new position in an orderly manner.

**ISSUE PRESENTED**

24      Whether the Court should issue a temporary restraining order and preliminary injunction to

25  preserve the status quo by requiring Defendants to continue making cost-sharing reduction

26  payments mandated under the ACA pending a final resolution of the merits of this lawsuit.

27

28      [4] https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-trump-
    cabinet-meeting.

3

**FACTUAL BACKGROUND**

The ACA is a landmark law that made affordable health coverage available to more than 20 million Americans and sharply reduced the number of Americans without health insurance.  It was designed to create local, state-based markets presenting affordable insurance choices for consumers, in order to "increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012).  The ACA adopted a "series of interlocking reforms" to achieve these goals.  *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).  The three "closely intertwined" reforms implemented by the Act are:  (1) requiring nearly everyone to maintain insurance coverage (the individual mandate); (2) mandating that insurers accept every person seeking coverage and not charge them higher premiums based on their health (i.e., not discriminating based on "pre-existing conditions"); and (3) providing subsidies designed to make insurance coverage more affordable.  *Id*. at 2486-87.  To achieve these goals, the ACA created local health insurance markets (called Exchanges), both state-run and federally-run, "basically, a marketplace that allows people to compare and purchase insurance plans."  *Id.* at 2485.[5]  The ACA relies on both the States and private insurance companies to bring those plans to market.  *Id.* at 2486-87.  These core principles of the ACA have made health care affordable and accessible for more than 20 million Americans.

One critical element of the ACA is that it permanently appropriated billions of dollars in federal subsidies to make health care more affordable for eligible low and moderate-income Americans.  Health care expenses (for those with health insurance) generally fall into two categories.  First, health insurance companies typically charge monthly premiums for the coverage that they provide.  Second, in addition to paying monthly premiums, insurance plans usually require insured individuals and families to make out-of-pocket payments to health care providers in the form of copayments for medical visits and prescription drugs, coinsurance, and

---

[5] Exchanges may be established either by a State, or, if a State does not establish an Exchange, by the federal government.  *King*, 135 S. Ct. at 2485.

deductibles (collectively known as "cost-sharing" requirements).[6]  Congress designed the ACA's subsidies to address both types of health care costs.

The ACA provides two forms of interrelated subsidies that reduce the cost of obtaining and utilizing health care coverage for lower income individuals and their families.  First, section 1401 provides premium tax credits that reduce monthly insurance premiums for eligible individuals.  26 U.S.C. § 36B.  Qualified individuals are those with household incomes between 100% and 400% of the federal poverty level.  *King*, 135 S. Ct. at 2487.  For 2017, the poverty level for a family of four is $24,600.[7]  Such individuals may purchase insurance with the premium tax credits—which the Treasury Secretary pays in advance directly to the individual's health insurer.  *King*, 135 S. Ct. at 2487.  The "tax credits are among the Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people."  *Id*. at 2489.

Second, to offset individuals' out-of-pocket costs when using their health insurance, section 1402 requires insurers to provide cost-sharing reductions to individuals:  (1) who are eligible to receive tax credits under Section 1401 and 26 U.S.C. § 36B; (2) whose household income is below 250% of the federal poverty level ($61,500 for a family of four); and (3) who are enrolled in a "silver" plan on one of the Exchanges.  42 U.S.C. § 18071(b), (c)(2), (f)(2).[8]  Eligibility for a premium tax credit under 26 U.S.C. § 36B is thus a statutory precondition for receipt of cost-sharing reductions.  42 U.S.C. § 18071(f)(2).  Insurers must reduce cost sharing for all qualified individuals.  *Id*. § 18071(c)(2).  But while the upfront cost is thus borne by the insurers, *id*. § 18071(a)-(c), the ACA requires the government to reimburse insurers for these cost-sharing reductions by "mak[ing] periodic and timely payments to the [insurer] equal to the value of the

---

[6] *See* https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-18-keyissues.pdf, at 16-17.

[7] *See* https://obamacare.net/2017-federal-poverty-level/.

[8] The Act classifies plans offered on the Exchanges into one of four "metal levels" based on their cost-sharing requirements.  42 U.S.C. § 18022(d).  A "silver" plan is structured so that the insurer pays 70% of the average enrollee's health care costs, leaving the enrollee responsible for the remaining 30% through cost sharing.  *Id*.  "Gold" and "platinum" plans cover a greater portion of the insured's average health care costs, while a "bronze" plan covers a smaller portion.  *Id*.  Insurers on the Exchanges must offer at least one "silver" and one "gold" level plan.  *Id*. § 18021(a)(1)(C)(ii).

reductions," *id.* § 18071(c)(3)(A).  Cost-sharing reductions are a major expense:  in 2016 they cost $7 billion, they will total $9 billion in 2017, and are expected to rise to $16 billion by 2026.[9] They play a crucial role in lowering out-of-pocket costs so that consumers can actually use their health care.  For example, in States with federally-run Exchanges, insurers on average reduced the overall out-of-pocket limit for silver plans from $6,224 to $2,047—a reduction of over 67%—for individuals with incomes between 150 and 200% of the federal poverty level.[10]

The ACA requires that "advance payments" for both tax credits and cost-sharing reductions be made as part of a single, unified program.  42 U.S.C. § 18082(a).  Under that unified program, the Secretary of the Treasury makes monthly "advance payments of such [tax] credits or [cost sharing] reductions" to the issuers of the qualified health plans in order to "reduce the premiums payable by individuals eligible for such credit."  *Id.* § 18082(a)(3).  These advance payments for both components of the subsidy program are made directly to health insurers.  *Id.*  Both premium tax credits and cost-sharing reductions are funded through a permanent appropriation under 31 U.S.C. § 1324, as amended by the ACA.  Section 1324 permanently appropriates "[n]ecessary amounts … for refunding internal revenue collections as provided by law," including "refunds due … from" specified provisions of the tax code.  31 U.S.C. § 1324(a), (b)(2).  And section 1401 of the Act amended the list of funded provisions to include "refunds due … from" Section 36B.  ACA § 1401(d)(1); 31 U.S.C. § 1324(b)(2).

Consistent with this statutory scheme, since January 2014, the Secretaries of Treasury and HHS have paid both cost-sharing reductions and premium tax credits under the authority of the permanent appropriation provided by 31 U.S.C. § 1324.  Those monthly payments began under the Obama Administration and were continued by the Trump Administration.  On October 12, 2017, however, the Trump Administration abruptly announced that it would no longer make CSR payments, beginning the following week.  In a brief press statement, issued late in the evening,

---

[9] Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65:  2016 to 2026* 8 (Mar. 2016) (CBO *Federal Subsidies*), https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51385-healthinsurancebaseline.pdf.

[10] *See* http://www.commonwealthfund.org/publications/issue-briefs/2016/mar/cost-sharing-reductions, at 7-8.

6

1  the White House stated that "[b]ased on guidance from the Department of Justice, the Department

2  of Health and Human Services has concluded that there is no appropriation for cost-sharing

3  reduction payments to insurance companies under [the ACA]. In light of this analysis, the

4  Government cannot lawfully make the cost-sharing reduction payments."[11] The next morning,

5  the U.S. Department of Justice attached a copy of a new, four-page opinion from the Attorney

6  General providing the purported legal basis for the Administration's action to a court filing in a

7  related case. *See United States House of Representatives v. Hargan*, D.C. Circuit Case No. 16-

8  5202, ECF No.1698827.

9        That same morning (October 13, 2017), President Trump tweeted "The Democrats

10  ObamaCare is imploding. Massive subsidy payments to their pet insurance companies has

11  stopped. Dems should call me to fix!"[12] Later that day, he tweeted that the ACA "is being

12  dismantled, but in the meantime, premiums & deductibles are way up!"[13] The next day, he

13  celebrated the plunge of health insurance stocks as the result of his Executive action.[14] And

14  during a cabinet meeting on Monday, October 16, 2017, President Trump bragged that he had

15  "knocked out the CSRs" and pronounced the ACA "dead," "finished," and "gone."[15]

16  **LEGAL STANDARD**

17        To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on

18  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

19  balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

20  *Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit applies a "sliding scale

21  approach under which a preliminary injunction could issue where the likelihood of success is

22  such that 'serious questions going to the merits were raised and the balance of hardships tips

23  sharply in plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th

24  Cir. 2010) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th

25

26  [11] http://thehill.com/policy/healthcare/355258-trump-to-cut-off-key-obamacare-payments.
   [12] https://twitter.com/realDonaldTrump/status/918772522983874561.

27  [13] https://twitter.com/realDonaldTrump/status/919009334016856065.
   [14] https://twitter.com/realDonaldTrump/status/919160558712172544.

28  [15] https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-trump-cabinet-meeting.

7

Cir. 2003)).  The purpose of interim injunctive relief is "not to conclusively determine the rights

of the parties," but instead to "balance the equities as litigation moves forward."  *Trump v. Int'l*

*Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  Crafting an injunction is an "exercise

of discretion and judgment, often dependent as much on the equities of a given case as the

substance of the legal issues it presents."  *Id.* (citing *Winter*, 555 U.S. at 20, 24).  Courts must

"also 'consider the overall public interest.'"  *Id.* (alterations and citations omitted).

The States seek a nationwide injunction, which is appropriate when the legal violation is

nationwide in scope.  "[T]he scope of injunctive relief is dictated by the extent of the violation

established, not by the geographical extent of the plaintiff."  *Califano v. Yamaski*, 442 U.S. 682,

702 (1979); see also *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (affirming

nationwide injunction against executive branch travel ban order).

## ARGUMENT

### I.   THE STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE EXECUTIVE BRANCH IS REQUIRED TO MAKE THE ACA'S MANDATORY COST-SHARING REDUCTION PAYMENTS

The States are likely to succeed on the merits of their claim that the Administration's

decision to stop making CSR payments is unlawful.  The APA provides that a person suffering a

legal wrong because of agency action or adversely affected or aggrieved by agency action is

entitled to judicial review.  5 U.S.C. § 702.  A final agency action for which there is no other

adequate remedy in a court is subject to judicial review.  *Id*. § 704.  A reviewing court shall:

"(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful

and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an

abuse of discretion, otherwise not in accordance with law; [or] without observance of procedure

required by law."  *Id*. § 706.  The APA defines "agency action" to include "the whole or a part of

an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to

act."  *Id*. § 551(13); *see id*. § 551(6) (defining "order" to mean "the whole or a part of a final

disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a

matter other than rule making but including licensing").

1   The ACA requires the Executive Branch to make timely and regular cost-sharing reduction

2   payments to insurers to ensure coverage of out-of-pocket health care expenses for beneficiaries,

3   and provides a permanent appropriation of the funds necessary to make those payments.  These

4   cost-sharing reductions are a core component of the ACA, and are essential to the ACA's central

5   goal of providing access to affordable health care coverage.  The federal government's sudden

6   refusal to make these payments is both "arbitrary, capricious" and "not in accordance with law,"

7   and therefore violates both the ACA and the APA.  5 U.S.C. § 706; *see Safe Air for Everyone v.*

8   *U.S.E.P.A.*, 488 F.3d 1088, 1101 (9th Cir. 2007) (agency decision based on legally erroneous

9   interpretation of statute is "'arbitrary, capricious, or otherwise not in accordance with law'").

10  **A.**   **The ACA Requires the Secretaries of the Treasury and HHS to Make**
        **Cost-Sharing Reduction Reimbursement Payments**

11

12      **1.**   **The text of the ACA mandates cost-sharing reduction reimbursement**
             **payments**

13      The text, structure, and design of the ACA establish the mandatory nature of cost-sharing

14  reduction payments, for which Congress permanently appropriated funds.  First, the Act's text

15  expressly requires—many times over—the Treasury Secretary to make these payments.  The

16  statute first states that "[a]n issuer of a qualified health plan making reductions under this

17  subsection shall notify the Secretary of such reductions and the Secretary *shall make* periodic and

18  timely payments to the issuer equal to the value of the reductions."  42 U.S.C. § 18071(c)(3)(A)

19  (emphasis added).  The ACA subsequently requires the Secretary of HHS to establish a program

20  under which "the Secretary of the Treasury *makes* advance payments of such credit or reductions

21  to the issuers of the qualified health plans in order to reduce the premiums payable by individuals

22  eligible for such credit."  *Id.* § 18082(a)(3) (emphasis added).  And the Secretary of the Treasury

23  "*shall make*" an "advance payment of the cost-sharing reductions" in the amount specified by the

24  Secretary of HHS.  *Id*. at (c)(3) (emphasis added).  Payment for cost-sharing reductions has even

25  been codified by federal regulation.  *See* 42 C.F.R. § 156.430.  The ACA's text leaves no

26  ambiguity regarding the mandatory nature of these payments.

27

28

9

**2.      The text, structure and design of the ACA demonstrate that Congress permanently appropriated funds for cost-sharing reduction payments**

The text, structure, and design of the ACA also demonstrate that Congress permanently appropriated funds for cost-sharing reduction payments.  As discussed above, 31 U.S.C. § 1324(b)(2) provides a permanent appropriation for "refunds due" from various "credit provisions" of the Internal Revenue Code.  The ACA amended this list to include refunds due from 26 U.S.C. § 36B.  Section 36B provides that "applicable taxpayers" are entitled to a credit against the "tax imposed by this subtitle" in "an amount equal to the premium assistance credit amount."  26 U.S.C. § 36B(a).  But this credit is not paid or credited directly to the individuals who are entitled to the premium subsidy; rather, it is paid to their insurers, so that the beneficiary never has to pay the up-front cost of the premium in the first place.  *See* 42 C.F.R. § 156.430.  In just the same way, the ACA also provides that a subset of the individuals eligible to receive premium tax credits under Section 36B are also entitled to have their insurance carrier "reduce the[ir] cost-sharing" expenditures in amounts that vary by income—and the insurer is entitled to have the government reimburse it for that subsidy, just as the government pays the premium subsidy credit directly to the insurer.  42 U.S.C. § 18071(c)(2), (c)(3), (f)(2).[16]  The two components of the ACA's subsidy program work in exactly the same way.  And when Congress amended Section 1324 to include a permanent appropriation for "refunds due" from Section 36B, it created a permanent appropriation for whatever amounts proved necessary to fund both.  *See also United States House of Representatives v. Hargan*, 2016 WL 6216355, at *46-53 (Brief of the Executive Branch in related litigation in the D.C. Circuit explaining how the ACA's permanent appropriation covers cost-sharing reduction payments).

Numerous provisions in the ACA reinforce the conclusion that Congress intended to treat premium tax credits and cost-sharing reduction payments as interrelated components of a single, integrated, and permanently appropriated subsidy program.  For starters, eligibility for premium tax credits and cost-sharing reductions are determined at the same time, through the same process,

---

[16] *See also* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS-Guidance-on-CSR-Reconciliation.pdf.

and by the same person.  The Secretary of HHS determines, in advance, the income eligibility of individuals "for the premium tax credit allowable under section 36B of Title 26 *and* the cost-sharing reductions under section 18071 of this title."  42 U.S.C. § 18082(a)(1) (emphasis added).  The Secretary uses the same information and verification process for both eligibility determinations.  *Id*. § 18082(a), (b)(3), (c)(3), (e)(2).  And both subsidies are directly linked by the fact that cost-sharing reductions are *only* available for a subset of tax credit recipients.  *Id.* § 18071(c)(2), (f)(2).  One cannot qualify for cost-sharing reductions without first being eligible for premium tax credits.  *Id.*

Furthermore, payments for both premium tax credits and cost-sharing reductions occur at the same time, through the same process, and are paid by the same person and to the same entities.  Under the statutory scheme, the Treasury Secretary makes "advance payments" on a monthly basis directly to insurers—payments that expressly cover both tax credits and cost-sharing reduction payments.  42 U.S.C. § 18082(c)(2)-(3).[17]  Congress created an integrated scheme to pay insurers at the same time and in the same manner for both types of subsidies, which further demonstrates that Section 1324's permanent appropriation applies to both premium tax credits and cost-sharing reduction payments.  42 U.S.C. § 18082(c)(2)-(3).  Any other reading of the statutory scheme would be "untenable in light of the statute as a whole."  *King*, 135 S. Ct. at 2495.

All told, no fewer than 45 provisions in the ACA link premium tax credits and cost-sharing reductions.[18]  From streamlining enrollment procedures for the ACA's Exchanges, to authorizing the IRS to disclose tax return information, to clarifying that eligibility for premium tax credits and cost-sharing reduction subsidies does not affect eligibility for other public benefits, the ACA

---

[17] Though paid at the same time and in the same manner, premium tax credit payments are prospective, whereas CSR reimbursement payments are retroactive because insurers have already made those payments on behalf of covered beneficiaries.

[18] *See* 42 U.S.C § 18083(e)(1); 26 U.S.C. § 6103(l)(21)(A); *id.* § 36B(f)(3)(B), (C); *id.* § 6055(b)(1)(B)(iii)(II); 29 U.S.C. § 218b(a)(2); 42 U.S.C § 18084(2); *id.* § 18054(c)(3)(A); 26 U.S.C. § 4980H(a)(2), (b)(1)(B), (c)(3), (d)(3); 42 U.S.C. § 300gg-4(l)(3)(A)(ii); *id.* § 1397ee(d)(3)(B); *id.* § 18023(b)(2)(A)(i)-(ii), (b)(2)(B)(i)(I); *id.* § 18031(c)(5)(B), (d)(4)(G), (i)(3)(B); *id.* § 18032(e)(2); *id.* § 18033(a)(6)(A); *id.* § 18051(a)(2), (d)(3)(A)(i), (d)(3)(A)(ii); *id.* § 18052(a)(3); *id.* § 18071(f)(2); *id.* § 18081(a)(1), (a)(2), (a)(2)(B), (b)(3), (b)(4), (c)(3), (e)(2)(A)(i), (e)(4)(B)(ii), (e)(4)(B)(iii), (g)(1), (g)(2)(A); *id.* § 18082(a)(1), (a)(2)(B), (a)(3), (c), (d), (e).

11

1    consistently and repeatedly treats premium tax credits and cost-sharing reduction payments as

2    part and parcel of a single, fully funded subsidy program.  Indeed, if cost-sharing reduction

3    payments did not always go hand-in-hand with premium tax credit payments, "these provisions

4    would make little sense."  *King*, 135 S. Ct. at 2492.  As the Supreme Court recently instructed in

5    *King*, "[a] fair reading of legislation demands a fair understanding of the legislative plan."  *Id*. at

6    2496.  The text, structure, and design of the ACA conclusively demonstrate that Congress

7    permanently appropriated funds for both premium tax credits and cost-sharing reductions.

8         **3.    Eliminating CSR reimbursement payments would have the perverse
             effect of increasing the federal government's net expenditures
9             because it would increase premium tax credits**

10   There is yet another reason why Congress could not possibly have intended for CSR

11   reimbursement payments not to be permanently funded.  If the government stops making these

12   payments, insurers are still mandated to make the payments and therefore will make up the

13   difference by increasing premiums for "silver" plans (the only plans eligible for cost-sharing

14   reductions).  Eyles Decl. ¶ 8.  This in turn raises costs for the federal government.  Premium tax

15   credits are calculated based on the premiums for silver plans, and thus an increase in premiums

16   for silver plans will trigger a commensurate increase in the amount of premium tax credits

17   available for *all* individuals eligible for such tax credits.  *See* 26 U.S.C. § 36B(b)(2)(B).

18   Both the Federal Department of Health and Human Services and the Congressional Budget

19   Office have explained that if CSR reimbursement payments are terminated, the resulting increase

20   in premium tax credit expenditures will cost the federal government billions of dollars *more* than

21   paying CSR reimbursements.  *See* Office of the Assistant Sec'y for Planning & Evaluation,

22   Department of Health & Human Services, *ASPE Issue Brief: Potential Fiscal Consequences of*

23   *Not Providing CSR Reimbursements* at 4 (2015) (federal deficits would be "billions of dollars

24   higher annually than it otherwise would be" if cost-sharing reduction payments are not made)[19];

25   Congressional Budget Office, *The Effects of Terminating Payments for Cost-Sharing Reductions*,

26   August 2017 (CBO Report) at 2 (federal deficit would increase by $194 billion over a 10 year

27   ―――――――――――――
          [19] *See* https://aspe.hhs.gov/system/files/pdf/156571/ASPE_IB_Cost-sharing
28   reductions.pdf.

window without cost-sharing reduction payments).[20]  For 2018 alone, terminating CSR payments would result in a net increase in federal costs of $2.3 billion.  Reyes Decl. ¶ 5.  Congress surely did not intend to increase the federal deficit by nearly $200 billion dollars over a decade by permanently funding only one of the ACA's two interrelated subsidies.  As the Supreme Court did in interpreting the ACA in *King*, this Court should conclude that "[i]t is implausible that Congress meant the Act to operate in this manner."  *King*, 135 S. Ct. 2494.

## B.   The Executive Branch's Sudden Decision to Terminate CSR Payments is "Arbitrary and Capricious" Under the APA

The Executive Branch's sudden decision to terminate CSR payments is not only substantively impermissible, but the process by which it was reached and announced is also arbitrary and capricious under the APA.  5 U.S.C. § 706.  As the President's own statements make clear (and as discussed further below), this decision is motivated by his desire to "finish" the ACA through unilateral executive action in light of Congress's failure to repeal it.  *See infra*, Part II.  That explains the timing of the President's abrupt change in position after his administration had relied on Section 1324's permanent appropriation to make CSR payments for the first eight months of this year.  But suddenly refusing to carry out a statutory mandate because Congress was unwilling to repeal that mandate—and creating chaos for millions of Americans in the process—undermines the rule of law and our democratic system of governance.  The States are likely to prevail on their claim that this unlawful executive action is arbitrary and capricious under the APA.

## II.   THE STATES ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR TAKE CARE CLAUSE CLAIM

Cost-sharing reduction reimbursement payments are mandatory and permanently appropriated by the ACA.  *See supra*, Part I.  The Executive Branch, therefore, cannot decline to follow the law by ending these mandatory payments.  "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there

---

[20] *See* https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53009-costsharingreductions.pdf.

13

1   is appropriated money available and the President has no constitutional objection to the statute."

2   *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (emphasis original).  *In re Aiken County*,

3   like this case, "raise[d] significant questions about the scope of the Executive's authority to

4   disregard federal statutes."  725 F.3d at 257.  In that case, the federal Nuclear Regulatory

5   Commission "declined to continue the statutorily mandated Yucca Mountain licensing process."

6   *Id*. at 259.  A federal statute provided that the Commission "shall consider" the Department of

7   Energy's license application to store nuclear waste at Yucca Mountain and "shall issue a final

8   decision approving or disapproving" the application within three years of its submission.  *Id*. at

9   257.  Yet the Commission had "no current intention of complying with the law" and refused to

10  process the licensing application because the Commission, as a policy matter, did not wish to

11  pursue Yucca Mountain as a storage site for nuclear waste (among other reasons).  *Id*. at 258-60.

12       The Court squarely rejected that contention, explaining that "Congress sets the policy, not

13  the Commission.  And policy disagreement with Congress's decision about nuclear waste storage

14  is not a lawful ground for the Commission to decline to continue the congressionally mandated

15  licensing process."  *In re Aiken County,* 725 F.3d at 260.  The Court emphasized that "the

16  President and federal agencies may not ignore statutory mandates or prohibitions merely because

17  of policy disagreement with Congress."  *Id*.  These are "settled, bedrock principles of

18  constitutional law."  *Id*. at 259; see also *Utility Air Regulatory Group v. E.P.A.*, 134 S. Ct. 2427,

19  2445 (2014) (holding that "[a]n agency has no power to 'tailor' legislation to bureaucratic policy

20  goals by rewriting unambiguous statutory terms").

21       Like *In Re Aiken*, this case has "serious implications for our constitutional structure.  It is

22  no overstatement to say that our constitutional system of separation of powers would be

23  significantly altered if we were to allow executive and independent agencies to disregard federal

24  law," 725 F.3d at 267, and not pay the cost-sharing subsidies expressly required by multiple

25  provisions of the ACA, *see* 42 U.S.C. § 18071(c)(3)(A); *id.* § 18082(a)(3) & (c)(3); *see also* 31

26  U.S.C. § 1324(b)(2) (permanently appropriating funds for these mandatory payments).  This case

27  is arguably more egregious than *In re Aiken* because here the President has made clear that his

28  specific intent is to undermine the proper functioning of the ACA so that this landmark

1   legislation—which brought affordable health insurance to over 20 million Americans—will be

2   "dismantled."[21]  To allow the Executive Branch to undermine an Act of Congress in this way

3   would "deal a severe blow to the Constitution's separation of powers."  *Utility Air Regulatory*

4   *Group*, 134 S. Ct. at 2446.  It would also violate the Executive Branch's constitutional obligation

5   under the Take Care Clause to "faithfully execute" the law.  U.S. Const., Art. II, § 3.

6       Although the President has been characteristically frank, the other Defendants have at least

7   sought to portray the Administration's change of position as the result of a legal analysis—despite

8   the fact that it represents a complete reversal of positions previously (and correctly) advanced by

9   the Executive Branch in the courts.  *See* Executive Branch Opening Br., *Price*, 2016 WL

10  6216355, at *46-53.  Under the extraordinary circumstances here, however, that portrayal lacks

11  the credibility it might normally have when presented in the form of a formal opinion by the

12  Attorney General.  Instead, the events of the last several months make it regrettably clear that last

13  week's sudden decision to stop CSR payments is just the latest and perhaps most drastic step in a

14  coordinated, politically-driven strategy to undermine the ACA because the current Administration

15  does not agree with its structure or objectives.  For example, during his October 16, 2017 Cabinet

16  meeting, President Trump stated that "Republicans are meeting with Democrats because of what I

17  did with CSR[s], because I cut off the gravy train" and declared that "Obamacare is finished.  It's

18  dead.  It's gone.  It's no longer—you shouldn't even mention.  It's gone.  There is no such thing

19  as Obamacare anymore."[22]  It is painfully apparent that terminating CSRs was not based on a

20  good faith legal analysis, but was instead intended to gut the ACA and force Democrats to

21  negotiate a replacement.

22      Indeed, for the past several months, and long before the Attorney General's recent legal

23  opinion was formulated, the President has threatened to cut off CSR payments.[23]  Those

24  statements created substantial market uncertainty, which led several insurers to withdraw from the

25  Exchanges and many others to raise premiums.  *See infra*, Part III.  And even setting aside CSR

26  _____

[21] https://twitter.com/realDonaldTrump/status/919009334016856065.

27  [22] *See* https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-trump-cabinet-meeting.

[23] *See, e.g.*, https://www.wsj.com/articles/trump-threatens-to-withhold-payments-to-insurers-to-press-democrats-on-health-bill-1492029844.

28

15

payments, the President has taken numerous other steps to undermine the ACA, including: (1) expanding access to "association health plans" that are not required to include coverage for the minimum suite of essential health benefits; (2) actively discouraging individuals from signing up for health care through the Exchanges by cutting the enrollment period in half and shutting down *HealthCare.gov* for nearly 12 hours every Sunday; and (3) eliminating nearly all advertising and outreach funding to encourage consumer signups on the Exchanges.[24]  Through these and other efforts, the Trump Administration has made its intentions clear:  it wants the ACA to fail, no matter how many millions of Americans stand to lose access to health care benefits and services as a result.  Far from "faithfully execut[ing]" the nation's laws, the President and his Administration are now actively working to undermine them.

### III.   THE STATES AND THEIR RESIDENTS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

In addition to being likely to succeed on the merits, the Plaintiff States and their residents will also suffer irreparable harm in the absence of preliminary relief.  *Winter*, 555 U.S. at 20.  The discontinuation of federal funds can cause irreparable harm.  *See United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where the unavailability of federal funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated"); *County of Santa Clara v. Trump*, 2017 WL 1459081 at *27 (N.D. Cal. April 25, 2017) (holding that "the risk of losing millions of dollars in federal funding" constitutes irreparable harm).[25]  And so can administrative (or, more accurately, political) actions designed not to uphold the law or provide for the orderly conduct of government, but rather to sow

---

[24] For example, earlier this year the Trump Administration cut the outreach budget from $5 million to $0 in the final two weeks of open enrollment.  As a result, only 400,000 signed up during this time when normally approximately 700,000 would have been expected.

[25] Furthermore, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (recognizing that "[a]n alleged constitutional infringement will often alone constitute irreparable harm").

16

confusion and instability, and to actively undermine the proper functioning of a critically important and complex nationwide program.

The D.C. Circuit recently recognized the harm to California (and other States) that would flow from cost-sharing reduction payments being halted.  That Court granted a motion for leave to intervene filed by California, New York, 16 other States, and the District of Columbia in the *United States House of Representatives v. Hargan* appeal, Case No. 16-5202.  In its August 1, 2017 Order permitting intervention, the D.C. Circuit recognized that termination of cost-sharing reduction payments "would lead directly and imminently to an increase in insurance prices, which in turn will increase the number of uninsured individuals for whom States will have to provide health care." *House v. Hargan*, 2017 WL 3271445, at *1.  The Court also explained that "state-funded hospitals will suffer financially when they are unable to recoup costs from uninsured, indigent patients for whom federal law requires them to provide medical care." *Id*.  The Court described the "causal linkage" between cost-sharing reduction payments being cutoff and the consequent harm to the States as "plausible, directly foreseeable, [and] imminent upon the grant of the House's requested relief." *Id*.  As shown below, terminating cost-sharing reduction payments will cause large premium increases, destabilize the individual markets, increase the number of uninsured residents in Plaintiff States, and significantly raise uncompensated care costs that are ultimately borne by the States and their taxpayers.

**A.    Ending Cost-Sharing Reduction Payments Will Destabilize the Individual Markets by Increasing Premiums, Decreasing Plan Choices, and Suppressing Market Participation**

The Administration's precipitous decision to stop making cost-sharing reduction payments will destabilize the individual markets by increasing premiums, decreasing plan choices offered in the market, and suppressing market participation, which could, in the words of President Trump, "explode," "dismantle[]," or "finish" the ACA.  As a preliminary matter, CSR payments directly benefit millions of Americans, and therefore terminating them would have an immediate and far reaching impact on our nation's health care system.  Nationwide, approximately 7 million

17

individuals—58% of all marketplace enrollees—receive cost-sharing reductions[26] estimated to be $9 billion in 2017.[27]  In California, over 673,000 residents receive cost-sharing reductions—nearly half of all Covered California enrollees.[28]  *See also* Reyes Decl. ¶ 3; McLeod Decl. ¶ 2. And it is estimated that—for September through December of 2017—failing to pay CSRs will result in a loss of $250 million for California insurers.  Thomas Decl. ¶ 10.

If the Administration's decision to halt CSRs is allowed to take effect, insurers will not be able to absorb these multi-million dollar losses.  Instead, they would be forced to raise premiums to cover the shortfall, and would strongly reconsider participating in the Exchanges in future years, making future years' market viability uncertain at best.  McLeod Decl. ¶¶ 2, 5; Thomas Decl. ¶ 11; Reyes Decl. ¶ 10; Frescatore Decl. ¶ 23; Wade Decl. ¶15.  And the premium hike would be large.  In California, it is estimated that premiums will increase (on average) by 12.4% in 2018, with some premiums rising by as much as 27%.[29]  And other States will witness even larger increases.  In Pennsylvania, "silver" plan insurance premiums sold on the exchange will increase by an average of 30.6% in 2018 because of the Executive Branch's decision to terminate CSR reimbursements.[30]  Mendelsohn Decl. ¶ 14; *see also* Kreidler Decl. ¶ 14 (up to 27.3% increase in premiums in Washington).  Overall, the CBO estimates that premiums for the most popular "silver plans" will rise by an average of 20%.  *See* CBO Report 1.

Rising premiums, in turn, will cause more state residents to forgo health insurance coverage.[31]  Among those most directly affected are the nearly 2.1 million people who currently purchase insurance through the Exchanges but do not qualify for premium tax credits because of

---

[26] http://www.commonwealthfund.org/publications/explainers/2017/apr/cost-sharing-reductions#/#11.

[27] CBO *Federal Subsidies* at 8.

[28] http://www.kff.org/health-reform/state-indicator/total-marketplace-enrollment-and-financial-assistance/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[29] http://www.coveredca.com/news/pdfs/CoveredCA_CL_2018_Rates-HHSLetter.pdf.

[30] http://thehill.com/policy/healthcare/health-insurance/355708-pennsylvania-obamacare-plans-to-see-massive-premium-spike.

[31] In addition, some enrollees that are not eligible for tax credits will respond to higher premiums by switching to lower tiered plans with higher cost sharing.  Reyes Decl. ¶ 6; Wadleigh Decl. ¶ 13.  And research shows that higher out-of-pocket costs often result in patients avoiding necessary medical care until their condition becomes dire, at which point it is more expensive to treat.  *Id.*  And that increases overall health care costs.  *Id.*

their incomes.[32]  Absent injunctive relief, many will be forced to pay for the increase in premiums triggered by the Administration's decision out of their own pockets.  Wadleigh Decl. ¶¶ 10-11. And higher premiums will mean that many families "cannot afford to stay covered under their health insurance plan."  McLeod Dec. ¶ 6.  Not surprisingly, as the States' experience with the ACA confirms, "[w]hen premium rates for plans offered through the Exchanges have risen, fewer individuals choose to buy them."  de la Rocha Letter 1-2; *see also* Kreidler Decl. ¶¶ 16, 20-23; Frigand Decl. ¶¶ 5-7; Vullo Decl. ¶ 8; Frescatore Decl. ¶¶ 24, 27, 30; Wadleigh Decl. ¶ 14. Hundreds of thousands of the States' residents may lose their health insurance coverage as a result of rising premiums.  Eyles Decl. ¶¶ 14-15; McLeod Decl. ¶ 7 (California); Brown Decl. ¶ 11 (Kentucky); Gustafson Decl. ¶¶ 6-7 (Vermont); Keen Decl. ¶ 5 (Oregon); Busz Decl. ¶ 6; *see also* CBO Report 7 (estimating that one million more Americans will be uninsured in 2018 if CSRs stop).

The termination of cost-sharing reduction payments will likely cause many insurers to exit the Exchanges, and that will further destabilize the individual markets.  Reyes Decl. ¶ 10; Eyles Decl. ¶¶ 9, 17.  One analyst predicts that insurers will "'rapid[ly] exit'" the Exchanges now that the Administration has stopped CSR payments.  Corlette Decl. ¶ 6.  Other industry experts similarly forecast that the Administration's decision makes it "likely" that insurers with withdraw from the Exchanges.  Eyles Decl. ¶ 17; *see also* Jones Decl. ¶ 10; Kreidler Decl. ¶¶ 25-26. Indeed, a survey of insurers conducted before the Administration's decision found that if CSRs cease, "[m]ost insurers believed that they would be forced to exit the marketplaces or the entire individual market as quickly as state or federal law would allow …."[33]  That is unsurprising, as most insurers view cost-sharing reduction payments as "integral to the sustainability of the individual health insurance market" and predicted that stopping them would "lead[] to a death spiral in the market."[34]

---

[32] *See* Centers for Medicare & Medicaid Services, *Health Insurance Marketplaces 2017 Open Enrollment Period Final Enrollment Report: November 1, 2016 – January 31, 2017* (Mar. 15, 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/ 2017-Fact-Sheet-items/2017-03-15.html.

[33] https://www.urban.org/sites/default/files/publication/87816/2001126-uncertain-future-for-affordable-care-act-leads-insurers-to-rethink-participation-prices_1.pdf at 2.

[34] *Id.* at 8.

19

Indeed, even before the Administration announced that it would no longer make CSR payments, insurers in several States had decided not to offer plans through the Exchanges in 2018, at least in part because of uncertainty over whether the payments would be made.  Anthem, for example, cited CSR uncertainty in explaining its decision to withdraw entirely from the Exchanges in Wisconsin, Indiana, and Ohio, and to stop offering plans in 16 of California's 19 insurance regions.[35]  Similarly, two Aetna insurers decided to withdraw from Delaware's Exchange based in part on uncertainty about CSR reimbursements being made in 2018.  Navarro Decl. ¶ 13.  Delaware has just a single insurer participating in its marketplace next year, *id*. ¶ 14, and the decision to stop CSR payments could lead it to withdraw from that State's Exchanges for the 2018 plan year, Kempski Decl. ¶ 7.

Further insurer withdrawals will be devastating for the States and their residents.  They are likely to lead to "bare" counties—counties in which no insurer intends to offer a plan through the Exchanges in 2018.  *See* Corlette Decl. ¶ 9; Navarro Decl. ¶ 17; *see also* CBO Report at 1 (decision to stop CSR payments will leave 5% of nation's residents in bare counties).  According to the Centers for Medicare and Medicaid Services, approximately 1,472 counties—covering over 2.6 million enrollees on the Exchanges—were slated to have just a single health insurer in 2018 before the Executive Branch's decision to terminate CSR reimbursement payments.[36]  Ending CSRs could easily prompt the lone insurer in these counties to withdraw from the Exchanges.  Navarro Decl. ¶ 17.  If that occurs, millions of qualified residents in those "bare" counties will be unable to take advantage of premium tax credits and CSRs during 2018.  *King*, 135 S. Ct. at 2487.  And although some may be able to procure health insurance through other means, most will not: "There are no 'good' options for addressing what would be a 'bare county.'" [37]  *See also* Corlette Decl. ¶ 10; Eyles Decl. ¶ 18.  Even in counties where insurers continue to offer plans, the dwindling number of insurers will lead to more uninsured.  Fewer insurers decreases competition,

---

[35] *See* Bartolone, et al. *Anthem's Retreat Leaves Californians with Fewer Choices, More Worries*, Kaiser Health News, Aug. 2, 2017; Mangan & Coombs, *Anthem pulls out of Obamacare Markets in Wisconsin and Indiana for 2018*, CNBC, June 21, 2017.

[36] *See* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/Downloads/2017-09-13-Issuer-County-Map.pdf.

[37] http://hbex.coveredca.com/data-research/library/PolicyOptions-CountiesWithNO-QHPCoverage--04-14-17%20Final.pdf.

20

1   which drives up premiums.  MacEwan Decl. ¶¶ 7, 13; Vullo Decl. ¶ 8; Navarro Decl. ¶¶ 15-17;

2   Reyes Decl. ¶ 10; Wadleigh Decl. ¶ 14.  Higher premiums force more people to forgo insurance.

3   Wadleigh Decl. ¶ 15.  Fewer insures will also reduce consumer's options, and may mean that the

4   only plans available to residents are ones that do not best fit their health care needs.  Corlette

5   Decl. ¶ 11.

6   **B.    Ending Cost-Sharing Reduction Payments Will Increase the Number of**
       **Uninsured Individuals and Increase Uncompensated Care Costs Paid for**
7       **by the States and Counties**

8        Ending cost-sharing reduction payments will increase the number of uninsured individuals

9   nationwide, and that directly increases the uncompensated care costs that are ultimately borne by

10   the States and counties which pay the bill when individuals without health insurance receive

11   medical treatment.  McLeod Decl. ¶¶ 7-9; Wadleigh Decl. ¶ 16; Rattay Decl. ¶¶ 4-6; de la Rocha

12   Letter 1-2; CBO Report 7.[38]  There is a direct relationship between the number of uninsured State

13   residents and the cost of publicly funded uncompensated care, as demonstrated by data drawn

14   from before and after California's implementation of the ACA.

15        Due to implementation of the ACA, California, for example, has substantially reduced the

16   number of uninsured residents in the State.  Cantwell Decl. ¶ 2.  Over 6 million Californians were

17   uninsured in 2013, prior to full implementation of the Act.  *Id.*  By 2015, approximately half of

18   that population gained health insurance, leaving around 3 million Californians remaining without

19   coverage.  *Id.*  Other States have witnessed similar decreases.  Billups Decl. ¶ 4; Busz Decl. ¶ 4;

20   Wynn Decl. ¶ 4; Kreidler Decl. ¶19.  And decreasing the ranks of the uninsured reduces

21   uncompensated care costs.  Cantwell Decl. ¶ 2.  For example, according to data collected and

22   published by the Office of Statewide Health Planning and Development (OSHPD), California

23   hospitals incurred uncompensated care costs totaling approximately $5.2 billion in 2013, which

24   was reduced to $1.9 billion by 2015 (a 64% decrease).  Cantwell Dec. ¶ 3.  An increase in the

25   number of uninsured individuals in California will inevitably increase the amount of

26   uncompensated care costs again.  *Id.*  And that would reintroduce the same type of financial strain

27   _____

       [38] Both federal and state law require state-funded hospitals to provide emergency care,
28   regardless of a patient's insurance status or ability to pay.  *See, e.g.*, 42 U.S.C. § 1395dd; Cal.
       Welf. & Inst. Code § 17000 et seq; Wynn Decl. ¶ 6.

                                   21

on state, local, and private health systems and programs that the ACA was intended to relieve.

Cantwell Decl. ¶ 3; Reyes Decl. ¶ 9; Billups Decl. ¶4; Keen Decl. ¶ 5.

### C.   Ending Cost-Sharing Reduction Payments Now Will Cause Substantial Consumer Confusion and Force Insurers to Absorb Multi-Million Dollar Losses, Further Destabilizing the Individual Market

The timing of the Administration's announcement to end CSR reimbursement payments is

particularly harmful.  Open enrollment for plans offered through the Exchanges will begin on

November 1, 2017.  In anticipation of that deadline, States and insurers finalized premium rates

for the 2018 plan year over the past several weeks.  Redmer Decl. ¶ 9; Gasteier Decl. ¶ 14.  Those

rates have been reviewed by state regulators, gone through a statutorily-required public comment

period, and have been communicated to consumers.  Redmer Decl. ¶¶4-10; Jones Decl. ¶ 3;

Gasteier Decl. ¶ 11; Cammarata Decl. ¶¶ 11-17; Frescatore Decl. ¶ 21.

The Administration's sudden announcement that CSRs will not be paid has thrown this

intricate planning process into disarray.  Kempski Decl. ¶ 8; Redmer Decl. ¶¶ 10-18; Eyles Decl.

¶ 10; Gasteier Decl. ¶¶ 15-17.  Because they anticipated that CSRs would be paid next year, many

regulators approved lower premium rates than they otherwise would have.  Redmer Decl. ¶ 9;

Eyles Decl. ¶ 12; Cammarata Decl. ¶¶ 13, 19; Maranjian Decl. ¶¶ 7-10.  Now, just a few weeks

before open enrollment is set to begin, regulators in these States either have or are considering

allowing insurers to raise premiums.  Redmer Decl. ¶ 13; Eyles Decl. ¶ 12; MacEwan Decl. ¶¶ 7-

10; Cammarata Decl. ¶ 20; Maranjian Decl. ¶¶ 11-12.[39]  That rise in rates will force residents to

forgo health insurance entirely, or to buy less comprehensive, but cheaper, plans.  Reyes Decl.

¶ 6; McLeod Decl. ¶¶ 7-9; MacEwan Decl. ¶ 12.  It will also create substantial confusion among

consumers, many of whom began shopping for insurance weeks ago and were informed that they

would be able to buy insurance for 2018 at the lower premium rates.  Redmer Decl. ¶¶ 10-15;

McLeod Decl. ¶¶ 5-6; Kempski Decl. ¶ 6; Jones Decl. ¶ 3; Cammarata Decl. ¶ 22; Frescatore

Decl. ¶¶ 21, 33.  That confusion increases the risk that residents will choose to forgo health

---

[39] The alternative would be much worse.  Refusing to allow insurers to set higher rates means that they will lose tens, if not hundreds, of millions of dollars during 2018.  Greene Decl. ¶ 5; Burrell Decl. ¶ 7; Gasteier Decl. ¶ 17.  That could lead insurers to withdraw, which would destabilize the markets even further.  Greene Decl. ¶ 5; Burrell Decl. ¶¶ 7-9; Eyles Decl. ¶12.

22

1    insurance next year.  Jones Decl. ¶ 5; Gasteier Decl. ¶¶ 21-22.

2         Finally, the Administration's decision will irreparably injure insurers.  As noted, insurers

3    must cover CSR costs, even if the federal government does not reimburse them.  *See* 42 U.S.C. §§

4    18021(a)(1), 18022(a)(2), 18071(a)-(c).  As a result of the Administration's abrupt about-face,

5    insurers will lose $1.8 billion in unreimbursed CSR costs for the 2017 plan year.  Eyles Decl. ¶ 9;

6    *see also* Keen Decl. ¶ 4; White Decl. ¶ 9; Wo Decl. ¶ 3; Vullo Decl. ¶ 11; Maranjian Decl. ¶ 5.

7    **IV.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF THE PLAINTIFF STATES
         AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST AND WILL PRESERVE**
8    **THE STATUS QUO**

9         Lastly, a preliminary injunction is appropriate where:  (1) the balance of equities tips in

10   favor of the applicants; and (2) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.

11   When the federal government is a party, these last two factors merge.  *Nken v. Holder*, 556 U.S.

12   418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  When

13   evaluating the balance of hardships, "a court must consider the impact granting or denying a

14   motion for a preliminary injunction will have on the respective enterprises."  *Int'l Jensen, Inc. v.*

15   *Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).  Among other things, "by establishing a

16   likelihood" of a constitutional violation, a plaintiff "establish[es] that both the public interest and

17   the balance of the equities favor a preliminary injunction."  *Ariz. Dream Act Coal. v. Brewer*, 757

18   F.3d 1053, 1069 (9th Cir. 2014).  As the Supreme Court recently emphasized, "the purpose of

19   such interim equitable relief is not to conclusively determine the rights of the parties, but to

20   balance the equities as the litigation moved forward."  *Trump v. Int'l Refugee Assistance Project*,

21   137 S. Ct. 2080, 2087 (2017).

22        Furthermore, "[t]he basic function of a preliminary injunction is to preserve the status quo

23   pending a determination of the action on the merits."  *Chalk v. U.S. Dist. Court Cent. Dist. Cal.*,

24   840 F.2d 701, 704 (9th Cir. 1988); *see also Leigh v. Salazar*, 677 F.3d 892, 902 (9th Cir. 2012)

25   ("Preliminary injunctions normally serve to prevent irreparable harm by preserving the status quo

26   pending a trial or other determination of the action on the merits.").

27        Here, the balance of equities tips sharply in favor of preserving the status quo by

28   temporarily enjoining the Executive Branch from abruptly halting cost-sharing reduction

1   payments.  As outlined above, terminating cost-sharing reduction payments will cause large

2   premium increases, destabilize the individual market, increase the number of uninsured, and

3   significantly raise uncompensated care costs that are ultimately paid from the public fisc.

4   McLeod Decl. ¶¶ 5-9; Thomas Decl. ¶ 11; de la Rocha Letter 1-2; Cantwell Decl. ¶¶ 2-3.

5   Granting preliminary relief would preserve critical reimbursements to insurers, thereby

6   preventing a hasty exodus of insurers from the marketplaces, skyrocketing premiums, and other

7   negative impacts that would be hard—if not impossible—to reverse later.  It is manifestly in the

8   public interest to prevent this widespread harm from occurring while the Court evaluates the

9   merits of the case.  Put differently, the public interest is best served if the Court continues cost-

10  sharing reduction payments while it determines the legality of ending them.  Otherwise, a harmful

11  chain of potentially irreversible events could result.

12          Further, a preliminary injunction will not harm the federal government.  The government

13  has willingly made cost-sharing reduction payments on behalf of beneficiaries for nearly four

14  years running, including for eight months under the current administration.  Requiring cost-

15  sharing reduction payments to continue for a few more months will not cause any significant

16  harm to the Executive Branch.  Moreover, permanently maintaining cost-sharing reduction

17  payments will actually *save* the federal government $194 billion dollars over ten years if the ACA

18  is properly interpreted as Plaintiffs contend (and as the Executive Branch itself contended until

19  last Thursday).  CBO Report at 2 (federal deficit would increase by $194 billion over 10 years

20  without cost-sharing reduction payments).  And even if this Court ultimately concludes otherwise,

21  every month in which payments are made while that issue is litigated will produce savings, not

22  costs, for the federal fisc.  Maintaining these payments is thus in the financial self-interest of the

23  federal government, in addition to being statutorily mandated.  The balance of the equities and the

24  public interest strongly support the issuance of a TRO and preliminary injunction.

25  **V.     A NATIONWIDE INJUNCTION IS NECESSARY AND APPROPRIATE**

26          Because the unlawful halting of mandatory cost-sharing reduction payments is nationwide

27  in scope, this Court should issue a TRO and preliminary injunction that applies nationwide.  *See*

28  *Califano v. Yamaski*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the

24

extent of the violation established, not by the geographical extent of the plaintiff.").  Courts

routinely grant nationwide relief under such circumstances.  *See*, *e.g.*, *Washington v. Trump*, 847

F.3d 1151, 1166-67 (affirming nationwide injunction against executive branch travel ban order);

*Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide preliminary

injunction preventing implementation of the DACA program); *Bresgal v. Brock*, 843 F.2d 1163,

1170-71 (9th Cir. 1987).  In this case, millions of Americans across the country enjoy affordable,

high quality health care because cost-sharing reductions lower their out-of-pocket costs.

Individuals and insurers in every State will be adversely affected if the Trump Administration is

permitted to abruptly halt these critical payments.  Accordingly, a nationwide injunction is

necessary and appropriate here.

## VI.   NO SECURITY SHOULD BE REQUIRED AS A CONDITION FOR GRANTING THE TRO OR PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65(c) provides that the "court may issue a preliminary

injunction or a temporary restraining order only if the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained."  In the Ninth Circuit, the district court "retains discretion" to

waive this requirement.  *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).  The Court should

not require California to provide a monetary security deposit because the relief sought will not

cause defendants to suffer any damages.  As outlined above, defendants have made cost-sharing

reduction payments consistently for nearly four years, and the requested injunction would actually

*save* the federal government billions of dollars.  CBO Report 2.  Under these circumstances, the

Court should exercise its discretion and decline to require California to provide a security deposit.

## CONCLUSION

For the foregoing reasons, the States respectfully request that the Court grant the

application for a temporary restraining order and order to show cause why a preliminary

injunction should not issue requiring the Secretaries of the Treasury and Health and Human

Services to continue making complete and timely cost-sharing reduction payments as required by

the ACA.

25

Dated:  October 18, 2017

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General

**/s/ Gregory D. Brown**
**/s/ Nimrod P. Elias**

GREGORY D. BROWN
NIMROD P. ELIAS
Deputy Attorneys General
*Attorneys for Plaintiff the State of California*

GEORGE JEPSEN
Attorney General of Connecticut
JOSEPH R. RUBIN
Associate Attorney General
ROBERT W. CLARK
Special Counsel to the Attorney General
*Attorneys for Plaintiff the State of Connecticut*

MATTHEW P. DENN
Attorney General of Delaware
AARON R. GOLDSTEIN
State Solicitor
SARAH FISHMAN GONCHER
JOHN H. TAYLOR
Deputy Attorneys General
*Attorneys for Plaintiff the State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia
ROBYN R. BENDER
Deputy Attorney General
*Attorneys for Plaintiff the District of Columbia*

LISA MADIGAN
Attorney General of Illinois
DAVID F. BUYSSE
Deputy Chief, Public Interest Division
*Attorneys for Plaintiff the State of Illinois*

THOMAS J. MILLER
Attorney General of Iowa
NATHAN BLAKE
Deputy Attorney General
*Attorneys for Plaintiff the State of Iowa*

26

ANDY BESHEAR
Attorney General
Commonwealth of Kentucky
LA TASHA BUCKNER
Executive Director
Office of Civil and Environmental Law
S. TRAVIS MAYO
TAYLOR PAYNE
Assistant Attorneys General
*Attorneys for Plaintiff the Commonwealth of Kentucky*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General
*Attorneys for Plaintiff the State of Maryland*

MAURA HEALEY
Attorney General of Massachusetts
ERIC GOLD
Assistant Attorney General
*Attorneys for Plaintiff the Commonwealth of Massachusetts*

LORI SWANSON
Attorney General of Minnesota
ALAN GILBERT
Solicitor General
JASON PLEGGENKUHLE
KATHERINE KELLY
Assistant Attorneys General
*Attorneys for Plaintiff the State of Minnesota*

HECTOR H. BALDERAS
Attorney General of New Mexico
TANIA MAESTAS
Chief Deputy Attorney General
*Attorneys for Plaintiff the State of New Mexico*

ERIC T. SCHNEIDERMAN
Attorney General of New York
BARBARA D. UNDERWOOD
Solicitor General
STEVEN C. WU
Deputy Solicitor General
HOWARD MASTER
Senior Enforcement Counsel
LISA LANDAU
Bureau Chief, Health Care Bureau
ERIC HAREN
Special Counsel and Senior Advisor
*Attorneys for Plaintiff the State of New York*

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOSHUA H. STEIN
Attorney General of North Carolina
RYAN Y. PARK
Deputy Solicitor General
SRIPRIYA NARASIMHAN
Deputy General Counsel
*Attorneys for Plaintiff the State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon
HENRY KANTOR
Special Counsel to the Attorney General
J. NICOLE DeFEVER
Assistant Attorney General
*Attorneys for Plaintiff the State of Oregon*

JOSH SHAPIRO
Attorney General of Pennsylvania
JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
PATRICK M. GREENE
Deputy Attorney General
*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

PETER KILMARTIN
Attorney General of the State of Rhode Island
REBECCA TEDFORD PARTINGTON
Chief, Civil Division
MICHAEL W. FIELD
Assistant Attorney General
*Attorneys for Plaintiff the State of Rhode Island*
THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
*Attorneys for Plaintiff the State of Vermont*

MARK R. HERRING
Attorney General of Virginia
MATTHEW R. MCGUIRE
Acting Deputy Solicitor General
*Attorneys for Plaintiff the Commonwealth of Virginia*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBERT W. FERGUSON
Attorney General of Washington
JEFFREY T. SPRUNG
RENE D. TOMISSER
Assistant Attorneys General
*Attorneys for Plaintiff the State of
Washington*

29