XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-5841
  Fax: (415) 703-5480
  E-mail: Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON, | Case No. 3:17-cv-05895-KAW<br><br>**DECLARATION OF MATTHEW DAVID EYLES, SENIOR EXECUTIVE VICE PRESIDENT AND CHIEF OPERATING OFFICER OF AMERICA'S HEALTH INSURANCE PLANS, INC. ISO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20, | |
| Defendants. | |

1

Declaration of Matthew David Eyles, Senior Executive Vice President and Chief Operating Officer of America's Health Insurance Plans, Inc. ISO Plaintiffs' Application for a Temporary Restraining Order (3:17-cv-05895-KAW)

## DECLARATION OF MATTHEW DAVID EYLES

I, Matthew David Eyles, declare:

1.      I am Senior Executive Vice President and Chief Operating Officer of America's Health Insurance Plans, Inc. (AHIP).  I have served as AHIP's Senior Executive Vice President and Chief Operating Office since September of this year. From January 2015 to September 2017, I was AHIP's Executive Vice President of Policy and Regulatory Affairs, and I continue to lead the Policy and Regulatory Affairs department at AHIP. In both my roles as Senior Executive Vice President of AHIP and Executive Vice President of Policy and Regulatory Affairs, I lead the development and implementation of AHIP's health policy initiatives and advocacy efforts at both the federal and state levels.  I have nearly two decades of experience working within the healthcare industry and over twenty years of health policy experience.  This includes experience working within the health insurance, pharmaceutical and healthcare consulting industries.  The facts below are based on my personal knowledge and expertise and I could and would competently testify to them.

2.      The Patient Protection and Affordable Care Act (ACA) was adopted to expand access to affordable, quality health insurance.  To achieve this goal, the ACA adopted several reforms, including the creation of an Exchange in each State.  Exchanges are marketplaces where people can go to compare and purchase insurance plans.  Some Exchanges are run by the States, while others are run by the federal government.

3.      AHIP is the national trade association representing the health insurance community and the tens of millions of Americans they serve every day.  AHIP's members provide health and supplemental benefits through employer-sponsored coverage, the individual insurance

2

market, and public programs such as Medicare and Medicaid.  In 2017, seventy (70) of AHIP's member health insurance plans offered qualified health plans through an Exchange that include cost sharing reductions (CSRs). This includes large national health plans, state-based plans, plans that predominately serve the Medicaid Managed Care and individual markets, and small and regional health maintenance organizations.  The plans offered by these 70 AHIP member companies provide health insurance in 45 states and the District of Columbia. Based on health plan data available as of January 31, 2017, more than 7 million consumers were insured on exchange coverage with AHIP member health plans.[1]

4.      Millions of hardworking Americans with low or modest incomes depend on CSRs to get affordable access to medical care.  To make health care treatments and services more affordable for low- and moderate-income Americans, the ACA mandates that insurance companies that participate in the Exchanges offer "Silver" plans that include CSRs. Through premium tax credits and CSRs, the ACA provides billions of dollars in federal funding to help pay for these insurance plans.  Specifically, Section 1402(a) of the ACA, 42 U.S.C. 18071(a), requires that qualified health plans (QHPs) participating on the ACA Exchanges "shall reduce the cost sharing" under the plans as prescribed in sub-section (c), which requires that QHPs reduce the out-of-pocket minimum payments for eligible plan members based on their income level.

---

[1] This number is based on data available in the *AIS's Directory of Health Plans: 2017. Washington, DC. Available on CD. Atlantic Information Services, Incorporated* which includes data on 9.6 million individuals of the approximate 11 million individuals insured on exchanges. This data set includes some portion of 230,000 lives covered on Small Business Health Options (SHOP) exchange coverage which accounts for less than 2% of the total lives represented in the AIS data. SHOP covered lives as of January 2017 are reported as a distinct number in CMS data resource found at https://www.cms.gov/CCIIO/Resources/Data-Resources/Downloads/SHOP-Marketplace-Enrollment-Data.pdf.

5.     CSRs, far from a "bail out," were structured to provide government funding of cost sharing by consumers, with the monies for such cost-sharing provided by insurers and their actual costs reimbursed by the government. These benefits are passed from the federal government through health plans to medical providers to help lower costs for patients who see a doctor to treat their cancer or fill a prescription for a life-saving medication. Insurers do not profit from this funding: They are reimbursed actual costs. These are not subsidies for insurers.  They are direct benefits for consumers and patients. As such, Section 1402(c)(3)(A) requires that "the [HHS] Secretary shall make periodic and timely payments to [QHPs] equal to the value of the [CSR] reductions."

6.     The funding of Advance Premium Tax Credits (APTCs) and CSRs has been the significant driver of enrollment by millions of Americans through the Exchanges. The Act provides tax credits that reduce monthly insurance premiums for individuals who earn between 100% and 400% of the federal poverty level (FPL)—in 2017, between $24,600 and $98,400 for a family of four—and who satisfy additional criteria.  Of the approximately 11.1 million people enrolled through Exchanges, 9.4 million (approximately 85%) rely on premium tax credits to lower the costs of insurance. The Act also requires insurers to cover some portion of cost-sharing expenses for individuals who are eligible to receive tax credits and whose household income is less than 250% of the federal poverty level and mandates that the government reimburse insurers for covering those expenses for consumers.  Approximately 6.4 million people enrolled through Exchanges received CSRs in 2016. This year, CSRs were estimated to total about $7 billion in 2017[2], and they are expected to rise to $16 billion by 2027.

---

[2] Congressional Budget Office. See https://www.cbo.gov/sites/default/files/recurringdata/51298-2017-01-healthinsurance.pdf. Page 4

4

7. Both premium tax credits and cost sharing reduction payments are transferred to insurers by the government on a monthly basis. In turn, insurers reduce enrollees' monthly premium bills and, for consumers eligible for CSR plans, reduce the out-of-pocket costs for those plans (co-payments, deductibles, etc.). For example, an individual in 2017 whose income is 150 percent of the federal poverty level ($18,090 in 2017) would qualify for a 94% CSR plan that would, on average, reduce their deductible from $3,600 in a standard Silver plan to only $300.[3] Subsequently, under a "reconciliation process" created by the Centers for Medicare & Medicaid Services (CMS), the federal agency with regulatory oversight of the program, the amount of advance cost-sharing reduction payments provided to a plan is reconciled with the actual amount of cost-sharing reductions provided by that plan based on actual claims incurred by CSR plan enrollees during the benefit year when health care treatments or services are provided to consumers. That approach—advance reimbursement followed by reconciliation—ensures that plans are able to fund the reductions during the course of the year, but are not over-reimbursed for providing that benefit to enrollees.

8. Insurers would not have offered plans on the Exchanges that include the CSR benefit at the premium rates set and approved absent the ACA's mandate that the government reimburse them. Indeed, the first page of the agreement between CMS and QHPs indicates that "[i]t is anticipated that periodic APTCs, advance payments of CSRs, and payments of FFE user fees will be due between CMS and QHPI." In the absence of advance payments of CSRs, insurers would have had to decide between either not offering Exchange plans or

_____

[3] Congressional Budget Office. See https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53009-costsharingreductions.pdf.

5

offering plans at higher premiums (as required under state law requirements of actuarial soundness). Either would negatively impact consumers, states, and plans.

9. The Administration's October 12, 2017, announcement that it would stop making CSR payments means a reduction in an estimated $1.75 billion in immediate 2017 funding to all Exchange health insurance plans.[4] I believe the Administration's announcement that it will not make CSR payments will create immediate and significant financial harm to many health plans currently participating in the market. For some companies, this may even raise the risk of insolvency or the need to tap reserve funds.

10. The Administration's announcement was made the same day that health plans in federal Exchange states received the final countersigned QHP contracts reflecting their commitment to participate in the Exchanges for 2018 and two weeks before the November 1, 2017 open enrollment period begins for consumers shopping for 2018 health insurance plans. This timing creates substantial uncertainty, instability and disruption for AHIP's members and their customers and creates an immediate issue regarding the availability and pricing of plans.

11. In ending CSR payments, the Administration announced it will not complete reconciliation of 2016 CSRs for some issuers. While 2016 reconciliation is largely complete, due to discrepancies in reporting, some outstanding payments remain to be made. As a result of the announcement, the Administration will collect outstanding

---

[4] The estimate is based on the following: CBO estimated approximately $7 billion in CSRs in 2017. This results in average monthly payments of $583 million. With payments ending in October, there are three months or an estimated $1.75 billion in payments that will not be made. The actual amount will vary based on several factors, including an individual issuer's enrollment during those months, claims incurred by enrollees, and the annual process to reconcile advance payments with actual reductions in cost-sharing amounts paid on behalf of enrollees.

6

payments owed by issuers but will not make any outstanding payments owed to issuers, failing to make whole issuers who were underpaid for 2016 CSRs.

12. States were forced to make decisions about 2018 rates by the end of September without being certain that CSRs would be paid in 2018. Insurers in at least 9 states were required to set premium rates for 2018 assuming that the government would meet its statutory obligation to make CSR payments. Now that the Administration has announced that it will not make these payments, the insurers in these states must either seek at the eleventh hour to file new rates -- if permitted by the state insurance regulators -- and face the prospect of continuing to offer plans for which they are required to continue reducing cost-sharing amounts for enrollees without reimbursement, or withdraw from the Exchanges altogether. The disruption to business continuity and planning is significant. At least one state (North Dakota) is not permitting plans to update premium rates as of this writing noting: "This decision was made in order to protect the 22,000 covered North Dakotans who have coverage from an individual insurance policy that is off of the federal marketplace along with those on the exchange who do not receive the subsidy."

13. As a result of the Administration's action, according to CBO and the Joint Committee on Taxation's projections, for single policyholders, gross premiums (that is, before premium tax credits are taken into account) for Silver plans offered through the marketplaces would, on average, rise by about 20 percent in 2018 relative to the amount in CBO's March 2016 baseline.[5]

14. Even in states in which rates assumed CSRs will not be paid, the Government's decision to not make CSR payments will significantly impact open enrollment proceedings and

---

[5] Congressional Budget Office, See https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53009-costsharingreductions.pdf.

7

consumers' enrollment decisions. There has been no time for planning, no time for an orderly transition, and no ramp up time to educate consumers about how the Government's decision not to make CSR payments will affect the products offered on the Exchanges. Consumer confusion about the availability of insurance options could lead to lower enrollment, which will likely have a negative impact on the risk pool by resulting in sicker, older, higher risk consumers enrolling in coverage without the necessary young and healthy population to balance costs.

15.     In at least four states—Colorado, Indiana, Mississippi, and West Virginia—the extra cost associated with uncompensated CSRs is spread across all metal level of products, rather than limited to Silver plans. Therefore, in those states the Government's actions will lead to higher prices for *all* purchasers of Exchange products, including those who do not receive assistance in the form of APTCs or enroll in products with CSRs.

16.     The availability of CSRs is a crucial part of all insurers' decisions to participate in the Exchanges going forward.

17.     Based on my knowledge and experience, I believe that the Administration's decision to stop making CSR payments will reduce enrollment, cause health plans to reconsider their interest in serving the individual market, and likely lead additional insurers to withdraw from the Exchanges for the 2018 and 2019 plan years. Several health insurance plans had already announced that they would no longer offer Exchange and/or individual market coverage during 2018 or were scaling back their presence in various states as a result of the Administration's prior announcement that it was evaluating the availability of CSRs on a month-by-month basis. I believe the Administration's October 12, 2017 announcement will exacerbate this situation.

8

Declaration of Matthew David Eyles, Senior Executive Vice President and Chief Operating Officer of America's Health Insurance Plans, Inc. ISO Plaintiffs' Application for a Temporary Restraining Order (3:17-cv-05895-KAW)

18.    Further withdrawals would be extremely damaging to the Exchanges and accordingly, to the customers of AHIP members. This would severely impair customers' access to high quality ACA coverage, including presenting them with only limited coverage options. Any individuals who are unable to buy health insurance through the Exchanges will then be unable to take advantage of either premium tax credits or CSRs, because consumers can only receive those subsidies if they buy plans offered through the Exchanges. An increase in the number of people who are unable to purchase affordable, high quality ACA coverage will inevitably result in more negative health outcomes as people either forego coverage until they become sick due to a lack of plan options or affordability, or elect to enroll in non-ACA coverage options that fail to meet their healthcare needs. The cumulative effect will be a less healthy population and increased costs for not only individuals, but all relevant stakeholders including health plans, healthcare providers, state governments and federal programs. Further, if any health plans make eleventh hour decisions to not participate in the Exchanges for 2018 due to uncertainty regarding CSR funding, remaining health plans will be forced to enroll a larger, possibly higher risk population of consumers, for which they did not account when setting premiums for 2018. This could lead to concerns of financial insolvency for some health plans and would lead to increased premiums for all consumers in the future.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on October 17, 2017, in Washington, DC.

Dated: October _17_, 2017        ___Matthew D. Eyles___
                                      Matthew David Eyles

Declaration of Matthew David Eyles, Senior Executive Vice President and Chief Operating Officer of America's Health Insurance Plans, Inc. ISO Plaintiffs' Application for a Temporary Restraining Order (3:17-cv-05895-KAW)