XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-5841
  Fax: (415) 703-5480
  E-mail: Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON,** | Case No. 4:17-cv-05895-KAW <br><br> **DECLARATION OF AUDREY MORSE GASTEIER, CHIEF OF POLICY AND STRATEGY, MASSACHUSETTS HEALTH INSURANCE CONNECTOR AUTHORITY ISO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| Plaintiffs, | |
| v. | |
| **DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,** | |
| Defendants. | |

1

I, Audrey Morse Gasteier, hereby state the following:

1.    I am the Chief of Policy and Strategy at the Massachusetts Health Insurance Connector Authority (the "Health Connector").

2.    I am over 18 years of age and am not a party to this action. The facts set forth in this declaration are based on my personal knowledge and my review of documents kept in the ordinary course of business by the Health Connector.

3.    I have been Chief of Policy and Strategy at the Health Connector since 2016 and have worked at the Health Connector since 2012. I have worked in Massachusetts state government on health reform policy since 2008, having worked at the Massachusetts Division of Health Care Finance and Policy on implementation of Chapter 58 of the Acts of 2006 (Massachusetts's state health reform law) from 2008 to 2012.

4.    In my role as Chief of Policy and Strategy of the Massachusetts Health Connector, I oversee program management, policy analysis and government affairs, and communications and outreach.

5.    Created in 2006 by state law, the purpose of the Health Connector is to facilitate the availability, choice, and adoption of private health insurance plans to eligible individuals and small groups as described in Mass. Gen. Laws c. 176Q.

6.    The Health Connector has been designated by the state Legislature as the Commonwealth's American Health Benefit Exchange for purposes of the federal Affordable Care Act.

7.    The Health Connector offers health insurance plans to individuals and small businesses.

8.    In 2017, the Health Connector offered health coverage underwritten by ten insurance carriers, offering a total of 62 unique product plan offerings for consumers.  As of October 2, 2017, 257,327 Massachusetts residents were insured under health coverage offered through the Health Connector.  This included 197,429 individuals enrolled in ConnectorCare, a Health Connector program which assists eligible individuals in affording coverage who fall below 300 percent of the Federal Poverty Level.

2

9. Of those Massachusetts residents, those with incomes under 250 percent of the Federal Poverty Level – approximately 161,000 – receive federal cost-sharing reductions ("CSRs") via ConnectorCare. These federal CSRs are applied to cost-sharing that members would generally pay out-of-pocket for health care services, such as deductibles and co-payments, thereby ensuring fuller access to health insurance coverage for individuals under 250 percent of the Federal Poverty Level as well as certain American Indians/Alaska Natives.

10. Beginning in 2014 and until this month, the federal government has made payments to insurers to reimburse them for federal CSRs ("CSR Payments").

11. The general process leading into Open Enrollment entails year-long activity by the Health Connector. In the first quarter of any given year, the Health Connector invites insurance carriers to submit plans to be considered for inclusion on the Health Connector. Plans for calendar year 2018 were all submitted in 2017 and were formulated based on an assumption that federal CSR Payments would be continued. The third quarter includes a preliminary approval of qualified plans, with a final approval occurring after a rate review by the Massachusetts Division of Insurance. Finally, those selected plans are then offered to Massachusetts residents during Open Enrollment in the fourth quarter of the year.

12. In preparing for Open Enrollment for the 2018 plan year, which will occur in November and December of 2017 and January of 2018, the Health Connector has spent considerable efforts engaged in contingency planning, including a minimum of a thousand staff hours across every level of the organization, in pursuit of a dual track approach to respond to the possibility that federal CSR Payments would not continue.

13. In addition to the resources expended by the Health Connector, insurance carriers have also been burdened with preparing for uncertainty, having to provide two sets of plans and associated rates for approval for Open Enrollment: one set based on the continuation of federal CSR Payments; and another set, increasing an additional roughly 18 percent over what their 2018 rates would have been in order to compensate for the loss of federal CSR Payments.

3

14.    On October 12, 2017, the Health Connector announced that it would proceed with rates for health insurance in 2018 that reflected an assumption of continuation of federal CSR Payments by the federal government.

15.    The federal government announced hours later, without prior notice to the Health Connector, that it will cease federal CSR Payments, less than a month prior to the commencement of Open Enrollment in Massachusetts.

16.    With the most recent announcement, the Health Connector is still deliberating on how best to respond to the announced cessation of CSR Payments by the federal government – not just with respect to which set of plans and rates to offer for 2018, but also with respect to how to respond to the overall market need for stability and clarity, how to avoid confusion among consumers, and how to protect the value and function of the state's exchange over the medium and long term.

17.    The loss of federal CSR Payments to Massachusetts insurance carriers for the remainder of 2017 are estimated to be $27-28 million. To date, there is no identified mechanism through which the carriers may recoup these losses.

18.    The amount of federal CSR Payments that would be lost for 2018 for Massachusetts insurance carriers is estimated to be $146 million.

19.    Raising premium rates to reflect a cessation of CSR Payments by the federal government will impose a meaningful administrative burden on the Health Connector, including undoing work that had been done to approve and sell plans with lower rates based on an assumption of continued CSR Payments.

20.    For plans that are impacted by the cessation of federal CSR Payments, premium rates will need to be further increased, beyond ordinary market trends, by approximately 18% for 2018. Up to 80,000 Massachusetts residents – those with incomes above 400% of the Federal Poverty Level or those who did not seek a subsidy – are expected to be enrolled in those plans at the time of Open Enrollment and do not receive a premium tax credit that would offset the expected rate increase. Those residents would thus face the full impact of those increases unless they change plans for 2018.

4

21.     There will be an increased burden on the Health Connector in informing and educating those individuals impacted by a potential rate increase.  Outreach to those consumers will require providing highly individualized information, including information about coverage options outside of the Health Connector's products that may be less expensive than the plan available through the Health Connector, but which will require the consumer to take potentially complex and burdensome actions in order to purchase and enroll.

22.     The significant rate increases, which would only be avoidable for many by switching plans, can be reasonably expected to result in consumer concern, confusion and some loss of coverage altogether. Furthermore, even if consumers are able to find a new plan, either on or off the Exchange, that is affordable to them or similarly priced to their 2017 plan, real hurdles may still exist in terms of ensuring continuity of care with long-standing providers who may no longer be in the provider network for the consumer's new, cost-appropriate plan.

23.     The loss of unsubsidized non-group membership and general market disarray likely to ensue as a result of the CSR non-payment causes immense and potentially irreparable harm to the policy objective of a state health insurance Exchange like the Health Connector, which was the first of its kind in the country. The Health Connector has worked diligently over the last ten years to steadily grow membership in the individual market. That membership, both for subsidized and unsubsidized enrollees, in turn allows the Health Connector to be a vehicle for price competition among insurance carriers and thus more effectively deliver affordable coverage to the residents of the Commonwealth. There is evidence that the Health Connector's scale and the organization of its marketplace has effectively "bent the cost curve." (The Health Connector's benchmark plan, which is used to determine the amount of federal premium tax credit subsidy expended by the federal government, has declined every year for the last four years, while most states and the US average have increased, and Massachusetts's 2017 benchmark plan was more than 30% below the US average). Loss of the scale that the state has spent a decade growing in the Exchange is likely to imperil that progress, resulting in higher health care costs, reduced competition, and reduced efficacy of the Exchange's principle values to the market.

5

24.    The cutoff of the CSR subsidy has thus caused meaningful burden and harm to the Health Connector and will cause harm to Massachusetts residents unless enjoined.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 18, 2017.

_____

Audrey Morse Gasteier

Chief of Policy and Strategy

Massachusetts Health Insurance Connector Authority

Declaration of Audrey Morse Gasteier, Chief of Policy and Strategy, Massachusetts Health Insurance Connector Authority ISO Plaintiffs' Application for a Temporary Restraining Order (4:17-cv-05895-KAW)