**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON, | NO. 4:17-cv-05895 <br><br> DECLARATION OF MYRON B. KREIDLER |

Plaintiffs,

v.

DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,

Defendants.

DECLARATION OF MYRON B. KREIDLER

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

4:17-cv-05895

I, Myron Bradford "Mike" Kreidler, declare as follows:

1. I am over the age of eighteen years old, have personal knowledge of all facts and matters herein, and am competent to testify to the matters below.

2. I am the elected Insurance Commissioner for the State of Washington. I was first elected to this position in 2000. I was reelected to my fifth four-year term in 2016.

3. As Insurance Commissioner, I am charged with the regulation of the insurance market in Washington State through the enforcement of the Insurance Code, Title 48, Revised Code of Washington, and enforcement of applicable federal statutes that affect insurance. Wash. Rev. Code § 48.02.060. I also sit as an ex officio member of the Washington Health Benefit Exchange (the Exchange) Board.

4. Since 1947, following the passage of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011-1015, primary authority to regulate the business of insurance has belonged to the states. 15 U.S.C. § 1012. Only federal statutes that expressly regulate the business of insurance are considered to preempt Washington State laws, regulations, and authority concerning insurance.

5. The Patient Protection and Affordable Care Act (Affordable Care Act) is one example of federal law that expressly addresses insurance. More specifically, it addresses how health plans must be regulated. However, it does not strip the states of their authority or responsibility to regulate health insurance carriers, health plans, or their markets. Instead, the Act, and rules implementing the Act, heavily rely on states, particularly state insurance regulators, to enforce its various provisions. 42 U.S.C.A. § 300gg-22; 45 C.F.R. § 150.201.

6. Because of my role in regulating insurance carriers and the plans they offer, my office has been at the center of implementation of the Affordable Care Act for the State of

DECLARATION OF MYRON B. KREIDLER

2

4:17-cv-05895

Washington since its passage in 2010. As a result, I and my office are in a unique position to understand the harmful impact caused by the United States Department of Health and Human Services (HHS) decision to unilaterally change its position regarding its obligation and ability to continue payments to carriers for reimbursement of cost sharing reductions (CSR) required by section 1402 of the Affordable Care Act, 42.U.S.C. §18071.

7.     At its core, the business of insurance is all about accurately predicting risk. In order to set plan rates, and compete in the market, a carrier must be able to accurately estimate 1) its costs to provide promised services to all of its enrollees, and 2) the number and nature of the enrollees a carrier believes it will have for the plan year. Both pieces involve complex analysis based on numerous factors including things like provider agreements, geographic locations, enrollee demographics, regulatory limits, past experience, and how other carriers are participating in the market.  Further, those calculations are performed for each service area where a carrier is considering doing business.

8.     When Congress established the requirement that carriers take on the cost of providing advance funding of CSRs for qualified enrollees, they did so with the promise that the government itself would bear the actual cost of the subsidies, by providing reimbursements to carriers. The government promise to take on this cost that would otherwise be borne by carriers wanting to participate in the market, has been built into the rates carriers submitted and my office approved for the 2017 plan year.

9.     Carriers are required to pay CSRs for their eligible enrollees, whether carriers are reimbursed or not. Unlike other states that may allow carriers to stop selling plans through the

DECLARATION OF MYRON B. KREIDLER

3

4:17-cv-05895

Exchange if CSR payments stop, Washington carriers cannot unilaterally leave the Exchange, or otherwise stop offering approved health plans midyear.

10. Any rates used during a plan year must be approved by my office prior to the beginning of open enrollment. Approved rates must be published at the beginning of open enrollment in order for carriers to charge those rates to consumers.

11. For the 2017 plan year, carriers were only permitted to submit a single rate for review. Because Washington carriers have only one approved rate for the 2017 plan year, carriers cannot alter their rates for the remainder of the 2017 plan year in order to make up for the loss of CSR reimbursement payments. As a result, HHS's refusal to make the remaining CSR reimbursements payments for 2017 is an unanticipated financial loss to carriers.

12. Although the ACA allows carriers to take into account their experience in setting rates, carriers are not permitted to recoup losses from a previous year by increasing premiums for the current year. Therefore, carriers will not be permitted to recoup the loss of CSR payments for the remainder of 2017 through premiums in future years. Even if the law were changed to allow carriers to recoup losses from previous years, as a practical matter, carriers cannot recoup the loss of 2017 CSR reimbursements in their 2018 premiums because those rates have already been filed and approved. Carriers cannot alter their 2018 plan filings at this point in time.

13. HHS's refusal to make the remaining CSR reimbursements payments for the remainder of the 2017 plan year will cause direct harm to the financial condition of carriers in Washington State. Because my office is also tasked with monitoring and correcting threats to carrier solvency, harmful impacts on the financial condition of Washington authorized carriers increases the workload imposed on my office. Carrier financial statements, which are filed with

DECLARATION OF MYRON B. KREIDLER

4

4:17-cv-05895

and monitored by my office, to date have assumed those payments will be made through the end of the plan year. Now that CSR reimbursement payments have been halted, my office will be obligated to closely review the financial impact that any unreimbursed payments have on carriers operating in Washington State, to ensure it does not negatively impact the measures my office uses to determine the financial health of carriers. My office has already begun a careful review of all health carriers participating in the Exchange who will be affected by this financial blow. That review is likely to take my team of financial examiners two (2) days of review.

14.     The impacts of HHS's refusal to make CSR payments will extend well beyond 2017. Most immediately, the failure to fund CSRs in 2018 will result in a dramatic premium increase for Washington consumers next year. Carriers have already submitted, and my office has already approved, rates for the 2018 plan year. Those rates included a bracketed rate for silver plans sold in the Exchange, that will be implemented now that HHS has announced it will not make CSR payments. The increase in premiums solely attributable to the lack of CSR payments is between 9.4-27.3% of the total premium for silver plans sold through the Exchange. As a result, absent a court order requiring the continued payment of CSR subsidies, all Washington consumers purchasing silver plans in the Exchange will be facing increased premiums, with no corresponding increase in benefits.

15.     For those individuals whose incomes fall between 250 – 400% of the federal poverty level, premium subsidies are established based on the second lowest-cost silver plan available. The increase in the silver level plan premiums will also result in an increase in the premium subsidies they are eligible for in plans sold through the Exchange. However, this increase in subsidies will increase the federal government's cost to provide subsidies.

DECLARATION OF MYRON B.
KREIDLER

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

4:17-cv-05895

16. Consumers who are not eligible for premium subsidies will receive no benefit from the higher premiums. More importantly, this increase in premiums, with no corresponding benefit, is likely to reduce the total number of people purchasing health plans at all.

17. For those individuals who do not receive premium subsidies but who choose to continue purchasing individual health plans, they are most likely to purchase those health plans outside of the Exchange. This is likely to result in a reduction in enrollment in the Exchange, and a corresponding reduction in the fees collected by the Exchange to cover its operational costs. Consumers who are unable to afford the cost of silver plans on the Exchange will not have the advantage of being able to efficiently compare available plans in one platform, making the task of finding the best options more cumbersome. Without the efficiency of the Exchange platform, consumers looking for silver plans may be less likely to purchase coverage at all.

18. In the long term, HHS's decision to halt CSR payments presents a real threat to the existence of a stable, fair, robust, and competitive insurance market in Washington State, and all the benefits that come with it.

19. For the last 17 years, I have worked with carriers, constituents, and lawmakers to rebuild the individual insurance market in Washington State. We have fully implemented the requirements of the Affordable Care Act with great success. Our uninsured rate has dropped from 13.9% in 2012, to 5.8% in 2017. The average rate increases that have been approved each year have dropped from 13.1% prior to passage of the Affordable Care Act, to 3.9 % in 2016. And the percentage of uncompensated care our state hospitals and health care providers have had to shoulder has dropped from $2.35 billion in 2013 to $1.20 billion in 2014, when the Exchange became operational and premium subsidies and CSRs became available to consumers.

DECLARATION OF MYRON B. KREIDLER

6

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

4:17-cv-05895

The failure of HHS to make CSR payments threatens to unravel many of these benefits.

20.    Our own state's history and experience demonstrates that, as premiums increase, fewer people purchase insurance. This is even more likely in light of the federal government's decision to relax (or eliminate) enforcement of the individual mandate in the Affordable Care Act.

21.    Further, the Affordable Care Act exempts individuals from the obligation to purchase coverage if the least expensive plan available in their area is more than 8.13% of their income. As premiums rise, more people qualify for this exemption, which leads to a further reduction of enrollment in the individual market risk pool.

22.    Our state has seen that when premiums increase, the people who continue to purchase coverage are generally those with significant health risks and health costs, who can't afford to go without it. With a smaller and sicker risk pool, premiums will likely continue to rise, creating smaller and sicker risk pools, and even higher premiums.

23.    In addition to upward spiraling rates, the more people who choose not to purchase coverage, the higher the uninsured rate climbs, and the amount of uncompensated care our state hospitals and health care providers will have to shoulder increases.

24.    With fewer people purchasing coverage, carriers may begin to leave the individual market. The Washington State market has already demonstrated that carriers will not simply continue to raise premiums indefinitely. Each carrier has a point at which the administrative costs of running a health plan and the risk associated with a small and costly pool of enrollees is no longer financially viable for the carrier. If premiums have to be raised too much, carriers are likely to simply stop selling health plans, particularly in the Exchange where

DECLARATION OF MYRON B. KREIDLER

7

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

4:17-cv-05895

CSRs are required.

25.     For carriers that choose to continue to sell in the Exchange, they are likely to look at other options for reducing their costs. One option for reducing costs that carriers are already exploring is eliminating service areas. For the 2018 plan year, my office has already had to work with carriers to ensure that every county has at least one plan offering. The threat of future counties without health plan offerings is a particular concern in rural counties, where the cost of providing services is higher. Several of our rural counties have some of the highest percentages of individuals enrolled in qualified health plans receiving CSRs.

26.     My concern that non-payment of CSRs will erode the individual market is not merely a speculative parade of horribles. This has been the actual experience of the State of Washington. When I took office in 2000, our individual insurance market had been devastated. In the early 1990s, Washington state enacted health insurance reforms that provided meaningful but expensive benefits to enrollees, with market controls that provided stability needed by carriers (an individual mandate). In 1995, the stabilizing provisions were eliminated by lawmakers, but the rich benefits were not. Rates went up, pricing healthy people out of the market. The risk pool got smaller and sicker, and rates went up again. Over the course of a few years, this "death spiral" resulted in the complete collapse of our individual market. For two years, Washington consumers could not buy an individual or family health insurance policy in Washington State. Requiring carriers to continue to offer CSRs without the reimbursement that stabilizes this benefit has the potential to similarly devastate the individual market in Washington State.

27.     Had HHS announced via a proposed rule or an official statement that it intends

DECLARATION OF MYRON B. KREIDLER

8

4:17-cv-05895

to impose a completely opposite interpretation of the funding provisions affecting CSR reimbursements, a broad interpretive and policy change, affecting virtually every Washington carrier participating in the Exchange, regulators and carriers could have provided input, suggested reasonable implementation timelines, and taken steps to address the impact this change would have. However, HHS has not taken steps to discuss the impact this change in position will have with regulators and carriers through official channels. Therefore, there has been no opportunity to address this broad change in policy through an administrative action prior to its full implementation by HHS.

28.    Carriers have also expressed their concern about the harmful impact HHS's refusal to make CSR reimbursements will have on their business and their consumers.  Attached as Exhibit A is a letter from Molina Healthcare of Washington, Inc., dated October 10, 2017.

29.    Because the harm that HHS's change in position will cause to our individual market is substantial, I and the State of Washington cannot risk allowing that decision to be implemented without the process, discussion, and review that typically accompany sweeping, and potentially harmful, changes in federal policy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 17th day of October 2017, at Boston, Massachusetts.


MYRON BRADFORD "MIKE"
KREIDLER
Washington State Insurance
Commissioner

DECLARATION OF MYRON B.
KREIDLER

9

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

4:17-cv-05895

# Exhibit A



Peter Adler
President
Molina Healthcare of Washington, Inc.
Direct: 425-398-2642
Peter.Adler@MolinaHealthcare.com

October 17, 2017

Mike Kreidler
Insurance Commissioner, State of Washington
Office of the Insurance Commissioner
Insurance Building
302 Sid Snyder Ave SW, Suite 200
POP Box 40258
Olympia, WA   98504

Dear Commissioner Kreidler,

Molina Healthcare has been serving the poor and underserved who are insured through government-sponsored healthcare programs for close to four decades, engaging in Medicaid markets in thirty states and Puerto Rico.  We have launched a successful business in the Health Insurance Marketplaces in nine different states.  In addition, Molina Healthcare has more Medicare Medicaid Program (MMP) dual eligible enrolled in our MMP plans than any other insurer in the country and we have been serving the neediest members of the Medicare Advantage program through our D-SNP product for close to a decade.  Today, we are one of the ten largest health insurers in the country, serving more than four and a half million low-income members in 12 states and Puerto Rico, including 1 million Marketplace members.  In Washington State, in addition to being the largest Medicaid Managed Care Organization with over 715,000 members, Molina is honored to also be the State's largest Marketplace carrier by enrollment, with over 43,000 members.

Pursuing our mission of serving the most vulnerable members of society who receive health coverage through government sponsored programs, Molina entered the Washington Health Benefit Exchange (WAHBE) in order to continue serving its members – those who were previously covered through the state's Basic Health Program, as well as those who would transition from the state's Medicaid program to the Exchange upon changes in eligibility levels – as well as extend its services to the low-income uninsured who prior to the ACA did not qualify for Medicaid and could not afford commercial insurance. Since our entry into this market, we have been providing Silver, Bronze, and Gold products for our WAHBE members.  In accordance with the requirements of the ACA, we offer Silver plans with reduced patient cost-sharing (e.g., deductibles and copays) to marketplace enrollees with incomes 100-250% of the poverty level. The reduced cost-sharing is only available in silver-level plans, and the premiums are the same as standard silver plans. In Washington today, 17,000 or 40% of our WAHBE members have Silver plans with the reduced cost-sharing, and nationally approximately 60% of our Marketplace members use such plans.  Providing lower levels of cost sharing to these low-income members while keeping their premiums at the same level as a standard Silver plan imposes a significant cost on us, so the Federal government, per the requirements of the ACA, makes direct payments to us and to other insurers to compensate us for these costs.  These payments are not a bailout – they are passed from the federal government through us and other insurers to medical

Exhibit A

providers to help lower deductibles and co-pays for patients who see a doctor or fill a prescription. In effect, they not only make insurance affordable for millions of Americans, but also lower financial barriers to care, and enable them to actually access care for treatment of their medical conditions.

As you know, last week President Trump announced the cessation of CSR payments to health plans, effective immediately. This action will result in immediate, direct financial harm for Molina, as health plans price their products one year in advance and then lock-in to pay for the covered care of their members for a full year at those premium levels. Our CY2017 rates (approved and committed to in 2016) assumed continued CSR funding. By ceasing CSR payments during the coverage year, the Federal Government is in breach of its contractual commitments with Qualified Health Plans (QHPs) serving Marketplace members, leaving QHPs like Molina at full financial risk for the CSR payment shortfall. Molina will be materially harmed by the cessation of CSR payments.

A portion of the financial harm to Molina is immediate and can be quantified in CY2017, and a portion of the harm can be projected and reflected in higher 2018 rates and deteriorating risk pools. Focusing only on the State of Washington, the immediate, direct financial harm to Molina will be in excess of $3 million in 2017. Since Molina is obligated by law (i.e. the ACA) to continue providing all covered services to our 2017 Marketplace members, Molina will incur $3 million in direct losses as a result of the cessation of the CSR payments for the remainder of 2017.

For 2018, Molina and American citizens in the State of Washington will also suffer material harm if the ACA CSR payments are not made. Specifically, in the absence of full CSR funding commitments for 2018, Molina will need to raise its 2018 average premiums by an additional 15% to account for this loss of funding. The cycle of major premium increases in response to de-funding CSRs will make Marketplace insurance plans increasingly unaffordable for the low income individuals and families who were intended to be served by the ACA, as well higher income individuals who do not qualify for subsidies. Currently, there are approximately 113,350 low-income Americans and 68,882 non-subsidy eligible Americans on the WAHBE who would be impacted by these premium increases in 2018. These price increases will drive many to exit the market with healthier and younger individuals likely being the first to cease purchasing coverage. As a result, the Marketplace risk pool will shrink in size, while increasing in its risk acuity. This cycle of adverse selection in subsequent years will increase prices, reduce affordability for consumers, and exacerbate volatility and instability in the Marketplace which could result in insurers and consumers leaving the program, leading to a potential collapse of the individual market.

Molina appreciates your ongoing leadership and supports any actions to reverse the decision by the Federal Government to cease making CSR payments mandated in the ACA.

Please do not hesitate to contact me if you desire additional information or wish to discuss further.

Sincerely,

Peter Adler
President
Molina Healthcare of Washington, Inc.

Cc: Joseph White, Interim CEO, Molina Healthcare, Inc.

{00047130;1}

Exhibit A