XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5841
  Fax: (415) 703-5480
  E-mail:  Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON,** | Case No. 3:17-cv-05895-KAW<br><br>**DECLARATION OF CATRINA REYES, ASSOCIATE DIRECTOR, CENTER FOR HEALTH POLICY, CALIFORNIA MEDICAL ASSOCIATION ISO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| Plaintiffs, | |
| v. | |
| **DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,** | |
| Defendants. | |

1

I, Catrina Reyes, declare:

1.    I am an Associate Director for the Center for Health Policy with the California Medical Association (CMA).  I am licensed to practice law in California and I have an M.P.A. in which my thesis was on implementation theories and the effective implementation of the Affordable Care Act.  As an Associate Director for the Center for Health Policy, I am responsible for overseeing and implementing CMA's advocacy and policy efforts relating to California's state-based exchange and the cost sharing reduction (CSR) payments to health insurers that help low-income Americans afford health insurance.  The facts stated herein are of my own personal knowledge, and I could and would competently testify to them.

2.    CMA is a non-profit, incorporated professional physician association of approximately 45,000 members throughout the State of California.  CMA's primary purposes are "to promote the science and art of medicine, the care and well-being of patients, the protection of public health, and the betterment of the medical profession."  CMA's membership includes California physicians engaged in the private practice of medicine in all specialties and settings.  Many CMA physicians provide care to patients who have health coverage through Covered California, commercial insurers and health plans, and public coverage such as Medicare and Medi-Cal.  CMA has formed committees and subcommittees within its governance structure to investigate, research, and address health insurer benefits, policies, and practices and their impact on physicians and patients' access to health care.

3.    As of February 2017, 48 percent of the 1.4 million individuals enrolled in Covered California received cost-sharing assistance to reduce out-of-pocket costs, such as copayments and deductibles.

4.    The CMA has urged Congress to continue funding the insurance CSR subsidies and has advocated that if CSR is not continued it would negatively impact health insurance premiums, costs, and patients' access to timely care.  A Covered California study found that eliminating federal funding for CSR payments would raise premiums for

2

Silver plan consumers by 16.6 percent in 2018, requiring patients to receive additional Advanced Premium Tax Credits (APTC) in order to afford coverage, switch to lower tiered plans with higher cost-sharing, or forgo health care coverage altogether.

5.     The APTC is calculated based on the price of the second-lowest Silver plan in each area in the Exchange.  Therefore, an increase in Silver premiums will result in an increase in the APTC.  A Kaiser Family Foundation study estimates that the increased cost to the federal government of higher premium tax credits would actually be 23 percent more than savings from eliminating cost-sharing reduction payments.  For fiscal year 2018, that would result in a net increase in federal costs of $2.3 billion.

6.     Physician experience and studies demonstrates that imposing higher out-of-pocket costs on patients results in patients delaying or skipping recommended medical tests, prescription medication and treatment.  Covered California reports that enrollees not eligible for additional tax credits will respond to the higher premiums by switching from Silver plans to lower tiered plans with higher cost-sharing or forgo health care coverage.  Higher out-of-pockets costs often result in patients avoiding necessary medical care until their conditions worsen, requiring more expensive intensive care for an exacerbated medical condition.  Illnesses and injuries that could have been prevented or treated with early intervention become life-threatening and more costly to treat.  This increases overall health care costs.

7.     Physicians' experience with patient care and high cost-sharing health insurance are substantiated by studies and data.  A March 2017 Kaiser Family Foundation national public Health Care tracking poll found that Americans have delayed or skipped care due to costs in the past year, including 27 percent of who say they have put off or postponed getting health care they needed, 23 percent who say they have skipped a recommended medical test or treatment, and 21 percent who say they have not filled a prescription for a medicine. An October 2017 study published in Health Affairs (*October 2017 vol. 36 no. 10 1762-1768)*, "High-Deductible Health Plans (HDHPs) Reduce Cost and Utilization, Including Use of Needed Preventive Services," concluded that current

3

evidence suggests that HDHPs are associated with lower health care costs as a result of a reduction in the use of medically necessary health care.  The authors performed an extensive review of rigorous studies that examined the impact of HDHPs on health care utilization and costs. The authors report that HDHPs were associated with a significant reduction in preventive care in seven of twelve studies and a significant reduction in office visits in six of eleven studies—which in turn led to a reduction in both appropriate and inappropriate care.

8.    Further evidence demonstrates that the cost-sharing reduction program has broken down cost barriers for patients who need care.  The California Health Care Foundation reported in December 2016 that two years after the Affordable Care Act was implemented out-of-pocket costs were less likely to be the reason people went without needed health care. CHCF reported, "While cost remains a barrier to health care access, some important progress was made in 2015: Among those who reported foregoing necessary care, the share who reported that they did so because of cost declined from 55.4% to 49.1% between 2013 and 2015." (ACA 411: Tracking Health Reform in California:  Two Years After ACA Implementation: Coverage Gains Continued and Fewer Affordability Concerns Cited, December 15, 2016)

9.    Patients unable to meet the increased cost-sharing amounts or more patients without health insurance coverage will result in physicians experiencing more uncompensated care, which further strains their ability to meet the health care needs of their communities. An increase in uncompensated care will exacerbate access to care challenges particularly in the rural and central valley regions of California where a substantial number of residents are already uninsured or enrolled in the Medi-Cal program. With the low Medi-Cal physician payment rates and largely uncompensated care for the uninsured it is difficult to attract and retain physicians, and therefore, these regions suffer from physician shortages and access to care challenges.

10.    The instability in the marketplace resulting from the elimination of the CSR subsidy could lead to health plans exiting the Exchanges resulting in fewer consumer

4

choices, less competition, and higher prices.  Anthem has already withdrawn from all but three of Covered California's rating areas.  Anthem reasoned that "the market for these plans has become unstable. And with federal rules and guidance changing, it's no longer possible for us to offer some of those plans."

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on this 16th day of October 2017, at Sacramento, California.

_____
Catrina Reyes

5