XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5841
  Fax: (415) 703-5480
  E-mail:  Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON,** | Case No. 4:17-cv-05895-KAW **DECLARATION OF MARIA T. VULLO, SUPERINTENDENT OF THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, ISO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| Plaintiffs, | |
| v. | |
| **DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,** | |
| Defendants. | |

Declaration of Superintendent Maria T. Vullo, Superintendent of the New York State Department of Financial Services ISO Plaintiffs' Application for a Temporary Restraining Order (4:17-cv-05895-KAW)

MARIA T. VULLO, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Superintendent of the New York State Department of Financial Services (DFS), and submit this Declaration in support of Plaintiffs' Application for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

2. DFS, among other responsibilities, regulates commercial accident and health insurers, non-profit health services corporations, and health maintenance organizations (collectively referred to as "Health Plans") and ensures their compliance with New York law and federal law including the applicable provisions of the Patient Protection and Affordable Care Act ("ACA"). Some of DFS's most important responsibilities include overseeing the solvency of Health Plans, reviewing and approving health insurance plan premium rates and adjustments, and ensuring that Health Plans pay consumer claims for covered benefits as they become due.

3. Health Plans offer a variety of products in New York, including Qualified Health Plans ("QHPs"), through the New York State of Health ("NYSoH" or "Marketplace"), New York State's Official Health Plan Marketplace established pursuant to the ACA.

4. In just six years, the ACA has succeeded in providing lower cost, higher quality coverage to millions of individuals and businesses in New York. Since the

2

ACA's implementation, New York's uninsured rate has dropped by approximately 50%, reducing the number of uninsured New Yorkers from approximately 10% to 5%. Under the ACA, approximately 4 million New Yorkers have received new coverage through our Marketplace – 227,796 of these enrollees are in Qualified Health Plans in the individual market. In addition, commercial health insurance premiums for individuals remain over 50% less costly in 2017 than they would have been without the ACA. Federal tax credits further reduce the cost of coverage to consumers. Equally importantly, the ACA's Cost Share Reduction (CSR) provisions reduce out-of-pocket expenses, such as deductibles and copayments, to make coverage even more affordable to the consumer which helps to make the market competitive and robust as well as providing health care options for all New Yorkers.

5.      Specifically, CSRs decrease out-of-pocket costs such as deductibles and co-payments for individuals who enroll in silver level Marketplace plans and have household incomes at or below 250% of the federal poverty level. By law, Health Plans must provide CSRs to their members, regardless of whether the CSRs are funded by the federal government. All CSR payments have been made through September 2017. In New York, not including the Basic Health Plan, 65,000 individuals in 2017 were eligible for CSRs through QHPs, reducing these New Yorkers' collective cost-sharing responsibilities by approximately $13.5 million.

3

6.     CSRs are an important component of the ACA's integrated requirements to ensure that all New Yorkers, including those with limited means, can purchase health insurance and that New York's Health Plans receive all of the amounts to which they are entitled under the ACA.  The loss of CSR payments will result in an unnecessary disruption to the highly functioning and successful NYSoH, and to the New York insurance market overall.  New York has enjoyed unquestionable success with the NYSoH Marketplace.  As noted, in 2017, more than 4 million New Yorkers – about 21 percent of the State's population – are enrolled in comprehensive and affordable coverage through the Marketplace.

7.     The immediate termination of CSR payments will impact Health Plans which, in 2016, anticipated that they would receive CSR payments throughout 2017 and based premium rate requests on this reasonable assumption.  Furthermore, for the 2018 plan year, the threat and now reality of termination of CSR payments has already caused a premium rate increase in New York's QHP market of approximately 1.5% of the average cost of a silver level Marketplace plan.   Unless these CSR payments are made, this situation will lead to increased premiums, more New Yorkers losing their health insurance as the insurance becomes unaffordable, and market instability.

8.     As a result of these premium increases, healthy individuals will be more likely to forego coverage, compared to sick individuals.  If healthy individuals leave the market, the remaining unhealthy individuals will be a larger portion of the

4

insured population. The disproportionate share of unhealthy individuals will further cause premiums to increase. Moreover, the failure of the federal government to fund CSR payments will create the risk that health insurers will choose to exit markets impacting competition, in addition to the risk of significant premium increases for those who choose to sell products.

9. On a yearly basis, all New York Health Plans must apply for and receive prior approval from DFS of premium rates for all commercial individual and small group insurance policies, as well as community rated large group policies. DFS carefully reviews the Health Plan rate applications and underlying calculations, including the cost of medical care, member utilization of medical services, administrative expenses and profit. Under the law, DFS may disapprove or modify an insurer's request for a premium rate increase if it is unreasonable, excessive, inadequate, or unfairly discriminatory.

10. Health Plans' proposed rates are based, in part, on actuarial assumptions about market conditions and third party funding sources during the relevant rating period. If the third party funding sources change after proposed rate increases are submitted by Health Plans and reviewed by DFS, the underlying actuarial assumptions will likely be incorrect. The consequences of incorrect underlying actuarial assumptions can be serious for consumers and Health Plans alike.

11. The amount of CSR payments that QHPs expect to receive is an important actuarial assumption regarding expected third party funding sources that impacts

5

Health Plan rate requests and DFS's decisions.   The Health Plan rates currently in effect for the 2017 plan year – the current plan year – are based on the assumption that all of the CSR payments for this year will be made.  If the federal government does not reimburse Health Plans for CSRs for the remainder of 2017, as currently threatened, Health Plans' rates will be inadequate and cause financial loss.  Moreover, because the administration has stated that it will stop CSR payments before the end of this year, the consequences will be even more significant for Health Plans, markets, consumers and DFS, as there is likely no mechanism other than federal funding for the CSR funding to be replaced for the remainder of 2017.  And, the failure to guarantee these payments in the future, as noted above, has already caused premium increases, and this continued situation will cause greater instability to the markets causing harm to all participants.

12.    DFS's regulatory burden will increase under any scenario in which CSR payments are terminated.  This increased burden will require hundreds of additional hours of work from state employees.

6

13.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2017

_____
Maria T. Vullo
Superintendent of Financial Services