XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5841
  Fax: (415) 703-5480
  E-mail:  Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON,** | Case No. 4:17-cv-05895-KAW<br><br>**DECLARATION OF JAMES R. WADLEIGH, JR., CEO, ACCESS HEALTH CT ISO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| Plaintiffs, | |
| **v.** | |
| **DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,** | |
| Defendants. | |

1

Declaration of James R. Wadleigh, Jr., CEO, Access Health CT ISO Plaintiffs' Application for a Temporary Restraining Order (4:17-cv-05895-KAW)

The undersigned, James R. Wadleigh, Jr. being first duly sworn, deposes and says:

1. That I am more than eighteen years of age and believe in the obligations of an oath.

2. That I am the Chief Executive Officer (CEO) of the Connecticut Health Insurance Exchange d/b/a Access Health CT (the "Exchange"). I have been employed by the Exchange since 2012, serving first as the Chief Information Officer, and then as the CEO since 2014. I am responsible for management of all aspects of the operation of the Exchange. The facts stated herein are of my own personal knowledge, and I could and would competently testify to them.

3. The Exchange serves the residents of the State of Connecticut by offering enrollment in qualified health plans pursuant to the Affordable Care Act (ACA), financial assistance through advance payments of the premium tax credit (APTCs) to help pay health insurance premiums, and cost-sharing reductions (CSRs) that reduce the amount of out-of-pocket costs that eligible consumers are required to pay for health care expenses during the year. Cost-sharing reduction payments are made by the health insurance carriers to providers, and the U.S. Department of Health and Human Services (HHS) reimburses health insurance carriers for these amounts.

4. The Exchange's plan certification process for the 2018 year began early in 2017. The two carriers offering plans through the Exchange in 2017 filed applications with the Exchange to participate in the Individual and Small Business Health Options Program (SHOP) marketplaces for 2018. However, both carriers stated that the instability in the marketplace due to the uncertainty concerning CSR reimbursement payments from HHS made it difficult for them to price their health insurance plans, and to determine whether they will participate in the Exchange for 2018.

5. The Connecticut Insurance Department (CID) instructed the carriers to file rates for the 2018 plan year with the assumption that HHS would continue making CSR payments to them. As part of the rate approval process, the CID held public hearings with both carriers who had filed plans to sell through the Exchange in 2018, Anthem Blue Cross Blue Shield and ConnectiCare Benefits, Inc. The uncertainty regarding the CSR payments was discussed at the hearings.

6. I have been engaged in numerous discussions with senior leadership of both carriers throughout this year regarding their participation in offering plans through the Exchange in 2018. The uncertainty of the CSR payments has continued to be a major discussion point regarding their decision on participation.

7. Carriers are generally required to notify the Exchange at least 90 days before the beginning of the annual Open Enrollment period if they will not participate in offering plans on the Exchange. However, in the event that the carrier receives an unfavorable rate decision from the CID, the Exchange permits the carriers to notify the Exchange of their decision five (5) days after the rate decision. Given the uncertainty in the marketplace for the 2018 plan year, the Exchange extended the date for notification until September 15, 2017. This was the latest date the Exchange could receive this notification in order to be able to have all of the new plan information and rates loaded into its Integrated Eligibility system to be available for the beginning of the Open Enrollment period on November 1, 2017.

8. In August of 2017, the CID requested that both carriers file a separate set of rates for the Silver Exchange plans for 2018, assuming that the CSR payments would not continue to be made in 2018. This new set of rates included significant premium increases for Silver plans in addition to the increases that the carriers had already requested in their original rate filings.

9. On September 13, the CID announced the approved rates for the 2018 plan year. These rates included increases in Silver premiums that are in addition to the other rate increases requested by the carriers. Both carriers also notified the CID and the Exchange that they will participate in offering plans through the Exchange for 2018.

10. The increases to the Silver plan premiums will have the most impact on consumers with annual incomes above 400% of the Federal Poverty Level (FPL), the upper income limit for eligibility for the premium tax credit and advance payments of the premium tax credit (APTC). These consumers will not have any financial assistance available to mitigate the cost of the premium increases. Approximately 25% of the Exchange's Individual Market enrollees do not qualify for APTC, or any other financial assistance, including the CSRs.

11. The cost of the premium increases for Exchange enrollees with annual incomes below 400% of the FPL will be mitigated by the increase in APTC payments that will result from the increase in Silver plan premiums. APTC amounts are calculated using the consumer's annual income, and the premium for the second lowest cost Silver plan for each enrollee, so an increase in Silver plan premiums will result in an increase in APTC amounts for all eligible enrollees.

12. Consumers who receive APTCs in 2018, but have an increase in their annual income, especially those consumers whose annual income increases to an amount over 400% of the FPL, will be required to pay some or all of the APTCs they receive in 2018 back to the Internal Revenue Service (IRS) when they file their federal tax returns for 2018.  The increase in 2018 Silver exchange premiums, resulting in the increase in APTC amounts, may cause an additional tax burden on those consumers when they are required to pay back the IRS for receiving APTC payments that they were not eligible to receive in 2018.

13. Consumers that are not eligible for financial assistance through APTCs for 2018 may elect to purchase a Bronze plan, which has lower premiums but also requires higher cost sharing of medical costs by the enrollee.  This will result in higher out-of-pocket costs for enrollees. Alternatively, consumers not eligible for financial assistance may elect to purchase coverage off the Exchange because the premiums may be lower.  This could create a financial risk to consumers.  In order to be eligible to claim a premium tax credit at the end of the plan year when a consumer files their federal tax return, a consumer must purchase a Qualified Health Plan (QHP) through an exchange.  If a consumer purchases a QHP off the exchange, and at the end of 2018, the consumer's actual annual income is below 400% of the FPL, the consumer will not be eligible to claim the premium tax credit when they file their federal tax return for 2018.

14. Healthier consumers who are not eligible for APTCs may also decide not to enroll in coverage for 2018 because of the increased cost of Silver on Exchange plans, which will result in a worsening of the risk pool for the Individual market. If healthy consumers are driven out of the Individual market due to rising costs, this will result in increased premiums in future years.

15. Since 2014, the uninsured rate in Connecticut has been reduced dramatically due to the qualified health plans and the financial assistance offered through the Exchange and the expansion of Medicaid for low-income adults.  The uninsured rate in Connecticut is estimated to be around 4% currently.  The increases in premiums in the Individual market for 2018 will cause financial hardship on consumers, especially those consumers with incomes above 400% of the FPL, and may result in an increase in the uninsured rate in Connecticut.  The increase in 2018 premiums due to these conditions, coupled with changes to Medicaid eligibility in Connecticut in recent years, may result in an increase in the uninsured rate to approximately 5.6%.

16. The continuing market insecurity caused by the current national environment in health insurance makes it difficult for the Exchange to determine how best to serve the residents of the State of Connecticut and maintain the progress that has been made in reducing the uninsured rate in the State in recent years.  Increases in the uninsured rate will harm the residents of the State of Connecticut by reducing their access to healthcare, and will shift financial burdens to states, hospitals and other providers.  Consumers will seek healthcare in hospital settings as a provider of last choice, causing a rise in uncompensated care at hospitals care, and increasing financial burdens to state governments, hospitals and other providers.

17. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 17th day of October, 2017.

_____
JAMES R. WADLEIGH, JR.
CEO
Connecticut Health Insurance Exchange
dba Access Health CT

Subscribed and sworn before me this 17th day of October, 2017

_____
Susan Rich-Bye
Commissioner of the Superior Court
Connecticut Juris No. 405996