CHAD A. READLER
Acting Assistant Attorney General
JAMES M. BURNHAM
Senior Counsel
Civil Division, U.S. Department of Justice

CHRISTOPHER HALL
Assistant Branch Director
STEVEN A. MYERS
JOSEPH C. DUGAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 305-8648
Facsimile: (202) 616-8460
E-mail: steven.a.myers@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE STATE OF CALIFORNIA, *et al.*,<br><br>        Plaintiffs,<br><br>            v.<br><br>DONALD J. TRUMP, President of the United States, *et al.*,<br><br><br>        Defendants. | No. 3:17-cv-05895 (VC)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br><br>Hearing Date:  October 23, 2017<br><br>Time:  2:00 p.m. |

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    I.  The Affordable Care Act ................................................................................... 3

    II.  Congress Declines To Appropriate Funds For CSR Payments. ....................... 5

    III. The House of Representatives Obtains An Injunction Against Expending
         Unappropriated Funds on CSR Payments ..................................................... 6

    IV. The Administration Concludes That Congress Has Not Appropriated Funds For
         CSR Payments And Accordingly Discontinues Those Payments. ................... 7

STATEMENT OF THE ISSUE TO BE DECIDED ................................................... 7

STANDARD OF REVIEW ........................................................................................ 7

ARGUMENT .............................................................................................................. 8

    I.  Plaintiffs Are Unlikely To Succeed On The Merits ......................................... 8

        A.  Plaintiffs' Prosecution Of This Lawsuit Violates The Rule Against Claim
            Splitting. ................................................................................................... 8

        B.  Plaintiffs Lack Article III Standing ...................................................... 11

        C.  Defendants Correctly Determined That Congress Has Not Appropriated
            Money For Cost-Sharing Reduction Payments. .................................... 15

            1.  The Statutory Text Demonstrates That 31 U.S.C. § 1324 Cannot Be
               Used To Fund CSR Payments .................................................... 16

            2.  The Statutory Context Makes Clear That 31 U.S.C. § 1324 Cannot Be
               Used To Fund CSR Payments .................................................... 18

            3.  Extra-Statutory Evidence Makes Clear That 31 U.S.C. § 1324 Cannot
               Be Used To Fund CSR Payments ............................................... 24

    II.  Plaintiffs Are Not At Imminent Risk Of Irreparable Injury ........................... 25

    III. The Balance Of The Equities And The Public Interest Weigh Against The
         Requested Injunction ....................................................................................... 28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV. Should The Court Grant Relief, It Should Grant A Narrowly Tailored Preliminary Injunction And Stay That Injunction Pending Appeal ................................................... 30

CONCLUSION ................................................................................................................. 32

# TABLE OF AUTHORITIES

**CASES**                                                         **Page(s)**

*Adams v. Cal. Dep't of Health Servs.*,
 487 F.3d 684 (9th Cir. 2007) ............................................................ 8-9

*Adams v. Freedom Forge Corp.*,
 204 F.3d 475 (3d Cir. 2000) .............................................................. 25

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
 458 U.S. 592 (1982) ............................................................................ 14

*Allen v. McCurry*,
 449 U.S. 90 (1980) ............................................................................... 9

*Ariz. Christian Sch. Tuition Org. v. Winn*,
 563 U.S. 125 (2011) ............................................................................ 11

*Bennett v. Spear*,
 520 U.S. 154 (1997) ............................................................................ 13

*Bergh v. Washington*,
 535 F.2d 505 (9th Cir. 1976) ............................................................. 10

*Cahen v. Toyota Motor Corp.*,
 147 F. Supp. 3d 955 (N.D. Cal. 2015) .............................................. 11

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ............................................................................ 31

*Carhart v. Ashcroft*,
 331 F. Supp. 2d 805 (D. Neb. 2004) ................................................. 31

*Caribbean Marine Servs. Co. v. Baldrige*,
 844 F.2d 668 (9th Cir. 1988) ............................................................. 25

*Cherokee Nation of Oklahoma v. Leavitt*,
 543 U.S. 631 (2005) ............................................................................ 23

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ...................................................................... 11-12

*Costantini v. Trans World Airlines*,
 681 F.2d 1199 (9th Cir. 1982) ........................................................... 10

*Courtney v. Smith*,
   297 F.3d 455 (6th Cir. 2002) ............................................................... 13

*Davis v. Sun Oil Co.*,
   148 F.3d 606 (6th Cir. 1998) ................................................................. 8

*Deck v. Wells Fargo Bank, N.A.*,
   No. 17-00234, 2017 WL 815678 (E.D. Cal. Feb. 27, 2017) ................. 11

*Flast v. Cohen*,
   392 U.S. 83 (1968) ............................................................................... 13

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
   463 U.S. 1 (1983) ................................................................................. 15

*Garcia v. Google, Inc.*,
   786 F. 3d 733 (9th Cir. 2017) ................................................................ 7

*Harrington v. Bush*,
   553 F.2d 190 (D.C. Cir. 1977) ............................................................. 30

*Hart's Case*,
   16 Ct. Cl. 459, 484 (1880) .................................................................... 30

*Hartsel Springs Ranch v. Bluegreen Corp.*,
   296 F.3d 982 (10th Cir. 2002) ............................................................... 9

*Highland Falls-Fort Montgomery Sch. Dist. v. United States*,
   48 F.3d 1166 (Fed. Cir. 1995) ............................................................. 30

*In re Aiken Cty.*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................. 15

*In re Excel Innovations, Inc.*,
   502 F.3d 1086 (9th Cir. 2007) ............................................................. 25

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ............................................................... 14

*John Doe #1 v. Veneman*,
   380 F.3d 807 (5th Cir. 2004) ............................................................... 31

*Kentuckians for Commonwealth v. Rivenburgh*,
   317 F.3d 425 (4th Cir. 2003) ............................................................... 31

*King v. Burwell,*
  135 S. Ct. 2480 (2015) ............................................................ 16, 18, 24

*L.A. Haven Hospice v. Sebelius,*
  638 F.3d 644 (9th Cir. 2011) ................................................................. 31

*Land of Lincoln Mut. Health Ins. Co. v. United States,*
  129 Fed. Cl. 81 (2016) ............................................................................ 30

*Lion Health Servs. v. Sebelius,*
  635 F.3d 693 (5th Cir. 2011) ................................................................. 31

*Lopez v. Brewer,*
  680 F.3d 1068 (9th Cir. 2012) ................................................................. 2

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
  634 F.2d 1197 (9th Cir. 1980) ............................................................... 29

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................ 11

*Maine Community Health Options v. United States,*
  133 Fed. Cl. 1 (2017) .............................................................................. 30

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ................................................................................ 14

*Mississippi v. Johnson,*
  71 U.S. 475 (1866) .................................................................................. 15

*Moda Health Plan, Inc. v. United States,*
  130 Fed. Cl. 436 (2017) .......................................................................... 30

*Molina Healthcare of California, Inc. v. United States,*
  133 Fed. Cl. 14 (2017) ............................................................................ 30

*Munaf v. Geren,*
  553 U.S. 674 (2008) ............................................................................. 7, 12

*Neb. Dep't of Health & Human Servs. v. HHS,*
  435 F.3d 326 (D.C. Cir. 2006) ............................................................... 31

*Nevada v. Dep't of Energy,*
  400 F.3d 9 (D.C. Cir. 2005) ................................................................... 16

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................... 7

*Nw. Requirements Utils. v. FERC,*
    798 F.3d 796 (9th Cir. 2015) ................................................................................ 13

*Okanogan School Dist. #105 v. Superintendent of Public Instruction for the State of Washington,*
    291 F.3d 1161 (9th Cir. 2002) .............................................................................. 14

*OPM v. Richmond,*
    496 U.S. 414 (1990) ........................................................................................ 29-30

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr,*
    636 F.3d 1150 (9th Cir. 2011) .............................................................................. 28

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.,*
    963 F. Supp. 1 (D.D.C. 1997) .............................................................................. 28

*People ex rel. Hartigan v. Cheney,*
    726 F. Supp. 219 (C.D. Ill. 1989) ........................................................................ 14

*Phany Poeng v. United States,*
    167 F. Supp. 2d 1136 (S.D. Cal. 2001) ................................................................ 25

*Prairie Cty., Mont. v. United States,*
    782 F.3d 685 (Fed. Cir. 2015) .............................................................................. 30

*Real Truth About Abortion, Inc. v. Fed. Election Comm'n,*
    681 F.3d 544 (4th Cir. 2012) ................................................................................ 31

*Remission to Guam & V.I. of Estimates to Be Collected for Taxes, Duties & Fees,*
    B-114808, 1979 WL 12213 (Comp. Gen. Aug. 7, 1979)............................... 18, 23

*Reuben H. Donnelley Corp. v. Federal Trade Comm'n,*
    580 F.2d 264 (7th Cir. 1978) .................................................................................. 8

*Rick's Mushroom Serv., Inc. v. United States,*
    521 F.3d 1338 (Fed. Cir. 2008) ............................................................................ 29

*Rogers v. Scurr,*
    676 F.2d 1211 (8th Cir. 1982) .............................................................................. 31

*Salazar v. Ramah Navajo Chapter,*
    567 U.S. 182 (2012) .............................................................................................. 23

*Saunders v. USAA Life Ins. Co.*,
   71 F. Supp. 3d 1058 (N.D. Cal. 2014) ................................................................10

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ............................................................................14

*Smith v. U.S. Department of Agriculture*,
   5-4497, 2016 WL 4179786 (N.D. Cal. Aug. 8, 2016) .........................................23

*Tongass Conservation Soc'y v. U.S. Forest Serv.*,
   No. 10-00006, 2010 WL 11534489 (D. Alaska Mar. 8, 2010).............................28

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) .......................................................................12, 14

*U.S. Dep't of Navy v. Fed. Labor Relations Bd.*,
   665 F.3d 1339 (D.C. Cir. 2012) ....................................................................15, 30

*U.S. House of Representatives. v. Burwell*,
   185 F. Supp. 3d 165 (D.D124.C. 2016)...........................................................*passim*

*United States v. Dickerson*,
   310 U.S. 554 (1940) ............................................................................................30

*United States v. MacCollom*,
   426 U.S. 317 (1976) ............................................................................................16

*United States v. Mitchell,*
   463 U.S. 206 (1983) ............................................................................................29

*U.S. House of Representatives. v. Price*,
   2017 WL 3271445 (D.C. Cir. Aug. 1, 2017) ......................................................14

*United States v. Testan*,
   424 U.S. 392 (1976) ............................................................................................29

*Va. Soc'y for Human Life v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ..............................................................................31

*Virginia ex rel. Cuccinelli v. Sebelius*,
   656 F.3d 253 (4th Cir. 2011) ..............................................................................13

*Wild Fish Conservancy v . Jewell*,
   730 F.3d 791 (9th Cir. 2013) ..............................................................................13

*Williams v. United States,*
    No. 01-cv-0024, 2001 WL 1352885 (N.D. Cal. Oct. 23, 2001) ................................8

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................7

## STATUTES

26 U.S.C. § 36A ..............................................................................................21
26 U.S.C. § 36B ........................................................................................*passim*
26 U.S.C. § 6401 ..............................................................................................4
26 U.S.C. § 6402 ..............................................................................................4
26 U.S.C. § 9510 ............................................................................................22
28 U.S.C. § 1391 ..............................................................................................8
28 U.S.C. § 1404 ............................................................................................10
28 U.S.C. § 1491 ............................................................................................29
31 U.S.C. § 1301 ............................................................................................16
31 U.S.C. § 1324 ......................................................................................*passim*
42 U.S.C. § 1397 ............................................................................................22
42 U.S.C. § 300gg ..........................................................................................19
42 U.S.C. § 18022 ............................................................................................4
42 U.S.C. § 18031 ..........................................................................................19
42 U.S.C. § 18033 ..........................................................................................19
42 U.S.C. § 18071 ....................................................................................*passim*
42 U.S.C. § 18082 ....................................................................................*passim*

American Recovery and Reinvestment Act of 2009,
    Pub. L. No. 111-5, 123 Stat 115 (2009) ..........................................................21

Consolidated Appropriations Act,
    Pub. L. No. 115-31, 131 Stat. 135 (2017) ........................................................21

Energy Employees Occupational Illness Compensation Program
    Pub. L. 106-398 (2000) ....................................................................................22

Health Care and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029 (2010) ......................................................3

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119 (2010) ........................................................3

Pub. L. No. 95-355, 92 Stat. 523, 564 (1978) ......................................................20

Retirement Pay and Medical Benefits for Commissioned Officers
    Pub. L. No. 84-569 (1956) ..............................................................................22

1

2    Vaccine Injury Compensation Program
         Pub. L. No. 99-660 (1986) ...........................................................................22

3    **LEGISLATIVE MATERIALS**

4
     S. Rep. No. 95-1061 (1978) .............................................................................20
5

6    **REGULATIONS**

7    45 C.F.R. § 156.410...........................................................................................4

8    45 C.F.R. § 156.430...........................................................................4-5, 17, 27

9

10   **OTHER AUTHORITIES**

11   Cong. Budget Office, *The Effects of Terminating Payments for Cost-Sharing Reductions* 1-2 (2017),
         https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53009-
12       costsharingreductions.pdf ........................................................................13

13   Joseph Story, Commentaries on the Constitution of the United States § 1342 (1833) ...........15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ix

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1

2

# **INTRODUCTION**

3          The power of the purse is among the most essential powers of the Legislative Branch.  As

4 James Madison wrote, it is "the most complete and effectual weapon with which any constitution

5 can arm the immediate representatives of the people, for obtaining a redress of every grievance, and

6 for carrying into effect every just and salutary measure."  Federalist No. 58.[1]  That power resides in

7 Congress alone.  Thus, no matter how compelling the rationale, neither the Executive nor the

8 Judiciary has the authority to expend taxpayer dollars, including billions of dollars in annual cost-

9 sharing reduction payments under the Affordable Care Act ("ACA"), if Congress has not

10 appropriated those funds.

11          Eighteen States and the District of Columbia ("Plaintiffs" or "States") are effectively asking

12 this Court to disregard that foundational principle and order the expenditure of billions of dollars

13 that Congress has repeatedly declined to appropriate.  *See* ECF No. 1 ("Compl.").  On October 18,

14 Plaintiffs filed an ex parte motion for a temporary restraining order.  *See* ECF No. 10-2 ("Mot.").

15 The Court should decline to enter that extraordinary relief:  Plaintiffs' claims are unlikely to succeed

16 on the merits, Plaintiffs have not established an imminent risk of irreparable harm, and the balance

17 of the equities weighs heavily against a judicial decree requiring the expenditure of six hundred

18 million taxpayer dollars.  Plaintiffs fail all three of these independent components of the preliminary

19 injunction standard.

20          *First*, Plaintiffs' claims are unlikely to succeed.  At the outset, the Court cannot reach

21 Plaintiffs' claims because the only Plaintiffs who satisfy the requirements of venue in this District

22 are simultaneously litigating the same question that is pending before this Court before the D.C.

23 Circuit in *House of Representatives v. Burwell*, No. 16-5202 (D.C. Cir.), a proceeding in which the states

24 intervened and became parties in order to make the same arguments they are pressing here.  Plaintiffs

25 cannot simultaneously pursue identical claims in two courts and can fully protect their interests by

26 seeking emergency relief in that proceeding, or by immediate transfer to that court for resolution of

27 their claims based on the briefing filed here.  As for the merits, Congress has not appropriated funds

28

---

[1] https://www.congress.gov/resources/display/content/The+Federalist+Papers.

1   for the payments that Plaintiffs demand — as the only court to consider the issue has already held.

2   *See U.S. House of Representatives v. Burwell*, 185 F. Supp. 3d 165 (D.D.C. 2016).

3          When Congress enacted the ACA, it created two separate programs to lower the cost of

4   health insurance purchased on the Act's exchanges.   The first was a tax credit.   In ACA § 1401,

5   Congress amended the Internal Revenue Code to add a new refundable tax credit (codified as 26

6   U.S.C. § 36B) to subsidize health insurance premiums for qualifying taxpayers.   The second program,

7   ACA § 1402 (codified as 42 U.S.C. § 18071) provides payments to insurers.   Specifically, this

8   program created a Cost-Sharing Reduction ("CSR") system that (1) requires insurers to reduce out-

9   of-pocket costs (such as co-payments) for qualifying insureds, and (2) authorizes the Department of

10  Health and Human Services ("HHS") to reimburse insurers for those reductions.   *See id.*

11         In creating these two programs, Congress provided a permanent appropriation to fund the

12  first program, but not the second.   In addition to enacting the tax credit described above, ACA

13  § 1401 amended a preexisting funding provision that provides a permanent appropriation of money

14  "for refunding internal revenue collections as provided by law."   31 U.S.C. § 1324(a).   As amended,

15  this provision states that "[d]isbursements may be made from the appropriation made by this section

16  only for" a list of specifically authorized payments, including, per the ACA, "refunds due . . . from

17  section . . . 36B" of Title 26.   *Id.* § 1324(b).   This funding provision says nothing about CSR payments

18  to insurers.   Rather, it provides permanent funding "only" for a variety of tax expenditures, including

19  tax credits due from 26 U.S.C. § 36B (which, again, is the codification of ACA § 1401 tax credits).

20  This provision thus cannot be used to fund CSR payments, which must accordingly be funded

21  through the regular appropriations process — the same process that funds most government

22  programs.   Congress may reverse course and appropriate funds, but the Executive cannot make that

23  decision for Congress by expending funds where no appropriation for CSR payments exists.

24  Plaintiffs' claims to the contrary are thus unlikely to succeed.

25         *Second*, Plaintiffs' motion should be denied because Plaintiffs have not demonstrated an

26  imminent risk of irreparable harm absent emergency relief.   A preliminary injunction is "an

27  extraordinary and drastic remedy" that should not be granted "unless the movant, *by a clear showing*,

28  carries the burden of persuasion.'"   *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation

2

omitted).  Plaintiffs have not met that burden.  The harms that they allege are speculative; at best they will occur months or years from now, not next week.  Such hypothetical and attenuated injuries are an inadequate basis for granting immediate injunctive relief.

*Finally*, the balance of the equities and public interest weigh heavily against an emergency judicial decree mandating the expenditure of hundreds of millions of dollars in unappropriated taxpayer dollars every month — particularly where, as here, the entities directly affected by the cessation of CSR payments (the insurers) are fully capable of seeking relief in the Court of Federal Claims, as many of them are currently doing in a comparable dispute about a different provision of the ACA.

Thus, Plaintiffs' motion for emergency relief should be denied. The Court should require Plaintiffs to press their claims in the forum they originally selected, or, failing that, should set a reasonable dispositive-motion briefing schedule to resolve this purely legal dispute.

## BACKGROUND

### I.      The Affordable Care Act

In 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (collectively, the "ACA"), which enabled individuals and small businesses to purchase health insurance through state-based marketplaces called Affordable Insurance Exchanges.[2]  The ACA established two programs to lower the cost to insureds of qualified health plans offered through the exchanges.

The first is a tax credit.  In § 1401 of the ACA, Congress added a new provision to the Internal Revenue Code authorizing a refundable tax credit to subsidize health insurance premiums for applicable taxpayers with household incomes between 100% and 400% of the federal poverty level.  *See* 26 U.S.C. § 36B.  Like other refundable tax credits, the premium tax credit reduces a taxpayer's tax liability.  If the credit exceeds the liability, the excess is treated as an overpayment, which either reduces a taxpayer's balance due or is refunded to the taxpayer from the Treasury

---

[2] An addendum of relevant statutory materials is attached hereto as Exhibit A.

3

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

account for refunding tax overpayments.   *See* 26 U.S.C. §§ 6401(b)(1), 6402(a); 31 U.S.C. § 1324(b)(2).

To receive the credit, an eligible taxpayer must complete IRS Form 8962 and file it with his or her tax return.  Under § 1412 of the ACA, an eligible taxpayer may elect to reduce his or her premiums up front by having advance payments of some or all of the tax credit paid to the insurance company that provides the taxpayer's insurance (known as the "issuer" in ACA parlance).  *See* 42 U.S.C. § 18082.  When a taxpayer chooses this option, an advance determination of income and eligibility is made, and it is reconciled on Form 8962 when the taxpayer files an annual return.  26 U.S.C. § 36B(f); 42 U.S.C. § 18082(b).  If advance payments exceed allowable amounts, the taxpayer is liable for the difference (subject to a cap in some circumstances, 26 U.S.C. § 36(f)(2)(B)); if advance payments are below allowable amounts, the taxpayer is credited the difference.  *See generally* Ex. B (Witt Decl.).

The second program consists of a CSR mandate and associated payment to issuers.  Section 1402 of the ACA requires issuers to make CSRs that limit the out-of-pocket health care costs (such as co-payments) for eligible insureds who have household incomes between 100% and 250% of the federal poverty level and who are enrolled in "silver" health plans in the individual market on ACA exchanges.  *See* 42 U.S.C. § 18071.[3]  To address the cost of these reductions to each issuer, this provision also states that the Secretary of HHS "shall make periodic and timely payments to the issuer equal to the value of the reductions.'"  *Id.* § 18071(c)(3)(A).

Unlike the tax credit, the CSR program is administered primarily by HHS and is not codified in the Internal Revenue Code.  Also unlike the tax credit, the CSR payment is both claimed by and paid to the issuer in all cases.  It is the issuer's responsibility to "ensure that an individual . . . pays only the cost sharing required," and the reduction "must be applied when the cost sharing is collected" from the individual.  45 C.F.R. § 156.410(a).  Issuers receive periodic advance payments to cover projected CSR amounts.  45 C.F.R. § 156.430(b).  The issuer must thereafter submit

---

[3] The ACA classifies plans offered on the exchanges into four "metal" levels based on their cost-sharing requirements. 42 U.S.C. § 18022(d). A "silver" plan is structured so that the insurer pays at least 70% of the average enrollee's health care costs, leaving the enrollee responsible for the other 30% through cost sharing. *Id.* In a "gold" or "platinum" plan, the insurer will bear a greater portion of health care costs, while the insurer will be responsible for a lower portion in a "bronze" plan. *Id.*

4

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1    information "in the manner and timeframe established by HHS" concerning the actual CSRs

2    provided to insureds, which HHS uses to perform periodic reconciliations.  45 C.F.R. § 156.430(c)-

3    (d).  If the issuer received payments from HHS in excess of the CSRs that it actually provided, the

4    issuer must repay the difference; if payments are below CSRs actually provided, then HHS

5    reimburses the issuer.  45 C.F.R. § 156.430(e)(1)-(2).

6         While § 1402 of the ACA provides for HHS to make CSR payments to issuers generally, *see*

7    42 U.S.C. § 18071(c)(3)(A), § 1412 requires the Treasury Department to make the advance

8    payments.  Under § 1412, the Secretary of HHS notifies the Secretary of the Treasury of the CSR

9    payments to be made, and Treasury provides advance payment "at such time and in such amount

10   as the Secretary [of HHS] specifies in the notice."  42 U.S.C. § 18082(c)(3).  Though no regulatory

11   or statutory provision expressly requires it, the government has made CSR payments on a monthly

12   basis, as part of a payment cycle that includes payments to issuers of the tax credit amounts.  HHS

13   generally has instructed Treasury to make payments around the twentieth of each month.[4]  *See*

14   *generally* Ex. C (Parish Decl.).

15   **II.    Congress Declines To Appropriate Funds For CSR Payments.**

16        While the ACA authorized both the tax credit program and the CSR program, the ACA

17   provided permanent funding for the tax credits only.  A provision that long predates the ACA

18   provides a permanent appropriation to Treasury "for refunding internal revenue collections,"

19   including refunds due from certain enumerated tax credits.  *See* 31 U.S.C. § 1324.  The ACA amended

20   this provision by adding Internal Revenue Code § 36B — ACA § 1401's tax credit — to the list of

21   tax expenditures for which this provision permanently appropriates funding.  *See* 124 Stat. 119, 213

22   (2010); 31 U.S.C. § 1324(b)(2).

23        Congress did not, however, add the CSR program to that permanent appropriation, or

24   otherwise appropriate money for that program in the ACA itself.  Instead, it left CSR payments (like

25   most government programs) to be funded in the regular appropriations process, wherein Congress

26   generally funds the government via annual appropriations acts.  Suggesting that the agencies

27   administering CSR payments initially recognized as much, the prior Administration submitted a

28

---

[4] Pursuant to 42 U.S.C. § 18082(c)(3), HHS notified Treasury of the amount of the payments for tax credits on October 13, 2017.  Those payments were sent to issuers on October 20, 2017.

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1    request to Congress on April 10, 2013, seeking an appropriation to HHS in the fiscal year 2014

2    annual appropriations act.  *See* OMB, *Budget of the United States Government, Fiscal Year 2014* app at 448

3    (2013).  In its budget justification, the Centers for Medicare & Medicaid Services ("CMS") identified

4    the CSR program as one of "its five annually-appropriated accounts" for which it needed funding.

5    CMS, HHS, *Justifications of Estimates for Appropriations Committees, Fiscal Year 2014*, at 2, 7 (2013).  The

6    following month, OMB issued an annual Sequestration Report, in which OMB indicated that the

7    funding proposed in the President's budget for CSR payments in fiscal year 2014 was subject to

8    sequestration.  OMB, *Sequestration Preview Report to the President and Congress for Fiscal Year 2014 and*

9    *OMB Report to the Congress on the Joint Committee Reductions for Fiscal Year 2014*, at 23 (corrected version

10   2013).

11        Congress did not provide an appropriation.  In January 2014, Treasury instead began making

12   monthly advance CSR payments to issuers out of § 1324's permanent appropriation for tax refunds.

13   **III.    The House of Representatives Obtains An Injunction Against Expending**

14   **          Unappropriated Funds on CSR Payments.**

15        After the CSR payments began, the House of Representatives sued the Secretaries of the

16   Treasury and HHS in the U.S. District Court for the District of Columbia, alleging that the CSR

17   payments violated Article I of the Constitution.  *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall

18   be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . .").  In 2016,

19   the district court ruled for the House.  Finding "no support" for a CSR appropriation in the statutory

20   text, the court held that Congress "authorized reduced cost sharing [in the ACA] but did not

21   appropriate monies for it."  *House of Representatives*, 185 F. Supp. 3d at 174, 177.  The court thus

22   enjoined further payments "until a valid appropriation is in place," though it stayed its injunction

23   pending appeal.  *Id.* at 189.  In July 2016, the previous Administration appealed to the U.S. Court of

24   Appeals for the District of Columbia Circuit.

25        Following the presidential election, the House of Representatives asked the D.C. Circuit to

26   hold that appeal in abeyance.  The D.C. Circuit granted this request and has directed the parties to

27   file regular status reports.  As discussed more fully below, nearly all States that are Plaintiffs in this

28   action have intervened in that D.C. Circuit appeal and are thus parties to that proceeding.

6

**IV.     The Administration Concludes That Congress Has Not Appropriated Funds For CSR Payments And Accordingly Discontinues Those Payments.**

On October 11, 2017, in response to a request from the Departments of Treasury and HHS for a legal opinion, the Attorney General concluded "that the best interpretation of the law is that the permanent appropriation for 'refunding internal revenue collections,' 31 U.S.C. § 1324, cannot be used to fund the CSR payments to insurers authorized by 42 U.S.C. § 18071." Attorney General Letter at 1 (Oct. 11, 2017) (Ex. D).

The next day, October 12, HHS sent a memorandum to CMS explaining that "CSR payments are prohibited unless and until a valid appropriation exists." Memorandum from Acting Sec'y of HHS Eric Hargan to Adm'r of CMS Seema Verma, Payments to Issuers for Cost-Sharing Reductions (CSRs), at 1 (Oct. 12, 2017) (Ex. D). That night, the Acting Secretary of HHS announced the discontinuation of CSR payments and publicly released his memo to CMS directing that such payments be stopped.

STATEMENT OF THE ISSUE TO BE DECIDED

Whether Plaintiffs are entitled to a preliminary injunction compelling Defendants to make CSR payments.

STANDARD OF REVIEW

A preliminary injunction is "extraordinary and drastic" and never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). A district court may enter a mandatory injunction — *i.e.*, an order to "take affirmative action" — only upon a finding that "the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

7

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1

## ARGUMENT

2

**I.     Plaintiffs Are Unlikely To Succeed On The Merits.**

3

    A.  <u>Plaintiffs' Prosecution Of This Lawsuit Violates The Rule Against Claim Splitting.</u>

4

        At the outset, Plaintiffs cannot proceed in this Court because doing so violates the rule

5

against claim splitting, the "'other action pending' facet of the *res judicata* doctrine." *Adams v. Cal.*

6

*Dep't of Health Servs.*, 487 F.3d 684, 689 (9th Cir. 2007) (quoting *Davis v. Sun Oil Co.*, 148 F.3d 606,

7

613 (6th Cir. 1998)), *overruled on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008).

8

        In the *House of Representatives* litigation, the House sought an injunction barring the

9

Government "from making any further Section 1402 Offset Program payments to Insurers."

10

Complaint Prayer for Relief ¶ B(i), *House of Representatives*, No. 1:14-cv-01967 (D.D.C. Nov. 21, 2014),

11

ECF No. 1.  The court enjoined "reimbursements paid to issuers of qualified health plans for the

12

cost-sharing reductions mandated by Section 1402 of the Affordable Care Act," though it stayed the

13

injunction pending appeal.  *See* Order, *House of Representatives* (D.D.C. May 12, 2016), ECF No. 74.[5]

14

On May 18, 2017, nearly every State that is a Plaintiff here moved to intervene in the D.C. Circuit

15

Appeal in order to "Defend Continued Implementation of the Affordable Care Act."  *See* Motion

16

to Intervene at 5, *U.S. House of Representatives. v. Hargan*, No. 16-5202 (D.C. Cir. May 18, 2017), Doc.

17

# 1675816 ("States' Mot. to Intervene"); Joinder of the States of North Carolina & Virginia, *Hargan*

18

(D.C. Cir. June 5, 2017), Doc. # 1678128.[6]  The D.C. Circuit granted that motion, 2017 WL 3271445

19

(D.C. Cir. Aug. 1, 2017), which means that these States are parties to the D.C. Circuit appeal.

20

---

21

    [5] Defendants have contended from the beginning that the House of Representatives lacks
standing to bring its claims and that there is accordingly no federal jurisdiction in that proceeding.

22

Defendants will continue to press this view.  But having lost that issue in the D.C. District Court,

23

Defendants should not have to face dueling litigation against the same Plaintiff-States pressing the
same claims in two courts.

24

    [6] The only States in this lawsuit that did not intervene in the D.C. Circuit appeal are Oregon and
Rhode Island.  As to both, venue is improper in this district if they are the sole Plaintiffs.  Venue

25

would not be appropriate under 28 U.S.C. § 1391(e)(1)(A), as all Defendants reside in Washington,

26

D.C.  *See, e.g.*, *Reuben H. Donnelley Corp. v. Federal Trade Comm'n*, 580 F.2d 264, 267 (7th Cir. 1978)
(government agency resides at its headquarters); *Williams v. United States*, No. C-01-0024 EDL, 2001

27

WL 1352885, at *1 (N.D. Cal. Oct. 23, 2001) (same).  Nor would it be proper under § 1391(e)(1)(B),
as no one could claim that "a substantial part of the events or omissions giving rise to the claim

28

occurred" in this district.  And as to § 1391(e)(1)(C), the only venue provision pleaded here, *see*
Compl. ¶ 12, Oregon and Rhode Island cannot be said to reside in this district.

8

In the D.C. Circuit appeal, Plaintiffs press the same contention they press here. *See, e.g.*, States' Mot. to Intervene at 8 ("The President has stated that CSR payments have not been authorized by Congress, while the States take the opposite view."). The legal question in both cases is binary: either there is an appropriation (such that Defendants are obligated to make the payments), or there is not an appropriation (such that Defendants may not make the payments). And the relief the States seek in both cases is the same: a ruling that Congress has appropriated funds for the CSR payments under 31 U.S.C. § 1324, such that the federal government is obligated to make those payments.

Plaintiffs are thus seeking two simultaneous opportunities to litigate the same legal question in the same factual context: once in the D.C. Circuit, and once again in this Court. It is clear that if there were a final judgment against the States in the D.C. Circuit appeal, that judgment would bar Plaintiffs from continuing with this action. *See, e.g.*, *Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."). A claim splitting challenge, however, "need not — indeed, often cannot — wait until the first suit reaches final judgment." *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 987 n.1 (10th Cir. 2002). "[I]n the claim splitting context, the appropriate inquiry is whether, *assuming that the first suit were already final*, the second suit could be precluded pursuant to claim preclusion." *Adams*, 487 F.3d at 689 (alteration in original) (emphasis added) (quoting *Hartsel Springs Ranch*, 296 F.3d at 987 n.1).

"[I]n assessing whether the second action is duplicative of the first, we examine whether the causes of action and relief sought, as well as the parties or privies to the action, are the same." *Adams*, 487 F.3d at 689. Here, except for the few States for whom venue is improper in this District, the parties are the same. "To ascertain whether successive causes of action are the same, we use the transaction test, developed in the context of claim preclusion." *Id.* The "transaction test" requires consideration of the following four criteria: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve

9

1   infringement of the same right; and (4) whether the two suits arise out of the same transactional

2   nucleus of facts." *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201-02 (9th Cir. 1982).

3         Each of those criteria demonstrates that this action is duplicative: the two cases arise from

4   the same nucleus of facts, allege infringement of the same rights, and depend on the same legal

5   analysis. And were the two cases to reach contrary judgments, rights established by one judgment

6   would be impaired by the other. Indeed, a ruling in favor of Plaintiffs here would subject the United

7   States to directly contradictory injunctions — a conflict that would become untenable if the stay of

8   the District of Columbia injunction were lifted. This Court should avoid that result and instead

9   require Plaintiffs to pursue their claims in the case where they originally sought relief. *Cf. Bergh v.*

10  *Washington*, 535 F.2d 505, 507 (9th Cir. 1976) ("When an injunction sought in one federal proceeding

11  would interfere with another federal proceeding, considerations of comity require more than the

12  usual measure of restraint, and such injunctions should be granted only in the most unusual cases.").

13        The Court's Order Regarding Briefing instructed Defendants to address "how the states

14  would be able to get their request for emergency relief" adjudicated in the D.C. Circuit. *See* ECF No.

15  26 at 1. Plaintiffs are parties to the D.C. Circuit proceeding, there are several ways that they could

16  seek relief in that forum, and, should such a request prevail, Plaintiffs' interests would be fully

17  protected while the federal government would avoid the untenable prospect of dueling injunctions

18  that simultaneously forbid it from making CSR payments and require it to make CSR payments.

19  *First*, the Plaintiffs could ask the D.C. Circuit to provide the same emergency relief they have asked

20  this Court to furnish. *Second*, given that the States and Defendants contend there is no jurisdiction in

21  the current D.C. Circuit proceeding, the Defendants would also consent to this Court immediately

22  transferring the present action to the D.C. District Court. *See* 28 U.S.C. 1404 ("For the convenience

23  of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any

24  other district or division where it might have been brought …."). This Court has "broad discretion"

25  to transfer a case in the interest of justice, *Saunders v. USAA Life Ins. Co.*, 71 F. Supp. 3d 1058, 1060

26  (N.D. Cal. 2014), and that interest favors doing so here. Transferring this proceeding would avoid

27  any issues related to the House of Representatives' standing because the Plaintiffs here would become

28  Plaintiffs there. And should the Court transfer this case, Defendants would not object to the D.C.

10

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

District Court immediately ruling on Plaintiffs' emergency request based on the briefing the parties have filed here.  The process in D.C. District Court could thus be completed at the same rapid clip this Court has moved here, such that Plaintiffs' interests would be fully protected.  *Finally*, and similarly, Plaintiffs could ask the D.C. Circuit for an immediate remand to the D.C. District Court so that they can file the same Complaint they have filed in this proceeding as Plaintiff-Intervenors, along with the same request for emergency relief that they have brought here.

Plaintiffs would thus be no worse off from being required to stick with the first jurisdiction that they selected to press their claims.[7]  And that would, of course, be in the interest of justice, as it avoids the prospect of inconsistent judgments involving the same parties, or, worse still, two judicial orders in two jurisdictions simultaneously commanding the federal government to do two diametrically opposed things.   The Court should require Plaintiffs to follow this prudent path.

### B. Plaintiffs Lack Article III Standing

Assuming the Court finds that the rule against claim-splitting does not prevent Plaintiffs from proceeding here, it should deny the preliminary injunction motion because they lack Article III standing and thus have "failed to show any likelihood of success on [their] claims," *Deck v. Wells Fargo Bank, N.A.*, No. 17-cv-00234, 2017 WL 815678, at *3 (E.D. Cal. Feb. 27, 2017).   The "irreducible constitutional minimum" of standing contains three elements:  first, that the plaintiff suffered an injury in fact that is concrete, particularized, and actual or imminent rather than hypothetical or conjectural; second, that the injury is fairly traceable to the defendant's alleged misconduct; and third, that the injury will likely be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  "In requiring a particular injury, the Court mean[s] 'that the injury must affect the plaintiff in a personal and individual way.'"  *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (citation omitted).  If the injury has not already occurred, it must be "*certainly* impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *accord, e.g., Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 970 (N.D. Cal. 2015) ("conclusory allegations

---

[7] Should one of these courses be adopted, Defendants would not assert — and hereby waive — any argument that the States cannot seek relief in a D.C. proceeding because they have not yet sought affirmative relief there.

1   of economic loss stemming from a speculative future risk of harm cannot establish Article III

2   standing unless plaintiffs plead 'something more'").

3        Establishing standing — and thus jurisdiction — is particularly important when seeking a

4   preliminary injunction, which "is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S.

5   674, 689-90 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure

6   § 2948, p. 129 (2d ed. 1995)).   "At the preliminary injunction stage," the party seeking that relief

7   must accordingly "make a *clear showing* of each element of standing."  *Townley v. Miller*, 722 F.3d 1128,

8   1133 (9th Cir. 2013) (emphasis added).  Plaintiffs here principally surmise that (1) insurers may "raise

9   premiums for plans . . . in future years"; (2) some insurers may "exit the Exchanges altogether"; (3)

10  consumers thus may have fewer affordable choices; and consequently (4) some consumers may wind

11  up uninsured, with the state left footing the bill for their emergency care.  Compl. ¶¶ 62-68, 73.

12  These alleged injuries are too conjectural to support Article III standing.  While Plaintiffs speculate

13  that some insurers in their States may leave the ACA market at some unspecified future point, they

14  have identified no insurer that has withdrawn or indicated an intent to do so.  Nor have Plaintiffs

15  demonstrated that the withdrawal of any insurer would necessarily result in residents becoming

16  uninsured, much less needing emergency care.  While Plaintiffs worry that insurance premiums for

17  their residents may rise "in future years," that is not an injury to Plaintiffs themselves.  And in any

18  event, that is too imprecise to satisfy Article III's requirement of an injury that is "certainly

19  impending," *Clapper*, 568 U.S. at 402.

20       Indeed, increased premiums would not necessarily yield increased costs for consumers

21  overall, even in the long run, because of the tax credit provision.  The amount of the refundable

22  credit equals the lesser of a household's monthly premium for qualified insurance, or the excess

23  premium associated with the second-cheapest silver plan available to the household over an income

24  factor.  *See* 26 U.S.C. § 36B(b)(2).  The Congressional Budget Office (CBO) recently projected that,

25  absent CSR payments, "[m]ost people would pay net premiums (after accounting for premium tax

26  credits) . . . throughout the next decade that were similar to or less than what they would pay

27  otherwise."   The CBO reasons that premiums for silver plans would increase, which would

28

1    accordingly increase the tax credit amounts.[8]  Plaintiffs' own brief recognizes as much.  *See* Mot. at

2    12 ("Premium tax credits are calculated based on the premiums for silver plans, and thus an increase

3    in premiums for silver plans will trigger a commensurate increase in the amount of premium tax

4    credits available for all individuals eligible for such tax credits.").  Plaintiffs have thus not only failed

5    to show an imminent risk that the cost of healthcare to individuals will rise but also failed to

6    demonstrate actual harm to their residents, let alone to themselves.

7         Plaintiffs also note that state regulators will face annual administrative hurdles if they must

8    wait for Congress to determine whether it will appropriate CSR payment funds.  Compl. ¶¶ 77-79.

9    But the Judiciary is not a "'forum' for the vindication of a state's 'generalized grievances about the

10   conduct of government.'"  *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 271 (4th Cir. 2011)

11   (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)).

12        Similarly Plaintiffs' interests fall outside the zone of interests protected by the provisions on

13   which Plaintiffs rely.  *See Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 807 (9th Cir. 2015) ("APA

14   'aggrievement' requires that 'the interest sought to be protected by the complainant . . . be arguably

15   within the zone of interests to be protected or regulated by the statute in question . . . .'" (citation

16   omitted)); *see also Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796-97 (9th Cir. 2013).  The Supreme

17   Court has made clear that the zone of interest "is to be determined not by reference to the overall

18   purpose of the Act in question . . . but by reference to the particular provision of law upon which

19   the plaintiff relies."  *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).  Section 1402 concerns CSR

20   payments to insurers; the States play no role in that process.  Plaintiffs themselves are not recipients

21   of CSR funds,[9] and any link between the termination of CSR payments and any possible harm to

22   the states *qua* states is highly attenuated.  The zone of interest does not reach Plaintiffs interest in

23   insisting that government payments be made to someone else.  *Cf. Courtney v. Smith*, 297 F.3d 455

---

24

25   [8] The tax credit amounts "are directly linked" to the premiums for silver plans.  Cong. Budget
     Office, *The Effects of Terminating Payments for Cost-Sharing Reductions* 1-2 (2017), https://www.cbo.gov/
26   system/files/115th-congress-2017-2018/reports/53009-costsharingreductions.pdf.

27   [9] Minnesota and New York, unlike the other States, receive direct payments under the ACA's
     Basic Health Program (BHP), a portion of which depends on CSR payments.  But even if a reduction
28   in BHP payments might give those two states standing, it does not place them in the zone of interest,
     and venue would not lie in this district if they were the only Plaintiffs.  *See supra* n.6.

13

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1   (6th Cir. 2002) (federal employees were outside the zone of interest to challenge government

2   contracting decision); *Okanogan School Dist. #105 v. Superintendent of Public Instruction for the State of*

3   *Washington*, 291 F.3d 1161, 1166-68 (9th Cir. 2002) (parents outside the zone of interest to challenge

4   State's allocation of federal funds earmarked for public education and public roads).  For that reason,

5   too, Plaintiffs' claims are not properly before this Court.

6         Finally, Plaintiffs are alleging injuries that will befall their citizens, not them.  Such injuries

7   do not give the States Article III standing, even if they lead to secondary effects on state budgets.

8   *See, e.g.*, *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (no standing where the State

9   claimed that "agriculture . . . production will suffer, which will dislocate agriculturally-based

10  industries, forcing unemployment up and state tax revenues down," even though "the State will face

11  increased responsibility for the welfare and support of its affected citizens"); *People ex rel. Hartigan v.*

12  *Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989) ("[T]he harm will fall on the taxpayers and citizens of

13  Illinois and not on the state qua state.").  What Plaintiffs are really trying to do is vindicate their

14  residents' private interests as *parens patriae*.  *See, e.g.*, Compl. ¶ 32 (State of Washington, explicitly

15  purporting to do that).  But the Supreme Court has held that a "State does not have standing as

16  *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto*

17  *Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485-86

18  (1923)); *accord Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

19        The burden rests on Plaintiffs to make a "clear showing" of each element of Article III

20  standing.  *Townley*, 722 F.3d at 1133.  Plaintiffs have not done so.[10]

21

22  ───────────────

23  [10] In a *per curiam* order, the United States Court of Appeals for the D.C. Circuit found that a
    consortium of States (including most of the Plaintiffs here) had standing to intervene in the *House of*

24  *Representatives* appeal.  *See U.S. House of Representatives v. Price*, No. 16-5202, 2017 WL 3271445 (D.C.
    Cir. Aug. 1, 2017).  Defendants respectfully disagree with that ruling, for the reasons stated above.

25  But in any event, an attempt by the States to rely on the D.C. Circuit's order simply underscores the
    point that the States should be pressing their claims in the D.C. Circuit, where they have been

26  permitted to intervene, rather than in two courts simultaneously.

27

28

14

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff Motion for a Temporary Restraining Order

C.  Defendants Correctly Determined That Congress Has Not Appropriated Money
    For Cost-Sharing Reduction Payments.

Even if Plaintiffs could overcome these threshold problems, their theory would fail on the merits.  Plaintiffs have advanced that theory through four claims — two under the Administrative Procedure Act, one under the Take Care Clause, and one under the Declaratory Judgment Act. Those four claims, however, collapse into one basic statutory argument: Defendants' determination that Congress has not appropriated funds for the CSR payments is wrong.[11]  As explained below, and as the only court to consider the question has held, Defendants' determination that Congress has not appropriated money for the CSR payments is the best reading of the law.[12]

The Constitution is clear:  "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  Congressional control over appropriations is "a bulwark of the Constitution's separation of powers" because without it "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure."  *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213-14 (1833)).  Money may be spent only if legislation has affirmatively

---

[11] Plaintiffs' contention that Defendants acted arbitrarily and capriciously in determining that no appropriation is available for CSRs, *see* Mot. at 13, obviously fails if the Court determines that Defendants are correctly interpreting the statute.  Plaintiffs' claim that the President is violating the Take Care Clause, *see* Mot. at 13-16, reduces to a claim that two cabinet officials are failing to comply with a federal statute; if the statute does not provide an appropriation for CSR payments, then Defendants are not violating any constitutional duties by failing to make such payments.  *See In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available . . . .") (cited in Mot. at 13-14).  Supreme Court precedent also makes clear that claims under the Take Care Clause are nonjusticiable.  *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) ("An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'").  Finally, Plaintiffs' declaratory judgment claim fails both on the merits and because the Declaratory Judgment Act does not create an independent cause of action.  *See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 15 (1983).

[12] Defendants acknowledge, of course, that the Executive Branch previously interpreted Section 1324 to provide an appropriation for CSRs, and advocated that position in litigation.  *See* Mot. at 6. As discussed *supra*, *see* Background Part IV, the Attorney General recently reviewed that prior interpretation and concluded that no appropriation is available.  In reliance on that conclusion, HHS determined that it could no longer make the CSR payments.

15

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

appropriated it. *United States v. MacCollom*, 426 U.S. 317, 321 (1976). It is not enough for Congress to authorize a program in which it *anticipates* money will be spent; Congress must provide an appropriation. *See generally* U.S. Gov't Accountability Office, *Principles of Appropriations Law* at 2-54 (4th ed. 2016) ("GAO Red Book"). As Congress has made clear, "[a] law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made." 31 U.S.C. § 1301(d). And once made, "[a]ppropriations shall be applied only to the objects for which [they] were made." *Id.* at § 1301(a). Thus, if Congress has not appropriated money to fund the CSR payments, the Executive Branch cannot make those payments, even if authorizing legislation contemplates that they will be made. *See, e.g., Nevada v. Dep't of Energy*, 400 F.3d 9, 13 (D.C. Cir. 2005) ("For Nevada to prevail, then, it must identify not just a command to make grants, but an appropriation of Waste Fund money that DOE may use for that purpose."); *cf.* Mot. at 9 (describing the "mandatory nature" of these payments as a matter of authorizing legislation).

These straightforward principles support Defendants' determination that the permanent appropriation for "refunding internal revenue collections," 31 U.S.C. § 1324, cannot be used to fund the CSR payments to insurers authorized by 42 U.S.C. § 18071.

    1. *The Statutory Text Demonstrates That 31 U.S.C. § 1324 Cannot Be Used To Fund CSR Payments*

"If the statutory language is plain," it must be enforced "according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). There is no question that 31 U.S.C. § 1324 contains a permanent appropriation for a variety of tax expenditures, but it is similarly plain that this appropriation does not extend to CSR payments to insurers.

By its terms, § 1324 is a permanent appropriation to the Treasury Department for the specific purpose of paying tax refunds: "Necessary amounts are appropriated to the Secretary of the Treasury for refunding internal revenue collections as provided by law." 31 U.S.C. § 1324(a). Further narrowing the limited scope of the appropriation, subsection (b) of § 1324 confines it to a specific set of enumerated refunds:

(b) Disbursements may be made from the appropriation made by this section *only for*—

    (1) refunds to the limit of liability of an individual tax account; and

16

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

(2) refunds due from credit provisions of the Internal Revenue Code of 1986 (26 U.S.C. 1 et seq.) enacted before January 1, 1978, or enacted by the Taxpayer Relief Act of 1997, or from section 25A, 35, 36, 36A, 36B, 168(k)(4)(F), 53(e), 54B(h), or 6431 of such Code, or due under section 3081(b)(2) of the Housing Assistance Tax Act of 2008.

31 U.S.C. § 1324(b) (emphasis added).  Subsection (b)(1) makes funds available to pay ordinary refunds to taxpayers who owe less in taxes than they have already paid to the IRS.  Subsection (b)(2) makes funds available to pay refunds resulting from certain refundable tax credits or similar provisions, which may also require outlays beyond what taxpayers have paid to the IRS.  Accordingly, if an individual were ultimately entitled to a larger tax credit than he received in advance (because, for instance, his income decreased during the year), he might be entitled to a refund under § 1324(b)(2) upon filing his tax return.  *See generally* Ex. B (Witt Decl.)

But the language of § 1324 does not encompass the ACA's CSR program.  CSR payments to insurers are not tax expenditures linked to "internal revenue collections."  31 U.S.C. § 1324(a).  Nor does the CSR program fall within the further limitations of subsection (b).  CSR payments to insurers are not "refunds to the limit of liability of an individual tax account," and they are not "refunds due from" any provision of the Internal Revenue Code.  *Id.* § 1324(b).  Accordingly, CSRs are not treated as tax credits on an individual's tax return and are never reconciled on an individual basis; in other words, unlike with the tax credits, individuals who receive too little or too much from their insurers through the advance payment program for CSRs are never repaid the underage or charged the overage.[13]  Nor does § 1324 make any mention of funding disbursements under 42 U.S.C. § 18071, the provision that authorizes CSR payments.  Plaintiffs' suggestion that the tax credits and the CSRs "work in exactly the same way," Mot. at 10, is simply not correct.

To the extent § 1324 reaches beyond ordinary tax refunds, it focuses on provisions that Congress placed in the tax laws, that the IRS administers through the tax-filing process, and that Congress typically calls tax credits.  The CSR program has none of those attributes.  It would be strange for Congress to have appropriated funds for the CSR program through a permanent

---

[13] Instead, issuers reconcile CSRs annually to confirm that issuers receive reimbursement equal to the value of CSRs provided to enrollees.  *See* 45 C.F.R. § 156.430(c).

17

appropriation for "refunding internal revenue collections," 31 U.S.C. § 1324(a), that is "only for" a specific list of tax expenditures. 31 U.S.C. § 1324(b). The text shows that Congress did not.

Congress did, by contrast, amend the permanent appropriation in § 1324 to include the ACA's *tax credit* program by adding a *specific reference* to that program in the list of tax expenditures enumerated in § 1324(b). But this explicit appropriation for "refunds due from . . . § 36B . . . of [the Internal Revenue] Code" cannot be read to silently encompass CSR payments to issuers that are separately authorized by 42 U.S.C. § 18071. CSR payments under § 18071 are not tax refunds; they are not due from § 36B of the Internal Revenue Code; they are not in the Internal Revenue Code at all. Nor does § 36B — the provision for which funding *is* authorized — authorize CSR payments. The plain text of § 1324 thus forecloses using that appropriation to fund CSR payments.[14]

### 2. *The Statutory Context Makes Clear That 31 U.S.C. § 1324 Cannot Be Used To Fund CSR Payments*

**i.** Although the "meaning — or ambiguity — of certain words or phrases may only become evident when placed in context," *King*, 135 S. Ct. at 2489 (citation omitted), the statutory context of these provisions is consistent with their plain meaning. The ACA's tax credits to reduce the costs of premiums and its payments to insurers to reimburse them for lowering out-of-pocket expenses are complementary, but they are nonetheless distinct programs, and an appropriation for one does not automatically fund the other. This is clear, for example, in § 1412 of the ACA, codified as 42 U.S.C. § 18082, which authorizes the Treasury Department to make advance payments to issuers of both tax credits and, as directed by HHS, CSR payments. That section addresses the two types of payments together for ease of administration, but nonetheless consistently recognizes that the two programs are separate by referring to each program distinctly in a separate provision. *See generally* 42 U.S.C. § 18082.

---

[14] Neither § 18071 nor § 18082 contains its own appropriation. These are authorizing provisions that do not expressly appropriate any funding, as they do not contain a designation of funds to be used. *See* GAO Red Book at 2-23 to 2-24 (Though "a statute need not use the word 'appropriation,' . . . a direction to pay without a designation of the source of funds is not an appropriation."); *In re Remission to Guam & V.I.*, B-114808, 1979 WL 12213, at *3 (Comp. Gen. Aug. 7, 1979) (distinguishing between statutory provisions that "establish permanent authority for [a] program" and those that make "permanent indefinite appropriation[s]").

18

Plaintiffs argue that the advance-payment provision conflates the two programs into one, such that all payments are "due from" the advance payment provision, 42 U.S.C. § 18082, rather than from § 36B (for tax credits) and 18071 (for CSR payments). *See* Mot. at 10-11 (referring to a "single, integrated, and permanently appropriated subsidy program"). Interpreting 42 U.S.C. § 18082 to be the operative provision that authorizes CSR payments and tax credits would mean that Congress has appropriated money for *neither* program. After all, 31 U.S.C. § 1324 does not authorize spending for advance payments pursuant to 42 U.S.C. § 18082 any more than it authorizes spending on § 18071 CSR payments.[15] It thus makes no difference from a funding perspective whether CSR payments are due from 42 U.S.C. § 18071 (authorizing CSR payments), or 42 U.S.C. § 18082 (authorizing the advance payment of both premium tax credits and CSR payments). What matters is that CSR payments are not due from section 36B.

While § 36B's tax credits and § 18071's CSR payments operate as related programs, they are statutorily distinct. Each program has a different focus (one on premiums, the other on cost-sharing); each program functions differently; and each has a different statutory eligibility formula. And throughout the ACA, Congress consistently used different language to refer to each program — calling one a "premium tax credit" and the other a "cost-sharing reduction."[16] Even in the provision authorizing advance payment to issuers under both programs, the ACA addresses each program separately in a distinct subsection. *Compare* § 18082(c)(2) (titled "Premium tax credit") *with*

---

[15] The fact that § 1324 does not refer to § 18082 poses no problem for advance payment of the tax credit because § 1324 *does* refer to § 36B and *does* providing funding for the credits that provision authorizes. The reality is that Section 18082 is simply a routing provision which authorizes the Treasury Department to route § 36B tax credits directly (and in advance) to the issuer and which would provide similar authorization to route CSR payments if an appropriation were available to make them.

[16] *See, e.g.,* 42 U.S.C. § 300gg-4(l)(3)(A)(ii) (state demonstration project shall not be approved unless it "will not increase the cost to the Federal Government in providing *credits under section 36B* of the Internal Revenue Code of 1986 or *cost-sharing assistance under section [1402]* of [the Patient Protection and Affordable Care Act]" (emphasis added)); 42 U.S.C. § 18031(i)(3)(B) (navigators shall "distribute fair and impartial information concerning . . . the availability of *premium tax credits under section 36B* of [the Internal Revenue Code of 1986] and *cost-sharing reductions under section [1402]*" (emphasis added)); 42 U.S.C. § 18033(a)(6) (compliance with False Claims Act "shall be a material condition of an issuer's entitlement to receive payments, including payments of *premium tax credits* and *cost-sharing reductions*" (emphasis added)).

19

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

*id.* § 18082(c)(3) (titled "Cost-sharing reductions"). The ACA thus takes great care to keep the two programs distinct, confirming that where Congress refers to § 36B, it means what it says.

  **ii.** The history of 31 U.S.C. § 1324 further supports limiting that permanent appropriation to the tax expenditures specifically enumerated therein. This provision originally functioned as an open-ended permanent appropriation for anything that could be construed as a "refund" of internal revenue collections, *see* 62 Stat. 561 (1948), which left identifying "refunds" to Treasury's discretion. But Congress eventually rejected that open-ended approach. Emphasizing that section 1324 had been intended merely "to refund Internal Revenue overpayments," members of Congress lamented that "[i]ts use for other purposes ha[d] increased" because it was being used for refundable tax credits in addition to ordinary refunds. S. Rep. No. 95-1061, at 153 (1978). This prompted a "concern[] that the permanent indefinite appropriation could be used to an even greater extent in the future and in ways never contemplated when the statute was enacted." *Id.*

  Congress accordingly amended the appropriation in 1978 to add subsection (b), making clear that this permanent appropriation was "only for" either "refunds to the limit of liability of an individual tax account" or "refunds due from any credit provision of the Internal Revenue Code enacted prior to January 1, 1978." Pub. L. No. 95-355, 92 Stat. 523, 564 (1978). The appropriation thus could not apply to any refundable tax credit enacted after 1978 unless Congress specifically amended subsection (b)'s limitation or otherwise indicated that this provision could be used. And in subsequent years, when Congress has enacted new refundable tax credits, it has expanded subsection (b)'s scope with incremental precision, amending it to specifically refer to new credit provisions. This history reveals a sustained effort by Congress over several decades to maintain careful control of section 1324's permanent appropriation— an extraordinary provision that indefinitely removes an expenditure from the regular budgetary process and year-to-year congressional control.

  In the ACA, Congress gave no indication that it was departing from its longstanding approach to § 1324. There does not appear to be any evidence that Congress, in amending § 1324, intended to create an implicit and open-ended appropriation for all programs related in any way to § 36B tax credits (such as CSR payments). The far better inference is that Congress followed its

consistent course since 1978 — carefully amending § 1324's permanent appropriation by identifying the particular provision that it wanted to permanently fund, on the understanding that the appropriation would extend no further.

Indeed, Congress took that very approach just one year before enacting the ACA. In the American Recovery and Reinvestment Act of 2009, Congress authorized two programs to stimulate the economy, one of which was a refundable tax credit and the other of which was a direct subsidy to individuals. Pub. L. No. 111-5, § 1001, 123 Stat. 115 (Making Work Pay tax credit), § 2201 (direct payments to recipients of retirement benefit programs). Even though the programs were related (*see id.* § 1001 (adding 26 U.S.C. § 36A(c)), Congress took care to separately appropriate money for them — appropriating the refundable tax credit through express amendment of section 1324's permanent appropriation for tax refunds (*id.* § 1001, adding 26 U.S.C. § 36A(e)(2)), while appropriating for the direct subsidy separately in the Act (*id.* § 2201(e)). Congress did not simply treat section 1324 as an all-purpose permanent appropriation for every program related to its enumerated tax expenditures.

**iii.**     Nothing else in the ACA demonstrates that Congress intended to fund the CSR program through section 1324's permanent appropriation. Congress's decision to permanently fund the ACA's tax credits without doing the same for CSRs makes sense given the differences between the programs.   Refundable tax credits had long been subject to section 1324's permanent appropriation, which made it natural to treat tax credits similarly.  CSRs, by contrast, were a new program, and Congress does not always provide permanent appropriations in the authorizing legislation for programs — even for programs that authorize regular payments.  In the case of HHS alone, numerous payment programs are funded through the regular appropriations process, rather than through permanent appropriations.  *See, e.g.*, Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 (providing funding to HHS for Grants to States for Medicaid, the Social Services Block Grant, vaccine injury compensation, retirement pay and medical benefits for commissioned officers, payments to states for foster care and adoption assistance, and Contract Support Costs); *see also House of Representatives.*, 185 F. Supp. 3d at 184 (recounting instance when Congress conferred "permanent authority" on Treasury "to permit prepayment . . . to territorial

21

treasuries of estimates of moneys to be collected" but made "no subsequent appropriation," such that "no such money could be spent").

Nor is this approach — creating a payment program that is funded through the annual appropriations process — unprecedented or extraordinary.  As the Court requested in its Order Regarding Briefing, *see* ECF No. 26, Defendants have compiled a list of programs that operate in a similar fashion.  Examples include the following programs:

- Grants to States for Medicaid, pursuant to title XIX of the Social Security Act;

- Social Services Block Grants, *see* 42 U.S.C. § 1397a;

- Promoting Safe and Stable Families, pursuant to sections 436-438 of the Social Security Act;

- Payments for Foster Care and Permanency, pursuant to section 474 of the Social Security Act;

- The Vaccine Injury Compensation Program, *see* 26 U.S.C. § 9510; Pub. L. No. 99-660, tit. III, 100 Stat. 3743 (1986); Pub. L. No. 100-203, subtit. D, 101 Stat. 1330 (1987);

- The Energy Employees Occupational Illness Compensation Program, *see* 42 U.S.C. ch. 84, subch. XVI; Pub. L. No.106-398, tit. XXXVI, 114 Stat. 1654 (2000);

- Retirement Pay and Medical Benefits for Commissioned Officers, *see* Pub. L. No. 84-569 (1956); 10 U.S.C. ch. 55;

- Payments to States for Child Support Enforcement and Family Support (pursuant to titles I, IV-D, X, XI, XIV, and XVI of the Social Security Act and 24 U.S.C. § 321-329);

- Contract Support Costs for the Indian Health Service, *see* 25 U.S.C. §§ 13, 450-450n, and 1601 et seq.;

- Compensation, pensions, burial benefits and miscellaneous assistance, pursuant to 38 U.S.C. § 107, chapters 11, 13, 51, 53, 55 and 61, 92 Stat. 2508 and article IV of the Soldiers' and Sailors' Civil Relief Act of 1940 (replaced by Service Members' Civil Relief Act in 2004, Pub. L. No. 108-189 (2003)); and other benefits authorized by 38 U.S.C. 107, 412, 777, and 806; Chapters 23, 51,53,55 and 61, 50 U.S.C. App. 540-548, 43 Stat. 122, 123; 45 Stat 735; 76 Stat. 1198;

- Veterans Insurance and Indemnities, *see* 38 U.S.C. ch. 19;

- The Supplemental Nutrition Assistance Program (SNAP), *see* 7 U.S.C. ch. 51;

22

- Child Nutrition Programs, *see* 42 § U.S.C. 1771 *et seq.*; and

- Federal unemployment benefit and allowances, *see* 19 U.S.C. § 2291.

The authorizing statutes for these programs direct that payments must be made; however, the funding for those payments is provided in annual appropriations Acts.  If Congress failed to enact an annual appropriation (and no previously appropriated funds were still available to make payments) these benefits payments would not be made.  An example of this is the SNAP program.  In 2015, a nationwide class of SNAP beneficiaries sought declaratory and injunctive relief because the U.S. Department of Agriculture (USDA) sent a letter to state SNAP administrators stating that USDA would not provide SNAP benefits during a lapse in appropriations.[17]  *See Smith v. U.S. Department of Agriculture*, 5-4497, 2016 WL 4179786 (N.D. Cal. Aug. 8, 2016).  Similarly, the Department of Veterans Affairs announced in its agency lapse plan that when funding for certain of its benefits programs was exhausted it would furlough employees because no further payments could be made.  *See* Dep't of Veterans Affairs, VA Contingency Plan:  Agency Operations in the Absence of Appropriations, at 3 n.* (2013), https://www.va.gov/opa/docs/VA_Contingency_ Plan_Document_20130927.pdf.

In *House of Representatives v. Burwell*, the Court discussed an example in which Congress failed to make the required annual appropriation.  *See* 185 F. Supp. 3d at 184 ("Congress once conferred, for example, 'permanent authority' on Treasury to permit prepayment . . . to territorial treasuries of estimates of moneys to be collected from certain taxes, duties, and fees.  Yet because no subsequent appropriation was made, no such money could be spent." (citation omitted; citing *Remission to Guam & Virgin Islands of Estimates of Moneys to be Collected*, B–114808, 1979 WL 12213, at *1 (Comp. Gen. Aug. 7, 1979))).  For other examples of litigation on this topic, *see, e.g.*, *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012); *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005); *Smith v. U.S. Department of Agriculture*, No. 15-4497, 2016 WL 4179786 (N.D. Cal. Aug. 8, 2016).

**iv.**     Finally, the issue here is quite different from the statutory question in *King, contra* Mot. at 12.  There, the Supreme Court held that certain language within the ACA seemed

---

[17] During the 2013 lapse in appropriations, SNAP benefits continued under the authorization for benefit payments in the American Recovery and Reinvestment Act (Pub. L. No. 111-5 (2009)).

unambiguous in isolation, but did not make sense in the larger context of the Act because "the most natural reading of the pertinent statutory phrase" would have prevented two of the ACA's "three major" policy changes from being applicable in certain States — something the Court saw as a "calamitous result that Congress plainly meant to avoid."  135 S. Ct. at 2495-96.  Here, the two programs function properly when operated according to their terms.  Unlike in *King*, practical difficulties do not result from any conflict *within the ACA*; rather, practical difficulties result, if at all, from Congress's *post-ACA* decision to not appropriate money for CSR payments.  Plaintiffs contend that "Congress could not possibly have intended for CSR reimbursements not to be permanently funded," Mot. at 12, but it was entirely reasonable for the Congress that enacted the ACA to have anticipated that subsequent Congresses would make the annual appropriations necessary to fund that large new program.  Yet subsequent Congresses did not do so, a choice that is within their power to make.  Nothing in *King* suggested that the ACA's plain text can be ignored in order to override the intentional legislative decisions of subsequent Congresses.

> 3.   *Extra-Statutory Evidence Confirms That 31 U.S.C. § 1324 Cannot Be Used To Fund CSR Payments*

Extra-statutory evidence further supports this straightforward interpretation of the ACA. Both the President's *Fiscal Year 2014 Budget of the U.S. Government* and the HHS-submitted House and Senate *Justification of Estimates for Appropriations Committees* sought an appropriation for section 1402 CSR payments.  *See House of Representatives*, 185 F. Supp. 3d at 186.  These requests support the inference that the Executive Branch needed an appropriation from Congress to fund section 1402 CSR payments to insurers.

Ultimately, it is not surprising that Congress chose to retain the power of the purse, even for an important component of the ACA.  After all:  "Most current appropriations are adopted on an annual basis and must be re-authorized for each fiscal year.  Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse strings."  *House of Representatives*, 185 F. Supp. 3d at 169-70.  Plaintiffs' frustration that Congress has declined to appropriate funds for CSR payments is understandable,

1   but that frustration does not permit the Judicial Branch to compel the Executive Branch to spend

2   money that the Legislative Branch has not appropriated.

3   **II.   Plaintiffs Are Not At Imminent Risk Of Irreparable Injury**

4   Emergency injunctive relief is also improper because the States have not "demonstrate[d]"

5   that they will be "immediate[ly]" and "irreparabl[y]" harmed if this case proceeds on a normal

6   briefing schedule. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).[18] Few of

7   the harms that Plaintiffs attribute to the cessation of CSR payments directly impact the States, and

8   all are speculative. Moreover, even if any of these alleged harms occurred, Plaintiffs have failed to

9   show that they will occur in the near future, let alone this week or even this month.

10   The thrust of the States' argument is that the loss of CSR payments will eventually lead to

11   rising insurance premiums and fewer coverage choices for their residents. Compl. ¶¶ 63-72, Mot.

12   at 17-21. That concern does not warrant emergency injunctive relief. *First*, the irreparable harm

13   analysis requires that the States demonstrate such harm to themselves, not to "third parties." *Phany*

14   *Poeng v. United States*, 167 F. Supp. 2d 1136, 1142 (S.D. Cal. 2001); *see also, e.g., Adams v. Freedom Forge*

15   *Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (similar).[19]

16   *Second*, even if the Court could consider harms to the States' residents, the States and their

17   declarants merely speculate that the Secretaries' actions will create a market with fewer affordable

18   options and more uninsured residents. Such hypothetical possibilities do not establish irreparable

19   harm and thus provide no basis for a preliminary injunction. *See In re Excel Innovations, Inc.*, 502 F.3d

20   1086, 1098 (9th Cir. 2007).

21   There is no risk of an imminent increase in insurance premiums for 2017. Rates for 2017

22   have been locked in since last year's open enrollment period. *See* Wu Decl. (Ex. E) ¶ 8 ("Health

23   insurance issuers in the individual market are generally not permitted to change premium rates mid-

24   year. Therefore, the HHS announcement regarding the end of CSR payments will not affect

25

26   [18] Plaintiffs cite the D.C. Circuit's ruling that many of the States in this case had standing to intervene in the *House* appeal as support for a finding of irreparable harm here. Mot. at 17. As

27   discussed above, Defendants disagree with the D.C. Circuit's decision. In any event, a finding that a party has standing does not mean that a party is at imminent risk of irreparable harm.

28   [19] For this reason, the States clearly lack standing to assert the interests of insurance companies that may sustain at least short-term losses as a result of the Administration's decision.

premiums or out-of-pocket costs for consumers in 2017.").  Plaintiffs have furnished no evidence showing that insurance companies will be permitted to re-rate 2017 plans: on the contrary, Plaintiffs' declarants focus on potential rate increases for the 2018 and 2019 policy years.  *E.g.*, ECF Nos. 10-18 at 8; 10-24 at 2; 10-29 at 2.  Relatedly, many insurers and regulators had already accounted for the possibility that CSR payments might terminate and had either priced that risk into their 2018 premiums or proposed alternate rate structures, as many of Plaintiffs' own witnesses admit.  *E.g.*, ECF Nos. 10-7 at 2; 10-14 at 4; 10-29 at 2; 10-36 at 4; 10-37 at 4; 10-39 at 4. *See also* Wu Decl. (Ex. E) ¶ 10 (noting that thirty-eight jurisdictions "had permitted or instructed their issuers, in setting 2018 premium rates, to assume the federal government would not make CSR payments").[20]

Notably, Plaintiffs have identified no insurers in their States that are imminently planning to exit the exchanges.  *See* Wu Decl. (Ex. E) ¶ 20.  On the contrary, several of Plaintiffs' declarants have acknowledged either that insurers *cannot* exit their respective markets or that prior concerns about so-called "bare" counties have been at least temporarily resolved.  *E.g.*, ECF Nos. 10–8 at 4; 10–27 at 4; 10–28 at 5; 10–38 at 5.  The best Plaintiffs can offer at this point is speculation that "the Administration's decision to stop making CSR payments *could* lead some insurers to withdraw" (ECF No. 10–12 at 2 (emphasis added)) or that the decision may "exacerbate" preexisting market instability (ECF No. 10–17 at 8), but those nebulous concerns do not warrant emergency relief.

Nor is it even clear that the ultimate impact of ending CSR payments would be negative for consumer choices or the market: given that premium tax credits will rise with a rise in premiums on silver plans, *see supra*, many individuals could see their range of affordable health plan options *increase* rather than decrease.  *See* Wu Decl. (Ex. E) ¶¶ 23-25 ("The premium tax credits available to most Exchange enrollees — which are calculated by using the premium of the second-lowest-cost Exchange silver plan available to the consumer — will generally compensate these enrollees for the increased premiums. . . . Because the premium tax credit is calculated based on rates for Exchange

---

[20] The Court's Order Regarding Briefing requested a "state-by-state breakdown . . . explaining whether insurance companies have in fact raised their rates based on the assumption that the reimbursements will stop." *See* ECF No. 26 at 2.  This question is addressed in the Wu Declaration (Ex. E).

1    silver plans, many Exchange enrollees will have greater purchasing power as a result of increases in

2    the premium tax credits.").

3              Plaintiffs' claims of *direct* irreparable harm to the States are equally deficient.  Although they

4    submit that ending CSR payments "will increase the number of uninsured individuals nationwide"

5    and thereby "directly increase[] the uncompensated care costs that are ultimately borne by the

6    States," *see* Mot. at 21, they offer no support for the inference that the numbers of uninsured in the

7    States will increase immediately (if at all) as a result of the CSR payments stopping.  Plaintiffs also

8    argue that the timing of the Secretaries' decision has caused considerable "consumer confusion" and

9    thrown "into disarray" the States' "intricate planning process" of finalizing premium rates for plans

10   to be offered on the exchanges for 2018.  *See* Mot. at 22-23; *see also, e.g.*, ECF No. 10-18 at 9.

11   Assuming that Plaintiffs have standing to challenge the incidental administrative burden that may

12   stem from compliance with federal law, Plaintiffs greatly overstate the impact of the announcement

13   on the 2018 exchange plans.  The deadline has passed for altering the rates for the federal exchanges

14   and the vast majority of the state exchanges.  *See* Wu. Decl. (Ex. E) ¶ 17.  Moreover, Plaintiffs fail

15   to show how a grant of *temporary* relief by this Court would alleviate the States' alleged difficulties in

16   planning for 2018 or beyond.  To the extent that Plaintiffs complain that such planning has already

17   been adversely affected by the uncertainty surrounding whether the CSR payments would continue,

18   a preliminary injunction would do nothing to change that uncertainty.

19             *Third*, and perhaps most importantly, even if Plaintiffs could demonstrate some actual, non-

20   conjectural risk of irreparable harm, they cannot show that such harm will occur if the Court does

21   not provide the emergency relief they demand.  Neither the ACA nor the implementing regulations

22   prescribes any particular schedule for making CSR payments.  The law requires only that issuers

23   "notify the Secretary" of their CSR reductions, and then authorizes the Secretary to "make periodic

24   and timely payments to the issuer equal to the value of the reductions."  42 U.S.C. § 18071(c)(3)(A);

25   *see also* 45 C.F.R. § 156.430(a).  HHS's past practice of making monthly CSR payments is no more

26   binding on the Government than is any other informal agency procedure.  Thus, even if Congress

27   had appropriated funds for CSR payments, the agencies would still have discretion about when to

28   make them.  And had Defendants opted to delay the next CSR payment for several months —

27

1  perhaps to convert to a system of quarterly or even bi-annual payments — Plaintiffs would have no

2  statutory or regulatory basis to challenge that decision.  Plaintiffs will not be irreparably harmed by

3  a one to two month delay that the ACA itself expressly contemplates while the courts resolve this

4  important question of appropriations law and statutory interpretation at a reasonable pace.

5  　　　　In short, there is no need for this Court to decide on the basis of one week of litigation

6  whether to order a monthly outlay of six hundred million dollars of taxpayer money.  The Court can

7  instead set a reasonable briefing schedule for dispositive motions addressing the pure legal dispute

8  at issue in this case.  No irreparable harm would ensue from that prudent course.

9  **III.    The Balance Of The Equities And The Public Interest Weigh Against The**

10 **      Requested Injunction**

11 　　　　Finally, equity and the public interest favor denial of Plaintiffs' motion.  Most importantly,

12 courts have consistently recognized that "the public interest is best served by having federal agencies

13 comply with the requirements of federal law."  *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963

14 F. Supp. 1, 6 (D.D.C. 1997); *accord, e.g.*, *Tongass Conservation Soc'y v. U.S. Forest Serv.*, No. 10-00006,

15 2010 WL 11534489, at *13 (D. Alaska Mar. 8, 2010) (referring to "significant public interest in having

16 agencies of the federal government comply with federal law"), *aff'd*, 385 F. App'x 708 (9th Cir. 2010).

17 Defendants have a strong interest in heeding the Constitution's Appropriations Clause and ensuring

18 that they do not pay billions of dollars annually that they lack legal authority to expend.

19 　　　　Plaintiffs are incorrect that the injunction they request would preserve the status quo.  *See*

20 Mot. at 23.  Plaintiffs are instead asking the Court to compel Defendants to expend hundreds of

21 millions of dollars without a valid Congressional appropriation.  Because Plaintiffs seek to compel

22 Defendants to "take affirmative action," they are requesting an order that would change the status

23 quo, not preserve it.  *See Garcia*, 786 F.3d at 740.  "In plain terms, mandatory injunctions should not

24 issue in 'doubtful cases.'"  *Id.* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636

25 F.3d 1150, 1160 (9th Cir. 2011)).  Denying the extraordinary relief Plaintiffs seek also best preserves

26 the Court's ability to effectuate its final judgment.  If the Court denies Plaintiffs' motion for

27 emergency relief but Plaintiffs ultimately prevail, the United States could make CSR payments,

28 including all necessary back payments, in compliance with the Court's order.

28

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

That a mandatory injunction potentially requiring the government to expend more than $7 billion annually is disfavored and should not issue here does not, of course, mean that there can never be litigation over whether the government is obligated to make CSR payments. Indeed, the Court recognized as much in the second question posed in its Order Regarding Briefing. *See* ECF No. 16. In response to that question, the most appropriate way for such litigation to occur is for the insurers who have been denied payments they believe they are owed to sue the United States in the Court of Federal Claims pursuant to the Tucker Act. The Court of Federal Claims is set up for the specific purpose of adjudicating monetary claims against the United States — a logical division of labor since claims for monetary injury are "not normally considered irreparable." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). And it is far more sensible for the entities that actually receive the payments at issue (*i.e.*, the issuers) to press the claim that the law requires those payments to be made.

An extraordinary injunction requiring the expenditure of public funds would thus be highly inequitable. The gravamen of Plaintiffs' claims and the relief Plaintiffs seek — payments by the United States to insurers — is best adjudicated in the forum Congress created for the specific purpose of adjudicating claims for damages against the federal government: the Court of Federal Claims. The Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over money claims against the United States. *See* 28 U.S.C. § 1491. To be sure, the Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398 (1976). Thus, a plaintiff "must look beyond the Tucker Act to identify a substantive source of law that creates the right to recovery of money damages against the United States," *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Mitchell,* 463 U.S. 206, 216 (1983)), because "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *OPM v.*

29

*California v. Trump,* No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1    *Richmond*, 496 U.S. 414, 424 (1990) (citation omitted).[21]  But the fact that the United States may well

2    contest liability in the Court of Federal Claims does not mean that court is an inadequate forum to

3    litigate this issue.

4           Indeed, litigation between insurers and the federal government over the insurers' entitlement

5    to payments in the Court of Federal Claims is precisely how a comparable dispute under the ACA

6    is currently being litigated.  Whether insurers can obtain damages for an alleged breach of a statutory

7    obligation under the ACA is the subject of thirty-seven Tucker Act suits by insurers that are now

8    pending before the Court of Federal Claims or the U.S. Court of Appeals for the Federal Circuit.  In

9    those cases, insurers have alleged that Congress's failure to appropriate funds for "risk-corridors"

10   payments allegedly required under section 1342 of the ACA entitles the insurers to damages under

11   the Tucker Act.  The government has opposed the insurers' claims and the trial courts in the Court

12   of Federal Claims have divided, with insurers prevailing in some cases,[22] and the federal government

13   prevailing in other cases.[23]  That is how litigation over whether the federal government owes money

14   to particular entities is typically handled.  And the availability of that forum — where, again, the

15   litigation would be between the insurers directly affected by the cessation of CSR payments and the

16   federal government — further underscores why the equities do not weigh in favor of this Court

17

18

---

19       [21] Courts have long recognized that Congress's control over federal expenditures is "absolute,"
20   that Congress "is responsible for its exercise of this great power only to the people," and that
     Congress "can refuse to appropriate for any or all classes of claims."  *Hart's Case*, 16 Ct. Cl. 459, 484
21   (1880), *aff'd sub nom. Hart v. United States*, 118 U.S. 62 (1886); *see also United States v. Dickerson*, 310 U.S.
     554, 555 (1940) ("There can be no doubt that Congress could suspend or repeal [statute providing
22   that enlistment bonus "shall" be paid to troops] . . . by an amendment to an appropriation bill.");
     *Prairie Cty., Mont. v. United States*, 782 F.3d 685, 690 (Fed. Cir. 2015) (federal obligations under statute
23   entitling local government to payment of statutorily calculated amount for lost tax revenue were
     limited to amount appropriated); *Highland Falls-Fort Montgomery Sch. Dist. v. United States*, 48 F.3d
24   1166, 1171-72 (Fed. Cir. 1995) (federal government not liable for shortfalls between statutory
     entitlement to funds when Congress specifically appropriated a lesser amount for a given year); *Dep't*
25   *of the Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (citing *Harrington v. Bush*, 553 F.2d 190,
     194-95 (D.C. Cir. 1977)).
26       [22] *E.g.*, *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017); *Molina Healthcare of California,*
     *Inc. v. United States*, 133 Fed. Cl. 14 (2017).
27       [23] *Maine Community Health Options v. United States*, 133 Fed. Cl. 1, 13 (2017); *Land of Lincoln Mut.*
28   *Health Ins. Co. v. United States*, 129 Fed. Cl. 81, 110-13 (2016).

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1    entering an emergency injunction in a proceeding brought by States that generally lack a direct stake

2    in the contested payments.

3    **IV.    Should The Court Grant Relief, It Should Grant A Narrowly Tailored Preliminary**
     **Injunction And Stay That Injunction Pending Appeal.**

4

5            If the Court were to disagree with Defendant, the broadest appropriate remedy would be to

6    enter preliminary relief solely in favor of States that are parties to this action, have standing, assert

7    claims not barred by principles of claim splitting, and satisfy venue requirements.  Absent a

8    recognized exception, "litigation is conducted by and on behalf of the individual named parties

9    only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).  Injunctive relief entered in an individual

10   case "should be no more burdensome to the defendant than necessary to provide complete relief to

11   the plaintiffs." *Id.* at 702; *see also, e.g., Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) ("An

12   injunction must be tailored to remedy specific harm shown."); *Neb. Dep't of Health & Human Servs.*

13   *v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006); *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th

14   Cir. 2011); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); *John Doe #1 v.*

15   *Veneman*, 380 F.3d 807, 819 (5th Cir. 2004*); Kentuckians for Commonwealth v. Rivenburgh*, 317 F.3d 425,

16   436 (4th Cir. 2003); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled*

17   *on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).  "This is

18   particularly true in cases of nationwide importance because a broad injunction may interfere with or

19   preclude other courts from ruling on . . . such matters" and may "'deprive the Supreme Court of the

20   benefit of decisions from several courts of appeals.'" *Carhart v. Ashcroft*, 331 F. Supp. 2d 805, 1047

21   (D. Neb. 2004) (quoting *Va. Soc'y for Human Life*, 263 F.3d at 393), *overruled on other grounds by Gonzales*

22   *v. Carhart*, 550 U.S. 124 (2007).  A nationwide injunction would be particularly inappropriate in this

23   case because, as discussed above, the various States are situated differently with respect to their

24   ability to modify their rates for 2018 at this late date.  *Hawaii v. Trump*, 859 F.3d 741, 787-788 (9th

25   Cir. 2017), which turned largely on the court's determination that immigration laws should be

26   uniformly applied throughout the country, particularly given the "nation's multiple ports of entry

27   and interconnected transit system," does not counsel a different result.

28

1    In addition, the Court's scheduling order requested the views of the parties on whether it

2    should enter a preliminary injunction or a temporary restraining order, should it decide to grant

3    interim relief.  *See* ECF No. 22.  Defendants submit that a preliminary injunction would be most

4    prudent because it would leave no doubt about Defendants' ability to file an expedited appeal.

5    Should the Court take that course, however, it should stay its injunction pending resolution of that

6    expedited appeal.  Defendants dispute Plaintiffs' claims of irreparable harm, but even on Plaintiffs'

7    terms, the asserted harm arises from *uncertainty about* CSR payments rather than from a brief delay in

8    the *provision of* those payments.  Plaintiffs do not contend that irreparable harm will result from

9    missing the October or November payments, so long as Defendants made back-payments after the

10   appellate process runs its course.  Rather, Plaintiffs contend that irreparable harm will result from

11   issuers not knowing whether CSR payments will *ever* happen — a harm that one or two CSR

12   payments would not ameliorate so long as litigation continues over these payments in this Court or

13   the D.C. courts.  The Court should thus allow an orderly — but expedited — appellate process

14   before requiring monthly expenditures of nearly $600 million in unappropriated funds.  In this

15   circumstance, Defendants would commit to seeking an expedited schedule that allows for appellate

16   resolution by December.[24]

17   Finally, as Plaintiffs acknowledge, Mot. at 25, where preliminary relief will cause harm to the

18   losing party — here, by requiring the expenditure of approximately $600 million per month that

19   would be difficult for the Government to recover — the ordinary practice is to require the prevailing

20   party to "give[] security in any amount that the court considers proper to pay the costs and damages

21   sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  Defendants

22   submit that the short stay described above would obviate the need for Plaintiffs to post a bond in

23   the event that this Court grants preliminary relief.

24

25

26

27   [24] Should the Court decline to stay its order pending appellate review, it should at least fashion

28   its order to permit Defendants a reasonable period of time in which to comply.  As explained in the
Declaration of Elizabeth Parish (Ex. C), it will take Defendants at least eight business days to comply
with any order directing them to make the payments requested by Plaintiffs.

32

*California v. Trump*, No. 3:17-cv-05895 (VC)
Defendants' Opposition to Plaintiff' Motion for a Temporary Restraining Order

1

**CONCLUSION**

2   Defendants respectfully request that the Court deny Plaintiffs' motion for preliminary relief.

3   October 20, 2017                        Respectfully submitted,

4

5                                           CHAD A. READLER
                                            Acting Assistant Attorney General
6                                           JAMES M. BURNHAM
                                            Senior Counsel
7                                           Civil Division, U.S. Department of Justice

8
                                            CHRISTOPHER HALL
9                                           Assistant Branch Director

10                                          */s/ Steven A. Myers*
11                                          STEVEN A. MYERS
                                            JOSEPH C. DUGAN
12                                          Trial Attorneys
                                            Civil Division, Federal Programs Branch
13                                          U.S. Department of Justice
                                            P.O. Box 883
14                                          Washington, D.C.  20044
                                            Telephone: (202) 305-8648
15                                          Facsimile: (202) 616-8460
                                            E-mail: steven.a.myers@usdoj.gov
16

17
                                            *Counsel for Defendants*
18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

        I hereby certify that on October 20, 2017, I filed the above document with the Court's

3

CM/ECF system, which will send notice of such filing to all parties.

4

5

Date:  October 20, 2017                    /s/ *Steven A. Myers*

6                                           Steven A. Myers

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28