# EXHIBIT D



THE SECRETARY OF HEALTH AND HUMAN SERVICES
WASHINGTON, D.C. 20201

To: Seema Verma, Administrator
Centers for Medicare and Medicaid Services

From: Eric Hargan
Acting Secretary

Date: October 12, 2017

Re: Payments to Issuers for Cost-Sharing Reductions (CSRs)

The Attorney General of the United States has provided the U.S. Department of Health & Human Services (HHS) and the U.S. Department of the Treasury with the attached legal opinion regarding CSR payments made to issuers of qualified health plans. In light of that opinion—and the absence of any other appropriation that could be used to fund CSR payments—CSR payments to issuers must stop, effective immediately. CSR payments are prohibited unless and until a valid appropriation exists.



**Office of the Attorney General**

**Washington, D. C. 20530**

October 11, 2017

The Hon. Steven Mnuchin, Secretary of the Treasury
U.S Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Don Wright, M.D., M.P.H., Acting Secretary
U.S. Department of Health & Human Services
200 Independence Avenue, SW
Washington, DC 20201

Dear Secretary Mnuchin and Acting Secretary Wright:

You have asked for my legal opinion as to whether the permanent appropriation for "refunding internal revenue collections," 31 U.S.C. § 1324, is available to fund the cost-sharing reduction (CSR) payments authorized by section 1402 of the Affordable Care Act, 42 U.S.C. § 18071. As you are aware, the prior administration originally sought an appropriation to fund CSR payments—suggesting it believed such an appropriation was necessary—but then later concluded that section 1324's permanent appropriation was available. The U.S. House of Representatives sued, contending that Congress had not appropriated funds for CSR payments. The U.S. District Court for the District of Columbia agreed, holding that section 1324 does not appropriate funds for CSR payments. *U.S. House of Reps. v. Burwell*, 185 F. Supp. 3d 165 (D.D.C. 2016). The district court "enjoin[ed] any further reimbursements under Section 1402 until a valid appropriation is in place," but "stay[ed] its injunction pending any appeal by the parties." *Id.* at 189. The prior administration appealed that decision, and the D.C. Circuit has held the appeal in abeyance to allow time for a resolution that would obviate the need for judicial determination of the appeal, including potential legislative action.

The Department of Justice has consulted with your Departments, as well as the Office of Management and Budget, all of which have now expressed the view that section 1324 does not appropriate funds for the CSR program. Although the Department of Justice has previously defended in court the government's decision to use the permanent appropriation in section 1324 for CSR payments, I have concluded that the best interpretation of the law is that the permanent appropriation for "refunding internal revenue collections," 31 U.S.C. § 1324, cannot be used to fund the CSR payments to insurers authorized by 42 U.S.C. § 18071.

*First*, "[i]f the statutory language is plain," it must be enforced "according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Here, the plain reading of the text is that the ACA permanently appropriated money for section 1401 premium tax credits, but not for section 1402

CSR payments to insurers. As relevant here, the ACA created two distinct programs that both have the broad purpose of providing government funding for the cost of health insurance obtained through ACA exchanges. Section 1401(a) created a program to reduce the health insurance premiums of qualified individuals by providing those individuals with refundable tax credits. Congress appropriated funds for this program in the ACA by: (1) amending the Internal Revenue Code to add a new refundable tax credit provision (§ 36B, entitled "Refundable Credit for Coverage Under a Qualified Health Plan"), *see* ACA § 1401(a); and (2) amending 31 U.S.C. § 1324—a preexisting funding provision that provides a permanent appropriation "for refunding internal revenue collections as provided by law," *id.* § 1324(a)—to include the new Internal Revenue Code § 36B credit in its list of permanently funded tax credits, *see* ACA § 1401(d)(1). That is, Congress amended the funding provision to provide for payment of "refunds due … from section … 36B." 31 U.S.C. § 1324(b)(2).

Separately, the ACA created the section 1402 CSR program, which Congress did not include in the Internal Revenue Code. Section 1402 (1) requires insurers offering policies through ACA exchanges to reduce co-payments and other out-of-pocket costs for certain policyholders (reductions referred to in the ACA as "Cost-Sharing Reductions"), *see* ACA § 1402, codified at 42 U.S.C. § 18071; and (2) authorizes the federal government to make payments directly to insurers to offset the lost revenue these reductions cause, *see* ACA § 1412(c)(3). But unlike with section 1401's refundable tax credit, the ACA did not itself provide an appropriation to directly fund the section 1402 CSR program. The ACA's amendment to the permanent appropriation in 31 U.S.C. § 1324 refers only to section 1401 tax credits (i.e., "refunds due … from [Internal Revenue Code] section … 36B"), and makes no reference to section 1402 payments (i.e., 42 U.S.C. § 18071 payments). As amended by the ACA, that appropriation provision thus supplies funding for Internal Revenue Code § 36B tax credits to insureds, but not for 42 U.S.C. § 18071 CSR payments to insurers.

*Second*, although the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," *King*, 135 S. Ct. at 2489, the statutory context of these provisions is consistent with their plain meaning. As noted above, while the two payment provisions appear sequentially within the ACA, only the section 1401 tax credits are included in the Internal Revenue Code (consistent with their status as tax credits for taxpayers). It is logical that the permanent appropriation in 31 U.S.C. § 1324—which funds a variety of tax expenditures—would fund the ACA's tax credits. But it would make little sense for a provision that appropriates funds for "refunding internal revenue collections," 31 U.S.C. § 1324(a), to also (and without saying so) permanently fund a non-tax program that provides payments to insurers.

The prior administration contended that CSR payments should be deemed "refunds due … from section … 36B" on the ground that both types of payments are essentially two parts of a single program. But the two programs are distinct. Each is authorized by a separate provision in a separate title of the U.S. Code; each has a different focus (tax credits for premiums, CSR payments for out-of-pocket costs); each functions differently; and each has a different eligibility formula. It is true that ACA section 1402(f)(2) provides CSRs are not "allowed … unless … a credit is allowed to the insured … under section 36B," but that provision means only that individuals who are ineligible for a tax credit are likewise ineligible for CSRs. It does not mean that CSR payments are the same as tax credits under section 36B—or even that they have the same

2

eligibility requirements. *Compare* 26 U.S.C. § 36B(c)(1)(A) (policyholder is eligible for tax credits if household income is between 100 and 400 percent of the federal poverty level), *with* 42 U.S.C. § 18071 (complex CSR formula providing for income-based reductions, adjustments to reductions to maintain actuarial levels, and additional reductions for lower-income insureds); *see also House of Reps.*, 185 F. Supp. 3d at 176. Indeed, the distinction between the programs is reflected throughout the ACA, including in the section providing for advance payments of both tax credits and CSRs to insurers—a provision that bundles the two types of payments together but nonetheless carefully distinguishes between the two programs. *See generally* 42 U.S.C. § 18082.

The issue here is quite different from the statutory question in *King*. There, the Supreme Court held that certain language within the ACA seemed unambiguous in isolation, but did not make sense in the context of the rest of the Act because "the most natural reading of the pertinent statutory phrase" would have prevented two of the ACA's "three major" policy changes from being applicable in certain States—something the Court saw as a "calamitous result that Congress plainly meant to avoid." 135 S. Ct. 2493, 2495-96. Here, the two programs in the ACA that provide government funding for insurance costs function properly when operated according to their terms. Unlike in *King*, practical difficulties do not result from any conflict or inconsistency within the ACA; rather, practical difficulties result, if at all, from Congress's post-ACA decision to not appropriate money for CSR payments. Nothing in *King* suggested that the ACA's plain text can be ignored in order to override the intentional legislative decisions of subsequent Congresses.

Congress has the power of the purse, and it is up to Congress to decide which programs it will and will not fund. *See, e.g., House of Reps.*, 185 F. Supp. 3d at 184 (recounting instance when Congress conferred "permanent authority" on Treasury "to permit prepayment ... to territorial treasuries of estimates of moneys to be collected" but made "no subsequent appropriation," such that "no such money could be spent"). There is no more fundamental power granted to the Legislative Branch than its exclusive power to appropriate funds. And the Executive Branch cannot unilaterally spend money that Congress has not appropriated. Congress's repeated choice to deny funding for CSR payments is thus Congress's prerogative. When Congress refuses to appropriate money for a program, the Executive is required to respect that decision.

*Third*, the contemporary evidence is consistent with this straightforward interpretation of the ACA's text. The prior administration, in the President's *Fiscal Year 2014 Budget of the U.S. Government*, and in the HHS-submitted House and Senate *Justification of Estimates for Appropriations Committees*, sought an appropriation for section 1402 CSR payments. *See House of Reps.*, 185 F. Supp. 3d at 186. These requests suggest that the prior administration initially believed that—unlike with section 1401 tax credits—it needed an appropriation from Congress to fund section 1402 CSR payments to insurers. It was only months after these submissions that the prior administration adopted an interpretation of the ACA that authorized funding CSR payments out of the permanent appropriation in 31 U.S.C. § 1324.

*Finally*, it is not surprising the Congress chose to retain the power of the purse, even for an important component of the ACA. After all: "Most current appropriations are adopted on an annual basis and must be re-authorized for each fiscal year. Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse strings." *House of Reps.*, 185 F. Supp. 3d at 169-70.

3

In sum, it is my opinion that the best interpretation of the law is that section 1324 does not appropriate funds for the Affordable Care Act's Cost-Sharing Reduction program.

Sincerely,

Jefferson B. Sessions III
Attorney General of the United States