# EXHIBIT E

CHAD A. READLER
Acting Assistant Attorney General
JAMES M. BURNHAM
Senior Counsel
U.S. Department of Justice, Civil Division

CHRISTOPHER HALL
Assistant Branch Director
STEVEN A. MYERS
JOSEPH C. DUGAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 514-3259
Facsimile: (202) 616-8470
E-mail: joseph.dugan@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, *et al.*,<br><br>Defendants. | No. 3:17-cv-5895 (VC)<br><br>DECLARATION OF JEFF WU IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |

Pursuant to 28 U.S.C. § 1746, I, Jeff Wu, make the following declaration under the penalties for perjury based on personal knowledge, on information contained in the records of the U.S. Department of

1

*California v. Trump*, No. 3:17-cv-05895 (VC)
Declaration of Jeff Wu

Health and Human Services ("HHS") and its subsidiary agencies, or on information provided to me by HHS employees:

1. I am the Associate Deputy Director for Policy for the Center for Consumer Information and Insurance Oversight ("CCIIO"), one of the centers in the Centers for Medicare & Medicaid Services ("CMS"), a component agency within HHS. CCIIO is charged with operating Healthcare.gov, including the federally facilitated exchanges and certain state-based exchanges that use the federal Healthcare.gov infrastructure. CCIIO is also responsible for administering the advance payment of the premium tax credit and cost-sharing reduction ("CSR") programs created by the Patient Protection and Affordable Care Act ("ACA" or "Act").

2. I graduated from Harvard College in 1992 with a bachelor's degree in economics, and from Stanford Business School and Stanford Law School in 2001 with a master's degree in business administration and a juris doctor degree, respectively.

3. In 2011, I joined CCIIO as a health insurance specialist, and I have served in various policy roles at CCIIO since then. I am currently the senior member of the career staff responsible for overseeing CCIIO's policy and regulatory activities, including policymaking with respect to the Exchanges and the advance-payment premium tax credit and CSR programs, and our payment policies.

4. I am providing this declaration testimony for use in *California v. Trump*, No. 17-cv-05895 (N.D. Cal.). I am testifying to the best of my knowledge and recollection.

5. My role at CCIIO encompasses policy matters pertaining to section 1401 of the ACA. Section 1401 of the ACA (26 U.S.C. § 36B) provides tax credits for qualified individuals with household income between 100% and 400% of the federal poverty level ("FPL") and who purchase health insurance through the Exchanges established by the ACA. Because these section 1401 tax credits are refundable, they

can subsidize insurance purchased by individuals who have no income tax liability. The vast majority of individuals who buy insurance on an Exchange elect to receive advance payments of these tax credits, frequently referred to as Advanced Premium Tax Credits ("APTCs"), which reduce their monthly premiums. In 2017, 84% of all Exchange enrollees received APTCs. *See* CMS, *2017 Effectuated Enrollment Snapshot* (June 12, 2017).

6. The amount of the tax credit is determined by the individual's annual household income and the cost of the second-lowest cost silver plan on the applicable Exchange. The premium tax credit helps ensure that the amount the individual pays for health insurance relative to income remains consistent, even as premiums rise. For instance, an eligible individual with household income equal to 100% of the FPL ($12,060 in 2017), if eligible for Exchange coverage, will pay no more than 2.04% of their monthly household income for their monthly premium ($20.50) after the tax credits are taken into account, if the individual were to purchase the second-lowest cost silver plan, regardless of the total cost of that plan. 26 U.S.C. § 36B(b)(3)(A).

7. My role at CCIIO also encompasses policy matters pertaining to section 1402 of the ACA (42 U.S.C. § 18071), which I understand is a disputed statutory provision in *California v. Trump*. In general, section 1402 requires issuers to provide CSRs to enrollees who are eligible to receive tax credits under section 1401 and whose household incomes are below 250% of the federal poverty level, as well as to Indian enrollees. 42 U.S.C. § 18071(c)(2), (f)(2). An issuer must reduce cost sharing (copayments, coinsurance, deductibles, and the annual limitation on cost sharing) for such individuals if they enroll in "silver plans"

through an Exchange. *Id.* § 18071(c)(2).[1] The Act directs the Government to make "periodic and timely payments to the issuer equal to the value of the reductions." *Id.* § 18071(c)(3)(A). By way of example, assume that an issuer enrolls ten individuals eligible for CSRs through eligible silver plans bought through an Exchange, and the issuer reduces those enrollees' cost sharing amounts by $10 per individual. If funds were appropriated for CSR payments, then the federal government would make $100 in CSR payments to the issuer. These payments are made monthly, according to a HHS formula, and then reconciled to the correct amount following the end of the calendar year. Thus, if the HHS formula called for a $1 per month payment per individual, and each individual was enrolled for 12 months, then HHS would pay out $120 in monthly advance payments, and would recoup $20 as part of reconciliation the following year.

8. Health insurance issuers in the individual market are generally not permitted to change premium rates mid-year. Therefore, the HHS announcement regarding the end of CSR payments will not affect premiums or out-of-pocket costs for consumers in 2017.

9. In the normal course of conducting its business, CCIIO is in frequent contact with state insurance regulators, issuers, state-based Exchanges that utilize the federal eligibility and enrollment platform ("SBE-FPs"), and state-based Exchanges ("SBEs") that do not utilize the federal eligibility and enrollment platform. CCIIO also reviews issuer filings related to the Exchanges, premium rates, and the states' rate-

---

[1] The ACA classifies plans offered on the Exchanges into one of four "metal" levels based on their cost-sharing requirements. A "silver" plan with no cost-sharing reduction is structured so that the issuer pays an estimated 70% of an enrollee's health care costs, leaving the enrollee responsible for the other 30% through cost-sharing. In a "gold" or "platinum" plan, the issuer bears a greater portion of health care costs, while the issuer is responsible for a lower portion of those costs in a "bronze" plan. An issuer that offers coverage on an Exchange is generally required to offer at least one plan at both the "silver" and "gold" levels of coverage.

setting process. Based on the information CCIIO obtains from this work, I can make the following observations:

10. Prior to the HHS announcement on CSRs, a total of thirty-eight jurisdictions (with varying types of Exchanges) had permitted or instructed their issuers, in setting 2018 premium rates, to assume the federal government would *not* make CSR payments.

11. Thirty-nine jurisdictions have either federally facilitated Exchanges ("FFEs") or SBE-FPs.[2] Immediately after the HHS announcement, CMS initiated a one-time process to allow the re-rating of 2018 Exchange plans in the seven states that (i) have FFEs and SBE-FPs, and (ii) instructed their issuers in 2017 to assume that CSR payments would continue in 2018. The re-rating of 2018 Exchange plans pursuant to that one-time process was done to adjust for the end of CSR payments.

12. The CMS process that enabled issuers on FFEs and SBE-FPs to re-rate for 2018 has ended, and CMS has no present intention to allow further re-rating for 2018 because the beginning of open enrollment is imminent and there is no time for further changes.

13. Among the thirty-nine jurisdictions with FFEs or SBE-FPs, only North Dakota and Arizona (which have FFEs) did not and are not permitting issuers to re-rate their 2018 exchange plans.

14. Eleven states and the District of Columbia operate SBEs. Five of those twelve jurisdictions – California, Connecticut, Minnesota, New York, and Idaho – addressed the CSR issue before the HHS announcement by allowing re-rating.

15. The other seven SBE jurisdictions (not including SBE-FP jurisdictions) assumed in 2017 that CSRs would be paid in 2018. Those states are Colorado, the District of Columbia, Maryland, Massachusetts,

---

[2] Health insurance that is sold on FFEs and SBE-FPs is available for purchase on Healthcare.gov.

Rhode Island, Vermont, and Washington. Five of those jurisdictions – Colorado, Maryland, Massachusetts, Rhode Island, and Washington – have decided since the federal government's announcement to allow re-rating for 2018. Colorado is loading new rates for 2018, while Massachusetts, Rhode Island, and Washington are in the process of doing so. Maryland has not yet approved a final re-rating for 2018, and is expected to load new rates for 2018 after providing that approval.

16. As a result, issuers in all SBE jurisdictions but Vermont and the District of Columbia (for which the end of CSR payments was not expected to have a material impact due to the small number of enrollees receiving CSRs) are permitting their issuers to re-rate their 2018 Exchange plans.

17. The open enrollment period for consumers to purchase 2018 benefit-year coverage in the individual market begins on November 1, 2017. It is now too late to change premium rates for 2018 Exchange plans on FFEs and SBE-FPs. Based on my own assessment, as a purely practical, operational matter (setting aside any potential legal constraints), it is too late to make another round of changes to premium rates for 2018 Exchange plans on SBEs without deferring open enrollment.

18. Even if it were practicable to begin engaging in an entirely new and distinct round of changes to premium rates for 2018 Exchange plans on FFEs, SBE-FPs, or SBEs, the HHS announcement regarding the end of CSR payments would not be a reason to do so. This is because, as noted above, issuers in nearly all jurisdictions have already re-rated (or are in the process of re-rating) their 2018 Exchange plans to account for the end of CSR payments. A new and distinct round of changes would be superfluous.

19. Based on CCIIO's research, if the federal government were ordered by a court to make CSR payments to issuers for 2018, the result would probably be billions of dollars in CSR payments to issuers in 2018 that far exceed the expectations of those issuers when they rated (or re-rated) 2018 Exchange plans. Thus, based on CCIIO's research and my own assessment, the disbursement of billions of dollars in CSR

payments to issuers that did not expect such payments when rating (or re-rating) 2018 Exchange plans likely would produce a windfall for most issuers.

20. In my role at CCIIO, I am in regular communication with state insurance regulators, SBE-FPs and SBEs, and issuers. So is the staff that reports to me. To the best of my knowledge, since the HHS announcement regarding the end of CSR payments, no issuer has informed CCIIO that it will exit an Exchange for 2018. One issuer, Sanford Health Plan in North Dakota (which did not permit issuers to re-rate their 2018 Exchange plans), has sought to reduce the plans it is offering.

21. I have received no information in connection with my work for CCIIO that suggests to me that Highmark, the only issuer on Delaware's Exchange, has decided to exit the Exchange for 2018.

22. Similarly, I have no reason to believe that there will be a "bare" county in any state for 2018 — that is, a county in which no Exchange plan is available — as a result of the HHS announcement regarding the end of CSR payments.

23. Even with these premium increases in 2018, individuals will still have many insurance choices of comparable affordability. The premium tax credits available to most Exchange enrollees — which are calculated by using the premium of the second-lowest-cost Exchange silver plan available to the consumer — will generally compensate these enrollees for the increased premiums. Also, other individuals will generally be able to purchase bronze or gold plans, or off-Exchange silver plans, potentially without premium increases.

24. Regulators in many states, including California and Florida, have specifically instructed Exchange issuers to increase rates on Exchange silver plans and not increase rates on other plans, and to offer a similar silver plan without the rate increase off the Exchange.

25. Because the premium tax credit is calculated based on rates for Exchange silver plans, many Exchange enrollees will have greater purchasing power as a result of increases in the premium tax credits.

Indeed, the increase in premium tax credits will likely make gold plans more affordable for Exchange enrollees and further reduce the cost of bronze plans. In addition, many other individuals will be able to purchase substantially the same coverage off the Exchange at a premium that does not reflect increases resulting from the discontinuation of CSR payments.

Executed on October 20, 2017 in Bethesda, Maryland.

_____
Jeff Wu