XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
GREGORY D. BROWN, SBN 219209
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5461
  Fax:  (415) 703-5480
  E-mail:  Gregory.Brown@doj.ca.gov
*Attorneys for Plaintiff the State of California*
*[Additional counsel listed on signature page]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF ILLINOIS; THE STATE OF IOWA; THE COMMONWEALTH OF KENTUCKY; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MINNESOTA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; and THE STATE OF WASHINGTON,** | Case No. 3:17-cv-05895-VC  **PLAINTIFFS' REPLY IN SUPPORT OF EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**  Date:          October 23, 2017  Time:          1:00 p.m.  Courtroom:  8, 19th Floor  Judge:         Hon. Vince Chhabria  Trial Date:   None Set  Action Filed:  October 13, 2017 |

Plaintiffs,

v.

**DONALD J. TRUMP, President of the United States; ERIC D. HARGAN, Acting Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; and DOES 1-20,**

Defendants.

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................................. 1

Argument ..................................................................................................................................... 3

I.    The States Are Likely to Succeed on the Merits .................................................... 3

      A.    The Text, Structure, and Design of the ACA Demonstrate that Congress Permanently Appropriated Funds for CSRs .............................. 3

      B.    Defendants' Attempts to Distinguish *King* Are Unpersuasive ................. 6

      C.    The Decision to Stop CSR Payments Violates the Take Care Clause ........ 8

      D.    Defendants' Claim-Splitting Argument Lacks Merit ................................. 8

      E.    The Plaintiff States Have Article III Standing ......................................... 11

II.    The States and Their Residents Will Suffer Irreparable Harm in the Absence of Preliminary Relief ............................................................................. 15

III.    The Balance of Equities Tips Sharply in Favor of the Plaintiff States and a Preliminary Injunction Is in the Public Interest and Will Preserve the Status Quo ...................................................................................................................... 19

IV.    The Court Should Issue a Preliminary Injunction ................................................ 20

Conclusion ................................................................................................................................ 20

i

Plaintiffs' Reply ISO Motion for a TRO and OSC Re Preliminary Injunction  (3:17-cv-05895-VC)
Plaintiffs' Reply ISO Motion for a TRO and OSC Re Preliminary Injunction  (3:17-cv-05895-VC)

1

**TABLE OF AUTHORITIES**

2

Page

3

CASES

4

*Abrams v. Heckler*
    582 F. Supp. 1155 (S.D.N.Y. 1984).................................................................15

5

6

*Adams v. California Dep't of Health Servs.*
    487 F.3d 684 (9th Cir. 2007)..........................................................................10

7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982).......................................................................................14

8

9

*Ass'n of Private Sector Colls. and Univs. v. Duncan*
    681 F.3d 427 (D.C. Cir. 2012) .......................................................................13

10

*Bruesewitz v. Wyeth LLC*
    562 U.S. 223 (2011) .........................................................................................5

11

12

*Cantrell v. City of Long Beach*
    241 F.3d 674 (9th Cir. 2001)..........................................................................11

13

14

*Feminist Women's Health Ctr. v. Codispoti*
    63 F.3d 863 (9th Cir. 1995)............................................................................10

15

16

*Golden Gate Restaurant Ass'n v. City & County of San Francisco*
    512 F.3d 1112 (9th Cir. 2008)........................................................................19

17

*GoTo.Com, Inc. v. Walt Disney Co.*
    202 F.3d 1199 (9th Cir. 2000)........................................................................19

18

19

*In re Aiken County*
    725 F.3d 255 (D.C. Cir. 2013) .........................................................................8

20

*Kansas v. United States*
    16 F.3d 436 (D.C. Cir. 1994) .........................................................................13

21

22

*Katz v. Gerardi*
    655 F.3d 1212 (10th Cir. 2011).....................................................................9, 10

23

24

*King v. Burwell*
    135 S. Ct. 2480 (2015) ...........................................................................1, 6, 7, 8

25

*Lenmark Int'l, Inc. v. Static Control Components, Inc.*
    134 S. Ct. 1377 (2014)...................................................................................14

26

27

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
    132 S. Ct. 2566 (2012)...................................................................................5, 7

28

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

Order, *United States House of Representatives v. Price*
 Case No. 16-5202, 2017 WL 3271445 (D.C. Cir. Aug. 1, 2017) ......................................11, 12

4

5

*Sharp Healthcare v. Leavitt*
 2008 WL 962628 (S.D. Cal. 2008) ...................................................................................15

6

*Smith v. U.S. Dept' of Agriculture*
 2016 WL 4179786 (N.D. Cal. Aug. 8, 2016)........................................................................5

7

8

*Trump v. Int'l Refugee Assistance Project*
 137 S. Ct. 2080 (2017) .................................................................................................2

9

*Utility Air Regulatory Group v. EPA*
 134 S. Ct. 2427 (2014) .................................................................................................8

10

11

*West Virginia v. EPA*
 362 F.3d 861 (D.C. Cir. 2004) ......................................................................................13

12

13

STATUTES

14

26 U.S.C.
 § 36B ...................................................................................................................3, 4

15

 § 36B(c)..................................................................................................................6

16

31 U.S.C.
 § 1324...................................................................................................................4, 6

17

 § 1324(b)................................................................................................................3

18

42 U.S.C.

19

 § 300gg-94(a)(1) ....................................................................................................13
 § 1395dd................................................................................................................12

20

 § 18021(a)(1)..........................................................................................................7
 § 18022(a)(2)..........................................................................................................7

21

 § 18023(b)(2)(A)(ii)...................................................................................................5

22

 § 18031(b)-(e) .........................................................................................................13
 § 18071..................................................................................................................3

23

 § 18071(a)-(c)..........................................................................................................7

24

 § 18071(c)(3)(a) ......................................................................................................18
 § 18071(f)(2)...........................................................................................................3

25

 § 18082..................................................................................................................3, 4
 § 18082(a)(3)...........................................................................................................4

26

 § 18082(c) ..............................................................................................................4
 § 18082(c)(2)...........................................................................................................4

27

 § 18082(c)(3)...........................................................................................................4

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

ACA

4

§ 1002 .................................................................................................................4

§ 2015 .................................................................................................................4

5

§ 2501 .................................................................................................................4

§ 2706(e) ............................................................................................................4

6

§ 3013(c) ............................................................................................................4

§ 3504(b) ............................................................................................................4

7

§ 3505(a) ............................................................................................................4

§ 3505(b) ............................................................................................................4

8

§ 3506 .................................................................................................................4

9

§ 3509(b) ............................................................................................................4

§ 3509(e) ............................................................................................................4

10

§ 3509(f) .............................................................................................................4

§ 3509(g) ............................................................................................................4

11

§ 3511 .................................................................................................................4

12

§ 4003(a) ............................................................................................................4

§ 4003(b) ............................................................................................................4

13

§ 4004(j) .............................................................................................................4

§ 4101(b) ............................................................................................................4

14

§ 4102(a) ............................................................................................................4

§ 4102(c) ............................................................................................................4

15

§ 4102(d)(1)(C) ..................................................................................................4

§ 4102(d)(4) ........................................................................................................4

16

§ 4201(f) .............................................................................................................4

17

§ 4202(a)(5) ........................................................................................................4

§ 4204(b) ............................................................................................................4

18

§ 4206 .................................................................................................................4

§ 4302(a) ............................................................................................................4

19

§ 4304 .................................................................................................................4

§ 4305(a) ............................................................................................................4

20

§ 4305(c) ............................................................................................................4

21

§ 5101(h) ............................................................................................................4

§ 5102(e) ............................................................................................................4

22

§ 5103(a)(3) ........................................................................................................4

§ 5203 .................................................................................................................4

23

§ 5204 .................................................................................................................4

24

§ 5206(b) ............................................................................................................4

§ 5207 .................................................................................................................4

25

§ 5208(b) ............................................................................................................4

§ 5210 .................................................................................................................4

26

§ 5301 .................................................................................................................4

§ 5302 .................................................................................................................4

27

§ 5303 .................................................................................................................4

§ 5304 .................................................................................................................4

28

1

## **TABLE OF AUTHORITIES**
### (continued)

2

Page

3

§ 5305(a) .................................................................4
§ 5306(a) .................................................................4
§ 5307(a) .................................................................4
§ 5309(b) .................................................................4

Cal. Health & Safety Code
§ 1385.06(a) ............................................................12
§ 1385.11(a) ............................................................12

Cal. Welf. & Inst. Code
§ 17000 ...................................................................12
§ 17600 ...................................................................12

Consolidated Appropriations Act, 2014, Pub. L. No. 113-176, Div. H, §§ 506-07,
    128 Stat. 5, 409 (2014).............................................5

Del. Code § 2503 ...........................................................13

Md. Code, Ins. § 11-603(c)(2)(i) .............................................13

N.Y. Insurance Law § 2303 ..................................................13

N.Y. Public Health Law § 2807-k..............................................12

Pub. L. No. 111-148, § 2705(f), 124 Stat. 119, 325 (2010)......................4

Tucker Act.............................................................19, 20

CONSTITUTIONAL PROVISIONS

Article III................................................................1

Take Care Clause ..........................................................8

COURT RULES

Fed. R. App. Proc. 8(a)(2)(A)...............................................10

OTHER AUTHORITIES

45 C.F.R.
§ 154.200-154.230 .......................................................13
§ 154.301 ...............................................................13
§ 155.1000-155.1010 .....................................................13
§ 156.20.................................................................13
§ 156.200................................................................13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3   Centers for Medicare & Medicaid Services, *Bulletin* (Apr. 13, 2017) .............................................7

4   Congressional Budget Office, *The Effects of Terminating Payments for Cost-*
5      *Sharing Reductions* (CBO Report)..........................................................................11, 14, 15, 18

6   https://twitter.com/realDonaldTrump/status/919009334016856065 ...................................................1

7   https://www.cbo.gov/about/products/budget-economic-data#3 ......................................................5

8   https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/tre.pdf .....................5

9   https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-
10      trumpcabinet-meeting ........................................................................................................2

11   Saturno & Tollestrup, *Continuing Resolutions: Overview of Components and*
      *Recent Practices* (2016), https://fas.org/sgp/crs/misc/R42647.pdf.............................................8

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2      Nine days ago, the President abruptly announced that he would no longer make a payment

3  critical to the proper operation of Patient Protection and Affordable Care Act.  That decision was

4  timed just eight days before the next payments were due, and less than three weeks before open

5  enrollment begins.  It has caused health insurance premiums to spike and destabilized health

6  insurance markets, and will soon create substantial confusion among consumers.  It is predicated

7  on a complete reversal of the legal position that the Executive Branch has maintained and acted

8  on for nearly four years, including eight months under the new Administration.  And it was

9  motivated by the President's desire to "dismantle[]" the ACA.[1]  In response to this illegal and

10 arbitrary act, the plaintiff States filed this suit to protect their interests and those of their residents.

11 They also asked for immediate relief, to prevent the imminent and irreparable harm that will

12 occur should the Administration's decision take effect.

13      Defendants oppose that request but offer no persuasive reason why interim injunctive relief

14 should not be granted.  On the merits, Defendants do not dispute that the ACA *requires* them to

15 make CSR payments; they argue instead that the law does not *authorize* them to make those

16 payments.  Defendants advance a series of hyper-technical arguments in support of their unduly

17 narrow construction of the ACA, but each lacks merit and conflicts with the guidance from the

18 U.S. Supreme Court in *King v. Burwell*.  And nowhere do Defendants provide a plausible

19 explanation for why Congress would have failed to include a permanent appropriation for CSRs

20 when it adopted the ACA.  Nor could they:  a correct understanding of Congress's legislative plan

21 demonstrates that a permanent appropriation for these funds is necessary to achieve the Act's

22 goals of making health care more accessible and affordable.  Finally, Defendants' threshold

23 objections to the States' suit are equally meritless.  The States are not barred from seeking

24 emergency relief here because they are also parties to the related litigation in *House of*

25 *Representatives v. Hargan*, D.C. Circuit Case No. 16-5202.  And the States plainly have Article

26 III standing to bring this lawsuit; indeed, the D.C. Circuit has already drawn that conclusion.

27

28
------
[1] https://twitter.com/realDonaldTrump/status/919009334016856065.

1

1    The Defendants' new understanding of the ACA will also irreparably—and imminently—
2    harm the States.  Defendants' sudden reversal has caused health insurance premiums across the
3    country to skyrocket, in some states by as much as 30%.  Consumers will begin shopping for
4    insurance at those unnecessarily inflated rates when open enrollment begins on November 1.
5    Many will be unable to afford these higher premiums, and will abandon the health insurance
6    market altogether.  That will harm not only the States' residents but the States themselves, which
7    will be forced to spend billions more on health care costs when these uninsured residents seek
8    emergency care at State-funded facilities.  Moreover, relief now will ensure that insurance
9    companies will not seek to withdraw from the Exchanges created by the Act, a consequence of
10   the Administration's action that could leave many Americans without access to high-quality,
11   affordable health care.  The balance of the equities also tips sharply in the States' favor, as an
12   injunction will *save* the Executive Branch money.  And an order preserving the status quo will
13   plainly serve the public interest, because it will ensure that millions of Americans will continue to
14   have access to affordable healthcare as the framers of the ACA intended.

15       The purpose of interim injunctive relief is "not to conclusively determine the rights of the
16   parties," but instead to "balance the equities as litigation moves forward."  *Trump v. Int'l Refugee*
17   *Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  Crafting an injunction is an "exercise of
18   discretion and judgment, often dependent as much on the equities of a given case as the substance
19   of the legal issues it presents."  *Id.*  Here, the equities strongly favor granting the States' motion
20   for a preliminary injunction.  The President's rash decision threatens grave and imminent harm to
21   the States and the residents.  It was made at a moment's notice, and at a time that is particularly
22   damaging to the States' health care markets.  Indeed, the President stated as much the morning
23   after ("I knocked out the CSRs … I cut off the gravy train … Obamacare is finished. It's
24   dead…").[2]  Interim relief will provide a modicum of stability to an otherwise chaotic situation,
25   while the Court considers the merits of this dispute in an orderly fashion.
26
27   _____

28       [2] https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-trumpcabinet-meeting.

2

**ARGUMENT**

**I.    THE STATES ARE LIKELY TO SUCCEED ON THE MERITS**

    **A.    The Text, Structure, and Design of the ACA Demonstrate that Congress Permanently Appropriated Funds for CSRs**

As Plaintiffs argued in their motion, the text, structure, and design of the ACA demonstrate that Congress permanently appropriated funds for CSRs.  Mot. 9-13.

Defendants offer several arguments in response, none of which withstand scrutiny.  Opp. 16-24.  Defendants first assert that 31 U.S.C. § 1324(b)'s "explicit appropriation for 'refunds due from … § 36B' … cannot be read to silently encompass CSR payments to issuers that are separately authorized by 42 U.S.C. § 18071."  Opp. 18.  But Defendants overlook that the statutory text of section 18071 *expressly references* section 36B's refundable credit.  Section 18071 states that "[n]o cost-sharing reduction shall be allowed under this section with respect to coverage for any month unless the month is a coverage month with respect to which a credit is allowed to the insured (or any applicable taxpayer on behalf of the insured) *under section 36B* of such title."  42 U.S.C. § 18071(f)(2) (emphasis added).  In other words, only beneficiaries entitled to a tax credit "under section 36B" in any given month qualify for cost-sharing reductions during that month.  Because eligibility for a premium tax credit "under section 36B" is a statutory *precondition* for receipt of CSRs, payments of CSRs are necessarily "refunds due from" section 36B in precisely the same manner as premium tax credits are due "from" that provision.

This conclusion is underscored by the fact that the ACA treats premium tax credits and CSR payments as interrelated components of a single, integrated, and permanently appropriated subsidy program in all material respects.  *See* 42 U.S.C. § 18082.  Eligibility for both are determined at the same time, through the same process, and by the same individual.  *Id*. at (a)(1).  Advance payments of both similarly occur at the same time, through the same process, are paid by the same person, and payments flow to the same entities (insurers).  *Id*. at (c).  And advance payments of both serve the same statutory purpose:  to reduce premiums payable by eligible individuals.  *Id*. at (a)(3).  Indeed, Defendants concede (as they must) that § 18082 "authorize[s] advance payment to issuers under both programs," but claim that § 18082 "addresses each

3

1   program separately in a distinct subsection" and therefore keeps the two programs "distinct."

2   Opp. 19-20 (comparing § 18082(c)(2) with § 18082(c)(3)).  In fact, § 18082(c) is titled "payment

3   of premium tax credits *and* cost-sharing reductions," and both of the referenced subsections use

4   the identical "shall make" language with respect to payments for both.  42 U.S.C. § 18082(c).

5        Moreover, multiple other provisions in § 18082 discuss premium tax credits and CSRs in

6   the same subsection.  For example, § 18082(a)(3) states that "the Secretary of the Treasury makes

7   advance payments of such *credit or reductions* to the issuers of the qualified health plans in order

8   to reduce the premiums payable by individuals eligible for such *credit*."  Emphases added.  Not

9   only does this subsection discuss premium tax credits and cost-sharing reductions together, but it

10   refers to both as "credit," *id.*, which reinforces that section 36B's "refundable credit" includes

11   both components of the ACA's subsidy program.  Far from taking "great care to keep the two

12   programs distinct," Opp. 20, both § 18082—and the ACA as a whole—repeatedly and

13   consistently speak of premium tax credits and CSRs in the same statutory breath.  They are

14   directly linked no fewer than 45 separate times in the ACA.  *See* Mot. 11, n.18.

15        Defendants also contend that "[t]here does not appear to be any evidence that Congress, in

16   amending § 1324, intended to create an implicit and open-ended appropriation for all programs

17   related in any way to § 36B tax credits (such as CSR payments)."  Opp. 20.  That too is incorrect.

18   In addition to the textual and structural arguments outlined above, there are at least three other

19   bases for concluding that Congress intended to permanently appropriate the funds for CSRs.

20   First, Congress omitted from the cost-sharing reduction provisions the language that it ordinarily

21   uses when it subjects payments to the annual appropriations process.  In such cases, Congress

22   enacts an "authorization of appropriations" provision, as it did in dozens of other provisions

23   scattered throughout the ACA.  *See* Pub. L. No. 111-148, § 2705(f), 124 Stat. 119, 325 (2010)

24   ("There are authorized to be appropriated such sums as are necessary to carry out this section.").[3]

25   The absence of such "annual appropriations" language is evidence that Congress believed that

26             [3] *See, e.g.,* ACA §§ 1002, 2706(e), 3013(c), 2015, 2501, 3504(b), 3505(a), 3505(b), 3506,

27   3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c),

28   5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b).

1    CSRs were permanently appropriated.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct.

2    2566, 2583 (2012) (*NFIB*) ("Where Congress uses certain language in one part of a statute and

3    different language in another, it is generally presumed that Congress acts intentionally.").

4         Defendants identify only one example in which the federal government did not fund an

5    entitlement for a short period of time—and that action resulted in immediate litigation that was

6    dismissed as moot once Congress made the appropriation.  *Smith v. U.S. Dept' of Agriculture*,

7    2016 WL 4179786 (N.D. Cal. Aug. 8, 2016).  Defendants also rely on an Executive Branch action

8    that occurred years after the Act became law.  Opp at 24.  But "[p]ost-enactment legislative

9    history (a contradiction in terms) is not a legitimate tool of statutory interpretation."  *Bruesewitz*

10   *v. Wyeth LLC*, 562 U.S. 223, 241-42 (2011) (citations omitted).

11        Notably, the CBO treats the CSR payments as a mandatory entitlement and includes these

12   payments as part of the federal spending baseline with other mandatory spending, including the

13   premium tax credits.[4]  The President's own FY 2018 Budget not only treats the cost-sharing

14   reduction payments as direct spending, mandatory spending for an entitlement, the President's

15   Office of Management and Budget funds the cost-sharing reduction payments out of the same

16   account number as the advance premium tax credits.[5]  Defendants' opposition brief is notably

17   silent regarding the justification—and funding source—for the past 8 months of CSR payments.

18   In short, both the federal scorekeepers, the CBO and OMB, treat the cost-sharing reduction

19   payments as a mandatory payment funded through the ACA.

20        Second, other ACA provisions would make no sense if cost-sharing reduction payments

21   were not permanently funded.  For example, the ACA prohibits the use of CSRs for abortion

22   services.  42 U.S.C. § 18023(b)(2)(A)(ii).  But if CSR payments were subject to annual

23   appropriations, a different federal law—the Hyde Amendment—would indisputably bar CSRs

24   from being used for abortion services.  *See, e.g.*, Consolidated Appropriations Act, 2014, Pub. L.

25   No. 113-176, Div. H, §§ 506-07, 128 Stat. 5, 409 (2014).  In other words, this abortion provision

26   would be redundant and unnecessary *unless* CSRs were permanently funded.

27   _____

28   [4] https://www.cbo.gov/about/products/budget-economic-data#3.
     [5] https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/tre.pdf.

1    Third, Congress could not possibly have intended for CSR reimbursement payments—but

2    not premium tax credits—to be subject to annual appropriations because paying for just the tax

3    credits will cost the federal government hundreds of billions of dollars more over the next decade

4    than subsidizing both.  *See* Mot. 12.

5        **B.    Defendants' Attempts to Distinguish *King* Are Unpersuasive**

6        The conclusion that Congress permanently appropriated funds for CSRs is bolstered by the

7    Supreme Court's decision in *King v. Burwell*, 135 S. Ct. 2480 (2015).  In that case, the Supreme

8    Court rejected a hyper-technical reading of the ACA because it was fundamentally incompatible

9    with statutory scheme and congressional intent.  The plaintiffs in *King* argued that the ACA's

10   premium tax credits were only available to residents who lived in States that ran their own

11   Exchange, and not in States with federally-run Exchanges.  *Id.* at 2487.  The statute provided that

12   tax credits were allowed when an eligible resident enrolled in an insurance plan made available

13   through an "'Exchange *established by the State*.'"  *Id.* (quoting 26 U.S.C. §§ 36B(b)-(c)).

14   Because federally-run Exchanges were not "established by the State," the plaintiffs argued, tax

15   credits were not available to individuals who signed up for health insurance through them.  *Id.*

16       The Court rejected this argument.  *King*, 135 S. Ct. at 2496.  It acknowledged that the

17   plaintiffs' "arguments about the plain meaning" of the statute were "strong."  *Id.* at 2495.  But it

18   concluded that their reading of the law was incorrect, and that the "context and structure of the

19   Act compel us to depart from what would otherwise be the most natural reading of the pertinent

20   statutory phrase."  135 S. Ct. at 2495.  The Court emphasized that "a fair reading of legislation

21   demands a fair understanding of the legislative plan," which was to "improve health insurance

22   markets, not to destroy them."  *Id.* at 2496.  Because the plaintiffs' reading of the ACA would

23   have produced a "'substantive effect that is [in]compatible with the rest of the law,'" the Court

24   rejected it.  *Id.* at 2492 (citation omitted).  As is often the case, the meaning of the ACA's text

25   "'only become[s] evident when placed in context.'"  *Id.* at 2489.

26       Here too, the statutory context demonstrates that when it amended Section 1324, Congress

27   created a permanent appropriation for both premium tax credits and CSR payments.  As in *King*,

28   reading the ACA to *not* include a permanent appropriation for CSRs would be fundamentally

6

1    inconsistent with the ACA's goal of establishing a stable, market-based framework to make

2    healthcare more accessible and affordable for millions of working Americans.  Defendants' claim

3    that it was "entirely reasonable" for Congress to have assumed that future Congresses would

4    make the discretionary appropriations necessary to fund CSRs, Opp. 24, willfully ignores the

5    realities of the insurance industry and of the annual appropriations process in Congress.

6         The ACA requires insurers to front billions of dollars in CSRs, and they would not be

7    willing to do so if they did not know they would recoup that money.  Insurers that offer coverage

8    through the Exchanges created by the ACA must include at least one healthcare plan that reduces

9    cost-sharing expenses for eligible individuals.  42 U.S.C. §§ 18021(a)(1), 18022(a)(2), 18071(a)-

10   (c).  The ACA provides no exception from this mandate; and insurers are required to cover the

11   cost of the reductions provided to beneficiaries, even if (for example) the federal government fails

12   to reimburse them.  *Id.* § 18071(a)-(c).  Without a permanent appropriation, the Act would impose

13   a mandatory expense on participating insurers without a guaranteed mechanism to recoup it.

14        It is "implausible that Congress meant the Act to operate in this manner."  *King*, 135 S. Ct.

15   at 2494.  Knowing whether billions of dollars in CSR costs will be reimbursed is—

16   unsurprisingly—a central component of insurers' decision to offer plans through the Exchanges,

17   and at what cost.  Eyles Decl. ¶ 8.  Absent the assurance of a permanent appropriation, many

18   insurers would preemptively raise premiums to offset the mandatory CSR costs that they would

19   later incur.  Others would opt not to participate in the Exchanges at all.  Both responses would

20   undermine the ACA's core purposes:  to "increase the number of Americans covered by health

21   insurance and decrease the cost of health care."  *NFIB*, 132 S. Ct. at 2580.

22        Moreover—and contrary to Defendants' suggestion, Opp. 24—the possibility of

23   discretionary funding during Congress's annual appropriations process does not supply a

24   plausible alternative of what Congress might have intended.  For each year, insurers must decide

25   whether to submit applications to participate in Exchanges, and, if so, where to set propose

26   premium rates sometime between April and July.[6]  Between 1977 and 2016, however, Congress

---

27        [6] *See* Wick, 2017 QHP Rate Filing—Key Dates (Apr. 18, 2016); *see also* Centers for
     Medicare & Medicaid Services, *Bulletin* 2 (Apr. 13, 2017) (CMS Bulletin).

28

7

1    did not finalize its regular appropriations until after October 1 on all but four occasions.[7]  Thus,

2    absent a permanent appropriation, insurers would have to decide whether to offer coverage

3    through the Exchanges and, if so, where to set premiums, several months before they would know

4    whether the federal government had the authority to reimburse them for CSRs.  Congress could

5    not have intended the ACA to operate in this manner.  *King*, 135 S. Ct. at 2494.

6          Thus, contrary to Defendants' assertions, interpreting the ACA as having permanently

7    appropriated only one of the two intertwined subsidy components would be internally

8    inconsistent, would be fundamentally incompatible with the core purposes of the statute, and

9    would cost the federal government (and, ultimately, the taxpayers) vastly greater sums of money.

10   As the Supreme Court did in *King*, this Court should reject a narrow reading of a single statutory

11   phrase that is unfaithful to the broader context, structure, and purpose of the statute as a whole.

12         **C.     The Decision to Stop CSR Payments Violates the Take Care Clause**

13         The States are also likely to succeed on their Take Care Clause cause of action.  Mot. 13-

14   16.  This argument does not "collapse into" the States' statutory argument.  Opp. 15.  The Take

15   Care Clause cabins the Executive's "authority to disregard federal statutes."  *In re Aiken County*,

16   725 F.3d 255, 257 (D.C. Cir. 2013).  But it also prohibits the President from taking actions that

17   are specifically intended to prevent a law from functioning as Congress intended.  And the

18   President's own words and actions make clear that the decision to stop CSR payments is not

19   based on a good-faith reading of the statute, but is instead part of a politically-driven strategy to

20   undermine the ACA because the current Administration disagrees with its objectives.  *See* Mot.

21   15-16 (colleting examples).  Allowing the Executive to undermine an Act of Congress in this way

22   would "deal a severe blow to the Constitution's separation of powers."  *Utility Air Regulatory*

23   *Group v. EPA*, 134 S. Ct. 2427, 2446 (2014).

24         **D.     Defendants' Claim-Splitting Argument Lacks Merit**

25         The States are not barred from seeking emergency relief here because they are also parties

26   in *United States House of Representatives v. Hargan*, D.C. Circuit Case No. 16-5202.  Opp. 8-11.

27   _____

28         [7] Saturno & Tollestrup, *Continuing Resolutions: Overview of Components and Recent Practices* 10 (2016), https://fas.org/sgp/crs/misc/R42647.pdf.

8

1    *Hargan* is an appeal of a district court order entering an injunction—presently stayed—

2    *prohibiting* the federal defendants from making CSR payments.  This case, in contrast, seeks an

3    order *requiring* the federal defendants to make CSR payments.  Moreover, *Hargan* involves not

4    only the statutory question presented to this case, but also the substantial issue of whether the

5    House plaintiffs had standing to bring that suit at all.  *See* Brief for Appellants at 19-38, *U.S.*

6    *House of Representatives v. Hargan*, No. 16-5202 (D.C. Cir. Oct. 24, 2016), Doc. #1642568.  The

7    States intervened when it became clear that the federal defendants could not be relied on to

8    continue to defend the correct resolution of the statutory question.  Before the D.C. Circuit can

9    reach that question, however, it must first reject the States' position—shared by the Executive

10   Branch—that the entire suit fails for lack of standing.  *See* Opp. 8, n.5.  And while prevailing on

11   standing grounds would provide the States with complete relief from the harmful effects of the

12   district court's injunction in that case, it would not remedy the harm caused by the federal

13   defendants' new, unilateral decision to stop making CSR payments.  To address that harm, the

14   States require a different form of relief:  a judicial declaration that the ACA *requires* the federal

15   defendants to make those payments without further specific appropriations.

16        The rule against claim splitting is therefore inapposite.  Opp. 8-11.  That doctrine generally

17   requires a "*plaintiff* to assert all of its causes of action arising from a common set of facts in one

18   lawsuit."  *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011) (emphasis added).  It is meant to

19   discourage plaintiffs from filing claims that arise out of the same facts in different lawsuits.  *Id.*

20   And although a claim-splitting challenge may be raised in a second suit before the first one is

21   final, *see* Opp. 9, it applies only if the first suit, when complete, "*would* preclude the second suit."

22   *Katz*, 655 F.3d at 1218 (emphasis added).  That is not the situation here.  The States are not

23   plaintiffs in *Hargan*.[8]  They did not "originally [seek] relief" in that forum, nor "select[] to press

24   their claims" there.  Opp. 10, 11.  Instead, they intervened—as defendants, and on appeal—

25   because doing so was necessary to protect their interests.  Indeed, intervention was the only way

26   for the States to ensure that the federal parties could not move to dismiss the appeal without also

27   _____

28        [8] Defendants identify no case in which the rule against claim splitting has been applied
     against a party in one suit because it was a *defendant* in another.

9

1   seeking vacatur of the district court's injunction—a move that would have preserved an

2   unreviewed ruling as a potential bar to future litigation.  And because of the substantial standing

3   issue in *Hargan*, there is no reason to assume that that case will result in a decision that "would

4   preclude" this suit.  *Katz*, 655 F.3d at 1218; *see also Adams v. California Dep't of Health Servs.*,

5   487 F.3d 684, 689 (9th Cir. 2007), *overruled on other grounds by Taylor v. Sturgell*, 553 U.S.

6   880 (2008) (claim splitting applies to suits where the "'available relief' does not "'significantly

7   differ'") (citation omitted).  Indeed, Defendants are ill positioned to argue that the States should

8   have to litigate the statutory issue in *Hargan* when they agree that the D.C. Circuit actually

9   should not reach the issue in that case—and where they have delayed resolution of that appeal for

10   months.

11          This suit is thus an entirely proper vehicle, and this Court an entirely proper forum, for the

12   States to seek emergency injunctive relief.  Certainly the D.C. Circuit could also enter an interim

13   order, as a means of preserving the status quo while it considers the issues before it.  But that

14   relief would be tenuous, clouded by the States' own assertion—shared by the Executive Branch—

15   that neither the D.C. District Court nor the D.C. Circuit have jurisdiction consider the merits due

16   to the House's lack of standing.[9]  In this case, unlike in *Hargan*, the statutory issue *must* be

17   reached.  In this case the factual record and legal arguments address the current reality, in which

18   the federal defendants have reversed their previous position and stopped making CSR payments.

19   In this case, the preliminary relief the States request would exactly match the permanent relief

20   that would be entered if the States prevail on the merits.  And this case is presently pending

21   before a district court, which is the ordinary forum in which to seek prompt interim equitable

22   relief.  *Cf.* Fed. R. App. Proc. 8(a)(2)(A) (equitable relief pending appeal normally sought in

23   district court in first instance).  Under these circumstances, this Court can and should act on the

24

25

26          [9] Because there is a strong possibility that the States and the federal defendants will
    prevail on standing grounds in *Hargan*, requiring the States to litigate this case in the D.C. Circuit
27   would undercut one of the core purposes of the claim-splitting doctrine:  the "'conserv[ation of]
    judicial resources.'"  *Feminist Women's Health Ctr. v. Codispoti*, 63 F.3d 863, 869 (9th Cir.
28   1995) (citation omitted).

                                                    10

1    States' request without regard to whether any similar relief might be sought or granted in the

2    overlapping, but quite distinct, proceedings in *Hargan*.

3          **E.    The Plaintiff States Have Article III Standing**

4          The States also have Article III standing.  Opp. 11-14.  In response to the decision to

5    terminate CSR payments, insurers will (and in many States already have) raise premiums.  Brown

6    Decl. ¶¶ 3, 7, 11; Bertko Decl. ¶ 6; Second Keen Decl. ¶ 3; Mendelsohn Decl. ¶ 14; Kreidler

7    Decl. ¶ 14.  Rising premiums, in turn, will force more state residents to forgo health insurance.

8    McLeod Decl. ¶ 6; de la Rocha Letter 1-2; Kreidler Decl. ¶¶ 16, 20-23; Frigand Decl. ¶¶ 5-7;

9    Vullo Decl. ¶ 8; Frescatore Decl. ¶¶ 24, 27, 30; Wadleigh Decl. ¶ 14.  The decision to stop CSR

10   payments will also lead to a rise in the number of uninsured residents because it will cause some

11   insurers to stop offering plans through the Exchanges.  Corlette Decl. ¶ 6; Reyes Decl. ¶ 10; Eyles

12   Decl. ¶¶ 9, 17.  Fewer insurers will lead to fewer affordable coverage choices, and ultimately

13   more uninsured residents.  Corlette Decl. ¶¶ 8-9; Congressional Budget Office, *The Effects of*

14   *Terminating Payments for Cost-Sharing Reductions*, August 2017 (CBO Report) at 7.  The

15   increase in the number of uninsured, in turn, will impose a direct financial burden on the States,

16   who must ultimately must cover the cost of care when the uninsured seek treatment at state-

17   funded facilities.  McLeod Decl. ¶¶ 7-9; Wadleigh Decl. ¶ 16; Rattay Decl. ¶¶ 4-6; de la Rocha

18   Letter 1-2; CBO Report 7; Wynn Decl. ¶ 6; Cantwell Decl. ¶ 3; Reyes Decl. ¶ 9; Billups Decl ¶ 4.

19         The Administration's decision thus imposes a concrete, particularized, and imminent injury

20   on the States.  That injury stems directly from the Administration's improper interpretation of the

21   ACA, and would be redressed by a favorable ruling from this Court.  The States have thus

22   established Article III standing.  *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir.

23   2001).  Indeed, the D.C. Circuit has already drawn this conclusion:  The termination of CSR

24   payments will lead "directly and imminently" to an increase in the cost of insurance, which in

25   turn will "increase the number of uninsured individuals for whom the States would have to

26   provide health care."  Order, *United States House of Representatives v. Price*, Case No. 16-5202,

27   2017 WL 3271445, at *1 (D.C. Cir. Aug. 1, 2017).  And state-funded hospitals will also suffer

28   financially when they are "unable to recoup costs from uninsured, indigent patients" whom they

11

1   must care for under state and federal law.  *Id.*; *see also* 42 U.S.C. § 1395dd (state hospitals must

2   provide emergency care regardless of patient's ability to pay); Cal. Welf. & Inst. Code §§ 17000,

3   17600 (similar); N.Y. Public Health Law § 2807-k (similar).  The causal link between the

4   Defendants' actions and the harm to the States is "plausible, directly foreseeable, [and]

5   imminent."  Order, *Price*, 2017 WL 3271445, at *1; *see also Massachusetts v. EPA*, 549 U.S.

6   497, 526 (2007) ("The risk of catastrophic harm, though remote, is nevertheless real.").

7        Defendants "disagree" with the D.C. Circuit's decision, but provide no persuasive argument

8   for drawing a different conclusion.  Opp. 14, n.10.  They do not dispute that the decision to stop

9   CSR payments will lead to a substantial rise in premiums for millions of Americans.  Instead,

10  they point to a recent Congressional Budget Office projection that "[m]ost" people's premiums

11  would remain similar over "the next decade" if CSR payments stop.  Opp. 12 (quoting CBO

12  Report at 2).  But they leave out the CBO's most important conclusion:  that *one million* residents

13  will lose insurance in 2018 if CSR payments stop.  CBO Report at 14.  Defendants' assertion that

14  insurers will not withdraw from the Exchanges now that CSR payments have stopped, *see* Opp.

15  12, similarly ignores the fact that several insurers decided not to participate in the Exchanges

16  during 2018 simply because they did not know whether CSR payments would be made next year.

17  *See* Mot. 20 (collecting examples).  Finally, Defendants offer no response to the bevy of evidence

18  introduced by the States demonstrating that a rise in the uninsured rate will lead to billions of

19  dollars in additional state spending on health care.  Cantwell Decl. ¶ 3; Wynn Decl. ¶¶ 7-11;

20  Frescatore Decl. ¶34; Billups Decl. ¶ 4; Rattay Decl. ¶¶ 4-5.

21       The increased administrative burden that the Administration's decision imposes on the

22  States also gives them Article III standing to bring this suit.  Compl.  ¶¶ 74-78.  That harm is not,

23  as Defendants contend, a mere "generalized grievance[] about the conduct of government."  Opp.

24  13 (citation and quotation marks omitted).  It is instead a direct injury to the States' regulatory

25  programs and their fiscs.  The States play a critical role in delivering plans offered through the

26  Exchanges.  State regulators review proposed premium rates to evaluate whether they are

27  "actuarially sound," Cal. Health & Safety Code § 1385.06(a), and whether proposed rate

28  increases are "unjustified," *id.* § 1385.11(a), or not "excessive, inadequate, unfairly

12

1   discriminatory, destructive of competition or detrimental to the solvency of insurers," N.Y.

2   Insurance Law § 2303.  *See also* 18 Del. Code § 2503; Md. Code, Ins. § 11-603(c)(2)(i).

3   Similarly, the ACA relies on regulators in most States to annually review "unreasonable increases

4   in premiums" and compel insurers to justify such increases before they go into effect.  42 U.S.C.

5   § 300gg-94(a)(1); 45 C.F.R. §§ 154.200-154.230, 154.301.  And States review plans offered on

6   their Exchanges to determine, among other things, whether they meet requirements such as

7   covering essential health benefits and paying CSRs for eligible individuals.  42 U.S.C.

8   § 18031(b)-(e); 45 C.F.R. §§ 155.1000-155.1010, 156.20, 156.200.

9       The Administration's decision makes those tasks substantially more complicated and

10  expensive.  While rate review and plan selection take place between May and October, *see* Wick,

11  *supra*; CMS Bulletin 2-4, Congress typically does not make appropriations decisions until

12  October or later.  The Administration's conclusion that CSRs are subject to an annual

13  appropriations process would require regulators to evaluate proposed premiums, and select plans

14  for inclusion in Exchanges, without knowing whether insurers would receive federal CSR

15  payments.  That would make it "more difficult and onerous" for regulators to determine

16  appropriate premiums and to ensure adequate insurer participation on Exchanges.  *West Virginia*

17  *v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004); *see also* Wade Decl. ¶¶ 2-10; Navarro Decl. ¶¶ 4-10;

18  Vullo Decl. ¶¶ 10-13.

19      At the very least, the Administration's decision will make these tasks more expensive.

20  Regulators typically review only one proposed premium rate per plan year.  Thomas Decl. ¶ 12.

21  If the Administration's decision is allowed to take effect, regulators would either have to review

22  two premium proposals or Exchange applications—one assuming CSRs will be reimbursed and

23  one not—or establish processes for modifying premiums or changing participation after the

24  review and selection process has begun.  In either scenario, the States would spend more.  *See*

25  Wade Declaration ¶ 18; Thomas Decl. ¶ 12; Vullo Decl. ¶ 12.  Courts have held that a plaintiff

26  has standing based on substantially less harm.  *See Ass'n of Private Sector Colls. and Univs. v.*

27  *Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (standing where regulation would impose "'greater

28  compliance costs,'" even though costs would not be "'significant'"); *Kansas v. United States*, 16

13

1  F.3d 436, 439 (D.C. Cir. 1994) (standing to challenge federal limit on direct flights to airport

2  where state employees "occasionally" flew to city, and more flights to airport 12 miles closer to

3  town would permit transfers from airport to city that "presumably would take less time and cost

4  Kansas somewhat less").

5       Indeed, the Administration's decision to reverse course has already interfered with the

6  States' regulatory decisions, and forced them to incur additional costs.  Because the

7  Administration refused to commit to continue making CSR payments throughout 2017, States

8  altered their regulatory programs, and spent additional tax dollars, in an effort to accommodate

9  that uncertainty.  *See* Wade Declaration ¶¶ 12-21; Thomas Decl. ¶ 13.  And the Administration's

10  announcement has forced several States to reevaluate whether previously approved premium rates

11  comply with the relevant statutory criteria, and spend even more money to restructure their

12  regulatory apparatuses.  *See* Redmer Decl. ¶¶ 13-17; MacEwan Decl. ¶ 17; Cammarata Decl. ¶

13  25.

14       Defendants' argument that the States fall outside the "zone of interests" protected by the

15  CSR provisions is similarly unavailing.  Opp. 13.  The "zone of interests" requirement under the

16  Administrative Procedure Act (APA) is a "lenient" test under which "the benefit of any doubt

17  goes to the plaintiff."  *Lenmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377,

18  1389 (2014).  Here, the States operate health insurance Exchanges that depend on the stable and

19  guaranteed funding of CSR payments to function properly, and the States will incur significant

20  financial costs from the increase in uninsured residents if CSR payments are not funded.  McLeod

21  Decl. ¶¶ 7-9; Wadleigh Decl. ¶ 16; Rattay Decl. ¶¶ 4-6; de la Rocha Letter 1-2; CBO Report 7.

22  The States are within the "zone of interests" protected by CSRs.

23       Finally, Defendants are incorrect that principles of *parens patriae* do not support the States'

24  standing here.  Opp. 14.  The Administration's decision will substantially injure the States' quasi-

25  sovereign interest in the health and well-being of their residents.  *Alfred L. Snapp & Son, Inc. v.*

26  *Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600, 607-608 (1982).  And while the law generally

27  disfavors *parens patriae* standing in suits that seek "'to protect [state] citizens from the operation

28  of federal statutes,'" *Massachusetts*, 549 U.S. at 520 n.17, this is not such a case.  The States

14

1   instead seek to *defend* a federal statute and thereby "'vindicate the Congressional will.'" *Abrams*

2   *v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984).

3   **II.   THE STATES AND THEIR RESIDENTS WILL SUFFER IRREPARABLE HARM IN THE**
    **ABSENCE OF PRELIMINARY RELIEF**

4

5       The States and their residents will suffer imminent irreparable harm absent immediate

6   injunctive relief because the halting of CSR payments will cause tremendous chaos, uncertainty,

7   and confusion in the health care markets just before open enrollment commences on November 1,

8   2017.  Mot. 16-23.  Indeed, President Trump has not just acknowledged but bragged about these

9   harms, making clear that his core reason for cutting off CSR funding is to "explode,"

10  "dismantle[]," and "finish[]" the ACA.  Mot. 2-3 & fns. 1-4.

11      Notwithstanding the President's admissions, Defendants contend that the harms caused by

12  terminating CSR payments cannot support injunctive relief because these harms do not

13  sufficiently affect the States, but only their residents.  Opp. 25.  That is incorrect.  The harms at

14  issue here directly affect the States, requiring them to expend additional money to care for an

15  increasing population of uninsured residents, McLeod Decl. ¶¶ 7-9; Wadleigh Decl. ¶ 16; Rattay

16  Decl. ¶¶ 4-6; de la Rocha Letter 1-2; CBO Report 7; Wynn Decl. ¶ 6, and also to administer a

17  large and complex health insurance system without knowing until the last minute whether, or for

18  how long, the crucial CSR component will be funded, Thomas Decl. ¶ 13.  Further, because this

19  case involves patients' access to health care coverage, harms to state residents who will lose their

20  health insurance or face higher costs provide an independent basis for injunctive relief.

21  "[A]lthough harm to third parties is generally not relevant, in cases involving Medicare and

22  similar health care programs, courts have routinely considered and granted injunctive relief based

23  on the potential harm to patients."  *Sharp Healthcare v. Leavitt*, 2008 WL 962628, at *5 (S.D.

24  Cal. 2008) (citing cases).

25      Defendants' assertion that the irreparable harms are "speculative" is incorrect.  Opp. 25-27.

26  Numerous health care experts have concluded that these harms—such as rising premiums,

27  insurers leaving the markets, and an increase in uninsured—are virtually certain to occur.

28  Cantwell Decl. ¶ 2; Bertko Decl. ¶¶ 6, 7; McLeod Decl. ¶¶ 2, 5, 6; Thomas Decl. ¶ 11; Reyes

1    Decl. ¶ 10; Fescatore Decl. ¶ 23; Wade Decl. ¶ 15; Corlette Decl. ¶¶ 6-7.  And those harms in fact

2    have already occurred in numerous places, where insurers have already raised their rates or

3    dropped out of the Exchanges specifically because of the uncertainty concerning whether CSRs

4    would be paid.  *See* Mot. 20.

5            Defendants assert that there is no risk of an imminent increase in premiums for 2017.  Opp.

6    25.  That is a red herring.  While the harms caused by terminating CSR payments in 2017 will

7    occur primarily in 2018 and 2019, those harms will become certain, and irreparable, as soon as

8    the CSR payments are cut off in 2017.  Many insurers will raise rates for 2018 and/or 2019 to

9    recoup their 2017 losses and anticipated 2018 shortfall, and others will simply exit the markets

10   due to the uncertainty and instability caused by the termination of CSR payments.  Bertko Decl. ¶

11   6; McLeod Decl. ¶¶ 2, 5; Thomas Decl. ¶ 11; Reyes Decl. ¶ 10; Fresacatore Decl. ¶ 23; Wade

12   Decl. ¶ 15; Eyles Decl., ¶¶ 9, 17; Jones Decl. ¶ 10; Kreidler Decl. ¶¶ 25-26.  Further, the chaos

13   caused by disrupting CSRs at the present time will directly affect consumer enrollment for 2018,

14   as the open enrollment period begins on November 1, 2017, and consumers will be faced with

15   tremendous uncertainty in attempting to select a plan.  Redmer Decl. ¶¶ 4-18; Gasteier Decl.

16   ¶¶ 11,14; Reyes Decl. ¶ 6; McLeod Decl. ¶¶ 5-9; MacEwan Decl. ¶ 12; Kempski Decl. ¶ 6; Jones

17   Decl. ¶ 3; Cammarata Decl. ¶ 22; Frescatore Decl. ¶¶ 21, 33.

18           Defendants note that many States and insurers already accounted for the absence of CSR

19   payments in setting premiums for 2018.  Opp. 26.  But many have not, and insurers in those

20   markets will need to raise their rates or suffer losses, and many insurers are likely to exit those

21   markets.  Redmer Decl. ¶¶ 9, 13; Eyles Decl. ¶¶ 9, 12, 17; Cammarata Decl. ¶¶ 13, 19, 20;

22   Maranjian Decl. ¶¶ 7-12; MacEwan Decl. ¶¶ 7-10; Corlette Decl. ¶ 6; Reyes Decl. ¶ 10; Jones

23   Decl. ¶ 10; Kreidler Decl. ¶¶ 25-26; Greene Decl. ¶ 5; Burrell Decl. ¶¶ 7-9.  Further, in States that

24   already authorized higher rates in anticipation of the lack of CSR funding, the termination of CSR

25   payments will lock in those higher rates—and thereby harm consumers—and preclude those

26   States from being able to reduce premiums on their Exchanges, which many would seek to do if

27   CSR payments were guaranteed.  Second MacEwan Decl. ¶ 6; Second Keen Decl. ¶ 4.

28

1     Also unavailing is Defendants' argument that the States have not identified insurers that are

2  "imminently planning" to exit the exchanges.  Opp. 26.  The States have provided extensive

3  evidence that insurers have already left numerous markets specifically because of the uncertainty

4  concerning CSR payments—for example, Anthem cited CSR uncertainty in explaining its

5  decision to withdraw from the Exchanges in Wisconsin, Indiana, and Ohio, and to stop offering

6  plans in 16 of California's 19 insurance regions, Mot. 20, n.35, and two Aetna insurers withdrew

7  from Delaware's Exchange based in part on the uncertainty about CSR reimbursements in 2018,

8  Navarro Decl. ¶ 13.  Experts predict that many other insurers are likely to exit the Exchanges if

9  the CSR payments are in fact terminated.  Reyes Decl. ¶ 10; Eyles Decl. ¶¶ 9, 17; Corlette Decl.

10  ¶ 6; Jones Decl. ¶ 10; Kreidler Decl. ¶¶ 25-26.  Preliminary injunctive relief would bring much

11  needed stability to these markets, and dramatically reduce the likelihood of insurers dropping out.

12  Plaintiffs' evidence is sufficient to meet their burden of establishing harm.

13     Defendants also point out that if CSR payments cease, premium tax credits will rise

14  because they are indexed to premiums for "silver" plans, and those premiums will rise if CSR

15  payments are not made.  Opp. 26-27.  While that is true (and confirms that the federal

16  government will *save* money on net if it continues to pay CSRs), it does not cure the irreparable

17  harm caused by defunding CSRs.  Terminating CSRs and increasing premium tax credits would

18  simply redistribute ACA funding, benefitting some recipients while harming others, all in a

19  manner that Congress did not intend.  And the fact that some consumers would benefit does not

20  change the fact that a significant number of consumers would be harmed—most notably, those

21  who purchase insurance on the Exchanges but do not qualify for premium tax credits.  Mot. 18-19

22  & n.32.  Nor does it change the fact that eliminating CSRs would cause chaos in the markets as

23  insurers scramble to determine whether to raise their rates or exit the market, and consumers

24  scramble to determine what plans are available, and at what price—all of which will lead to more

25  consumers choosing, or being forced, to forgo insurance entirely or buy less comprehensive, but

26  cheaper, plans.  Reyes Decl. ¶ 6; McLeod Decl. ¶¶ 5-9; MacEwan Decl. ¶ 12; Redmer Decl. ¶¶

27  10-15; Kempski Decl. ¶ 6; Jones Decl. ¶¶ 3, 5; Cammarata Decl. ¶ 22; Frescatore Decl. ¶¶ 21, 33;

28  Gasteier Decl. ¶¶ 21-22.

17

1      Similarly, Defendants claim there is no evidence that the number of uninsured will increase

2    immediately as a result of the cessation of CSR payments.  Opp. 27.  To the contrary, the CBO

3    report estimates that *one million* more Americans will be uninsured in 2018 of CSRs nonpayment.

4    CBO Report 7, see also Mot. 18-19, 20-21.  That result begins immediately, as open enrollment

5    for 2018 starts in a matter of days.  Defendants argue that the deadline has already passed for

6    altering rates for 2018 plans, but that *exacerbates* the harm, rather than mitigating it.  As noted

7    above, if States cannot change premium rates, many insurers will be undercompensated, which

8    will cause some insurers to exit the markets.  And many States will seek to allow insurers to raise

9    their premium rates anyway, which will negatively affect consumers and create confusion during

10   the crucial open enrollment period.  If CSR payments stop now, there are no good options.

11      Defendants also claim that a preliminary injunction would not give States the certainty that

12   they need.  Opp. 27.  But the fact that injunctive relief might not completely or permanently

13   resolve the problem created by Defendants is not a reason to deny injunctive relief; as long as the

14   remedy can help mitigate the irreparable harm—and it here it certainly will—injunctive relief is

15   necessary and appropriate.

16      Defendants also contend that they are not required to make monthly payments, but only

17   "periodic and timely" payments.  Opp. 27-28.  Of course, if Defendants guaranteed that CSRs

18   would be paid, but said they would pay them on a different timetable, that would raise a different

19   set of issues, and might or might not violate the "periodic and timely requirement" under 42

20   U.S.C. § 18071(c)(3)(a).  But that is not what Defendants have done here:  they have cut off CSR

21   payments completely, and that is legally improper and will cause irreparable harm.

22      Finally, Defendants note that these preliminary injunction issues are being decided "on the

23   basis of one week of litigation," and ask for additional time for a "reasonable briefing schedule."

24   Opp. 28.  But the short litigation schedule is entirely Defendants' own creation:  they chose to

25   abruptly announce that they would not make the October 2017 CSR payments late in the day on

26   October 12, 2017, just eight days before Defendants' had scheduled payment, and just a few

27   weeks before the start of open enrollment.  Having unilaterally created the emergency that

28   necessitates preliminary injunctive relief, Defendants cannot be heard to complain that their time

18

1    to respond is too short.

2    **III.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF THE PLAINTIFF STATES
      AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST AND WILL PRESERVE
3     THE STATUS QUO**

4         The balance of equities and public interest strongly favor a preliminary injunction that

5    preserves the status quo and enjoins the Executive Branch from abruptly terminating cost-sharing

6    reduction payments, which would destabilize the health insurance markets, cause large premium

7    increases, increase the number of uninsured, and significantly raise uncompensated care costs that

8    are ultimately borne by the States.  Mot. 23-24.

9         Defendants contend that a preliminary injunction would not preserve the status quo.  Opp.

10   28.  That is incorrect.  The status quo here is the continued payment of CSR reimbursements,

11   which the Executive Branch has paid monthly since the inception of the CSR program, including

12   for the past eight months under the current Administration, and which are integral to the stability

13   of the ACA's Exchanges.  The Executive Branch's abrupt change of position, announced just

14   nine days ago, does not create a new "status quo."  "The status quo ante litem refers not simply to

15   any situation before the filing of a lawsuit, but instead to 'the last *uncontested* status which

16   preceded the pending controversy.'"  *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210

17   (9th Cir. 2000) (emphasis added) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804,

18   809 (9th Cir. 1963)).  In any event, "[i]f the currently existing status quo itself is causing one of

19   the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury....

20   The focus always must be on prevention of injury by a proper order, not merely on preservation

21   of the status quo."  *Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d

22   1112, 1116 (9th Cir. 2008) (citation omitted).

23        Defendants also argue that other remedies are available, such as an order for the United

24   States to make back payments to insurers if Plaintiffs ultimately prevail, or the possibility that

25   insurers could recover CSR payments from the federal government in the Court of Federal Claims

26   pursuant to the Tucker Act.  Opp. 28-31.  But none of these remedies would relieve the

27   immediate and irreparable disruption to the health care system, with the resulting increase in the

28   number of uninsured, that will occur if CSR payments are abruptly cut off now.  Such a system

                                            19

1    would leave the Exchanges in an untenable bind:  To maintain lower premiums, the States would

2    have to require insurers to incur significant CSR losses up front, with a vague promise that they

3    might (or might not—Defendants will surely contest any such claims) be compensated at some

4    unspecified (much) later date if they bring a successful lawsuit under the Tucker Act, or if the

5    States ultimately prevail in this lawsuit.  Alternatively, the States would have to allow insurers to

6    raise premiums to account for the lack of CSR reimbursements, with consequent harms to

7    consumers.  Neither of these options is equitable or in the public interest.

8         Indeed, Defendants' "equitable" arguments completely ignore the essential equitable

9    issue—the tremendous and irreparable disruption to the health care system that abruptly cutting

10    off CSR payments will cause.  Plaintiffs seek to preserve the status quo pending resolution of this

11    action, which will allow many more people to maintain affordable health care coverage and save

12    the federal government money on net.  Defendants seek to abruptly terminate an essential piece of

13    the ACA's integrated affordable health care system, which will cause a tremendous number of

14    people to lose their health care coverage and cost the federal government more money on net.

15    The equities and public interest tip overwhelmingly in favor of a preliminary injunction.

16    **IV.   THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION**

17         The Court should treat the pending motion as one for preliminary injunction.  First, the

18    parties have fully briefed the merits.  Additional evidence and argument before this Court is not

19    necessary for the Court to rule on the issue presented.  Moreover, the Plaintiff States' request for

20    a temporary restraining order has expired because it requested relief from the Court by Thursday,

21    October 19, 2017 at 4:00 p.m.  As open enrollment begins on November 1, 2017, relief from the

22    Court to continue the payments is necessary for stability, and to avoid the chaos, uncertainty, and

23    confusion created by the Defendants' precipitous declaration of nonpayment.  In order to alleviate

24    that harm, relief more durable than a temporary restraining order is needed.  Finally, in the event

25    that either party would like to seek review of the Court's order, a preliminary injunction order

26    provides a cleaner procedural vehicle for review, which is in everyone's interest.

27                                **CONCLUSION**

28         The Court should grant Plaintiffs' request for a preliminary injunction.

                                     20

1    Dated:  October 21, 2017                     Respectfully Submitted,

2                                                 XAVIER BECERRA
                                                  Attorney General of California
3                                                 JULIE WENG-GUTIERREZ
                                                  Senior Assistant Attorney General
4

5                                                 */s/ Gregory D. Brown*
                                                  */s/ Nimrod P. Elias*
6
                                                  GREGORY D. BROWN
7                                                 NIMROD P. ELIAS
                                                  Deputy Attorneys General
8                                                 *Attorneys for Plaintiff the State of California*

9                                                 GEORGE JEPSEN
                                                  Attorney General of Connecticut
10                                                JOSEPH R. RUBIN
                                                  Associate Attorney General
11                                                ROBERT W. CLARK
                                                  Special Counsel to the Attorney General
12                                                *Attorneys for Plaintiff the State of Connecticut*

13                                                MATTHEW P. DENN
                                                  Attorney General of Delaware
14                                                AARON R. GOLDSTEIN
                                                  State Solicitor
15                                                SARAH FISHMAN GONCHER
                                                  JOHN H. TAYLOR
16                                                Deputy Attorneys General
                                                  *Attorneys for Plaintiff the State of Delaware*
17
                                                  KARL A. RACINE
18                                                Attorney General for the District of Columbia
                                                  ROBYN R. BENDER
19                                                Deputy Attorney General
                                                  *Attorneys for Plaintiff the District of Columbia*
20
                                                  LISA MADIGAN
21                                                Attorney General of Illinois
                                                  DAVID F. BUYSSE
22                                                Deputy Chief, Public Interest Division
                                                  *Attorneys for Plaintiff the State of Illinois*
23
                                                  THOMAS J. MILLER
24                                                Attorney General of Iowa
                                                  NATHAN BLAKE
25                                                Deputy Attorney General
                                                  *Attorneys for Plaintiff the State of Iowa*
26

27

28

Plaintiffs' Reply ISO Motion for a TRO and OSC Re Preliminary Injunction  (3:17-cv-05895-VC)

1                                     ANDY BESHEAR
                                    Attorney General
2                                     Commonwealth of Kentucky
                                    LA TASHA BUCKNER
3                                     Executive Director
                                    Office of Civil and Environmental Law
4                                     S. TRAVIS MAYO
                                    TAYLOR PAYNE
5                                     Assistant Attorneys General
                                    *Attorneys for Plaintiff the Commonwealth of*
6                                     *Kentucky*

7                                     BRIAN E. FROSH
                                    Attorney General of Maryland
8                                     STEVEN M. SULLIVAN
                                    Solicitor General
9                                     *Attorneys for Plaintiff the State of Maryland*

10                                   MAURA HEALEY
                                    Attorney General of Massachusetts
11                                     ERIC GOLD
                                    Assistant Attorney General
12                                   *Attorneys for Plaintiff the Commonwealth of*
                                    *Massachusetts*
13

14                                   LORI SWANSON
                                    Attorney General of Minnesota
15                                     ALAN GILBERT
                                    Solicitor General
16                                     JASON PLEGGENKUHLE
                                    KATHERINE KELLY
                                    Assistant Attorneys General
17                                   *Attorneys for Plaintiff the State of Minnesota*

18                                   HECTOR H. BALDERAS
                                  Attorney General of New Mexico
19                                   TANIA MAESTAS
                                  Chief Deputy Attorney General
20                                   *Attorneys for Plaintiff the State of New Mexico*

21                                   ERIC T. SCHNEIDERMAN
                                  Attorney General of New York
22                                   BARBARA D. UNDERWOOD
                                  Solicitor General
23                                   STEVEN C. WU
                                  Deputy Solicitor General
24                                   HOWARD MASTER
                                  Senior Enforcement Counsel
25                                   LISA LANDAU
                                  Bureau Chief, Health Care Bureau
26                                   ERIC HAREN
                                  Special Counsel and Senior Advisor
27                                 *Attorneys for Plaintiff the State of New York*

28

JOSHUA H. STEIN
Attorney General of North Carolina
RYAN Y. PARK
Deputy Solicitor General
SRIPRIYA NARASIMHAN
Deputy General Counsel
*Attorneys for Plaintiff the State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon
HENRY KANTOR
Special Counsel to the Attorney General
J. NICOLE DeFEVER
Assistant Attorney General
*Attorneys for Plaintiff the State of Oregon*

JOSH SHAPIRO
Attorney General of Pennsylvania
JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
PATRICK M. GREENE
Deputy Attorney General
*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

PETER KILMARTIN
Attorney General of the State of Rhode Island
REBECCA TEDFORD PARTINGTON
Chief, Civil Division
MICHAEL W. FIELD
Assistant Attorney General
*Attorneys for Plaintiff the State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
*Attorneys for Plaintiff the State of Vermont*

MARK R. HERRING
Attorney General of Virginia
MATTHEW R. MCGUIRE
Acting Deputy Solicitor General
*Attorneys for Plaintiff the Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of Washington
JEFFREY T. SPRUNG
RENE D. TOMISSER
Assistant Attorneys General
*Attorneys for Plaintiff the State of Washington*

23

SF2017401709
12856587

24