UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, et al.,<br><br>        Defendants. | Case No.  17-cv-05895-VC<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |

The Affordable Care Act requires health insurance companies to subsidize the cost of co-payments and deductibles for lower-income people.  In turn, the Act requires the federal government to make advance payments to the companies to cover the cost of this subsidy.  The legal problem in this case is that while the Act requires the insurance companies to be paid, it's unclear whether the Act actually appropriated money for these payments.  If Congress doesn't appropriate money for a program, the Constitution prohibits the executive branch from spending money on that program – even if Congress previously enacted a statute requiring the expenditure.

The Obama Administration took the position that the Affordable Care Act indeed appropriated money for the payments, so it drew funds from the U.S. Treasury every month to make them.  The Trump Administration initially continued this practice, but has now concluded that the Act did not actually make the necessary appropriation.  So the Trump Administration has terminated the payments, at least until Congress decides to appropriate the money.

In response, the State of California, along with 17 other states and the District of Columbia, filed this lawsuit, contending the Obama Administration was right.  They seek an

emergency ruling requiring the Trump Administration to continue making the payments while the lawsuit is pending. This request is denied. First, although the case is at an early stage, and although it's a close question, it appears initially that the Trump Administration has the stronger legal argument. Second, and more importantly, the emergency relief sought by the states would be counterproductive. State regulators have been working for months to prepare for the termination of these payments. And although you wouldn't know it from reading the states' papers in this lawsuit, the truth is that most state regulators have devised responses that give millions of lower-income people better health coverage options than they would otherwise have had. This is true in almost all the states joining this lawsuit. Including California, whose regulators issued a press release just days before the suit explaining how so many lower-income people will benefit.

# I.

The central purpose of the Affordable Care Act is to provide health coverage for the millions of people who don't get it through their jobs. Six years after its enactment in 2010, the Act is well on its way to achieving that purpose: almost half of the previously uninsured people in the United States now have coverage.[1] Some people have coverage because the Act expanded Medicaid eligibility.[2] Many others have purchased insurance, usually on new insurance "exchanges" where people can shop for coverage. Three key policies acting in concert have enabled the Act's success: (1) the Act bars insurance companies from denying coverage to people or charging them more based on their health status; (2) the Act requires people to buy insurance; and (3) the Act provides significant subsidies to help lower-income people buy insurance on the exchanges. It cannot reasonably be disputed that, for the Affordable Care Act to achieve its

---

[1] *See* Robin A. Cohen et al., National Center for Health Statistics, *Health Insurance Coverage: Early Release of Estimates from the National Health Interview Survey, 2016* at 2 (May 2017), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201705.pdf [https://perma.cc/W2TP-L9RK].

[2] Around 15 million people were covered by the expansion of Medicaid in 2016. *Medicaid Expansion Enrollment, Timeframe: FY 2016*, Kaiser Family Foundation, https://www.kff.org/health-reform/state-indicator/medicaid-expansion-enrollment [https://perma.cc/EWQ4-MUZ5].

goals, all three of these pillars must remain standing.  *See King v. Burwell*, 135 S. Ct. 2480, 2485, 2487 (2015).

     Lower-income people have access to two forms of subsidies to help them afford insurance sold on the exchanges.  The most significant subsidy is a tax credit to help offset the cost of monthly insurance premiums: people whose income puts them between 100% and 400% of the federal poverty level receive significant tax credits to alleviate the cost of buying insurance.  (The federal poverty level for a single person is a mere $12,060 per year.)[3]  To use an example of how the tax credit works on the exchanges, in San Francisco, a 60-year-old making around $45,000 in 2017 could purchase a fairly typical plan for around $360 per month – even though the actual premiums would be $940 per month absent the tax credits.[4]  A large majority of people who purchase health care on the exchanges rely on these tax credits.[5]

     The premium tax credit is structured so you get it in advance, when you are actually paying your insurance premiums.  Although normally with tax credits you have to wait for the benefits until your tax returns are filed the following year, the Affordable Care Act established a system through which your tax credit is estimated and paid in advance to the insurance companies, so they can reduce your premiums by a corresponding amount.  If, after the year is over, there is a discrepancy between the discount you received and the amount of your premium tax credit, it is reconciled through your tax returns.  26 U.S.C. § 36B(f).  In fact, when you're shopping for insurance on the exchange – at least in California – you are not even told the amount of monthly premium before the tax credit.  You're simply told the amount you're required to pay.[6]

---

[3] Annual Update of the HHS Poverty Guidelines, 82 Fed. Reg. 8831, 8832 (Jan. 31, 2017).
[4] App. B at 2, 5; 2017 QHP Individual Rates, Covered California, http://hbex.coveredca.com/data-research/library/2017_QHP_Individual_Rates_File_for_Posting_100716.xlsx [https://perma.cc/2MT6-EH3D]; *see also* 26 U.S.C. § 36B(b)(2)(B).
[5] In March 2016, 84.7% of people who purchased health care on the exchanges received the tax credit.  March 31, 2016 Effectuated Enrollment Snapshot, Centers for Medicare & Medicaid Services, https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-sheets-items/2016-06-30.html [https://perma.cc/3ESH-M44Z].
[6] *See, e.g.*, App. B at 4-6, 9-11.

The other subsidy – the one that's the subject of this dispute – reduces the amount that lower-income people have to pay out-of-pocket when they use their insurance to get care.  When you have insurance, you typically make "co-payments" when you visit the doctor or pick up medications from the pharmacy.  Sometimes you also have a "deductible," which means that you must pay the full cost of your health-care expenses until you reach the deductible amount, at which point your insurance kicks in and covers the rest.  You also might be required to pay "co-insurance."  Co-insurance is triggered after you've reached your annual deductible and requires you to pay a percentage, say 20%, of your doctor's bill or the price of your medications; the insurance company pays the remaining share.

The Affordable Care Act refers to these payments as "cost-sharing" payments, because you are sharing the cost of your treatment with your insurance company.  The subsidy provided by the Act is called a "cost-sharing reduction," because the insurance companies are forced to reduce your cost-sharing payments.  Specifically, the Act requires insurance companies to offer plans to lower-income people with reduced cost-sharing payments.  People whose income puts them between 100% and 250% of the federal poverty level can buy plans of this type.

In turn, the Act requires the federal government to compensate the insurance companies for those reductions.  Typically, people refer to the payments by the federal government to the insurance companies as "cost-sharing reduction payments," or "CSR payments."  Throughout this opinion, the phrase "CSR payments" references these payments that the federal government is required to make to the insurance companies.

As with the tax credits, the Act provides that the federal government will pay for these subsidies in advance.  Specifically, the federal government estimates in advance the amount of subsidy to which you are entitled and makes a CSR payment in that amount to your insurance company.  As a result, the insurer can reduce your cost sharing by a corresponding amount throughout the year on the federal government's dime.  If, after the year is over, you ended up using less money from the subsidy than what the federal government gave the insurance company, the insurance company must return the excess to the federal government.  *See* 45

C.F.R. § 156.430(e)(2).

The premium tax credits and the cost-sharing reductions work together: the tax credits help people obtain insurance, and the cost-sharing reductions help people get treatment once they have insurance.  In 2016, the federal government spent $32 billion on premium tax credits, and these credits helped around 10 million people purchase insurance on the exchanges.  For the same year, it spent $7 billion on CSR payments to insurance companies, which helped 7 million people pay for doctor's visits, medications, and other treatment. [7]

Following passage of the Affordable Care Act, and once the exchanges were ready to get up and running, an issue about the statutory language arose.  For the premium tax credits, the language of the Act was clear: it required the tax credits to be paid, and made a "permanent appropriation" for those tax credits, meaning the money would automatically be available each year for the executive branch to fulfill its duty to make the payments.  But for the cost-sharing subsidies, the language of the Act was different.  It required the insurance companies to give people the reductions, and it required the federal government to pay the insurance companies in advance for these reductions, but it did not explicitly make a permanent appropriation for the CSR payments to the insurance companies.  Absent a permanent appropriation, the responsibility would be on Congress to help fulfill the federal government's obligation to make the CSR payments by providing money through the annual appropriations process.

In 2013, the Obama Administration concluded that the Act could be interpreted as implicitly making a permanent appropriation for CSR payments, meaning that no annual appropriations were required.  So, beginning in January 2014, the Administration began drawing money from the U.S. Treasury to make those payments on a monthly basis, just as it did for the

---

[7] Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026* 31, tbl. 2 (2016), https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51385-healthinsurancebaselineonecol.pdf [https://perma.cc/M3S7-8X53]; 2017 Marketplace Plan Selections with Financial Assistance, Kaiser Family Foundation, https://www.kff.org/health-reform/state-indicator/2017-marketplace-plan-selections-by-financial-assistance-status [https://perma.cc/VX6G-Q47Z].

premium tax credits.  In contrast, the House of Representatives took the position that the Act contained no permanent appropriation for CSR payments.  Because Congress was not making annual appropriations, the House believed the Administration was violating the Constitution by making payments to the insurance companies for which money had not been appropriated.  *See* U.S. Const. art. I, § 9, cl. 7 ("No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . .").

Accordingly, in November 2014, the House filed a federal lawsuit against the Obama Administration in Washington, D.C., to stop the allegedly unconstitutional payments.  In May 2016, United States District Judge Rosemary Collyer ruled in favor of the House, concluding the Act had made no permanent appropriation for the federal government to make CSR payments. As a result, Judge Collyer concluded, the Administration could not (absent annual appropriations or an amendment to the Affordable Care Act providing for a permanent appropriation) continue to make the CSR payments.  *U.S. House of Representatives v. Burwell*, 185 F. Supp. 3d 165, 168 (D.D.C. 2016).  However, Judge Collyer stayed her ruling so the federal government could continue making the payments while the Obama Administration pursued an appeal of her ruling in the D.C. Circuit.  *Id.*  The Obama Administration therefore continued making payments.

Then the election happened.  Shortly afterward, on November 21, 2016, the House asked the D.C. Circuit to stay the appeal.  Appellee's Motion to Hold Briefing in Abeyance, *U.S. House of Representatives v. Burwell*, No. 16-5202 (D.C. Cir. Nov. 21, 2016).  The House explained that, in light of public statements by members of the incoming Trump Administration, it believed that the executive branch might reconsider its legal position on the validity of the payments. Given that, the House asserted that it might be a waste of time to keep moving forward on an appeal the new Administration might eventually drop.  *Id.* at 3-4.  The D.C. Circuit granted the motion in December 2016 and stayed the case.  Order Granting Motion to Hold in Abeyance, *U.S. House of Representatives v. Burwell*, No. 16-5202 (D.C. Cir. Dec. 5, 2016).

In spring 2017, 17 states (including most of those bringing the current lawsuit) and the District of Columbia sought to intervene in the D.C. Circuit appeal.  Their argument for

intervention was that: (i) they believed the Affordable Care Act had made a permanent appropriation for CSR payments; (ii) it appeared the Trump Administration was prepared to renounce that position, leaving nobody in the case to argue it; and (iii) the states would be harmed if the payments stopped.  In August 2017, the D.C. Circuit granted the states' motion.  It concluded that the states had standing to intervene because they would be injured by any decision to terminate the payments, and that the states' participation in the appeal was needed to ensure that someone would continue to argue the position previously taken by the Obama Administration in the case.  Order Granting Motion to Intervene, *U.S. House of Representatives v. Price*, No. 16-5202 (D.C. Cir. Aug. 1, 2017).  But the D.C. Circuit kept the stay in place, apparently awaiting the Trump Administration's decision about whether it would change its position in the case.

Meanwhile, seeing the writing on the wall, states throughout the country began working with insurance companies early in 2017 to prepare for the likelihood that the Trump Administration would switch positions and stop making the CSR payments.  The problem was that even if the payments to the insurance companies stopped, the Affordable Care Act would still require the companies to provide the cost-sharing reductions to patients enrolled in certain plans.  To offset this cost increase, insurance companies would want to raise premiums for 2018 insurance coverage.  And if the companies did not believe they'd be able to offset the costs through premium increases, they might withdraw from the exchanges for 2018.  Withdrawal by an insurance company would be especially harmful if it was the only company offering plans on an exchange for a given region: although people can buy insurance "off-exchange," they are only eligible for premium tax credits or cost-sharing reductions if they purchase insurance on an exchange.  *See* 42 U.S.C. § 18071(b)(1); 26 C.F.R. § 1.36B-2(a)(1).  So most states went to work with the insurance companies to try to figure out a way the companies could increase premiums to make up for the expected termination of the CSR payments.  Their efforts are described more fully in Section IV below.

On October 11, 2017, the anticipated termination of the CSR payments became a reality.

The Attorney General sent a letter to the Treasury Department and the Department of Health and Human Services, explaining his view that the Affordable Care Act had not made a permanent appropriation for the CSR payments, and that the agencies therefore were precluded from making them. Notice at 6, *U.S. House of Representatives v. Hargan*, No. 16-5202 (D.C. Cir. Oct. 13, 2017). The next day, the White House announced this decision to the media. The day after that, October 13, the Justice Department filed a notification with the D.C. Circuit, informing it of the decision. *Id.*

Also on October 13, the State of California, along with 17 other states and the District of Columbia, filed this lawsuit in San Francisco. They allege the federal government is required under the Affordable Care Act to make the CSR payments to the insurance companies, that the Act permanently appropriated the money to make these payments, and that the Administration is therefore violating the law by refusing to make them. On October 18, the states filed a request for a temporary restraining order that would force the Administration to make the payments. The states sought a ruling by 4 p.m. on October 19, because the insurance companies had been anticipating the next round of payments on October 20. During a telephonic conference with the parties, the Court declined to issue a ruling on such a tight time frame and without receiving a response from the Administration. Instead, the Court scheduled a hearing for October 23. Since then, both sides have agreed that the TRO application should be converted to a motion for a preliminary injunction. Therefore, the question presented by this motion is whether the Court should issue a preliminary injunction requiring the Administration to make the CSR payments to the insurance companies while this case is pending, rather than wait until the case is fully adjudicated before deciding what relief (if any) is appropriate.

## II.

The Administration believes that two procedural defects in the states' lawsuit prevent the Court from even inquiring whether to issue a preliminary injunction. The current record reveals no such defects.

First, the Administration contends the states lack standing under Article III of the

Constitution to bring this case in federal court, because they have failed to allege any direct injury from the decision to terminate the CSR payments. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992). But the states allege – among other harms – that they have incurred and will continue to incur administrative costs because of the disruption to the exchanges caused by the federal government's decision to stop CSR payments. And the states have presented evidence to back up those allegations. These costs are enough to satisfy the standing requirement. *See West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004); *see also Texas v. United States*, 787 F.3d 733, 748-41 (5th Cir. 2015); *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012); Order Granting Motion to Intervene at 1-2, *U.S. House of Representatives v. Price*, No. 16-5202 (D.C. Cir. Aug. 1, 2017) (holding the states have standing based on their allegations of harm to their citizens from the termination of CSR payments and the resulting costs likely to be borne by the states in response to the harm).

Second, the Administration contends that even if the states have standing to sue in federal court, they haven't sued in the proper federal court. Since most of the plaintiffs in this case have intervened in the D.C. Circuit appeal, the Administration contends it is not appropriate for the states to pursue a separate action in this Court. While it's true that the usual rule is for federal district courts to refuse to adjudicate matters where a case with significant overlap is already being adjudicated in another federal court, that rule is subject to many exceptions. Whether to allow the second suit to proceed is a matter of judicial discretion, particularly in extraordinary cases. *See Church of Scientology of California v. U.S. Dep't of Army*, 611 F.2d 738, 749-50 (9th Cir. 1980), *overruled on other grounds*, *Animal Legal Defense Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016) (en banc); *see also Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991); *EEOC v. Univ. of Pennsylvania*, 850 F.2d 969, 977 (3d Cir. 1988). This is not a situation where a plaintiff sued in one court, didn't like how it was going, and then tried to sue in another court. *See, e.g.*, *Padilla v. Willner*, No. 15-cv-04866-JST, 2016 WL 860948, at *5 (N.D. Cal. Mar. 7, 2016). Nor is it a situation where a plaintiff sued in one court only to see the defendant respond by suing in a different forum that the defendant found

more attractive.  *See, e.g.*, *Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F. Supp. 2d 949, 955-64 (N.D. Cal. 2008).  The states were not parties to the D.C. litigation until they moved to intervene in the appeal to protect their interests.

Moreover, given the states' alleged need for emergency relief, it was not merely justifiable to seek that relief in a different forum; it was prudent.  The D.C. case is on appeal, and currently stayed, so it's not clear how quickly the states could get their request for emergency relief heard in D.C.  What's more, there are serious questions about whether the D.C. Circuit has jurisdiction in the appeal.  The Obama Administration argued, and the Trump Administration continues to argue, that the House of Representatives never had standing to bring the lawsuit challenging the CSR payments in the first place.  Brief for Appellants at 19-38, *U.S. House of Representatives v. Burwell*, No. 16-5202 (D.C. Cir. Oct. 24, 2016); Defs.' Opp'n at 8 n.5, Dkt. No. 35.  If that's correct (and could it really be wrong if both Administrations agree on it?), it means Judge Collyer lacked jurisdiction to issue the ruling against the Obama Administration. This, in turn, likely means the D.C. Circuit lacks jurisdiction to do anything other than dismiss the appeal (or remand to the district court with instructions to dismiss the case for lack of standing).  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *see also, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 539-49 (1986); *Ervine v. Desert View Regional Medical Center Holdings, LLC*, 753 F.3d 862, 866-71 (9th Cir. 2014).

## III.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  A court may grant a preliminary injunction even if a plaintiff only shows that there are "serious questions going to the merits"—a lesser showing than likelihood of success on the merits, if the balance of hardships "tips sharply in the plaintiff's favor," the plaintiff is likely to suffer irreparable harm, and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

(9th Cir. 2011).  When the government is a party, the public interest and balance of hardships analyses often merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

## A.

First the merits.  On the legal question presented – whether Congress has appropriated money for the CSR payments – both sides have reasonable arguments.  However, with the important caveats that the Court has only been given a few days to study this complex matter and the states may not have fully developed all arguments, it initially appears the Administration has the stronger legal position.[8]

To understand both sides' arguments, it's important to know how laws get put on the books.  When statutory provisions from new laws like the Affordable Care Act are incorporated into the U.S. Code (the official compilation of all federal laws), they are considered "codified."  The U.S. Code is divided into different parts based on subject area, such as the Internal Revenue Code and the Public Health and Welfare Code.  The numbering of the sections of bills when they are first passed by Congress do not match the numbering of the sections of the U.S. Code where they are ultimately codified.  In other words, when Congress votes on a bill, that bill has many sections.  But language from different sections of the bill is often inserted into different parts of the U.S. Code, based on what the particular section seeks to accomplish.

The Affordable Care Act contains clear language making a permanent appropriation for the premium tax credits.  Section 1401 of the Act established the premium tax credits, and the language of section 1401 was codified in the Internal Revenue Code – specifically, in 26 U.S.C. § 36B.  Section 36B provides that lower-income people buying insurance on an exchange "shall"

---

[8] The states raise claims under the Administrative Procedure Act, the Take Care Clause of the U.S. Constitution, and the Declaratory Judgment Act.  Complaint at 22-23.  Success on any of these claims almost certainly depends on whether Congress appropriated money to fund the CSR payments, because the Court can only award the relief the states seek if money was appropriated for this purpose.  *See, e.g.*, *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424-25 (1990); *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850); *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992).

receive the "premium assistance credit." *Id.* That is how, to use federal budgeting parlance, the tax credits were "authorized." But this language does not appropriate the money for the credits. The Affordable Care Act accomplished the appropriation by amending a different statute, namely 31 U.S.C. § 1324. This statute is contained in the portion of the U.S. Code titled "Money and Finance," and section 1324 is in fact titled "refund of internal revenue collections." Subsection 1324(a) makes a permanent appropriation for tax refunds, stating that "[n]ecessary amounts are appropriated to the Secretary of the Treasury for refunding internal revenue collections as provided by law." Then, subsection 1324(b) imposes limits on the tax refunds for which the permanent appropriation is made. It states that the executive branch may "only" make disbursements under section 1324 for: (1) individual tax refunds; and (2) "refunds due from" various provisions of the Internal Revenue Code, including (after passage of the Affordable Care Act) section 36B. Therefore, section 1324 clearly contains a permanent appropriation for the premium tax credit program codified at 26 U.S.C. § 36B.

This clarity is in contrast to the language in the Act involving cost-sharing reductions. As mentioned in the preceding paragraph, section 1401 of the Affordable Care Act created the tax credits and was codified at 26 U.S.C. § 36B – which is part of the Internal Revenue Code. Section 1402 of the Affordable Care Act created the cost-sharing reduction program. Unlike section 1401's premium tax credits, section 1402's cost-sharing reduction program is not codified in section 36B of the Internal Revenue Code; rather it is codified in the Public Health and Welfare Code, at 42 U.S.C. § 18071. The cost-sharing reduction program requires the insurance companies to lower the amount consumers must pay out of pocket, and in turn requires the federal government to pay the companies for the reductions. 42 U.S.C. § 18071(c)(3)(A) (federal government "*shall* make periodic and timely payments to the [insurance company] equal to the value of the reductions" (emphasis added)). This is how the Affordable Care Act "authorized" the cost-sharing reduction program and the CSR payments to the insurers. But there is no explicit language regarding appropriations. While the Act added section 36B of the Internal Revenue Code to the permanent appropriations statute for tax refunds (namely, 31

U.S.C. § 1324) the Act did not add section 18071 of the Public Health and Welfare Code to that same appropriations statute for tax refunds.  Nor does the Act appear to have included any other explicit language making a permanent appropriation for the CSR payments to insurers.  This may suggest that Congress needed to make annual appropriations before the executive branch could make the CSR payments, and that the Obama Administration (along with the Trump Administration for the first half of 2017) acted unconstitutionally by making the payments every month since 2014.  *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."); *see also U.S. House of Representatives*, 185 F. Supp. 3d at 185.

The response by the states is that the language of 31 U.S.C. § 1324, which makes a permanent appropriation for the premium tax credits established in 26 U.S.C. § 36B, impliedly includes a permanent appropriation for the CSR payments established by 42 U.S.C. § 18071.  Specifically, the states argue that: (i) 31 U.S.C. § 1324 appropriates money for "refunds due from" 26 U.S.C. § 36B; (ii) the cost-sharing reductions from 42 U.S.C. § 18071 are closely coordinated with the premium tax credits throughout the statute; (iii) a person cannot receive the cost-sharing reductions unless she also gets the tax credits; and therefore (iv) the cost-sharing reductions from 42 U.S.C. § 18071 should be considered "refunds due from" section 36B within the meaning of section 1324.

This argument is based on the Supreme Court's ruling in *King v. Burwell*, which also involved the Affordable Care Act.  There, the Court considered language providing that tax credits would go to people who purchased insurance through "an Exchange established by the State."  *King*, 135 S. Ct. at 2487.  This language seemed unambiguous when read in isolation: premium tax credits were available for lower-income people who purchased insurance through an exchange established by a state, but not for people who purchased insurance through an exchange established by the federal government.  But the Court held that the Act did, in fact, provide premium tax credits for lower-income people who bought insurance through federal exchanges.  *Id.* at 2495-96.

13

There were two steps in the Court's analysis.  First, the Court determined that although the pertinent language seemed unambiguous when read in isolation, it became ambiguous upon reading other parts of the Act.  Among other things, the Act required all exchanges (state and federal) to complete certain tasks relating to the premium tax credits.  "If tax credits were not available on Federal Exchanges," the Court explained, "these provisions would make little sense."  *Id.* at 2492.

Second, after concluding that the phrase "an Exchange established by the State" was ambiguous in light of the surrounding statutory language, the Court set out to resolve the ambiguity by examining the purposes of the Affordable Care Act.  That part was easy, because as discussed at the outset of this ruling, there are three pillars to the Act: preventing insurers from refusing coverage or charging more based on a person's health status, requiring people to get insurance, and making it affordable to purchase insurance on the exchanges.  The failure to provide tax credits to lower-income people in places with federal exchanges would have removed one of those pillars, causing the whole health care reform project designed by Congress to come crumbling down.  *Id.* at 2495-96.  Thus, the Court resolved the ambiguity in the pertinent language by interpreting it to provide tax credits for insurance purchased on all exchanges, state and federal.

In this case, the states present some good arguments relating to the second part of the *King v. Burwell* analysis.  To be sure, the absence of money for CSR payments does not seem to be causing health care reform to come crumbling down, as discussed in the next section.  Nonetheless, the absence of a permanent appropriation for these payments may be in significant tension with congressional purpose.  For example, as argued most persuasively by the amicus brief from America's Health Insurance Plans, the absence of a permanent appropriation seems odd from a timing standpoint.  Insurance companies must work with the states to set their rates for the coming year well in advance (for example, insurers were expected to set their 2018 rates early in 2017).  If CSR payments are subject to the vagaries of the annual appropriations process (which Congress often does not complete until late in the year), insurance companies cannot

14

reasonably predict how much it will cost to provide insurance on the exchanges. This uncertainty could make insurance companies less likely to offer coverage on the exchanges, leaving consumers with fewer options (or, far worse, no options) in a given geographic region.[9]

In addition, the two subsidies that form one pillar of health care reform – the tax credits and the cost-sharing reductions – fit hand in glove: the tax credits allow lower-income people to buy health coverage, and the cost-sharing reductions allow people to actually use this coverage. It's not clear why Congress would have intended more certainty for one type of expenditure than the other. This is particularly true where the Act establishes the same basic procedure for processing the subsidies. The federal government estimates the amount of tax credits and cost-sharing reductions to which a person is entitled and provides that amount in advance to the insurance company, allowing the insurance company to provide cheaper coverage to lower-income people who get insurance on the exchanges.[10] *See* 42 U.S.C. § 18082.

---

[9] On the other hand, perhaps one response is that this is not the first time Congress has imposed mandatory spending requirements – important ones – on the executive branch, while leaving appropriations for those spending requirements to the annual appropriations process. *See, e.g.*, 42 U.S.C. § 1396-1 (authorizing annual appropriations for Medicaid grants to states pursuant to Title XIX of the Social Security Act); Defs.' Opp'n at 22-23, Dkt. No. 35 (listing other mandatory spending programs funded by annual appropriations); *see also U.S. House of Representatives*, 185 F. Supp. 3d at 185.

[10] But perhaps the response here is that the tax credits are far more central to the Act's health care reform project, so Congress took extra care to protect funding for those. After all, as discussed earlier, the tax credits represent a much larger investment of money by the federal government – $32 billion in 2016 compared to $7 billion for the cost-sharing reductions. Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026* at 31, tbl. 2 (2016), https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51385-healthinsurancebaselineonecol.pdf [https://perma.cc/M3S7-8X53]. They benefit more people, as well as a wider range of the population (for the tax credits, people whose incomes put them between 100% and 400% of the federal poverty level, and for the cost-sharing reductions, people whose incomes put them between 100% and 250% of the federal poverty level). 2017 Marketplace Plan Selections with Financial Assistance, Kaiser Family Foundation, https://www.kff.org/health-reform/state-indicator/2017-marketplace-plan-selections-by-financial-assistance-status [https://perma.cc/VX6G-Q47Z]. It also bears recalling that the absence of funding for CSR payments does not prevent lower-income people from receiving that subsidy. It means only that the insurance companies pay for it, rather than the federal government. And as discussed in the next section, the states have devised a way for insurance companies to recoup those costs, apparently while also avoiding harm to (and instead

But recall that the Court in *King v. Burwell*, before resolving a statutory ambiguity by looking to the purpose of the Affordable Care Act, first had to conclude that a provision which seemed clear in isolation was actually ambiguous in light of other language in the Act.  It's this first part of the analysis that gives the states a tougher challenge.

Although the states emphasize that the premium tax credits and cost-sharing reductions are mentioned together no fewer than 45 times in the Affordable Care Act, it's not clear that this feature of the statute supports their proposed reading of it.  Repeatedly referring to the two programs by their separate names suggests Congress considered them distinct, if undoubtedly related.  And the statute often recites not just the names of these two programs, but the different statutory provisions that created them.  For instance, in the advance payment provision, which is central to the states' argument, the statute refers to "the premium tax credit allowable under section 36B of Title 26 and the cost-sharing reductions under section 18071 of this title."  42 U.S.C. § 18082(a)(1); *see also, e.g.*, *id*. § 300gg-4(l)(3)(A)(ii) ("credits under section 36B of Title 26 or cost-sharing assistance under section 18071 of this title"); *id*. § 18031(i)(3)(B) ("premium tax credits under section 36B of Title 26 and cost-sharing reductions under section 18071 of this title").  That Congress so often identified each reform by its location in one title of the U.S. Code or the other suggests that Congress was cognizant of the different way in which each reform fit into the statutory scheme.  In other words, the language relied on by the states may further suggest that  Congress did not intend the reference to section 36B in the permanent appropriation provision to encompass the CSR payments codified in an altogether different place.

The states also point to language prohibiting the use of either premium tax credits or CSR payments for abortion services.  *See id.* § 18023(b)(2)(A).  This language achieves the same purpose as the Hyde Amendment, which is the amendment routinely enacted as part of annual appropriations legislation that likewise bars the use of federal funds for abortion services.  *See*

---

benefitting) lower-income people who buy insurance on the exchange.

*Dalton v. Little Rock Family Planning Services*, 516 U.S. 474, 475 n.1 (1996) (per curiam). Including a similar restriction in the Affordable Care Act, the states contend, would be redundant unless the CSR payments were exempted from the annual appropriations process. Perhaps that's right. On the other hand, there appears to be no requirement that Congress incorporate the Hyde Amendment into its appropriations legislation every year. So perhaps there is an argument that Congress, by including a similar restriction in the Affordable Care Act, simply intended to ensure that the federal money associated with either reform not be used to pay for abortion services regardless of whether Congress chose to enact the Hyde Amendment in any given year. *See id.* at 477-78 (acknowledging "the changeable nature of spending bills in general, and the Hyde Amendment in particular" (citation omitted)).

The states also argue that, had Congress intended for the CSR payments to be funded through annual appropriations, it would have included a provision saying so. For instance, Congress could have included an "authorization of appropriations" provision when it set up the cost-sharing program, as it did in several other provisions of the Affordable Care Act. *See, e.g.*, Pub. L. No. 111-148, § 3511, 124 Stat. 119, 538 (2010); *id.* § 4003(a)(7), 124 Stat. at 543; *id.* § 5306(a), 124 Stat. at 626-67. In other words, in the states' view, because the Act included language authorizing annual appropriations for other programs implementing health care reform, the omission of such language in the CSR payment provisions suggests that Congress funded the CSR payments through the permanent appropriation in 31 U.S.C. § 1324(b). That might be right, but it's not a necessary conclusion. At oral argument, counsel for the states referred to other, unspecified programs created by the Affordable Care Act that didn't include specific authorization language but for which there may also be no permanent appropriation. Moreover, apparently such language is not needed to authorize an annual appropriation, and annual appropriations appear to be the default way in which Congress provides funds. *See* U.S. Government Accounting Office, GAO-04-261SP, Principles of Federal Appropriations Law (Vol. 1) 2-13, 2-41 (3d ed. 2004); *Civil Rights Commission*, 71 Comp. Gen. 378 (1992).

Looming over this whole discussion is the fact that the parties are disputing the meaning

of an appropriations statute, not just any statute.  Congress has established certain rules regarding appropriations, including that "[a] law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made . . . ."  31 U.S.C. § 1301(d).  Perhaps the clear-statement rule announced in this provision is of limited relevance here, since it is undisputed that the appropriations provision at issue, 31 U.S.C. § 1324, makes a permanent appropriation, meaning that the disagreement concerns the scope of that appropriation, not its existence.  Counsel for the Administration appeared to concede this point at oral argument.  But even putting section 1301 aside, the role of the Appropriations Clause in enforcing the constitutional separation of powers provides reason for caution in adopting a reading of an appropriations statute broader than the one most obviously provided by the text. *See, e.g.*, *U.S. Dep't of Navy v. Federal Labor Relations Authority*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).[11]

In sum, the Affordable Care Act requires the federal government to pay insurance companies to cover the cost-sharing reductions.  The federal government is failing to meet that obligation.  If there was no permanent appropriation in the Act, Congress is to blame for the

---

[11] There are a couple of arguments the states and their allies do not make.  Perhaps there is good reason for this, so the Court mentions them only as an indication of the extent to which further briefing and research would be helpful before a definitive ruling on the merits.  First, although the states contend Congress affirmatively intended to make a permanent appropriation through section 36B while the Administration contends Congress affirmatively intended to leave CSR payments to the annual appropriations process, it's conceivable that Congress simply forgot to include permanent appropriations language for the payments.  Certainly if CSR payments are as integral to the statutory scheme as the states claim (and as the Obama Administration argued) then the omission of any appropriations-related language may have been unintentional.  *Cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004); *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 872 (9th Cir. 1981).  There are, after all, numerous apparent errors in the statutory text. *See, e.g.*, *King*, 135 S. Ct. at 2942 (noting that the Affordable Care Act created "three separate Section 1563s").  The parties have not discussed what the legal implications would be if Congress had intended, but simply forgotten, to make the appropriation.  Nor do the states explore, as an alternative argument, the possibility that funds for CSR payments could be drawn from a general programmatic appropriation or other source.  *Cf.* Department of Health and Human Services – Risk Corridors Program, B-325630, 2014 WL 4825237 (Comp. Gen. Sept. 30, 2014).

failure, because it has not been making annual appropriations for CSR payments. The Administration cannot fix Congress's error, because the Constitution prevents the Administration from making payments on its own. In contrast, if the Act created a permanent appropriation, the Administration is legally at fault for the federal government's failure to meet its obligation under the Act to make CSR payments. On the merits, it's a close and complicated question, even if the Administration may seem to have the better argument at this stage.

## B.

The remaining three preliminary injunction inquiries (irreparable harm to the plaintiffs, the balance of hardships, and the public interest) overlap significantly, so they are discussed together in this section. On the issue of harm to the plaintiffs themselves (namely, the states), the Administration's decision to terminate the CSR payments certainly will cause some degree of direct and irreparable injury. As already discussed in Section II, the states are incurring significant administrative costs in responding to the termination of the payments, and there likely is no way to remedy that when the case is over. But in a case like this, where so much of the harm is alleged to be inflicted on society, and particularly on lower-income residents who need health coverage, the crucial question is whether the absence of a preliminary injunction would harm the public and impede the objectives of health care reform. The Affordable Care Act is the law of the land, and its goal is to provide meaningful and affordable health coverage to people who don't get it through their jobs. Any significant interference with that goal not clearly permitted by law is a major harm that would justify an injunction.

But it bears repeating that the only question presented by this motion is whether the Court should require the Administration to make the CSR payments for a few months – that is, until this Court can reach a final decision on the case, likely in early 2018. Therefore, allegations by the states about harms that loom further on the horizon – say, in 2019 or beyond – are not particularly relevant at the moment, because those harms can likely be addressed at the end of the case, if the states are indeed able to prevail on the merits. What matters for this motion is how people will be affected in 2017 and 2018 without a preliminary injunction.

In that regard, it appears that because of the measures taken by the states in anticipation of a decision by the Administration to terminate CSR payments, the large majority of people who purchase insurance on exchanges throughout the country will either benefit or be unharmed.  In particular, many lower-income people stand to benefit.  To explain this requires a somewhat detailed discussion of how things work on the exchanges.

There are four basic levels of health insurance plans available on the exchanges: bronze plans, silver plans, gold plans, and platinum plans.  As the names imply, the levels vary in quality, with the bronze plans estimated to cover 60% of a person's health care costs, the silver plans 70%, the gold plans 80%, and the platinum plans 90%.  *See* 42 U.S.C. § 18022(d).

If you meet the income requirements (that is, if your income puts you between 100% and 400% of the federal poverty level) you qualify for the premium tax credits, and you can use those tax credits to help purchase insurance on the exchanges.  As mentioned earlier, you don't need to front the full premium payments and wait for a tax credit the following year.  Under the Affordable Care Act, the federal government estimates your tax credit for next year and gives the insurance company the money, so that you get an upfront discount on premiums based on your tax credit.  *See* 42 U.S.C. § 18082(c)(2)(A).

The calculation of the tax credit is complicated, but for this discussion what's important is that the amount is based on the cost of the second-cheapest silver plan available on the exchange in your geographic area, and then adjusted based on your income (that is, based on where you fall on the spectrum between 100% and 400% of the federal poverty level).  So, if premiums for the second-cheapest silver plan in your area go up, the amount of your tax credit will go up by a corresponding amount.  *See* 26 U.S.C. § 36B.

With respect to cost-sharing subsidies, the Affordable Care Act only requires insurers to offer them for silver plans.  42 U.S.C. § 18071(b)(1).  This often makes silver plans the most attractive for lower-income people who qualify for both tax credits and cost-sharing subsidies (people who earn between 100% and 250% of the poverty level).  The monthly premiums of the silver plans are relatively low and covered in part by tax credits, and the cost of actually going to

20

the doctor is low because of the Act's cost-sharing reductions.[12]

      With this background, let's rewind to early 2017.  Anticipating that the Administration would terminate CSR payments, most states began working with the insurance companies to develop a plan for how to respond.  Because the Affordable Care Act requires insurance companies to offer plans with cost-sharing reductions to customers, the federal government's failure to meet its CSR payment obligations meant the insurance companies would be losing that money.  So most of the states set out to find ways for the insurance companies to increase premiums for 2018 (with open enrollment beginning in November 2017) in a fashion that would avoid harm to consumers.  And the states came up with an idea: allow the insurers to make up the deficiency through premium increases for *silver plans only.*  In other words, allow a relatively large premium increase for silver plans, but no increase for bronze, gold, or platinum plans.[13]

      As a result, in these states, for everyone between 100% and 400% of the federal poverty level who wishes to purchase insurance on the exchanges, the available tax credits rise substantially.  Not just for people who purchase the silver plans, but for people who purchase other plans too.

---

[12] For example, when a person earning between 100% and 150% percent of the federal poverty level buys a silver plan, that silver plan is estimated to cover 94% of the person's health care costs because of the cost-sharing reduction subsidies.  *See* 42 U.S.C. § 18071(c)(2)(A).  Recall that a silver plan without cost-sharing subsidies is designed to cover only 70% of a person's health care costs.  By covering 94% of her costs, the silver plan with cost-sharing subsidies provides more insurance than even a platinum plan, which is designed to cover 90% of a person's health care costs.

[13] To be precise, premium increases for those other plans were permitted for other reasons, such as to account for changing medical costs and the overall health of plan members, but not to account for the loss of CSR payments from the federal government.

As an example, take a 50-year-old single person at 300% of the poverty level who lives in Santa Clara County (specifically, San Jose).  The chart below shows the effect for her, in 2018, of California's response to the Administration's termination of the CSR payments.  For 2017, her available tax credit was $284.  In 2018, because of the silver plan premium increases, her tax credit will be $393.  As a result, the area's most popular bronze plan would have cost her $134 per month in 2017, but the same bronze plan, with her increased tax credit, will cost her $53 per month in 2018.  The area's most popular silver plan would have cost her $292 per month in 2017, while the same plan will cost her only a dollar more per month in 2018.  And take a look at the gold plan.  The area's most popular gold plan would have cost her $354 per month in 2017, but it will cost her just $267 per month in 2018.  This means that if she had the silver plan in 2017, she can switch to the gold plan in 2018, paying $25 less per month for higher quality care.



These figures were taken directly from the website for Covered California, the state entity that operates the exchanges and is largely responsible for administering the Affordable Care Act exchanges in the state.  The chart is reproduced at Appendix A to this opinion, backed up by the screenshots from the queries made on the Covered California website.  Incidentally, in these screenshots the consumer is not told what the premium price would be absent the tax credit, so there's nothing to scare the customer away – nothing to mislead her into thinking the premiums are higher than they actually will be for her.  Appendices B through E contain charts and screenshots for people in other California cities and with different income levels.  Although results vary somewhat from place to place, the pattern is largely similar: for lower-income people who purchase insurance on the exchange, the elimination of the CSR payments will not increase premiums for the silver plans, but it will cause premiums for the other plans to go down. No wonder that back in January 2017, economists hired by the State of California estimated that the state's response to the anticipated termination of CSR payments would result in 20,000 more people buying health care in California in 2018.[14]

Even before the Administration announced its decision, 38 states accounted for the possible termination of CSR payments in setting their 2018 premium rates.[15]  And now that the

---

[14] Wesley Yin & Richard Domurat, Covered California, Evaluating the Potential Consequences of Terminating Direct Federal Cost-Sharing Reduction (CSR) Funding (2017), https://www.coveredca.com/news/pdfs/CoveredCA_Consequences_of_Terminating_CSR.pdf [https://perma.cc/ZB9D-XVVL].

[15] *See* Decl. of Jeff Wu at 5, Dkt. No. 35-5; *see also, e.g.*, *Part II Rate Increase Justification*, Mountain Health CO-OP, https://doi.idaho.gov/DisplayPDF?Cat=consumer&ID=2018_MHC_Indiv&Type=pdf [https://perma.cc/T6MN-PC4Z]; *Insurance Shopping A Challenge for Connecticut Consumers*, New Haven Register (Oct. 20, 2017), http://www.nhregister.com/news/article/Insurance-shopping-a-challenge-for-Connecticut-12293891.php [https://perma.cc/VH65-BYWD]; Steve Sinovic, *Subsidy Cut Already Priced Into Premiums*, Albuquerque Journal (Oct. 19, 2017), https://www.abqjournal.com/1080093/subsidy-cut-already-priced-into-premiums.html [https://perma.cc/9HKF-KP26]; Margot Sanger-Katz, *Trump's Attack on Insurer 'Gravy Train' Could Actually Help a Lot of Consumers*, New York Times (Oct. 18, 2017), https://www.nytimes.com/2017/10/18/upshot/trumps-attack-on-insurer-gravy-train-could-actually-help-a-lot-of-consumers.html; Kristen Schorsch, *How Team Rauner Hustled To Protect Obamacare from Trump*, Crain's Chicago Business (Oct. 17, 2017), http://www.chicagobusiness.com/article/20171017/NEWS03/171019869/how-team-rauner-hustled-to-protect-obamacare-from-trump [https://perma.cc/26GG-P9X4]; Louise Norris, Nevada's Health Insurance Marketplace: History and News of the State's Exchange,

announcement has been made, even more states are adopting a strategy like California's, including states that are plaintiffs in this lawsuit but had not already put a plan in place.[16]  Recall that roughly 85% of people who purchase insurance on exchanges throughout the country qualify for tax credits, and recall that roughly 12 million people purchase insurance on exchanges, so the improvements described above have the potential to benefit millions of lower-income people.

What about a person who does not qualify for tax credits?  This question is more complicated.  In the states that responded to the Administration's decision by permitting premium increases for only silver plans, this higher-income person can buy a bronze, gold, or platinum plan for the same price they'd otherwise have been required to pay.[17]  And in at least a

HealthInsurance.org (Oct. 5, 2017), https://www.healthinsurance.org/nevada-state-health-insurance-exchange/#CSR [https://perma.cc/W4E3-XUST].

[16] *See* Decl. of Jeff Wu at 5-6, Dkt. No. 35-5; Meredith Cohn, *Maryland Officials Consider Higher Obamacare Rates After Federal Subsidies Cut*, Baltimore Sun (Oct. 23, 2017), http://www.baltimoresun.com/health/bs-hs-new-obamacare-rates-20171023-story.html; Holly K. Michels, *Health Insurance Companies Able To Raise Rates, Continue Selling on Exchange*, Independent Record (Oct. 19, 2017), http://helenair.com/news/politics/state/health-insurance-companies-able-to-raise-rates-continue-selling-on/article_f2e30986-d61e-5b15-8fdc-73e8448ee1e4.html [https://perma.cc/C278-9RNA]; Press Release, Pennsylvania Pressroom, Acting Insurance Commissioner Announces Approved 2018 Individual and Small Group Rates, Highlights Opportunities To Lessen Impact of Trump Administration Actions on Pennsylvania Consumers (Oct. 16, 2017), http://www.media.pa.gov/Pages/Insurance-Details.aspx?newsid=278 [https://perma.cc/HZ8P-2VLE]; Letter from Mike Kreidler, Insurance Commissioner, State of Washington, to Plan Year 2018 Individual Market Health Plan Issuers (Oct. 16, 2017), https://www.insurance.wa.gov/sites/default/files/documents/Kreidler-letter-to-issuers-CSR-101617.pdf [https://perma.cc/Q5W9-SBG9]; Press Release, Oregon Division of Financial Regulation, State Announcement Regarding Trump Administration Discontinuation of Cost-Sharing Reduction Payments, Oregon Division of Financial Regulation (Oct. 13, 2017), http://dfr.oregon.gov/news/Pages/20171013-trump-payment-reduction.aspx [https://perma.cc/3HTP-RU58]; Liz Ruskin, *Premera To Bump Up Premium To Cover Trump Cut*, Alaska Public Media (Oct. 13, 2017), http://www.alaskapublic.org/2017/10/13/premera-to-bump-up-premium-to-cover-trump-cut [https://perma.cc/T4G8-TNCF].

[17] *See* Decl. of Jeff Wu at 7-8, Dkt. No. 35-5; *see also, e.g.*, Press Release, Oregon Division of Financial Regulation, State Announcement Regarding Trump Administration Discontinuation of Cost-Sharing Reduction Payments (Oct. 13, 2017), http://dfr.oregon.gov/news/Pages/20171013-trump-payment-reduction.aspx [https://perma.cc/3HTP-RU58]; Press Release, Pennsylvania Pressroom, Acting Insurance Commissioner Announces Approved 2018 Individual and Small Group Rates, Highlights Opportunities To Lessen Impact of Trump Administration Actions on Pennsylvania Consumers (Oct. 16, 2017), http://www.media.pa.gov/Pages/Insurance-Details.aspx?newsid=278 [https://perma.cc/HZ8P-2VLE]; Press Release, Covered California, Covered California Keeps Premiums Stable by Adding Cost-Sharing Reduction Surcharge Only to Silver Plans to Limit Consumer Impact 2 (Oct. 11, 2017), https://www.calhospital.org/sites/main/files/file-attachments/10-11-17_-_coveredca_-_csr_surcharge.pdf [https://perma.cc/4P73-BPCU].

subset of the states described above, including California, this person can also buy a silver plan without paying more. Although the monthly premiums for silver plans sold *on* the exchange will increase, insurers and regulators in some states have also developed a set of comparable plans available *off* the exchange. The monthly premiums for these "off-exchange silver" plans will not increase in response to the CSR increases, because unlike on-exchange silver plans, these plans will not provide cost-sharing reductions.[18] So someone with a higher income who wants to purchase a silver plan need not lose money, but to do so he will have to purchase that policy from outside the exchange.

For all these reasons, Covered California issued a press release the day before the Administration publicly announced its decision to terminate CSR payments. In the press release, Covered California proclaimed: "because the surcharge [that is, the increase attributable to the Administration's decision] will only be applied to Silver-tier plans, nearly four out of five consumers will see their premiums stay the same or decrease, since the amount of financial help they receive will also rise." The press release later says: "In addition, Covered California consumers with Silver plans *who do not receive financial help* to pay their premium can also avoid paying the surcharge by switching to a different metal tier or buying near-identical Silver coverage directly from a health insurance company."[19]

But apparently, even in California, one out of five consumers will see premiums increase because of the termination of CSR payments. Though the states certainly haven't offered a concrete explanation for why some people might see increased premiums, here are some possibilities. Some people whose income is not low enough to receive tax credits will likely enroll or re-enroll in silver plans sold on the exchange because they do not know they can purchase a comparable but more affordable plan outside the exchange. Others may see their

---

[18] *See supra* note 17.
[19] Press Release, Covered California, Covered California Keeps Premiums Stable by Adding Cost-Sharing Reduction Surcharge Only to Silver Plans to Limit Consumer Impact 1-2 (Oct. 11, 2017), https://www.calhospital.org/sites/main/files/file-attachments/10-11-17_-_coveredca_-_csr_surcharge.pdf [https://perma.cc/4P73-BPCU].

rates increase because the price of the silver plan they purchased increased by more than the price of the second cheapest silver plan in their region (the plan that matters for purposes of measuring tax credits). In any event, the Covered California press release says that about half those people "will see increases of less than $25 per month."[20]

Presumably, if the payments were restored, premiums for the silver plans would need to be reduced, because the insurance companies would no longer need to increase them to recover the value of the lost CSR payments. But as the above discussion shows, such a remedy would likely cause millions of lower-income people across the country who purchase insurance on the exchanges to be worse off than if today's status quo is preserved. Their tax credits would go down, the bottom-line cost of purchasing bronze and gold plans would go up, and the bottom-line cost of purchasing silver plans wouldn't go down.

When counsel for the State of California was confronted at oral argument with the fact that the relief sought by the states could cause this harm, he responded by suggesting that perhaps the Court could order the Administration to resume the CSR payments even while the states continue to allow the insurance companies to charge higher premiums on the exchanges, with the idea that the numbers would reconciled later, through some unexplained process. In other words, allow the insurance companies to collect double payments in 2018. This argument does not even merit a response.

But it does raise the question: why, in light of this discussion, have all these Attorneys General rushed to court seeking an emergency ruling against President Trump?

The primary reason offered by the states, and one they repeat over and over, is that premiums will go up for millions of people. But as already discussed, they are only able to make that argument sound compelling by omitting the fact that the premium increases in almost every state will cause tax credits to increase in a corresponding amount, leaving so many people (especially lower-income people) better off or unharmed. To be sure, in the few states that have

---

[20] *Id.* at 2.

not responded as most states have, the harm may be greater.  But it may not be too late for those states to change course; for example, just two days ago, Maryland apparently finalized its decision to take the California approach.[21]

The states also assert that insurance companies will withdraw from the exchanges for 2018 because of the Administration's decision to terminate the CSR payments.  But for the most part insurance companies seem to have chosen to work with the states to anticipate the termination rather than withdrawing.  And the states don't identify a single company that has withdrawn since the Administration announced its decision 13 days ago, even though open enrollment for 2018 begins just 7 days from now.  It's true, as the states note, that Anthem withdrew from some exchanges earlier this year, primarily citing the anticipated termination of CSR payments.  But the fact that more insurance companies have not done so suggests perhaps Anthem did not understand that states would devise a way for insurance companies to recoup their costs while avoiding harm to most people and in fact benefitting many.[22]

The states repeatedly cite a report from the Congressional Budget Office from August 2017 that predicted that termination of CSR payments would cause the ranks of the uninsured in the United States to increase by 1 million.  Two things about that.  First, this prediction was based on the assumption that many insurance companies would respond by fleeing the exchanges – something that hasn't happened (at least not for 2018).  Second, the Congressional Budget Office report predicts that, starting in 2020, the CSR payment termination will cause the ranks of

---

[21] Morgan Eichensehr, *Maryland Seeks To Minimize Higher Obamacare Premiums Following Subsidy Cut*, Baltimore Business Journal (Oct. 23, 2017), https://www.bizjournals.com/baltimore /news/2017/10/23/maryland-seeks-to-minimize-higher-obamacare.html [https://perma.cc/23GM-VNBN]; *see also* Decl. of Jeff Wu at 5-6, Dkt. No. 35-5.

[22] There may be one very real harm to the insurance companies: although they are recouping the lost CSR payments through 2018 premium increases, it appears those increases don't compensate for the missed payments in October, November, and December of 2017.  But financial harm is almost never irreparable harm.  *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).  The insurance companies could presumably recover that money once this case is over, if not through a judgment by this Court then through lawsuits brought under the Tucker Act, 28 U.S.C. § 1491(a)(1).  *See Greenlee County. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007); *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 441, 450 (2017); *see also United States v. Mitchell*, 463 U.S. 206, 215-16 (1983).

the uninsured to *decrease* by roughly 1 million people.[23]

Speaking of which, another harm the states discuss is that the termination of CSR payments will end up costing the federal government more money. They note, correctly, that the widespread increase in silver plan premiums will qualify many people for higher tax credits, and that the increased federal expenditure for tax credits will be far more significant than the decreased federal expenditure for CSR payments. In other words, in their effort to get emergency relief, the states complain that the federal government will be spending more money on health coverage for poor people.

The United States suffers from immense inequality of wealth and opportunity. Courts (and in fact, all branches of government) should be reluctant to balance harms or apply laws in ways that exacerbate these inequalities.[24] That's especially true when the statute involved – the Affordable Care Act – reflects a policy judgment that it's unacceptable to allow tens of millions of people (mostly lower-income people) to go uninsured. As the Ninth Circuit has explained in an analogous context, when the tradeoff is between saving money and allowing lower-income people to obtain meaningful health coverage, the balance tips sharply in favor of health coverage. *Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1125-26 (9th Cir. 2008). Therefore, to the extent the states are truly arguing that it's harmful to bolster health coverage for lower-income people through the use of the progressive tax system, that argument is not well-taken.

Finally, the states express concern that the termination of CSR payments will cause confusion among people who shop on the exchanges. In particular, the states argue, the fear of increased premiums may scare consumers from the exchanges. There is likely some truth to that. The Affordable Care Act is complicated, the endeavor of buying insurance on the exchanges is

---

[23] Congressional Budget Office, *The Effects of Terminating Payments for Cost-Sharing Reductions* 7 (2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53009-costsharingreductions.pdf [https://perma.cc/RF6V-TY3C].
[24] *See* Joseph Fishkin & William E. Forbath, *Wealth, Commonwealth, & the Constitution of Opportunity: A Story of Two Traditions*, NOMOS (forthcoming), http://ssrn.com/abstract=2620920 [https://perma.cc/RZ2R-4N28].

confusing enough as it is, and the consumers who shop there are not universally sophisticated. *See* Brief of Amicus Curiae Families USA et al. at 12-19, Dkt. No. 51-2.  But if the Administration's decision to terminate the CSR payments added to the confusion, would a court order requiring their resumption alleviate it?  Moreover, the states may be overstating their "confusion" argument.  As the Appendices illustrate, if you benefit from tax credits and you go shopping for insurance on the Covered California website, you may never even realize that premiums went up.  You are only informed of what *you* have to pay for insurance.  And as already discussed, if you're eligible for tax credits, it's highly likely you'll pay the same or less.

One last point on the issue of confusion.  If the states are so concerned that people will be scared away from the exchanges by the thought of higher premiums, perhaps they should stop yelling about higher premiums.  With open enrollment just days away, perhaps the states should focus instead on communicating the message that they have devised a response to the CSR payment termination that will prevent harm to the large majority of people while in fact allowing millions of lower-income people to get a better deal on health insurance in 2018.

# IV.

The motion for a preliminary injunction is denied.  A telephonic case management conference will take place on November 21, 2017, at 2:30 p.m. for the purpose of setting a schedule for the full adjudication of the case.

**IT IS SO ORDERED.**

Dated: October 25, 2017

_____

VINCE CHHABRIA
United States District Judge