XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
NELI N. PALMA, SBN 203374
NIMROD P. ELIAS, SBN 251634
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5841
  Fax:  (415) 703-5480
  E-mail:  Nimrod.Elias@doj.ca.gov
*Attorneys for Plaintiff the State of California*
*[Additional Counsel Listed on Signature Pages]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP, President of the United States, et al.,**<br><br>Defendants. | 3:17-cv-05895-VC<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER STAYING PROCEEDINGS OR, IN THE ALTERNATIVE, DISMISSING ACTION WITHOUT PREJUDICE**<br><br>**[IMMEDIATE VACATION OF DATES FOR DISPOSITIVE CROSS MOTIONS REQUESTED]**<br><br>Date:        August 23, 2018<br>Time:        10:00 a.m.<br>Courtroom:  4, 17th Floor<br>Judge:      Hon. Vince Chhabria<br>Trial Date:  None set<br>**Date Filed:  October 13, 2017** |

PLEASE TAKE NOTICE that on August 23, 2018, at 10:00 a.m., or as soon thereafter as

the matter may be heard in Courtroom 4 on the 17th Floor of the United States District Court for

the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California,

94012, Plaintiffs State of California, State of Connecticut, State of Delaware, District of

Columbia, State of Illinois, State of Iowa, Commonwealth of Kentucky, State of Maryland,

Commonwealth of Massachusetts, State of Minnesota, State of New Mexico, State of New York,

1

1   State of North Carolina, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island,

2   State of Vermont, Commonwealth of Virginia, and State of Washington will and hereby do

3   respectfully move this Court for an Order staying the proceedings, including vacating the dates in

4   the Court's Order of April 18, 2018 (ECF No. 99) (which set the dates/deadlines for the filing of

5   dispositive cross-motions), or, in the alternative, dismissing this action without prejudice.

6          As further detailed in the moving papers, staying the proceedings is warranted to avoid

7   disturbing the status quo given the general success of the practice commonly referred to as

8   "silver-loading" which mostly curbed the harm caused by the federal government's unjustified

9   cessation of cost-sharing reduction (CSR) subsidies mandated by Section 1402 of the Patient

10  Protection and Affordable Care Act (ACA).  At the same time, because of the real threat of the

11  federal government taking action to prohibit silver-loading, the Court should retain jurisdiction,

12  thus allowing the Plaintiff States to expeditiously seek appropriate remedies from this Court for

13  the protection of their citizens.  Alternatively, if the Court determines that a stay is not

14  appropriate at this time, the Plaintiff States respectfully request that the Court dismiss the action

15  without prejudice.

16         Because the Plaintiff States' motion for summary judgment is currently due on July 20,

17  2018, they respectfully request that this Court immediately vacate the dates for the dispositive

18  cross-motions set forth in the Court's Order of April 18, 2018 (ECF No. 99), pending resolution

19  of this motion.

20         The undersigned counsel has conferred with counsel for the federal Defendants about the

21  Plaintiff States' intention to file this motion for an order staying the proceedings or, in the

22  alternative, dismissing this action without prejudice.  Defendants' position is as follows:

23  "Defendants would not oppose the dismissal of this action without prejudice, but in light of

24  Plaintiffs' determination that they do not wish to proceed with litigation at this time, will oppose

25  Plaintiffs' alternative request that this case remain indefinitely stayed and open on the Court's

26  docket."

27

28

Notice of Motion for Order Staying Proceedings, or in the
Alternative, Dismissing Action Without Prejudice (3:17-Cv-05895-Vc)

1   Dated:  July 16, 2018                    Respectfully submitted,

2                                            XAVIER BECERRA
                                             Attorney General of California
3                                            JULIE WENG-GUTIERREZ
                                             Senior Assistant Attorney General
4                                            KATHLEEN BOERGERS
                                             Supervising Deputy Attorney General
5

6                                            */s/ Nimrod P. Elias*

7                                            NIMROD P. ELIAS
                                             NELI PALMA
8                                            Deputy Attorneys General
                                             *Attorneys for Plaintiff the State of California*
9
                                             GEORGE JEPSEN
10                                           Attorney General of Connecticut
                                             JOSEPH RUBIN
11                                           Associate Attorney General
                                             *Attorneys for Plaintiff the State of Connecticut*
12
                                             MATTHEW P. DENN
13                                           Attorney General of Delaware
                                             AARON R. GOLDSTEIN
14                                           Chief Deputy Attorney General
                                             SARAH FISHMAN GONCHER
15                                           JOHN H. TAYLOR
                                             Deputy Attorneys General
16                                           *Attorneys for Plaintiff the State of Delaware*

17                                           KARL A. RACINE
                                             Attorney General for the District of Columbia
18                                           ROBYN R. BENDER
                                             Deputy Attorney General
19                                           VALERIE M. NANNERY
                                             Assistant Attorney General
20                                           *Attorneys for Plaintiff the District of Columbia*

21                                           LISA MADIGAN
                                             Attorney General of Illinois
22                                           DAVID F. BUYSSE
                                             Deputy Chief, Public Interest Division
23                                           *Attorneys for Plaintiff the State of Illinois*

24                                           THOMAS J. MILLER
                                             Attorney General of Iowa
25                                           NATHAN BLAKE
                                             Deputy Attorney General
26                                           *Attorneys for Plaintiff the State of Iowa*

27

28

1 ANDY BESHEAR
  Attorney General
2 Commonwealth of Kentucky
  LA TASHA BUCKNER
3 Executive Director
  Office of Civil and Environmental Law
4 S. TRAVIS MAYO
  TAYLOR PAYNE
5 Assistant Attorneys General
  *Attorneys for Plaintiff the Commonwealth of Kentucky*
6

7 BRIAN E. FROSH
  Attorney General of Maryland
8 STEVEN M. SULLIVAN
  Solicitor General
  *Attorneys for Plaintiff the State of Maryland*
9

10 MAURA HEALEY
  Attorney General of Massachusetts
  ERIC GOLD
11 Assistant Attorney General
  *Attorneys for Plaintiff the Commonwealth of*
12 *Massachusetts*

13 LORI SWANSON
  Attorney General of Minnesota
14 ALAN GILBERT
  Solicitor General
15 JASON PLEGGENKUHLE
  KATHERINE KELLY
16 Assistant Attorneys General
  *Attorneys for Plaintiff the State of Minnesota*
17

18 HECTOR H. BALDERAS
  Attorney General of New Mexico
  TANIA MAESTAS
19 Chief Deputy Attorney General
  *Attorneys for Plaintiff the State of New Mexico*
20

21 BARBARA D. UNDERWOOD
  Acting Attorney General of New York
  STEVEN C. WU
22 Deputy Solicitor General
  HOWARD MASTER
23 Senior Enforcement Counsel
  LISA LANDAU
24 Bureau Chief, Health Care Bureau
  ERIC HAREN
25 Special Counsel and Senior Advisor
  *Attorneys for Plaintiff the State of New York*
26

27

28

1         JOSHUA H. STEIN
      Attorney General of North Carolina
2         RYAN Y. PARK
      Deputy Solicitor General
3         SRIPRIYA NARASIMHAN
      Deputy General Counsel
4         *Attorneys for Plaintiff the State of North Carolina*

5         ELLEN F. ROSENBLUM
      Attorney General of Oregon
6         HENRY KANTOR
      Special Counsel to the Attorney General
7         J. NICOLE DEFEVER
      Assistant Attorney General
8         *Attorneys for Plaintiff the State of Oregon*

9         JOSH SHAPIRO
      Attorney General of Pennsylvania
10        JONATHAN SCOTT GOLDMAN
      Executive Deputy Attorney General
11        MICHAEL J. FISCHER
      Chief Deputy Attorney General
12        PATRICK M. GREENE
      Deputy Attorney General
13        *Attorneys for Plaintiff the Commonwealth of*
      *Pennsylvania*
14

15        PETER KILMARTIN
      Attorney General of the State of Rhode Island
16        REBECCA TEDFORD PARTINGTON
      Chief, Civil Division
17        MARIA R. LENZ
      Special Assistant Attorney General
18        MICHAEL W. FIELD
      Assistant Attorney General
19        *Attorneys for Plaintiff the State of Rhode Island*

20        THOMAS J. DONOVAN, JR.
      Attorney General of Vermont
21        BENJAMIN D. BATTLES
      Solicitor General
22        *Attorneys for Plaintiff the State of Vermont*

23        MARK R. HERRING
      Attorney General of Virginia
24        MATTHEW R. MCGUIRE
      Acting Deputy Solicitor General
25        *Attorneys for Plaintiff the Commonwealth of Virginia*

26        ROBERT W. FERGUSON
      Attorney General of Washington
27        JEFFREY T. SPRUNG
      RENE D. TOMISSER
28        Assistant Attorneys General
      *Attorneys for Plaintiff the State of Washington*

5

1   XAVIER BECERRA
    Attorney General of California
2   JULIE WENG-GUTIERREZ
    Senior Assistant Attorney General
3   KATHLEEN BOERGERS
    Supervising Deputy Attorney General
4   NELI N. PALMA, SBN 203374
    NIMROD P. ELIAS, SBN 251634
5   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3444
7     Fax:  (415) 703-5480
      E-mail:  Nimrod.Elias@doj.ca.gov
8   *Attorneys for Plaintiff the State of California*
    *[Additional Counsel Listed on Signature Pages]*
9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

**THE STATE OF CALIFORNIA, et al.,**          3:17-cv-05895-VC

14                               Plaintiffs,   **MEMORANDUM OF POINTS AND**
                                               **AUTHORITIES IN SUPPORT OF**
15          v.                                 **MOTION FOR ORDER STAYING**
                                               **PROCEEDINGS OR, IN THE**
16                                             **ALTERNATIVE, DISMISSING ACTION**
                                               **WITHOUT PREJUDICE**
17   **DONALD J. TRUMP, President of the**
     **United States, et al.,**
18                               Defendants.   Date:         August 23, 2018
                                               Time:         10:00 a.m.
19                                             Courtroom:    4, 17th Floor
                                               Judge:        Hon. Vince Chhabria
20                                             Trial Date:   None set
                                               **Date Filed:  October 13, 2017**
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

      A.    Statutory Background and Procedural History of This Case ...................... 3

      B.    The Effects of Silver-Loading, and the Federal Government's
            Statements About Ending It ...................................................................... 5

      C.    Pending Litigation to Invalidate the Entire ACA ..................................... 7

DISCUSSION ..................................................................................................................... 7

    I.    Proceedings in This Case Should Be Stayed ......................................... 7

    II.    Alternatively, The Case Should Be Dismissed Without Prejudice ..................... 11

CONCLUSION .................................................................................................................. 12

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*CMAX, Inc. v. Hall*
5
   300 F.2d 265 (9th Cir. 1962)...................................................................8, 10

6

*eBay Inc. v. MercExchange, LLC*
   547 U.S. 388 (2006) .................................................................................8

7

*Filtrol Corp. v. Kelleher*
8
   467 F.2d 242 (9th Cir. 1972)...................................................................8

9

*Franciscan Alliance, Inc. et al v. Burwell et al.*
   7:16-cv-00108 (N.D. Tex. filed Aug. 23, 2016) ECF No. 105, Aug. 16, 2017
10
   Order ........................................................................................................10

11

*Landis v. North Am. Co.*
12
   299 U.S. 248 (1936) .................................................................................8

13

*Lockyer v. Mirant Corp.*
   398 F.3d 1098 (9th Cir. 2005)..................................................................7

14

*Minuteman Health, Inc. v. United States*
15
   1:16-cv-1157 (D. Mass. filed July 29, 2016) ECF No. 77 .......................9

16

*New Mexico Health Connections v. United States*
17
   1:16-cv-00878 (D.N.M., filed July 29, 2016) .........................................9

18

*NFIB v. Sebelius*
   567 U.S. 519 (2012) .................................................................................7

19

*Smith v. Lenches*
20
   263 F.3d 972 (9th Cir. 2001)....................................................................11

21

*Texas, et al. v. United States et al.*
22
   4:18-cv-00167 (N.D. Tex. filed Feb. 26, 2018) ......................................7, 9

23

*United States House of Representatives v. Azar, et. al.*
   14-cv-01967-RMC (D.D.C.), ECF No. 88...............................................5

24

*Westlands Water Dist. v. U.S.*
25
   100 F.3d 94 (9th Cir. 1996)......................................................................11

26

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*
27
   655 F.3d 1039 (9th Cir. 2011)..................................................................11

28

ii

Mem. of Ps & As ISO Mot. For Order Staying Proceedings, or in the Alternative, Dismissing Action Without
Prejudice (3:17-cv-05895-VC)

1
2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3    **STATUTES**

4    42 U.S.C. § 18063(a)(1) ........................................................................................9

5    **COURT RULES**

6    Federal Rule of Civil Procedure
7         41(a)(1)(A)(i) ...........................................................................................11
          41(a)(2)......................................................................................................11

8    **OTHER AUTHORITIES**
9
     Covered California, *The Roller Coaster Continues—The Prospect for Individual*
10        *Health Insurance Markets Nationally for 2019: Risk Factors, Uncertainty and*
          *Potential Benefits of Stabilizing Policies* (Jan. 18, 2018),
11        http://board.coveredca.com/meetings/2018/01-18/CoveredCA-
          Roller_Coaster_Continues_1-18-18.pdf ...............................................................6
12

13   *CSR Costs*, Health Affairs (May 15, 2018), https://www.healthaffairs.org/do/
          10.1377/hblog20180511.621080/full......................................................................5
14

15   *Drivers of 2019 Health Insurance Premiums*, American Academy of Actuaries
          (June 25, 2018), http://actuary.org/files/imce/premium-drivers-webinar-
16        6252018.pdf ............................................................................................................9

17   *How Elimination of Cost-Sharing Reduction Payments Changed Consumer*
          *Enrollment in State-Based Marketplaces*,  National Academy for State Health
18        Policy (Mar. 20, 2018), https://nashp.org/how-elimination-of-cost-sharing-
          reduction-payments-changed-consumer-enrollment-in-state-based-
19        marketplaces/.........................................................................................................6

20   https://twitter.com/realDonaldTrump/status/919009334016856065 ...........................1, 6

21   https://www.c-span.org/video/?447448-1/president-trump-addresses-nevada-
22        republican-party-convention ................................................................................7

23   https://www.c-span.org/video/?c4733697/secretary-azar-silver-loading; ...................6, 9

24   https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2018-
          Press-releases-items/2018-07-07.html .................................................................9
25

26   Inside Health Policy, *Verma Says She Is "Very Concerned" About Silver Loading*
          *Practices*, Inside Health Policy (Mar. 22, 2018),
27        https://insidehealthpolicy.com/daily-news/verma-says-she-%E2%80%98very-
          concerned%E2%80%99-about-silver-loading-practices......................................6, 9
28

iii

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

Katie Keith, Insurers Can Continue Silver Loading for 2019, Health Affairs (June
4    13, 2018),
     https://www.healthaffairs.org/do/10.1377/hblog20180613.293356/full/ .................................6

5

Letter from Attorney General Jefferson B. Sessions III to Speaker Paul Ryan,
6    https://www.justice.gov/file/1069806/download ........................................................9

7

Rabah Kamal, et al., *Tracking 2019 Premium Changes on ACA Exchanges*, Kaiser
     Family Foundation (Jan. 6, 2018), https://www.kff.org/private-insurance/issue-
8    brief/tracking-2019-premium-changes-on-aca-exchanges/.........................................5

9

*Republicans Couldn't Knock Down Obamacare.  So They're Finding Ways
10   Around it*, N.Y. Times, The Upshot (Apr. 11, 2018), https://www.
     nytimes.com/2018/04/11/upshot/republicans-couldnt-knock-down-obamacare-
11   so-theyre-finding-ways-around-it.html ........................................................................6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On October 11, 2017, a coalition of eighteen States and the District of Columbia (Plaintiff States or States) filed this action in response to the federal Defendants' decision to stop making "cost-sharing reduction" (CSR) payments, a subsidy critical to the proper operation of the Patient Protection and Affordable Care Act (ACA).  Defendants based their action on a flawed interpretation of the ACA, and—to use the President's own statement—acted with the hope of "dismantl[ing]" that landmark legislation.[1]  The States sought preliminary injunctive relief as one way to combat the substantial disruption that the untimely, unilateral termination of these subsidy payments was intended to cause for consumers and the individual insurance markets.

Litigation, however, was not the only tool at the States' disposal.  Anticipating that Defendants might abruptly stop making CSR payments, state regulators developed a possible work-around to that unjustified and irresponsible action.  That work-around—known as "silver-loading"—allowed insurance companies to cover the cost of the mandated, but now unfunded, federal subsidies by increasing the prices of premiums for certain plans offered through the Exchanges established by the ACA.  Because a different subsidy—premium tax credits—was tied to the amount of those premiums, silver-loading promised to offset much of the immediate damage that the federal government's abrupt decision to end CSR payments would otherwise do.  Indeed, if it worked as expected, silver-loading would actually decrease premiums for many subsidized consumers, although not for all consumers who bought insurance through the ACA's Exchanges.  That expectation was reflected in this Court's opinion denying the States' motion for a preliminary injunction.  *See* ECF No. 76 at 7, 19-29.

The States have been working to gather information and prepare a motion for summary judgment, currently due on July 20, 2018.  To secure the relief such a motion would seek—a permanent injunction ordering the federal government to resume CSR payments—the States would need to show both that they are right on the merits and that it would serve the public interest for the Court to enter such an injunction at this time.  As to the merits, the States stand by

---

[1] https://twitter.com/realDonaldTrump/status/919009334016856065.

their position that the ACA includes a permanent appropriation for CSR payments, which is essential to permit the Act to work as Congress intended, with a predictable, stable market to give consumers affordable coverage options.  Congress could not have intended to leave one of the ACA's two subsidies to the whims of the annual appropriations process.  As to the public interest, however, for the moment the makeshift silver-loading strategy developed by state regulators has been allowed to operate, and so far it has largely had the effect that the Court anticipated: it has lowered premiums for many, though not all, consumers who buy insurance on the ACA's Exchanges.  As long as the silver-loading strategy is allowed to continue, it is not clear that the public interest requires changing the status quo.

In a situation such as this, the States would normally move to dismiss the present action, without prejudice to their ability to file a new complaint when the circumstances changed.  Here, however, the States respectfully suggest that the better course would be for the Court to stay these proceedings but to retain jurisdiction over them, at least for the time being.

Federal officials have verbally stated that they are considering taking regulatory action to prevent the States from using silver-loading; and although they have suggested that any such action would not affect premiums for the 2019 plan year, they have offered no assurance about future years.  Any action to prevent the States from silver-loading would materially change the circumstances of this case.  It would trigger significant premium increases for all consumers across all metal tiers, and would further destabilize the individual insurance market.  Moreover, the present Administration has made clear that it will use any means available to undermine the ACA—including, for example, in the positions it has taken in litigation now pending in a district court in Texas in which it has declined to defend major provisions of the ACA.  There is accordingly every reason to be wary of the possibility of sudden, unilateral, and irresponsible federal action that could call for turning swiftly back to the issues presented by this case.

Under these unusual circumstances, this Court should vacate the briefing schedule and stay the present proceedings but retain jurisdiction, providing for status reports by the parties at appropriate intervals.  This would allow the States to bring any developments that would undermine the silver-loading strategy, and thus substantially change the present posture of this

2

1   case, promptly and efficiently before the Court.  Alternatively, however, should the Court

2   determine that a stay is not appropriate, the Court should dismiss this action without prejudice so

3   that the States may file a new action when that becomes necessary.

4                                                **BACKGROUND**

5       **A.     Statutory Background and Procedural History of This Case**

6           The ACA is a landmark law that made affordable health coverage available to more than 20

7   million Americans and sharply reduced the number of Americans without health insurance.  As

8   this Court has explained, among other things the ACA established "Exchanges" where people can

9   shop for health insurance plans.  ECF No. 76 at 2.  And it provides two forms of subsidies to low-

10  income people to help them afford that insurance.  *Id.* at 3.  The first is premium tax credits,

11  which help offset the monthly cost of insurance.  *Id.*   "Cost-sharing reduction" subsidies, the

12  second form of subsidies available under the ACA, reduce the amount that lower income people

13  must pay out-of-pocket when they use their insurance to get care.  *Id.* at 4. The ACA provides that

14  the federal government will pay insurance companies for each subsidy in advance, and the

15  companies in turn pass those subsidies on to low-income consumers who purchase health

16  coverage through the Exchange as savings in out-of-pocket costs.  *Id.*

17          Once the Exchanges were up and running, an issue about the payment of these subsidies

18  arose.  ECF No. 76 at 5.  It is clear that Congress created a "permanent appropriation" for

19  premium tax credits.  *Id.*  That means the money for those subsidies is automatically available

20  each year, and the executive branch does not need to get further authorization from Congress

21  before making those payments.  *Id.*  But the ACA did not explicitly make a permanent

22  appropriation for CSRs.  *Id.*

23          In 2013, the Obama Administration concluded that the ACA implicitly made a permanent

24  appropriation for CSRs, and the government began drawing money from the Treasury on that

25  basis in January 2014.  ECF No. 76 at 5.  The House of Representatives disagreed with that view,

26  and filed suit in the district court for the District of Columbia that same year.  *Id.* at 6.  The House

27  prevailed in that litigation in the district court, and the Obama Administration appealed.  *Id.*  The

28  district court stayed its ruling pending appeal.  *Id.*  Shortly after the federal government filed its

                                                      3

1    opening brief, President Trump was elected, and the D.C. Circuit stayed the appeal at the House's

2    request in December 2016.  *Id.*  In May 2017, a group of 17 States and the District of Columbia

3    (most of whom are plaintiffs in this action) moved to intervene in that litigation based on public

4    statements from the new President (among others) indicating that the new Administration might

5    reverse the federal government's position on the permanent appropriation question at issue in this

6    appeal.  *Id.* at 6-7.  The D.C. Circuit granted that motion on August 1, 2017, but kept the stay in

7    place.  *Id.*

8         In addition to this legal action, in early 2017 states across the country began to seek

9    alternative ways of protecting consumers, should the Trump Administration decide to terminate

10   CSR payments.  ECF No. 76 at 7; *see also id.* (describing the problems that would arise if CSR

11   payments ended).  The primary strategy developed by the States was "silver-loading."  *Id.* at 21.

12   Under that plan, States would allow insurers to "load" the cost of providing CSRs onto the cost of

13   premiums for certain plans offered through the Exchanges.  *Id.*  Specifically, the extra costs

14   would be added to the cost of the "silver plans" offered by insurance companies.  *Id.*  And

15   because the amount of premium tax credits available was tied to the cost of these silver plans, this

16   "silver-loading" would cause tax credits to "rise substantially"—not only for people who

17   purchased silver plans, but for those who purchased other plans as well.  *Id.*  The States hoped it

18   would insulate consumers from the harm of ending CSRs, but were uncertain how it would

19   impact the market.

20        On October 11, 2017, just 21 days before the 2018 open enrollment, the Trump

21   Administration announced that it would stop making CSR payments.  ECF No. 76 at 7-8.  Two

22   days later the Plaintiff States filed this action, and shortly thereafter they moved for a preliminary

23   injunction requiring the Secretaries of Health and Human Services (HHS) and of the Treasury to

24   continue making the CSR payments required by the ACA.  *See id.* at 8.

25        On October 25, 2017, this Court denied the States' request for preliminary injunctive relief.

26   ECF No. 76 at 29.  The Court concluded that the merits of the permanent appropriation question

27   were "close and complicated," although Defendants "m[ight] seem to have the better argument at

28   this stage."  *Id.* at 19.  But as to the remaining factors—irreparable injury, balance of the equities,

4

1    and the public interest—the Court concluded that the States had not met their burden.  *Id.* at 19.

2    In particular, the Court emphasized that because of the silver-loading strategy the States had

3    devised, it appeared that "the large majority of people who purchase insurance on exchanges

4    throughout the country w[ould] either benefit or be unharmed" by the decision to end CSRs, and

5    "many lower-income people st[ood] to benefit."  *Id.* at 20.  The Court accordingly denied the

6    request for a preliminary injunction, and set a schedule for cross dispositive motions.  The States'

7    motion for summary judgment is currently due on July 20, 2018, with a hearing set for October

8    24, 2018.[2]

9        **B.    The Effects of Silver-Loading, and the Federal Government's Statements**
             **About Ending It**
10

11       Since this Court set its dispositive motion briefing schedule, the States have now witnessed

12   the impact of the silver-loading strategy as it has become a reality.  The workaround strategy has

13   largely protected subsidized consumers from the harm inflicted by the decision to end CSRs, and

14   provided some stability to help ensure a functioning insurance market.  In many states, the

15   approach has resulted in the availability of zero or nominal premium bronze plans and gold plans

16   that were less than or similar in price to the benchmark silver plans.[3]  But according to the Kaiser

17   Family Foundation, 2019 premiums across the country are projected to generally increase within

18   a range of seven percent (Richmond, VA) to 36 percent (Baltimore, MD) due to the uncertainty in

19   the individual market driven by, among other things, the end of CSRs.[4]  The States' experience

20   has now confirmed this Court's analysis at the preliminary injunction stage:  silver-loading has

21

22           [2]  The parties twice agreed to postpone the summary judgment briefing schedule so that
       they could resolve the litigation in the D.C. Circuit.  On May 18, 2018, that case was finally
23     resolved when the district court vacated the operative portion of its injunction.  *United States*
       *House of Representatives v. Azar, et. al*., 14-cv-01967-RMC (D.D.C.), ECF No. 88.

24           [3] David Anderson, et al., Implications of CMS Mandating A Broad Load of CSR Costs,
       Health Affairs (May 15, 2018), https://www.healthaffairs.org/do/
25     10.1377/hblog20180511.621080/full/.

26           [4] Rabah Kamal, et al., *Tracking 2019* Premium Changes on ACA Exchanges, Kaiser
       Family Foundation (Jan. 6, 2018), https://www.kff.org/private-insurance/issue-brief/tracking-
27     2019-premium-changes-on-aca-exchanges/.

28

1   had a mostly, although not entirely, salutary effect for subsidized consumers.  As the Court

2   anticipated, silver-loading has largely made premiums lower for many low-income Americans

3   than they would have been, had CSR payments continued in the ordinary course.[5]  As the Court

4   also predicted, however, silver-loading has caused premiums to increase for some consumers.

5   *See* ECF No. 76 at 25.  For example, some individuals who do not receive subsidies enrolled or

6   re-enrolled in silver plans offered through the Exchanges, and bore the full brunt of the increase

7   in premiums caused by silver-loading as a result.  *Id*. at 25-26.[6]

8         Because of silver-loading, the decision to end CSR payments has not had the effect that the

9   President and others hoped it might:  to "dismantle" the ACA.[7]  That failure, however, has not

10   escaped the notice of federal officials.  In March 2018, Centers for Medicare & Medicaid

11   Services (CMS) Administrator Seema Verma stated that she was "very concerned" with silver-

12   loading.[8]  A month later, she indicated that the current Administration is considering barring

13   States from using the practice.[9]  While HHS Secretary Alex Azar recently represented to a

14   Congressional committee that the Administration would not attempt to block the practice for the

15   2019 plan year, he made no assurances about future plan years.[10]  All the while, federal

16         [5] Christine Cousart, How Elimination of Cost-Sharing Reduction Payments Changed
17   Consumer Enrollment in State-Based Marketplaces, 2, National Academy for State Health Policy
     (Mar. 20, 2018), https://nashp.org/how-elimination-of-cost-sharing-reduction-payments-changed-
18   consumer-enrollment-in-state-based-marketplaces/; Covered California, The Roller Coaster
     Continues—The Prospect for Individual Health Insurance Markets Nationally for 2019: Risk
19   Factors, Uncertainty and Potential Benefits of Stabilizing Policies, 2, (Jan. 18, 2018), 2,
     http://board.coveredca.com/meetings/2018/01-18/CoveredCA-Roller_Coaster_Continues_1-18-
20   18.pdf.

21         [6] *See* Covered California, *supra* note 5.

22         [7] https://twitter.com/realDonaldTrump/status/919009334016856065.

23         [8] Inside Health Policy, Verma Says She Is "Very Concerned" About Silver Loading
     Practices, Inside Health Policy (Mar. 22, 2018), https://insidehealthpolicy.com/daily-news/verma-
24   says-she-%E2%80%98very-concerned%E2%80%99-about-silver-loading-practices.

25         [9] Margot Sanger-Katz, *Republicans Couldn't Knock Down Obamacare.  So They're
     Finding Ways Around it*, N.Y. Times, The Upshot (Apr. 11, 2018), https://www.
26   nytimes.com/2018/04/11/upshot/republicans-couldnt-knock-down-obamacare-so-theyre-finding-
     ways-around-it.html.

27         [10] *See* https://www.c-span.org/video/?c4733697/secretary-azar-silver-loading; Katie Keith,
     Insurers Can Continue Silver Loading for 2019, Health Affairs (June 13, 2018),
     https://www.healthaffairs.org/do/10.1377/hblog20180613.293356/full/.

28

1    officials—including the President—have continued efforts to—in his own words—"gut[]" the

2    ACA.[11]

3    **C.    Pending Litigation to Invalidate the Entire ACA**

4    Meanwhile, in *Texas, et al. v. United States et al.,* 4:18-cv-00167 (N.D. Tex. filed Feb. 26,

5    2018), twenty plaintiff States have alleged that the ACA is no longer constitutional under *NFIB v.*

6    *Sebelius*, 567 U.S. 519 (2012), following passage of the Tax Cuts and Jobs Act of 2017, which

7    zeroed-out the tax penalty associated with the ACA's minimum coverage requirement (ECF No.

8    27 at 2).  They further assert that the minimum coverage requirement is not severable from the

9    rest of the ACA, and ask the Court to invalidate the ACA in its entirety.  *Id.*  In the alternative,

10   they ask the Court to strike down the ACA's "guaranteed issue" and "community-rating"

11   provisions, which prohibit insurers from denying coverage or charging higher premiums because

12   of preexisting medical conditions or medical history.  *Id.* ¶ 58.  Sixteen states (including 15 of the

13   Plaintiffs in this action) and the District of Columbia have intervened as defendants in that case to

14   defend the ACA (ECF No. 74).

15   The plaintiffs in that action have applied for a preliminary injunction (ECF No. 39).  On

16   June 7, 2018, the federal defendants responded to the application, siding with the plaintiffs in

17   arguing that the minimum coverage requirement cannot stand; and while the federal defendants

18   disagree with the plaintiffs on wholesale invalidation of the ACA, they assert that the ACA's

19   guaranteed issue and community-rating provisions are not severable from the minimum coverage

20   requirement, and therefore must also be declared invalid beginning in January 2019 (ECF No.

21   92).  The district court has not yet ruled on the motion for a preliminary injunction.

22                                  **DISCUSSION**

23   **I.    PROCEEDINGS IN THIS CASE SHOULD BE STAYED**

24   "A district court has discretionary power to stay proceedings in its own court."  *Lockyer v.*

25

26   ───────────────
          [11] In reference to Senator John McCain's July 28, 2017 vote against repeal of the ACA,
27   President Trump stated the following on June 23, 2018: "We got it—gutted it anyway."
     Available at https://www.c-span.org/video/?447448-1/president-trump-addresses-nevada-
28   republican-party-convention at 00:27:29.

1    *Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005).  "[T]he power to stay proceedings is

2    incidental to the power inherent in every court to control the disposition of the causes on its

3    docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. North*

4    *Am. Co.*, 299 U.S. 248, 254 (1936).  When determining whether a stay is appropriate, courts

5    weigh the damage that may result from granting a stay, the hardship or inequity a party may

6    suffer in having to go forward, and "the orderly course of justice measured in terms of the

7    simplifying or complicating of issues, proof, and questions of law which could be expected to

8    result from a stay."  *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962); *see also Filtrol Corp.*

9    *v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972).

10       Here, the Plaintiff States are confident that the Defendants' decision to stop making CSR

11   payments was and is unlawful under a proper interpretation of the ACA.  But to secure the relief

12   at issue in this case—an injunction ordering the Secretaries of HHS and the Treasury to resume

13   making the CSR payments required by the Act—the States would have to show more.  Permanent

14   injunctions, like preliminary ones, are equitable remedies.  A party seeking one must show not

15   only that it is correct on the legal merits but also that (1) it has been irreparably injured, (2) any

16   remedies available at law, such as money damages, will not adequately compensate for that

17   injury, (3) the balance of the hardships between the plaintiff and the defendant demonstrate that a

18   remedy in equity is warranted, and (4) the public interest would not be disserved by a permanent

19   injunction.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  As long as silver-

20   loading is permitted, these factors may well weigh against granting the specific, equitable relief

21   that the Plaintiff States seek.  In particular, because the available evidence suggests that, in

22   practice, silver-loading has been largely (although not entirely) beneficial for consumers, it is not

23   clear, at present, that the public interest would be served by entering an injunction requiring

24   resumption of CSR payments.

25       That analysis will change dramatically, however, if the Defendants or others in the current

26   Administration attempt to prevent the States from silver-loading in the future.  Such an effort

27   would trigger significant premium increases, which would harm individual consumers and

28

destabilize the individual insurance market.[12]  And the possibility of such damaging action is very real.  CMS Administrator Verma has said she is "very concerned" about silver-loading, and has indicated that the Administration is reviewing the issue and may soon take steps to prevent it.[13]  While Secretary Azar told a Congressional committee that his Department will not move to end silver-loading for the 2019 plan year, he has not made any commitments beyond that period.[14]  The present Administration, moreover, has made clear at every turn that it will use any means available to undermine the ACA and create uncertainty in the market—including, for example, in the positions it has recently advanced in the Texas ACA litigation described above.[15]  And in the latest example, on July 7, 2018 CMS announced that it was suspending $10.4 billion in risk adjustment transfer payments for 2017 that are required by the ACA.[16]  There is accordingly every reason to be wary of the possibility of sudden, unilateral, and irresponsible federal

---

[12] *See, e.g.*, Barb Klever, et al., <u>Drivers of 2019 Health Insurance Premiums</u>, American Academy of Actuaries (June 25, 2018), http://actuary.org/files/imce/premium-drivers-webinar-6252018.pdf (predicting that the end of silver-loading would cause premiums for both subsidized and unsubsidized enrollees to increase); Anderson, *supra* note 3 (predicting that the end of silver-loading will harm 1.8 million consumers nationwide, and that some will exit the marketplaces altogether).

[13] *Supra* note 8.

[14] *Supra* note 10.

[15] *See* June 7, 2018 Letter from Attorney General Jefferson B. Sessions III to Speaker Paul Ryan, https://www.justice.gov/file/1069806/download; Federal Defendants' Memorandum in Response to Plaintiffs' Application for Preliminary Injunction, ECF No. 92, *Texas et al. v. United States et al.,* 4:18-cv-00167 (N.D. Tex. filed Feb. 26, 2018), https://www.justsecurity.org/wp-content/uploads/2018/06/ACA.Azar_.filing.pdf.

[16] *See* https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2018-Press-releases-items/2018-07-07.html.  Under the risk adjustment program, insurers are assessed a charge if the actuarial risk of their enrollees "for a year is less than the average actuarial risk of all enrollees in all plans or coverage in such State for such year," which are then used to compensate insurers with higher risk consumers.  42 U.S.C. § 18063(a)(1).  The Plaintiff States are assessing the impact of this action, including its potential impact on the present case.  The Plaintiff States disagree with the Administration that this latest action is required by the district court's February 28, 2018 decision in *New Mexico Health Connections v. United States*, 1:16-cv-00878, (D.N.M., filed July 29, 2016) which held that the use of statewide average premiums in its risk adjustment methodology, although permissible, was not adequately explained by the Department of Health and Human Services in the rulemaking process (ECF No. 55).  The assessments were also upheld on January 30, 2018 in *Minuteman Health, Inc. v. United States*, 1:16-cv-1157 (D. Mass. filed July 29, 2016).  ECF No. 77.

1   actions—or perhaps developments in related litigation—that could materially alter this case and

2   thus the propriety of injunctive relief.

3       In these unusual circumstances, the States respectfully suggest that the best course would be

4   for this Court to stay proceedings in this case but retain jurisdiction for the time being, requiring

5   status reports from the parties at appropriate intervals such as every 90 days.  While the Court

6   could instead dismiss this action without prejudice, and the States could then file a new complaint

7   if Defendants begin actively threatening the silver-loading strategy, *see infra* Section II, staying

8   the current case for the time being would seem to be more efficient.  This Court's retention of

9   jurisdiction would permit the States to move quickly to resume proceedings if the Administration

10  seeks to end silver-loading (or if other circumstances warrant), and would likewise permit a

11  prompt and efficient response by Defendants and consideration of the issue by this Court.[17]

12      The other factors that courts typically weigh when considering whether to grant a stay also

13  counsel in favor of the States' request.  No party will be prejudiced by staying these proceedings

14  while the federal government considers whether to take any action that would threaten the States'

15  ability to continue using silver-loading in the future.  And "the orderly course of justice" will be

16  promoted by asking this Court—which is already familiar with the complex issues—to make a

17  final determination on the merits if—but only if—the federal government takes further actions

18  that would make it appropriate to issue the injunctive relief that the States have sought.  *CMAX*,

19  300 F.2d at 268.

20      For these reasons, Plaintiffs request that the Court vacate the current briefing schedule, stay

21  all proceedings in this case, and direct the parties to file status reports at 90-day intervals or

22  within 7 days of potentially material events.

23

24

---

25      [17] At least one other district court has entered a similar stay when presiding over a
    challenge to the ACA.  *See e.g., Franciscan Alliance, Inc. et al v. Burwell et al.*, 7:16-cv-00108
26  (N.D. Tex. filed Aug. 23, 2016) ECF No. 105, Aug. 16, 2017 Order (granting voluntary remand
    and stay and maintaining "supervisory role" over plaintiffs' asserted claims pending further rule
27  making on ACA provisions by the federal government, and requiring periodic status reports; stay
    and bi-monthly status reports ongoing [ECF Nos. 106-114]).

28

10

Mem. of Ps & As ISO Mot. For Order Staying Proceedings, or in the Alternative, Dismissing Action Without
Prejudice (3:17-cv-05895-VC)

1    **II.    ALTERNATIVELY, THE CASE SHOULD BE DISMISSED WITHOUT PREJUDICE**

2          Alternatively, under the circumstances here, the Court should vacate the current briefing

3    schedule and dismiss this case without prejudice. *See* Fed. R. Civ. P. 41(a)(2). Although

4    Plaintiffs maintain they may seek dismissal without prejudice as of right under Federal Rule of

5    Civil Procedure 41(a)(1)(A)(i), given the importance and complexity of this case, they seek an

6    Order from this Court expressly dismissing this action without prejudice as they also believe that

7    they meet the standard for doing so under Rule 41(a)(2). Even where such dismissal at the

8    request of a plaintiff requires leave of court, that leave is properly granted "unless a defendant can

9    show that it will suffer some plain legal prejudice as a result." *Smith v. Lenches*, 263 F.3d 972,

10   975 (9th Cir. 2001). Plain legal prejudice means "prejudice to some legal interest, some legal

11   claim, [or] some legal argument." *Westlands Water Dist. v. U.S.*, 100 F.3d 94, 97 (9th Cir. 1996).

12   It does not result merely because a dispute remains unresolved, there is a threat of future litigation,

13   the defendant will be inconvenienced by having to defend in another forum, or the plaintiff would

14   gain a tactical advantage by dismissing. *Smith*, 263 F.3d at 976; *see also WPP Luxembourg*

15   *Gamma Three Sarl*, 655 F.3d 1039, 1058 n.6 (9th Cir. 2011) (case properly dismissed without

16   prejudice where only purported harm to defendants was the "risk of having to defend this action

17   again"). The analysis instead focuses on "the rights and defenses available to a defendant in

18   future litigation." *Westlands*, 100 F.3d at 97.

19          Here, Defendants can complain of no legal prejudice, plain or otherwise, from dismissing

20   this case without prejudice: there is no legal interest, claim, or argument that they would be

21   foreclosed from raising in any future litigation. *Westlands*, 100 F.3d at 97. And the mere

22   possibility that Defendants might be required to litigate the legal issues presented in this case at

23   some point in the future does not constitute legal prejudice. *See Smith*, 263 F.3d at 976; *WPP*

24   *Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1058 n.6 (9th Cir. 2011).

25   Moreover, it is early in the litigation and the parties have briefed only the States' preliminary

26   injunction request. The Defendants have not yet filed an Answer, no discovery has occurred, and

27   no dispositive motions have been filed. Therefore, in addition to the lack of legal prejudice,

28   dismissal would cause no inconvenience to the parties or to the Court. Accordingly, if the Court

11

1  declines to stay the proceedings, it should grant Plaintiffs' motion to dismiss this action without

2  prejudice.  That is an outcome that even the federal Defendants do not oppose.[18]

3                                    **CONCLUSION**

4          The Court should issue an order staying this case pending further action by the Defendants

5  with respect to silver-loading or other material developments.  In the alternative, the Court should

6  dismiss this case without prejudice.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26          [18] As explained in the Notice of Motion, Defendants' position is as follows: "Defendants
would not oppose the dismissal of this action without prejudice, but in light of Plaintiffs'
27  determination that they do not wish to proceed with litigation at this time, will oppose Plaintiffs'
alternative request that this case remain indefinitely stayed and open on the Court's docket."

28

12

Dated:  July 16, 2018            Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General


*/s/ Nimrod P. Elias*

NIMROD P. ELIAS
NELI PALMA
Deputy Attorneys General
*Attorneys for Plaintiff the State of California*

GEORGE JEPSEN
Attorney General of Connecticut
JOSEPH RUBIN
Associate Attorney General
*Attorneys for Plaintiff the State of Connecticut*

MATTHEW P. DENN
Attorney General of Delaware
AARON R. GOLDSTEIN
Chief Deputy Attorney General
SARAH FISHMAN GONCHER
JOHN H. TAYLOR
Deputy Attorneys General
*Attorneys for Plaintiff the State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia
ROBYN R. BENDER
Deputy Attorney General
VALERIE M. NANNERY
Assistant Attorney General
*Attorneys for Plaintiff the District of Columbia*

LISA MADIGAN
Attorney General of Illinois
DAVID F. BUYSSE
Deputy Chief, Public Interest Division
*Attorneys for Plaintiff the State of Illinois*

THOMAS J. MILLER
Attorney General of Iowa
NATHAN BLAKE
Deputy Attorney General
*Attorneys for Plaintiff the State of Iowa*

13

ANDY BESHEAR
Attorney General
Commonwealth of Kentucky
LA TASHA BUCKNER
Executive Director
Office of Civil and Environmental Law
S. TRAVIS MAYO
TAYLOR PAYNE
Assistant Attorneys General
*Attorneys for Plaintiff the Commonwealth of Kentucky*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General
*Attorneys for Plaintiff the State of Maryland*

MAURA HEALEY
Attorney General of Massachusetts
ERIC GOLD
Assistant Attorney General
*Attorneys for Plaintiff the Commonwealth of Massachusetts*

LORI SWANSON
Attorney General of Minnesota
ALAN GILBERT
Solicitor General
JASON PLEGGENKUHLE
KATHERINE KELLY
Assistant Attorneys General
*Attorneys for Plaintiff the State of Minnesota*

HECTOR H. BALDERAS
Attorney General of New Mexico
TANIA MAESTAS
Chief Deputy Attorney General
*Attorneys for Plaintiff the State of New Mexico*

BARBARA D. UNDERWOOD
Acting Attorney General of New York
STEVEN C. WU
Deputy Solicitor General
HOWARD MASTER
Senior Enforcement Counsel
LISA LANDAU
Bureau Chief, Health Care Bureau
ERIC HAREN
Special Counsel and Senior Advisor
*Attorneys for Plaintiff the State of New York*

1
          JOSHUA H. STEIN
          Attorney General of North Carolina
2
          RYAN Y. PARK
          Deputy Solicitor General
3
          SRIPRIYA NARASIMHAN
          Deputy General Counsel
4
          *Attorneys for Plaintiff the State of North Carolina*

5
          ELLEN F. ROSENBLUM
          Attorney General of Oregon
6
          HENRY KANTOR
          Special Counsel to the Attorney General
7
          J. NICOLE DEFEVER
          Assistant Attorney General
8
          *Attorneys for Plaintiff the State of Oregon*

9
          JOSH SHAPIRO
          Attorney General of Pennsylvania
10
          JONATHAN SCOTT GOLDMAN
          Executive Deputy Attorney General
11
          MICHAEL J. FISCHER
          Chief Deputy Attorney General
12
          PATRICK M. GREENE
          Deputy Attorney General
13
          *Attorneys for Plaintiff the Commonwealth of*
          *Pennsylvania*
14

          PETER KILMARTIN
15
          Attorney General of the State of Rhode Island
          REBECCA TEDFORD PARTINGTON
16
          Chief, Civil Division
          MARIA R. LENZ
17
          Special Assistant Attorney General
          MICHAEL W. FIELD
18
          Assistant Attorney General
          *Attorneys for Plaintiff the State of Rhode Island*
19

          THOMAS J. DONOVAN, JR.
20
          Attorney General of Vermont
          BENJAMIN D. BATTLES
21
          Solicitor General
          *Attorneys for Plaintiff the State of Vermont*
22

          MARK R. HERRING
23
          Attorney General of Virginia
          MATTHEW R. MCGUIRE
24
          Acting Deputy Solicitor General
          *Attorneys for Plaintiff the Commonwealth of Virginia*
25

          ROBERT W. FERGUSON
26
          Attorney General of Washington
          JEFFREY T. SPRUNG
27
          RENE D. TOMISSER
          Assistant Attorneys General
28
          *Attorneys for Plaintiff the State of Washington*

15